## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JAMES BLASSINGAME and SIDNEY HEMBY | ) ) ) | |
| *Plaintiffs,* | ) ) ) | |
| v. | ) ) | Civil Case No. 1:21-cv-00858-APM |
| DONALD J. TRUMP | ) ) ) | |
| *Defendant.* | ) ) ) ) | |

## <u>DEFENDANT'S MEMORANDUM IN SUPPORT OF HIS MOTION TO DISMISS</u>

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................. i

TABLE OF AUTHORITIES ......................................................... iii

BACKGROUND ............................................................................ 2

ARGUMENT ................................................................................ 6

I.    The Constitution forecloses this court from exercising jurisdiction over President Trump's actions taken during his presidency. ........... 7

    a.  Absolute immunity bars the claims against President Trump.... 7
    b.  The political question doctrine also bars the claims against President Trump. ....................................................................... 13
    c.  The claims against President Trump are precluded by the Impeachment Judgement Clause, res judicata and collateral estoppel. ......................................................................... 14

II.    Well-established First Amendment law bars Plaintiffs' claims based on President Trump's political speech. .............................................. 22

    a.  President Trump's speech was petitioning activity undertaken in his official capacity. ..................................................................... 24
    b.  President Trump's speech does not meet the standard for incitement under *Brandenburg v. Ohio*. .................................... 25
    c.  Incitement is limited to true threats and a holding to the contrary would subject anti-riot laws to facial challenges. ....................... 26
    d.  Plaintiffs' reading of § 1985 and argument for liability would result in such expansive liability to subject the statute to a facial challenge. ..................................................................... 27

III.    Plaintiffs do not adequately plead a conspiracy under § 1985, much less the higher pleading standard required for an allegation of civil conspiracy. ............................................................................. 28

    a.  Plaintiffs do not allege a violation of 42 U.S.C. § 1985(1). ......... 29
    b.  Plaintiffs fail to plead the elements of civil conspiracy. ............. 32

IV.    Plaintiffs fail to state a claim upon which relief may be granted for any District of Columbia claim ......................................................... 33

    a.  Plaintiffs fail to establish that President Trump aided and abetted or "directed" any action. ................................................. 34

CONCLUSION...............................................................................................42

CERTIFICATE OF SERVICE .....................................................................43

# TABLE OF AUTHORITIES

## Cases

*Allen v. District of Columbia,*

    187 A.2d 888, 889 (D.C. 1963) .................................................................. 23

*Allen v. McCurry,*

    449 U.S. 90, 94 (1980) ....................................................................... 15, 16

*Apotex, Inc. v. FDA,*

    393 F.3d 210, 217–18 (D.C. Cir. 2004) .................................................... 16

*\* Ashcroft v. Free Speech Coal.,*

    535 U.S. 234, 253 (2002) ......................................................................... 26

*Ashcroft v. Iqbal,*

    556 U.S. 662, 678 (2009) .................................................................. 28, 29

*Baker v. Carr,*

    369 U.S. 186, 217 (1962) ......................................................................... 14

*Bancoult v. McNamara,*

    455 F.3d 427, 432 (D.C. Cir. 2006) .......................................................... 14

*Behrens v. Pelletier,*

    516 U.S. 299, 308 (1996) ........................................................................... 8

*Bell Atl. Corp. v. Twombly,*

    550 U.S. 544, 549 (2007) .................................................................. 28, 29

*Blonder-Tongue Lab'ys, Inc. v. Univ. of Ill. Found.,*

    402 U.S. 313, 323–24 (1971) .................................................................... 15

iii

*Bonner v. S-FER Int'l, Inc.*,
  207 F. Supp. 3d 19, 25 (D.D.C. 2016) ....................................................................... 41

\* *Brandenburg v. Ohio*,
  395 U.S. 444, 449 (1969) ............................................................................... 25, 26, 27

*Calomiris v. Calomiris*,
  3 A.3d 1186, 1190 (D.C. 2010) ............................................................................... 15

*Chaplinsky v. New Hampshire*,
  315 U.S. 568 (1942) ............................................................................................... 23

*Chastain v. Sundquist*,
  833 F.2d 311, 315 (D.C. Cir. 1987) .......................................................................... 8

*Clinton v. Jones*,
  520 U.S. 681, 696 (1997) ......................................................................................... 8

*Competitive Enter. Inst. v. Mann*,
  150 A.3d 1213, 1260 (D.C. 2016) ............................................................................ 41

*Crawford-El v. Britton*,
  523 U.S. 574, 588 (1998) ....................................................................................... 10

*Crist v. Bretz*,
  437 U.S. 28, 40–41 (1978) ..................................................................................... 21

*Dalton v. U.S.*,
  71 Ct. Cl. 421, 425 (1931) ...................................................................................... 30

*Duke v. Feldman*,
  226 A.2d 345 (Md. 1967) ....................................................................................... 36

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*,

    472 U.S. 749, 758-59 (1985) ....................................................................... 23

*Feiner v. New York*,

    340 U.S. 315, 321 (1951) ............................................................................ 23

*Franklin v. Massachusetts*,

    505 U.S. 788, 827 (1992) .............................................................................. 9

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,

    561 U.S. 477, 498 (2010) ........................................................................... 29

*Gometz v. Culwell*,

    850 F.2d 461, 464 (7th Cir. 1988) ............................................................ 29

*Griffin v. Breckenridge*,

    403 U.S. 88, 101 (1971) ............................................................................. 28

*Halberstam v. Welch*,

    705 F.2d 472, 477 (D.C. Cir. 1983) ................................................... passim

*Halberstam v. Welch*,

    705 F.2d 472, 478 (D.C. Cir. 1983) .................................................. 34, 35

*\* Harlow v. Fitzgerald*,

    457 U.S. 800, 807 (1982) ......................................................................... 8, 10

*Herrion v. Children's Hosp. Nat'l Med. Ctr.*,

    448 F. App'x 71, 72 (D.C. Cir. 2011) ....................................................... 15

*Hollingsworth v. Perry*,

    570 U.S. 693, 713 (2013) ........................................................................... 39

*Imbler v. Pachtman,*

    424 U.S. 409, 423 (1976) ................................................................................ 11, 12

Investors Research Corp. v. SEC,

    628 F.2d 168, 178 (D.C. Cir. 1980) ............................................................... 34

*Japan Whaling Ass'n. v. Am. Cetacean Soc.,*

    478 U.S. 221, 230 (1986) ............................................................................... 13, 14

*Jefferson Sch. of Soc. Sci. v. Subversive Activities Control Bd.,*

    331 F.2d 76, 83 (D.C. Cir. 1963) .................................................................. 17

*Jones v. Kirchner,*

    835 F.3d 74, 84 (D.C. Cir. 2016) .................................................................. 13

*Kaiser Grp. Int'l, Inc. v. World Bank,*

    420 F. App'x 2, 5 (D.C. Cir. 2011) ............................................................... 39

*Lewis v. Drug Enf't Admin.,*

    777 F. Supp. 2d 151, 161 (D.D.C. 2011), *aff'd,* 2012 WL 1155698 (D.C. Cir. 2012)

    ...................................................................................................................... 15

*Lewis v. News-Press & Gazette,*

    782 F. Supp. 1338, 1342 (W.D. Mo. 1992) ................................................... 31

*Maniaci v. Georgetown Univ.,*

    510 F. Supp. 2d 50, 64 (D.D.C. 2007) .......................................................... 39

*McCord v. Bailey,*

    636 F.2d 606 (D.C. Cir. 1980) ..................................................................... 29

*McCreary v. Heath,*

    2005 WL 3276257, at *5 (D.D.C. Sept. 26, 2005) ................................................... 33

*McFadden v. U.S.,*

    576 U.S. 186, 197 (2015) ........................................................................................ 28

*McIntyre v. Fulwood,*

    892 F. Supp. 2d 209, 216 (D.D.C. 2012) ................................................................ 16

*\* Members of City Council of City of Los Angeles v. Taxpayers for Vincent,*

    466 U.S. 789, 816 (1984) ........................................................................................ 22

*Mensah-Yawson v. Raden,*

    170 F. Supp. 3d 222, 230 (D.D.C. 2016) ........................................................... 32, 33

*Mitchell v. Forsyth,*

    472 U.S. 511, 521 (1985) ...................................................................................... 7, 8

*\* Morse v. Frederick,*

    551 U.S. 393, 442 (2007) ........................................................................................ 25

*\* Nixon v. Fitzgerald,*

    457 U.S. 731, 744 (1982) .............................................................................. 7, 9, 11

*Nixon v. United States,*

    506 U.S. 224, 229–30 (1993) ............................................................................ 19, 20

*Nixon v. United States,*

    938 F.2d 239, 246 (1991) ........................................................................................ 20

Parks v. United States,

    627 A.2d 1, 5 (D.C. 1993) ....................................................................................... 40

*Pierson v. Ray*,

   386 U.S. 547, 554 (1967) ........................................................................... 9

*Rael v. Cadena*,

   604 P.2d 822 (1979) ................................................................................. 35

*Rockwell v. Morris*,

   12 A.D.2d 272, 279 (N.Y. Sup. Ct. 1961) ................................................. 23

*Secretary of State of Md. v. Joseph H. Munson Co., Inc.*,

   467 U.S. 947, 958 (1984) ......................................................................... 27

*Sessions v. Dimaya*,

   138 S. Ct. 1204, 1212 (2018) ................................................................... 27

*Smalls v. United States*,

   471 F.3d 186, 192 (D.C. Cir. 2006) .......................................................... 15

*Snyder v. Phelps*,

   562 U.S. 443, 451-52 (2011) ............................................................... 22, 23

*Stern v. U.S. Gypsum, Inc.*,

   547 F.2d 1329, 1337 (7th Cir. 1977) ........................................................ 31

*Sunshine Anthracite Coal Co. v. Adkins*,

   310 U.S. 381, 402–03 (1940) ................................................................... 17

*Tenney v. Brandhove*,

   341 U.S. 367, 376 (1951) ................................................................ 9, 11, 12

*Thomas v. Collins*,

   323 U.S. 516, 535 (1945) ......................................................................... 25

*Transamerica Leasing, Inc. v. La Republica de Venezuela*,

    200 F.3d 843, 849 (D.C. Cir. 2000) .......................................................................... 39

\* *Trump v. Vance*,

    140 S. Ct. 2412, 2426 (2020) ............................................................................... 9, 18

\* *United States v. Miselis*,

    972 F.3d 518, 536 (4th Cir. 2020) .......................................................................... 26

*United States v. Mouat*,

    124 U.S. 303, 307 (1888) ........................................................................................ 29

*United States v. Schwimmer*,

    279 U.S. 644, 654–55 (1929) ..................................................................................... 6

Williamson v. United States,

    445 A.2d 975, 978 (D.C. 1982) .............................................................................. 40

## Statutes

28 U.S.C. § 2679(b) ...................................................................................................... 13

42 U.S.C. § 1983 ............................................................................................................. 9

42 U.S.C. § 1985 .......................................................................................... 27, 29, 30, 31

## Other Authorities

1 Restatement (Third) of Agency § 1.01, cmt. f (Am. L. Inst. 2005) ........................... 39

147 Cong. Rec. H35 (daily ed. Jan. 6, 2001) ................................................................... 3

151 Cong. Rec. H110–11 (daily ed. Jan. 6, 2005) ........................................................... 3

163 Cong. Rec. H186–87, 189 (daily ed. Jan. 6, 2017) .................................................... 3

167 Cong. Rec. H165 (daily ed. Jan. 13, 2021) ............................................................. 16

3 J. Story, Commentaries on the Constitution of the United States § 1563, pp. 418-19 (1st ed. 1833) .................................................................................. 8

51 Cong. Rec. H110 (daily ed. Jan. 6, 2005) ................................................ 3

A Sitting President's Amenability to Indictment and Criminal Prosecution, 24 Op. O.L.C. 222, 258-60 (2000) ...................................................... 19

Benjamin Cassady, *"You've Got Your Crook, I've Got Mine": Why the Disqualification Clause Doesn't (Always) Disqualify*, 32 Quinnipiac L. Rev. 209, 279 (2014)......... 30

Kevin Foley, *Availability of Tolling in A Presidential Prosecution*, 168 U. Pa. L. Rev. 1789, 1799–800 (2020) ............................................................ 19

Restatement (Second) of Torts § 876 (Am. L. Inst. 1979) ........................................ 35

Sarah Ferris & Ally Mutnick, *Democrat drops election contest in Iowa house race*, POLITICO (Mar. 31, 2021), https://www.politico.com/news/2021/03/31/democrat-drops-election-contest-in-iowa-house-race-478736................................... 3

STAFF OF S. COMM. ON HOMELAND SEC. & GOV'T AFFS., 117TH CONG., REP. ON EXAMINING THE U.S. CAPITOL ATTACK: A REVIEW OF THE SECURITY, PLANNING, AND RESPONSE FAILURES ON JANUARY 6 ............................................................. 4

Test Act of 1673, 25 Car. II, c. 2 (U.K.)....................................................... 30

The Federalist No. 72, p. 487 (J. Cooke ed. 1961) (A. Hamilton)............................... 29

Webster's Third New International Dictionary 2168 (1971)..................................... 20

## U.S. Constitution

U.S. Const. amend. V....................................................................... 21

\* U.S. Const. Art. I, § 2, cl. 5 ............................................................ 17

* U.S. Const. Art. I, § 2, cl. 6 ........................................................................... 20

* U.S. Const. Art. I, § 3, cl. 6 ...................................................................... 17, 19

* U.S. Const. Art. I, § 3, cl. 7 ..................................................................... 20, 21

* U.S. Const. Art. I, § 6, cl. 2 ........................................................................... 30

* U.S. Const. Art. II, § 1, cl. 2 .......................................................................... 30

* U.S. Const. Art. II, § 2, cl. 2 .................................................................... 29, 30

   \* Authorities upon which President Trump primarily relies are marked by an asterisk.

On January 6, 2021, the President of the United States encouraged Americans to "peacefully and patriotically make [their voices] heard" regarding the certification of presidential electors by Congress. Challenges to election results are common; the freedom to advocate for action on such a challenge is a core principle of our republican style of government. Indeed, many Democratic politicians raised challenges to the 2000, 2004, and 2016 elections. The uniquely American freedoms guaranteed in the First Amendment protect the right to challenge election results and Congressional action without fear of court sanctioned reprisals. Yet that is precisely what Plaintiffs seek here.

Moreover, the Constitution protects the President from encroachment on his duties from other co-equal branches of government. A U.S. district court has no more authority to penalize the President for his use of his bully pulpit than the President has in having the U.S. Marshall Service arrest a judge because of a disfavored legal decision.

Judicial economy also forestalls this Court's ability to hear this case. The U.S. Capitol Police is a legislative agency whose interests were represented by the U.S. House of Representatives' impeachment managers during the Impeachment process. As such, Plaintiffs are prohibited from bringing these claims under the doctrines of res judicata and collateral estoppel.

Finally, Plaintiffs do not allege facts plausibly establishing any of their claims. Plaintiffs weave their own conspiracy in an attempt to bootstrap the President into not only a conspiracy under § 1985, but also a civil conspiracy to violate numerous

state laws. In support of these claims, Plaintiffs bring threadbare allegations and factually deficient claims.

Plaintiffs should be commended for their service and dedication as police officers. Any attacks against law enforcement should be condemned and the perpetrators punished, as President Trump has said repeatedly. Plaintiffs' dispute here, however, is not with President Trump but with any individuals who chose to engage in violence and who should be held accountable.

## BACKGROUND

Donald J. Trump, the 45th President of the United States, is known for his patriotic and inspiring speeches that particularly resonate with those who feel forgotten by Washington D.C.'s political establishment. His speeches draw immense crowds throughout the country, but also bring scorn from political adversaries and most of the corporate news media.

Following the 2020 election, President Trump (among numerous others) raised critical questions about the results of elections in several States. In the weeks and months after the election, the President and his supporters were engaged in litigation, recounts, and appeals.

Post-election challenges are common and are made by candidates of both political parties. For example, Ms. Rita Hart, a candidate for the U.S. House of Representatives from Iowa's 2nd Congressional District, contested the results of her

narrow loss for five months after the 2020 election.[1] Ms. Hart's petition for the U.S. House of Representatives to overturn the results of her district's election followed a fully certified election and a recount under Iowa State law. This is much different than President Trump's election challenge, which took place while he and his team were litigating and challenging results that were not yet certified.

There is ample historical precedent for challenging the certification of electors. Democratic members of Congress challenged the certification of electors after the 2000, 2004, and 2016 elections. In 2000, Representatives Maxine Waters and Barbara Lee objected to counting Florida's electoral votes. *See* 147 Cong. Rec. H35 (daily ed. Jan. 6, 2001) (statements of Reps. Waters and Lee). In 2004, Representatives Barbara Lee and Jerrold Nadler objected to counting electoral votes from Ohio and voted to object to certification of Ohio's certified electors. *See* 151 Cong. Rec. H110 (daily ed. Jan. 6, 2005) (statement by Rep. Lee); 151 Cong. Rec. H110–11 (daily ed. Jan. 6, 2005) (statements by Reps. Nadler and Lee regarding alleged voting irregularities). And in 2016, Democratic representatives challenged nine States' electoral votes—more than Republicans challenged after the 2020 election. *See* 163 Cong. Rec. H186–87, 189 (daily ed. Jan. 6, 2017) (statements of Reps. Jayapal, Lee, and Waters).

While President Trump is a vocal proponent of election integrity he also is strongly committed to public safety and law and order. Indeed, just this month, the

---

[1] Sarah Ferris & Ally Mutnick, *Democrat drops election contest in Iowa house race*, POLITICO (Mar. 31, 2021), https://www.politico.com/news/2021/03/31/democrat-drops-election-contest-in-iowa-house-race-478736.

Senate Homeland Security and Governmental Affairs released a staff report ("HSGA

Report") exonerating President Trump of involvement in the January 6 security

failures. In pertinent parts, the HSGA Report found that President Trump had

delegated the ability to use emergency powers, a lead federal agency had been

designated to deal with the security concerns around the January 6 counting of

electoral ballots, and President Trump personally asked if the security was ready on

January 3.[2] These are not the actions of a co-conspirator attempting to undermine

security, rather the actions of a leader concerned with making sure that security is

properly in place.[3]

Plaintiffs allege that during his 2016 campaign and throughout his presidency,

President Trump threatened, encouraged, and condoned acts of violence against his

political opponents. *See* Am. Compl. ¶ 12. Yet if Plaintiffs' characterizations are

correct, then the words spoken by countless other politicians could qualify as threats

of violence amounting to conspiracies.[4] Plaintiffs also try to establish liability because

---

[2] STAFF OF S. COMM. ON HOMELAND SEC. & GOV'T AFFS., 117TH CONG., REP. ON EXAMINING THE U.S. CAPITOL ATTACK: A REVIEW OF THE SECURITY, PLANNING, AND RESPONSE FAILURES ON JANUARY 6, at 77 ("HSGA Report").

[3] *Id.* at 56, 95. The HSGA Report found that the agencies working on security did not properly perform their functions, which is regrettable. The Report also discusses knowledge of chatter by outside organizations regarding potential action at the United States Capitol, but there is no mention of any involvement of President Trump.

[4] Under Plaintiffs' logic, Representative Maxine Waters would be far more culpable for incitement to violence or riot when she actively encouraged people to go out and harass Trump administration appointees in 2018 and again in 2021 if her favored verdict was not returned in the *State v. Chauvin* case in Minnesota. *See* Emma Colton, *Here are six videos of Democrats calling for violence or physical confrontations that are still active on Twitter*, Washington Examiner

of the way *others interpreted* President Trump's tweet about the rally on January 6, alleging that it was "understood by many of his supporters as a literal call to arms." Am. Compl. ¶ 33. This chilling legal argument is made without plausible factual support. Plaintiffs simply cite two posts on social media by unknown entities without alleging any connection to the President's words. *Id.*

Plaintiffs attempt to bring their actions for damages against President Trump in his personal capacity, alleging—without support—that a sitting President running for re-election acts in his personal capacity when commenting on the results of an election that he believes has violated the Constitution and state laws. *See* Am. Compl. ¶ 18. Commenting on matters of public concern, especially commentary on the security of a major election, falls dead center within the President's constitutional duties to see that the laws are faithfully executed.

---

(Jan. 11, 2021, 5:44 PM), https://www.washingtonexaminer.com/news/democrats-physically-confont-twitter ("[I]f you see anybody from that Cabinet . . . you get out, and you create a crowd. And you push back on them. And you tell them they're not welcome anymore, anywhere"); Chandelis Duster, *Waters calls for protesters to 'get more confrontational' if no guilty verdict is reached in Derek Chauvin trial*, CNN (Apr. 19, 2021, 8:32 PM), https://www.cnn.com/2021/04/19/politics/maxine-waters-derek-chauvin-trial/index.html (quoting Rep. Waters telling people to "stay on the street" and "get more confrontational"). Similarly, Representative Cory Booker encouraged people to go to the Hill and "get up in the face of some congresspeople." *Id.* And Senator Jon Tester said that the way to beat President Trump in states that voted for him was to "go back and punch him [Trump] in the face." Mike Brest, *Democratic senator on how to beat Trump: 'Punch him in the face'*, Washington Examiner, (July 19, 2019, 09:43 AM), https://www.washingtonexaminer.com/news/democratic-senator-on-how-to-beat-trump-punch-him-in-the-face. These threatening words are protected by the First Amendment, and they far surpass the language spoken by President Trump.

5

## ARGUMENT

Plaintiffs assert claims that blame President Trump for the actions of individuals with whom Plaintiffs allege he conspired based on his political speech leading up to and following the 2020 election. These allegations rely on out of context political speech and expression made by the President in press statements, social media, and the rally at the Ellipse. To attempt to hold a political leader vicariously liable for the actions of others as a result of constitutionally protected political speech would contradict the Supreme Court's well-established First Amendment precedent. Even if the speech in question was not cloaked with the highest presumption of legal protection, Plaintiffs' claims are precluded by absolute Presidential immunity, res judicata, and collateral estoppel.

Free expression of political speech is central to the functioning of our Republic. "[I]f there is any principle of the Constitution that more imperatively calls for attachment than any other it is the principle of free thought—not free thought for those who agree with us but freedom for the thought that we hate." *United States v. Schwimmer*, 279 U.S. 644, 654–55 (1929) (Holmes, J. dissenting). Our country's dedication to free speech can be seen in the refutation of the criminalization of false, scandalous, or malicious speech against the Government with the Alien and Sedition Acts in 1798. The Acts prompted future presidents Thomas Jefferson and James Madison to author the Virginia and Kentucky Resolutions to express their belief in the unconstitutionality of the laws, which essentially criminalized political opposition to the Government. It would fly in the face of our country's history of protecting free speech to find that President Trump can be liable for incitement for expressing his

6

genuine beliefs about the possible security and illegality of certain elections and encouraging his supports to peacefully protest.

In addition to all the legal reasons why Plaintiffs' claims must be dismissed, the Court should decline to exercise jurisdiction over these types of claims generally as they represent value judgments reserved for the political branches. Opening the courts to challenges of this nature, which at their core require evaluation of the content of political speech, would unreasonably restrict the rights guaranteed by the First Amendment. While an adverse holding would burden all individuals, the Presidency in particular should not be burdened with apprehension that liability may attach for political speech and action; the high-profile nature of the Office and the need for quick decision making on critical issues support a conclusion to dismiss lawsuits of this nature.

## I.    The Constitution forecloses this court from exercising jurisdiction over President Trump's actions taken during his presidency.

### a.    Absolute immunity bars the claims against President Trump.

Presidents must be decisive. When making critically important decisions, often of historic proportions, it is imperative that their discretion not be colored, or their actions chilled, by a fear that their presidential actions will result in civil liability— ripening either during or after their presidential term. Consequently, courts have long held that presidents are covered by absolute immunity, which is grounded in the principle of separation of powers and entrenched in precedent dating back to common law traditions. *See Mitchell v. Forsyth*, 472 U.S. 511, 521 (1985); *Nixon v. Fitzgerald*, 457 U.S. 731, 744 (1982); 3 J. Story, Commentaries on the Constitution of the United

States § 1563, pp. 418-19 (1st ed. 1833) (reasoning that the President "must be deemed, in civil cases at least, to possess an official inviolability."). This immunity is based on considerations of the official function, the nature of the task in question, and the practical need to insulate the official's decision making from second guessing by the courts. *See Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982) (holding that absolute immunity extends to "legislators, in their legislative functions," "judges, in their judicial functions," members of the executive branch who perform prosecutorial or adjudicative functions, and the President); *Mitchell*, 472 U.S. at 521 (explaining that the Court looks to the "historical or common-law basis for the immunity in question").

Immunity covers the President's conduct up to the "outer perimeter" of his duties. *See Chastain v. Sundquist*, 833 F.2d 311, 315 (D.C. Cir. 1987) (holding that presidential immunity "is absolute, . . . subject only to the requirement that [his] actions fall within the outer perimeter of [his] official duties"); *Clinton v. Jones*, 520 U.S. 681, 696 (1997) (finding no immunity for purely private acts or acts outside of official duties). Indeed, decisions where a President has been found subject to suit for an action taken during his presidency are non-existent in the various circuit courts of appeal.

Immunity is the right not just to avoid judgment, but also to avoid pretrial burdens, which can be disruptive to effective governance. *See Mitchell*, 472 U.S. at 526; *Behrens v. Pelletier*, 516 U.S. 299, 308 (1996). Precluding civil litigation against the President is vital to ensuring a functioning executive branch—the absence of immunity would incentivize lawsuits that would make the President hesitant to

8

exercise his discretion "even when the public interest required bold and unhesitating action." *Nixon*, 457 U.S. at 744–45. *See also Pierson v. Ray*, 386 U.S. 547, 554 (1967) (explaining that immunity serves the public interest in preserving the independence and decisiveness necessary of government officials). Even when a plaintiff alleges that a president's actions exceed his legal authority, the privilege *still* prohibits litigation. Otherwise, the rule would be swallowed whole by the exception; litigation would constantly test whether a particular "action was unlawful[] or was taken for a forbidden purpose." *Nixon*, 457 U.S. at 756.

The dominant concern motivating the Court's reasoning regarding immunity is the possibility of "distortion of the Executive's 'decision[-]making process' with respect to official acts that would stem from 'worry as to the possibility of damages.'" *Trump v. Vance*, 140 S. Ct. 2412, 2426 (2020). For this reason, the defense of immunity extends beyond traditional actions at common law to civil cases for monetary damages. *See Tenney v. Brandhove*, 341 U.S. 367, 376 (1951) (holding that despite not explicitly providing the defense of immunity, 42 U.S.C. § 1983 does not abrogate the defense, which is "so well grounded in history and reason"). Presidential immunity also extends to suits seeking declaratory and injunctive relief. *See Franklin v. Massachusetts*, 505 U.S. 788, 827 (1992) (Scalia, J., concurring) (explaining that the Court's reasoning in *Nixon* "appl[ies] with equal, if not greater, force to requests for declaratory or injunctive relief in official-capacity suits that challenge the President's performance of executive functions"). Claims attempting to hold the President civilly liable for a speech, rally, or petitioning activity would irreparably

distort his decision-making process in a way that the Court recognizes is unacceptable.

On the same day the Supreme Court decided that the President had absolute immunity, the Court drew a distinction between the persons entitled to such absolute immunity and those only entitled to a lesser form of immunity. *See Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982). In *Harlow*, the Supreme Court distinguished between ordinary executive branch officials who would be entitled to qualified immunity from those that are entitled to the higher protection of absolute immunity. *Harlow,* 457 U.S. at 807 ("[O]ur cases make plain that qualified immunity represents the norm."). As the Supreme Court clearly explained, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 817–18. The Court has also held that evidence of a defendant's subjective intent is irrelevant. *See Crawford-El v. Britton*, 523 U.S. 574, 588 (1998) ("[The] defense of qualified immunity may not be rebutted by evidence that the defendant's conduct was malicious or otherwise improperly motivated."). "[J]udgments surrounding discretionary action almost inevitably are influenced by the decisionmaker's experiences, values, and emotions" and allowing subjective intent would result in no clear standard for relevant evidence. *Harlow*, 457 U.S. at 816.

Here, President Trump was engaged in discretionary action pursuant to his Constitutional duty to ensure that the laws were faithfully executed by petitioning

10

Congress not to certify the electors from States with ongoing election challenges. As such, he is entitled to immunity because his speech did not violate any clearly established legal duties. Based on the logic of *Harlow*, the President is entitled to absolute immunity. The Court has continuously re-affirmed the purpose of these immunities to allow officials to carry out their functions without fear of civil retribution for legitimate acts. *See Nixon*, 457 U.S. at 749, *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951) ("Legislators are immune from deterrents to the uninhibited discharge of their legislative duty, not for their private indulgence but for the public good."); *Imbler v. Pachtman*, 424 U.S. 409, 423 (1976) (holding that absolute immunity existed for a federal prosecutor to prevent distraction from his public duties or improper consideration in the exercise of his independent judgment). To hold that the President is in some actions protected by absolute immunity and in others protected by qualified immunity would unnecessarily burden the Office of the President with different liabilities at different times. This would be inconsistent with the rationale for extending the immunity in the first place.

Further, such liability would be inapposite to the protection offered to legislators for the exact same reasons. In *Brandhove*, the Court held that the "privilege would be of little value if [a protected person] could be subjected to the cost and inconvenience and distraction of a trial upon the conclusion of the pleader, or to the hazard of a judgment against them based upon a jury's speculation as to motives." *Brandhove*, 341 U.S. at 377. The Court determined that "Courts are not the place for such controversies[,]" but rather "self-discipline and the voters must be the ultimate

reliance for discouraging or correcting such abuses." *Id.* at 378. In *Brandhove*, the Court limited its rationale to the facts before it, the plaintiff alleged that a state legislator violated an individual's constitutional right by intimating him into silence through an improper exercise of legislative power, calling him to testify. *Id.* at 371. The Court ultimately ruled that they could not find the committee exceeded the bounds of the legislative power unless there is an "usurpation" of the executive or judicial powers that is "obvious." *Id.* at 378.

In *Imbler*, the Court held that a prosecutor could not be held liable for those against whom he brings charges but fails to convict. 424 U.S. 409, 423 (1976). The Court went on to pronounce that the office of public prosecutor is such that it must be administered with "courage and independence." If such litigation were allowed, the "apprehension of such consequences would tend to towards great uneasiness and toward weakening the fearless and impartial policy which should characterize the administration of this office." *Id.* at 424. These principles are easily extended to the present case.

Here, President Trump is an elected official entitled to absolute immunity. President Trump was engaged in the execution of his duties as President. Duties that are solely determined by the person properly elected to that office. In this case, those duties involved the use of his bully pulpit to ensure the faithful execution of the laws of the United States and lobbying for proper legislative action to the same ends. The office of President even more than the office of prosecutor requires the ability to act boldly and fearlessly to carry out the duties of the office.

A holding that Plaintiffs can bring a suit of this subjective nature would encourage political opponents to take their disputes out of the public square and the halls of Congress and into courtrooms to punish a president for his disfavored speech. The President's absolute immunity forecloses the jurisdiction of this Court.[5]

**b.    The political question doctrine also bars the claims against President Trump.**

Similar to absolute immunity is the practical consideration expressed in the political question doctrine. "The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n. v. Am. Cetacean Soc.,* 478 U.S. 221, 230 (1986). There are several instances when the doctrine makes a case nonjusticiable, including when there is a "textually demonstrable constitutional commitment of the issue to a coordinate political department" and when it is impossible to decide an issue without making "an initial policy determination of a

---

[5] Even if President Trump was not covered by absolute immunity, as a governmental actor, the claims against him would also be foreclosed by immunity under the Westfall Act. *See* 28 U.S.C. § 2679(b). Westfall Act immunity applies to any employee of the United States that commits or is accused of committing any tort while acting within the scope of his employment. The United States shall be substituted as the defendant under the doctrine of *respondeat superior.* Plaintiffs' allegations arise out of President Trump's political speech, clearly within the scope of his employment, (i.e., ensuring the faithful execution of the laws and carrying out his other Constitutional duties). Moreover, even if those doctrines did not apply, President Trump would be protected by qualified immunity, as no Court has previously held a President liable for political speech. *See Jones v. Kirchner*, 835 F.3d 74, 84 (D.C. Cir. 2016). These immunities, of course, are narrower than the dispositive absolute immunity arising directly from the Constitution.

kind clearly for nonjudicial discretion." *Bancoult v. McNamara,* 455 F.3d 427, 432 (D.C. Cir. 2006) (citing *Baker v. Carr*, 369 U.S. 186, 217 (1962)).

Here, Plaintiffs seek declarations and damages against Mr. Trump based on actions taken while he was acting in his official capacity as President of the United States. *See* Am. Compl. at 48. Adjudication of such a claim based upon the words or actions of the President would improperly regulate the executive department. Moreover, adjudication of Plaintiffs' claims would require the Court to make a value determination about what is or is not proper for the President to say during a political speech when advocating for governmental action. As previously discussed, such value determinations of the content of speech are not appropriate for the judiciary. The courts are not the branch constitutionally tasked with making "policy choices and value determinations," and they cannot serve to second-guess the President's judgments. *Japan Whaling*, 478 U.S. at 230.

The impeachment managers chosen by the House of Representatives had a full and fair opportunity to make their case at impeachment. They failed; President Trump was acquitted by the United States Senate sitting as an Impeachment Court. Its verdict was the final word on this matter. To hold otherwise would displace the Senate as the final arbiter on the subject of impeachment, showing a disrespect for a co-equal branch. As such, this Court should decline to adjudicate Plaintiffs' claims.

c.   **The claims against President Trump are precluded by the Impeachment Judgement Clause, res judicata and collateral estoppel.**

Under the doctrine of res judicata, "a subsequent lawsuit will be barred if there has been prior litigation (1) involving the same claims or cause of action, (2) between

14

the same parties or their privies, and (3) there has been a final, valid judgment on the merits, (4) by a court of competent jurisdiction." *Smalls v. United States*, 471 F.3d 186, 192 (D.C. Cir. 2006) (citing *Blonder-Tongue Lab'ys, Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 323–24 (1971)). Under D.C. law, which forms the basis for most of the Plaintiffs' claims, a court will consider "(1) whether the claim was adjudicated finally in the first action; (2) whether the present claim is the same as the claim which was raised or which might have been raised in the prior proceeding; and (3) whether the party against whom the plea is asserted was a party or in privity with a party in the prior case" to determine whether a claim is barred by res judicata. *Herrion v. Children's Hosp. Nat'l Med. Ctr.*, 448 F. App'x 71, 72 (D.C. Cir. 2011) (quoting *Calomiris v. Calomiris*, 3 A.3d 1186, 1190 (D.C. 2010). While these tests are formulated slightly differently, the core principles are that res judicata requires that claims be barred if they arise from the same common nucleus of facts, if the prior case resulted in a final judgment on the merits, and if the parties to the former litigation are the same or are privies of those parties.

"[T]he parties to a suit and their privies are bound by a final judgment and may not relitigate any ground for relief which they already have had an opportunity to litigate *even if they chose not to exploit that opportunity* whether the initial judgment was erroneous or not." *Lewis v. Drug Enf't Admin.*, 777 F. Supp. 2d 151, 161 (D.D.C. 2011), *aff'd*, 2012 WL 1155698 (D.C. Cir. 2012). *See also Allen v. McCurry*, 449 U.S. 90, 94 (1980) ("Under res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were

or could have been raised in that action."). A Plaintiff alleging no new facts but simply a new legal theory "is precisely what is barred by *res judicata.*" *McIntyre v. Fulwood*, 892 F. Supp. 2d 209, 216 (D.D.C. 2012) (quoting *Apotex, Inc. v. FDA,* 393 F.3d 210, 217–18 (D.C. Cir. 2004)).

### 1. *All of Plaintiffs' claims arise from the same common nucleus of facts.*

Plaintiffs' claims arise out of the same operative facts as the claims addressed in the Senate's impeachment trial. That trial did not result in a conviction—despite overwhelming political animus towards the President, the Senate acquitted the President of the incitement to insurrection charge. The articles of impeachment alleged that President Trump "willfully made statements that, in context, encouraged—and foreseeably resulted in—lawless action at the Capitol[.]" 167 Cong. Rec. H165 (daily ed. Jan. 13, 2021). These are the same charges that Plaintiffs bring now, alleging violations of laws that have substantially the same language. *See* Compl. ¶ 151 (alleging that President Trump's words and actions amounted to directing and ratifying assault and battery); ¶¶ 183, 197 (alleging that President Trump's words incited a riot and disorderly conduct); ¶ 220 (alleging that President Trump's words and conduct amount to a conspiracy to interfere with federal officials performing their duties).

Res judicata applies not only to the actual claims brought, but also to any claims that could have been brought stemming from the same facts. *See Allen*, 449 U.S. at 94. The House of Representatives is tasked with "the sole power of impeachment." U.S. Const. Art. I, § 2, cl. 5. It had the opportunity to dream-up any articles of impeachment and it chose to bring only one article for incitement to

insurrection, alleging that the President's First Amendment protected speech on January 6, 2021, rose to the level of the types of "high crimes and misdemeanors" that warrant removal from office. The Senate has "the sole Power to try all Impeachments" but what level of proof is required to convict is determined by each individual Senator. U.S. Const. Art. I, § 3, cl. 6. Even under this lower standard of proof, and despite only needing a two-thirds vote to convict—a potentially lower bar than the President faces in this case—it failed to do so. The failure to bring additional claims does not permit parties or their privies to bring later litigation stemming from the same events, otherwise no judgment would ever truly be final.

### 2.   *Plaintiffs are in privity with Congress.*

The Capitol Police is an agency under the legislative branch whose interests were adequately represented during the Senate's impeachment trial, which was predicated on the same nucleus of alleged facts that Plaintiffs bring here.

A "privy" is one "so identified in interest with a party to former litigation that he represents precisely the same legal right in respect to the subject matter involved." *Jefferson Sch. of Soc. Sci. v. Subversive Activities Control Bd.*, 331 F.2d 76, 83 (D.C. Cir. 1963). "The government, its officers, and its agencies are regarded as being in privity for claim-preclusive purposes." *McIntyre*, 892 F. Supp. 2d at 215 (quoting *Wilson v. Fullwood*, 772 F. Supp. 2d 246, 263 (D.D.C. 2011)). *See also Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 402–03 (1940) ("There is privity between officers of the same government so that a judgment in a suit between a party and a representative of the United States is res judicata in relitigation of the same issue between that party and another officer of the government.").

17

In essence, the House of Representatives' impeachment managers, serving in roles similar to prosecutors or plaintiffs, represented the interests of all the parties involved in the events that supported the article of impeachment brought against the President. Plaintiffs' claims are predicated on injuries they sustained from the actions of individuals at the Capitol, which the House blamed on President Trump. The Senate, tasked with hearing the evidence and passing a final judgment on the matter, did not find that President Trump's First Amendment protected speech rose to the level of incitement. The Senate, sitting as an Impeachment Court under an oath to the Constitution, issued a final judgment acquitting the President of the incitement to insurrection charge thus precluding any parties or their privies who could have brought claims from relitigating the matter. Indeed, Plaintiffs could not have charged the President in a civil lawsuit for the claims they now attempt to bring because of absolute presidential immunity from claims for damages resulting from official acts. *See Vance*, 140 S. Ct. at 2426. The House was the only party that could bring the claim and the Senate was the only court which could hear the claims. As such, the House was the relevant party bringing the suit and it adequately represented the interests of the Capitol Police, a legislative agency tasked with protecting Congress so that its members may carry out their legislative duties. This relationship makes the Capitol Police privies of the House and bars their attempts to bring these particular claims against the President.

3.   *The Senate's Impeachment trial is a final judgment on the merits issued by a court of competent jurisdiction.*

Res judicata requires that a court of competent jurisdiction issue a final judgment on the merits for that decision to preclude future lawsuits stemming from the same facts. The Constitution in Article I, § 3, cl. 6 *specifically* designates the Senate to sit as an Impeachment Court, which means that it qualifies as a court of competent jurisdiction, tasked with examining the articles presented by the House in the manner of a judge. *See Nixon v. United States*, 506 U.S. 224, 229–30 (1993) (analyzing the definition of "try" as used in the Constitution to reach the conclusion that the Framers did not intend to impose additional limitations on impeachment trial procedure beyond requiring that "Members must be under oath, a two-thirds vote is required to convict, and the Chief Justice presides when the President is tried").

Once the Senate has decided a case as an Impeachment Court, it is necessary to treat that decision with finality. *See* Kevin Foley, *Availability of Tolling in A Presidential Prosecution*, 168 U. Pa. L. Rev. 1789, 1799–800 (2020) (describing that the impeachment process is better suited for prosecuting the President for numerous factors among which is the finality of the lack of an appeal) (citing *A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. O.L.C. 222, 258-60 (2000)); *Nixon*, 506 U.S. at 236 (discussing the necessity of the finality of the Senate's judgment after an impeachment because "opening the door of judicial review to the procedures used by the Senate in trying impeachments would 'expose the political life of the country to months, or perhaps years, of chaos.'") (citing *Nixon v.*

*United States*, 938 F.2d 239, 246 (1991)). This is especially true because the Senate is the sole court that *can* pass judgment on impeachment. *See* U.S. Const. Art. I, § 2, cl. 6. "The commonsense meaning of the word 'sole' is that the Senate alone shall have authority to determine whether an individual should be acquitted or convicted." *Nixon*, 506 U.S. at 230–31. If the courts were permitted to review the processes and decisions of the Senate, this would compromise the Senate's ability to "'function[] . . . independently and without assistance or interference.'" *Id.* (citing Webster's Third New International Dictionary 2168 (1971)).

The one exception to the finality of judgment of the Senate respects an individual impeached *and convicted*. "[T]he Framers recognized that most likely there would be two sets of proceedings for individuals who commit impeachable offenses—the impeachment trial and a separate criminal trial." *Nixon*, 506 U.S. at 234. "[T]he Constitution explicitly provides for two separate proceedings." *Id.* (citing U.S. Const. Art. I, § 3, cl. 7). The Court explained that the separation of the two forums was a deliberate move by the Framers to "avoid raising the specter of bias and to ensure independent judgments." *Nixon*, 506 U.S. at 234 (citing The Federalist No. 65, p. 442 (J. Cooke ed. 1961)). In this case, however, the Senate acquitted President Trump. That acquittal by the Senate is a final judgment on the merits and precludes this court from exercising jurisdiction.

### 4.    *Statutory construction of the Impeachment Judgment Clause shows that only an individual convicted is subject to follow-on litigation, and only for criminal offenses.*

The Impeachment Judgment Clause, U.S. Const. Art. I, § 3, cl. 7, states that judgment "shall not extend further than to removal from Office, and disqualification

to hold and enjoy any Office of honor, Trust or Profit under the United States: but the Party convicted shall nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to Law." Two aspects of this clause stand out. First, the only provision for follow-on liability is for a party *convicted*. The Framers could have written the party "tried" or the party "impeached," but the ultimate wording was limited to the party convicted. This alone should make clear that an individual impeached but not convicted shall not be subject to follow-on litigation.

Second, the clustering of post-conviction liability for "Indictment, Trial, Judgment and Punishment, according to Law" leads with "Indictment," which implies that an individual convicted is only potentially liable for follow on criminal charges brought by the government rather than a civil suit on the same issues. The Framers were familiar with the concept of res judicata and collateral estoppel. *See Crist v. Bretz*, 437 U.S. 28, 40–41 (1978) (describing that "the constitutional guarantee against double jeopardy was restricted to cases in which there had been a complete trial—culminating in acquittal or conviction. . . . This was consonant with the prevailing English practice regarding pleas in bar"). Recognition of the need to prevent repetitive suits is definitively expressed in the Constitution, which prohibits anyone from being "subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. The Constitution then explicitly carves out an exception for this commonly understood prohibition against being subject to judgment more than once for the same claim only in cases where an individual is impeached and convicted. But an individual will not be subject to judgment in all cases—the

Constitution again limits the liability to indictment, trial, judgment, and punishment. Indictments are only issued for criminal offenses, not for civil lawsuits. The process of the impeachment trial is deemed a final judgment on the merits, but it will not prevent the individual convicted of a high crime or misdemeanor from facing judgment in a court of law for the crime in question. This makes sense because the Senate cannot bring a criminal charge against an individual impeached—only the executive branch can bring litigation to enforce the laws of the United States. Through being granted the power of impeachment, Congress was given an important check on the Executive and Judicial Branches, who could not have been trusted to prosecute and try themselves. Once removed from office, those individuals could then be properly tried in the courts of law.

President Trump was not convicted on the impeachment charge brought against him. Because he is not a party convicted, he is not liable to be subject to further litigation on a matter already decided.

## II.   Well-established First Amendment law bars Plaintiffs' claims based on President Trump's political speech.

An individual's rights to speak, assemble, and petition the government for redress of grievances are afforded the strongest presumption against infringement. *See Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 816 (1984) ("[P]olitical speech is entitled to the fullest possible measure of constitutional protection."). "[S]peech on 'matters of public concern' . . . is 'at the heart of the First Amendment's protection.'" *Snyder v. Phelps*, 562 U.S. 443, 451-52 (2011) (quoting *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758-59

(1985)). The First Amendment reflects "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *Snyder*, 562 U.S. at 452. That is because "speech concerning public affairs is more than self-expression; it is the essence of self-government." *Id.* Accordingly, "speech on public issues occupies the highest rung of the hierarchy of First Amendment values and is entitled to special protection." *Id.* "The primary question is whether the message conveyed . . . was of such a nature as to come within the ambit of the First Amendment Protection, or whether it must be placed in the categories of speech which the Supreme Court has held are not protected." *Allen v. District of Columbia*, 187 A.2d 888, 889 (D.C. 1963) (citing *Chaplinsky v. New Hampshire,* 315 U.S. 568 (1942)).

At least for Plaintiffs' District of Columbia state law claims of incitement to riot and disorderly conduct, the "[defendant's] conduct, and not the crowd's reaction to it, must be the starting point, for 'the measure of the speaker is not the conduct of his audience.'" *Allen,* 187 A.2d at 889 (quoting *Rockwell v. Morris*, 12 A.D.2d 272, 279 (N.Y. Sup. Ct. 1961)). Therefore, the "[a]udience reaction, and the immediacy of the disorder, become significant elements of proof only after the speaker 'passes the bounds of argument or persuasion and undertakes incitement to riot.'" *Allen,* 187 A.2d at 889 (citing *Feiner v. New York,* 340 U.S. 315, 321 (1951)). Here, President Trump's speech did not surpass any reasonable standard for the bounds of argument and persuasion commonly used by politicians.

a. **President Trump's speech was petitioning activity undertaken in his official capacity.**

The speech that President Trump gave on January 6, 2021, regarding the 2020 Presidential Election is certainly on matters of public concern. As President, it is his duty to ensure that the laws are faithfully executed, and he had valid concerns about the integrity of the November election results. Allegations of election interference were more than welcome by politicians and the media in 2000, 2004, and 2016 when they were being voiced by Maxine Waters, Jerrold Nadler, Barbara Lee, Stacy Abrams, and Hillary Clinton. In 2020, President Trump was decried for voicing concerns with the massive changes to state election procedures that brought uncertainty into the security of the election procedures.

State legislatures are charged with setting the election process in every state, but the President has every right to question whether procedures were being followed and were secure. Indeed, dialog between the political branches of government and the several states on such issues is at the core of federalism and the checks and balances that are the heart and soul of the constitutional framework developed by the founders. Questioning the propriety of the election was part of the President's duty to uphold and defend the Constitution. At the very least, his discussion of the matter while attempting to petition the government to redress his grievance was a matter of public concern cloaked with the highest presumption of protection. It clearly does not meet the standards described by the Supreme Court for when speech may be restricted without violating the First Amendment.

24

### b. President Trump's speech does not meet the standard for incitement under *Brandenburg v. Ohio*.

At numerous points throughout the amended complaint, Plaintiffs allege that President Trump incited and provoked individuals at the Ellipse and via social media (*see* Compl. ¶¶ 10, 40, 116, 212, 226) by voicing his concerns over the legitimacy of the elections and petitioning for the Vice President to not certify the election. From these allegations, they ascribe liability for the subsequent actions of individuals at the Capitol. President Trump's speech clearly articulated his desire for those who believed as he did to "peacefully and patriotically make [their voices] heard" at the Capitol where the election certification was going to take place. At no point during the speech was there any advocacy for violence or unlawful activity. Retrospectively assuming a speaker's intent based upon the actions of others is not a constitutionally acceptable method of pleading an unlawful incitement. *See Brandenburg v. Ohio*, 395 U.S. 444, 449 (1969).

One cannot have negligent liability for incitement—intent on the part of the speaker is a required element of a plaintiff's claim. A holding that an individual can be liable for incitement based on how others interpreted his speech would blur "the distinction between advocacy and incitement." *Morse v. Frederick*, 551 U.S. 393, 442 (2007) (Stevens, J., dissenting). The Supreme Court rejected such an interpretation because this "would 'pu[t] the speaker in these circumstances wholly at the mercy of the varied understanding of his hearers and consequently of whatever inference may be drawn as to his intent and meaning.'" *Id.* at 442–43 (quoting *Thomas v. Collins,* 323 U.S. 516, 535 (1945)).

The right to protest was continually referred to in the media this past year as a central part of our functioning Republic—even when the protests that were being encouraged in cities throughout the country were clearly turning violent and putting Americans' lives and property in jeopardy. A finding that President Trump's speech is not protected by the First Amendment would open the floodgates to liability for any individual if another person committed unlawful conduct and claimed to be under the influence of that individual's political speech, cluttering the dockets of the district courts and incentivizing using courts as a weapon against political opponents.

c. **Incitement is limited to true threats and a holding to the contrary would subject anti-riot laws to facial challenges.**

As the Supreme Court has recognized, the "mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 253 (2002). After all, "mere encouragement is quintessential protected advocacy" under the First Amendment. *United States v. Miselis*, 972 F.3d 518, 536 (4th Cir. 2020). Indeed, the Fourth Circuit has held that an Anti-Riot Act that "proscribes speech tending to 'encourage' or 'promote' a riot, as well as speech 'urging' others to riot or 'involving' mere advocacy of violence" was overbroad under *Brandenburg* and swept up too much protected speech to be constitutional. *Miselis*, 972 F.3d at 540. If the courts can conclude that urging others to riot or directly advocating for violence cannot incur liability under the First Amendment, the allegations that Plaintiffs have made here are surely insufficient. Otherwise, D.C.'s Anti-Riot statute would be subject to a facial challenge as sweeping in too much protected speech under the Supreme Court's analysis in *Brandenburg*,

26

395 U.S. at 447, which permits advocacy of the use of force except in limited circumstances where the speech both is intended to incite imminent lawless action and has a high likelihood of inciting imminent lawless action.

### d.    Plaintiffs' reading of § 1985 and argument for liability would result in such expansive liability to subject the statute to a facial challenge.

If Plaintiffs are allowed to bring this claim under § 1985, any time that there is a standoff between the political branches that involves fiery speech, it could be construed as an unlawful conspiracy. This could make the statute subject to a facial challenge for being overbroad or void for vagueness. The overbreadth doctrine allows facial challenges to boundless statutes to prevent the chilling of First Amendment speech. *See Secretary of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 958 (1984). The void for vagueness doctrine ensures that citizens are on notice of what a statute proscribes and also guards against arbitrary or discriminatory enforcement. *See Sessions v. Dimaya,* 138 S. Ct. 1204, 1212 (2018).

Should Plaintiffs' construction of § 1985 be adopted, it would lead to a boundless statute that would essentially hold politicians vicariously liable for the actions of their supporters, substantially chilling critically important political speech. Moreover, the broad and vague prescriptions of the statute would encourage selective enforcement, inevitably based upon the political affiliations of the *enforcer*. Simply put, Plaintiffs' proposed interpretation of the statute provides no way to draw clear lines, requiring that they be struck down as facially invalid.

But this historic statute need not be endangered. A conspiracy under § 1985(1) should not be read so broad as to broadly apply to all tortious interferences with the

rights of others. *See Griffin v. Breckenridge,* 403 U.S. 88, 101 (1971) (discussing the legislative history of the statute, specifically as it applied to § 1985(3)). Indeed, a plain reading of the word "conspiracy" in the statute requires that the Court limit its application to specific agreements to interfere with the acceptance or performance of an officers' duties through an unlawful act. Ergo, an agreement to engage in lawful political speech and assembly with others is no conspiracy at all; there must be an actual agreement to perform an overt act that extends beyond protected political speech. *See McFadden v. U.S.,* 576 U.S. 186, 197 (2015) (requiring that avoidance be used only when courts must choose between competing plausible interpretations). And as with any conspiracy allegation, proof of the actual agreement is key to surviving a motion to dismiss. Plaintiffs here do not meet that required pleading standard.

As President Trump's speech is protected under the First Amendment, and all the claims against him stem directly and solely from his political speech, this Court should dismiss the Plaintiffs' Amended Complaint in its entirety.

### III.   Plaintiffs do not adequately plead a conspiracy under § 1985, much less the higher pleading standard required for an allegation of civil conspiracy.

To state a claim upon which relief may be granted, Plaintiffs are charged with pleading their Amended Complaint so that it plausibly lays out a legally recognized case against Defendants. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 549 (2007). While they need not include "detailed factual allegations," they must do more than state an unadorned "the-defendant-unlawfully-harmed-me" accusation. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). A pleading that offers "labels

28

and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 557. Moreover, Plaintiffs' conspiracy allegations must be pled with particularity. *See Gometz v. Culwell*, 850 F.2d 461, 464 (7th Cir. 1988); *McCord v. Bailey,* 636 F.2d 606 (D.C. Cir. 1980).

### a. Plaintiffs do not allege a violation of 42 U.S.C. § 1985(1).

Plaintiffs' claims against President Trump under § 1985 are contingent upon a finding that President Trump conspired to interfere with the duties of a federal officer as described in § 1985(1). Neither members of Congress nor Vice President Pence, whom the Plaintiffs allege in ¶ 222 were the individuals prevented by force, intimidation, and threats from discharging their duties, are federal officers for purposes of § 1985(1). An officer of the United States is one who "holds his place by virtue of an appointment by the president, or of one of the courts of justice or heads of departments authorized by law to make such an appointment." *United States v. Mouat*, 124 U.S. 303, 307 (1888). Additionally, as the Supreme Court explained in 2010, "[t]he people do not vote for the 'Officers of the United States.' U.S. Const. Art. II, § 2, cl. 2. They instead look to the President to guide the 'assistants or deputies . . . subject to his superintendence.'" *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 498 (2010) (*quoting*, The Federalist No. 72, p. 487 (J. Cooke ed. 1961) (A. Hamilton)). Furthermore, the Appointments Clause makes it clear that the President appoints the Officers of the United States. *See* U.S. Const. Art. II, § 2, cl. 2.

29

The Constitution makes clear that members of Congress are not office holders "under . . . the United States." 42 U.S.C. § 1985(1). The Ineligibility Clause specifically states that "no person holding any Office under the United States, shall be a member of either House during his Continuance in Office." U.S. Const. Art. I, § 6, cl. 2. Ergo, a member of Congress is not in an office under the United States, otherwise the Constitution would state that they could not hold more than one such office. In defining an office of the United States, the United States Court of Claims defined it as a "public station or employment established or authorized by Congress and conferred by appointment of the Government." *Dalton v. U.S.*, 71 Ct. Cl. 421, 425 (1931).

Neither do members of Congress hold a position of trust or a place of confidence under the United States. The Constitution specifically delineates between senators, representatives, and those holding an office of trust or profit under the United States when it prohibits any of the above from serving as electors. U.S. Const. Art. II, § 1, cl. 2. In common law, an office of trust or profit referred exclusively to those in the employ in the executive, judiciary, or the church. *See* Benjamin Cassady, *"You've Got Your Crook, I've Got Mine": Why the Disqualification Clause Doesn't (Always) Disqualify*, 32 Quinnipiac L. Rev. 209, 279 (2014). English statutes applied the term to offices conferred by the Crown, not by Parliament. *Id.* (citing Test Act of 1673, 25 Car. II, c. 2 (U.K.)).

There are few examples of those who hold a place of confidence under the United States. A district court has applied that term to state court judges since they

decide federal constitutional issues and are bound by federal law. *See Lewis v. News-Press & Gazette,* 782 F. Supp. 1338, 1342 (W.D. Mo. 1992). Other authority suggests that all the categories listed in Section 1 are limited to those who carry out and apply the law. *See Stern v. U.S. Gypsum, Inc.,* 547 F.2d 1329, 1337 (7th Cir. 1977) (explaining the statutory history of § 1985(1) and concluding that the purpose of the legislation was to protect the "federal interest in the carrying out of federal functions"). However, given the previously discussed limitation that officers of the United States are those who are appointed by the President, the fact that the Vice President is elected with the President prevents a finding that he is an officer.

One thing is clear: the Congress that adopted the statute could very well have clearly made it applicable to the legislative branch and to the President and Vice President. But it did not. Indeed, if the statute did apply as broadly as the Plaintiffs allege, any time that Congress and the President disagreed politically it could incur liability on either party in the courts of law if their bombastic rhetoric or conduct could be perceived as a threat to the other. Plaintiffs do not have a cause of action under § 1985(3) because neither the members of Congress nor Vice President Pence qualify as individuals with whom interference of their duties gives rise to a cause of action under § 1985(1). As such, count seven must be dismissed.

### 1. *Plaintiffs do not adequately allege that President Trump caused the events of January 6.*

Plaintiffs have not alleged that President Trump took any action other than his protected speech to cause the alleged events in their Amended Complaint. Plaintiffs have woven their own story in an attempt to implicate President Trump in

a plot between individuals unrelated and distant from President Trump and the opportunistic people in the District of Columbia that joined them on that fateful day.

President Trump's speech, in addition to being protected, was far removed from the Capitol. He spoke to his fellow citizens at the Ellipse. Further, President Trump's language both during the speech and subsequent to the speech indicates that he wanted his supporters to remain peaceful. *See* Am. Compl. ¶ 118 (President Trump's tweet urging people to "support our Capitol Police and Law Enforcement" and "[s]tay peaceful!"), ¶ 127 (President Trump's tweet telling people to "[g]o home with love & in peace"). The protestors' and rioters' lack of obedience clearly demonstrates that President Trump did not have control over their actions and was not directing them, nor was he the one that incited them. The HSAG Report also indicates that there were organizations and individuals planning to get involved in the events at the Capitol ahead of time. President Trump's words and actions, however, show that he wanted nothing more than an effective, peaceful, and patriotic demonstration in support of election integrity.

### b. Plaintiffs fail to plead the elements of civil conspiracy.

"The elements of a civil conspiracy are: '(1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme.'" *Mensah-Yawson v. Raden*, 170 F. Supp. 3d 222, 230 (D.D.C. 2016) (quoting *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983)). Making a "bare assertion[] of the existence of an agreement among the conspirators cannot sustain a

conspiracy claim." *Id.* To sustain a common law civil conspiracy claim, a plaintiff must allege the existence of "events, conversations, or documents indicating . . . an agreement or 'meeting of the minds' between [defendants]." *McCreary v. Heath*, 2005 WL 3276257, at *5 (D.D.C. Sept. 26, 2005). Plaintiffs do not meet this bar, as they only allege that President Trump spoke, and others responded. *See* Am. Compl. ¶ 14 (alleging that President Trump directed and therefore conspired with the Proud Boys by making a statement on national television that their group should "stand back"); ¶ 33 (alleging that President Trump calling for his supporters to attend a political rally/protest was a "literal call to arms"—unlike all the other protests held by any other political group that are presumed peaceful by media despite evidence to the contrary); ¶ 37 (alleging that communication by a member of the Proud Boys with a cell phone number from the White House is sufficient to establish that the individual was Trump).

Plaintiffs fail to meet this high pleading standard. Their claim should be dismissed.

## IV.    Plaintiffs fail to state a claim upon which relief may be granted for any District of Columbia claim.

Plaintiffs have brought three claims against President Trump based on alleged District of Columbia law violations in addition to the incitement to riot and disorderly conduct claims explicitly precluded by President Trump's freedom of speech. Each of these claims fails because Plaintiffs' arguments are precluded by President Trump's absolute presidential immunity, the principles of res judicata and President Trump's First Amendment rights to freedom of speech, petition for redress of grievances, and

freedom of association. Even if the claims for assault and battery and intentional infliction of emotional distress were not precluded, Plaintiffs have failed to plead their case as required.

### a. Plaintiffs fail to establish that President Trump aided and abetted or "directed" any action.

Plaintiffs have brought claims for both "directing" and aiding and abetting different crimes. Specifically, "directing" and ratifying assault, aiding and abetting assault, and "directing" intentional infliction of emotional distress. Under D.C. law, aiding and abetting has a similar standard to that of conspiracy, but even though courts and litigants commonly blur the lines, each has a unique standard. The D.C. Circuit has previously held that the "prime distinction" between the standards is that a conspiracy is about an "agreement to participate in a wrongful activity" while aiding and abetting is about "substantial assistance." *Halberstam v. Welch*, 705 F.2d 472, 478 (D.C. Cir. 1983). This distinction and others are critical in determining liability when a specific charge is brought. "For example . . . liability may be based on a more attenuated relation with the principal violation in a conspiracy than in aiding and abetting." *Id.* at 485.

To state a claim for aiding and abetting, a plaintiff must show: "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as party of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation." *Halberstam*, 705 F.2d at 477 (citing *Investors Research Corp. v. SEC,* 628 F.2d 168, 178 (D.C. Cir. 1980)).

In practice, the key consideration for liability under an aiding and abetting theory is "how much encouragement or assistance is substantial enough." *Id.* at 478. The Restatement provides five factors for making this determination: "the nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, his relation to the other [tortfeasor] and his state of mind." *Id.* (citing Restatement (Second) of Torts § 876 (Am. L. Inst. 1979)). In *Halberstam*, the D.C. Circuit took time to distinguish what it termed "pure" aiding and abetting cases from those that it considered to be also arguably conspiracy cases. *Id.* at 481. Such examples set this case in stark contrast to any "pure" aiding and abetting case. Citing *Rael v. Cadena*, 604 P.2d 822 (1979), the D.C. Circuit points out that the usual aiding and abetting case involved explicit encouragement of an action such as "verbal encouragement ('Kill him!' and 'Hit him more!') to an assailant." *Id.*

Plaintiffs apparently seek to hang their hat on the language of *Halberstam* when they claim that "through his words" President Trump "planted the seeds to create a public disturbance" and "planted the seeds that made likely the violence." Am. Compl. ¶¶ 185, 197. In *Halberstam*, the D.C. Circuit did note that "[s]uggestive words may also be enough to create joint liability when they plant the seeds of action and are spoken by a person in an apparent position of authority." *Id.* at 481–82. Plaintiffs, however, misinterpret *Halberstam*. Their claims in support appear to be that President Trump: (1) encouraged the future actions with his rhetoric thereby planting the seeds, and (2) enjoyed the outcome and supported it. The court in *Halberstam* explicitly rejected the latter as a consideration, and the case erodes

Plaintiffs' arguments on the former. *Halberstam* pointedly showed that approval of the actions, taking pleasure in them, and even supporting them without further aid would not be sufficient to create liability. *Id.* at 483 (citing *Duke v. Feldman,* 226 A.2d 345 (Md. 1967)).

Taking the factors from the Restatement and the additional factor from *Halberstam* one at a time, it becomes clear that President Trump did not aid and abet any action at the United States Capitol on January 6, 2021. First, the nature of the act encouraged. Plaintiffs bring several claims each unique in some regard, but they boil down to three main allegations: (1) President Trump incited assaults on individual Plaintiffs, (2) President Trump incited the infliction of emotional distress on Plaintiff Blassingame, and (3) President Trump incited the intimidation of Members of Congress and Vice President Pence. Each of these revolves only around the speech of President Trump, protected on other grounds and also insufficient to establish liability in this case. District of Columbia caselaw recognizes that the nature of the offense in relation to the aiding and abetting is key. Here, President Trump spoke, admonishing the crowd to be peaceful, well before any violence was conducted by anyone listening to his speech. There is little temporal connection compared to aiding and abetting cases commonly cited based on speech when a person acts during or immediately after the speech.

The second factor is the amount of assistance given by the defendant. Plaintiffs tacitly admit that President Trump provided no assistance. He was not even present at the time of the conduct, nor did he provide any equipment, information, or any

other kind of assistance. Plaintiffs' claims are solely based on President Trump's speech. President Trump's speech can be of minimal assistance to Plaintiffs' case as he explicitly admonished the crowd to be peaceful.

Third, the defendant's presence or absence at the time of the tort. As discussed previously and admitted by Plaintiffs several times, President Trump was not present at the United States Capitol at any time on January 6, 2021.

Fourth, the defendant's relation to the other tortfeasors. Plaintiffs also admit that President Trump has no relationship with the tortfeasors in this case. They may be supporters of President Trump, but they are not persons known to President Trump.

Fifth, the defendant's state of mind. Plaintiffs allege that President Trump took pleasure in the news coverage of the events on January 6, 2021. But Plaintiffs even admit that President Trump took several actions to try to stop the actions on January 6. *See* Am. Compl. ¶ 118 (showing President Trump's tweet asking people to "[s]tay peaceful!"), ¶ 155 (explaining that President Trump made statements in the late afternoon). They do not otherwise allege anything as to state of mind. As *Halberstam* clearly stated, taking pleasure in something does not constitute aiding and abetting. *See Halberstam,* 705 F.2d at 483.

Sixth and finally, as *Halberstam* held, the duration of the assistance also weighs heavily on the determination. Here, President Trump's supposed assistance was brief and consisted of sporadic tweets and speeches. President Trump's relationship to the true damages in this case is tangential and tenuous at best.

Therefore, as *Halberstam* points out, conspiracy would have been the stronger argument as "liability may be based on a more attenuated relation with the principal violation in a conspiracy than in aiding and abetting." *Id.* at 485. Plaintiffs also have been unable to sufficiently plead a conspiracy claim, as discussed at length above.

Furthermore, President Trump was not aware of any plan or his role in those plans. Plaintiffs have not credulously alleged any knowledge on behalf of President Trump. Plaintiffs also have not alleged that President Trump *knowingly and substantially assisted* in the principal violations. Plaintiffs have not alleged President Trump was even involved in the principal violations at the United States Capitol.

Moreover, Plaintiffs allege that President Trump directed or ratified several crimes "by his words and conduct". Am. Compl. ¶ 153. Plaintiffs also allege that President Trump had influence over the individuals who caused their harms and should be held liable because he did not attempt to stop the ongoing events at the Capitol. Am. Compl. ¶ 154. Yet Plaintiffs have not satisfactorily answered how President Trump could be "directing" these actions when the persons taking the actions were not listening to him—President Trump explicitly requested that protestors be peaceful, he explicitly asked them to respect law enforcement, and he explicitly asked them to leave the Capitol. *See* Am. Compl. ¶ 118 (President Trump's tweet urging people to "support our Capitol Police and Law Enforcement" and "[s]tay peaceful!"), ¶ 127 (President Trump's tweet telling people to "[g]o home with love & in peace"). That protestors that were responsible for any injuries to Plaintiffs failed

to comply with the President's requests, demonstrates that President Trump did not have control over their actions and was not directing them.

To sustain their claim that President Trump directed or ratified the assault and battery, Plaintiffs would have to allege facts proving that an agency relationship exists between President Trump and the individuals who caused Plaintiffs' harm. They have not done so. "An agency relationship requires the existence of three elements: (1) the principal must manifest a desire for the agent to act on the principal's behalf; (2) the agent must consent to act on the principal's behalf; and (3) the principal must have the right to exercise control over the agent with respect to matters entrusted to the agent." *Kaiser Grp. Int'l, Inc. v. World Bank*, 420 F. App'x 2, 5 (D.C. Cir. 2011) (citing *Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 849 (D.C. Cir. 2000)). "An essential element of agency is the principal's right to control the agent's actions." *Hollingsworth v. Perry*, 570 U.S. 693, 713 (2013) (citing 1 Restatement (Third) of Agency § 1.01, cmt. f (Am. L. Inst. 2005)). Directing or ratifying assault or battery is usually claimed against employers whose employees committed the assault or battery while acting within the scope of their employment. *See, e.g.*, *Maniaci v. Georgetown Univ.*, 510 F. Supp. 2d 50, 64 (D.D.C. 2007) (finding Plaintiffs adequately plead a theory of direct liability against employer University because University officials ratified employees' conduct by directing and controlling their actions and then doing nothing to stop the tortious conduct).

Therefore, President Trump was not engaged in a conspiracy, nor was he aiding and abetting or "directing" any crime, especially assault. While Plaintiffs injuries are

appalling, President Trump is not the party responsible for them. Plaintiffs should pursue their remedies against the people responsible for their injuries.

### 1. Plaintiffs fail to state a claim against President Trump for assault or battery.

To establish an assault under District of Columbia law, a plaintiff must show three elements: (1) "an act on the part of the defendant," (2) "at the time the defendant commits the act, he or she must have the apparent present ability to injure or frighten the victim," and (3) "at the time the act is committed, the defendant must have the intent to perform the act which constitutes the assault." *Parks v. U.S.,* 627 A.2d 1, 5 (D.C. 1993) (citing *Williamson v. United States*, 445 A.2d 975, 978 (D.C. 1982).

As discussed above, the Restatement factors for aiding and abetting and agency liability do not apply to President Trump under these charges. President Trump was not present during the alleged assaults and batteries, nor did he condone or ratify the conduct. In fact, President Trump multiple times asked for peace and calm. President Trump was not present at the time of any of the alleged assaults or batteries, nor was he strongly temporally linked to the assaults. President Trump specifically spoke to the individuals at the Ellipse, who according to the cell phone data cited by Plaintiffs did not arrive at the Capitol for *hours* after the speech. This left plenty of time for them to cool off and consider their actions even if President Trump's words had not explicitly admonished them to be peaceful.

### 2. *Plaintiff Blassingame fails to state a claim against President Trump for intentional infliction of emotional distress.*

To state a claim for intentional infliction of emotional distress Plaintiff must plausibly plead facts showing "(1) extreme and outrageous conduct on the part of the defendant[], which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." *Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1260 (D.C. 2016). "The standard for 'extreme and outrageous conduct' is exceptionally demanding. 'Conduct is considered "extreme and outrageous" when it is "so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Bonner v. S-FER Int'l, Inc.*, 207 F. Supp. 3d 19, 25 (D.D.C. 2016). Insults, threats, and indignities are insufficient for meeting this rigorous standard. *Id.* The harm suffered by a plaintiff must include severe emotional distress, "of so acute a nature that harmful physical consequences are likely to result." *Mann*, 150 A.3d at 1261.

Plaintiffs have not and cannot meet this high standard. As an initial matter, they have pled political speech by Defendants they apparently found distasteful. Then they pled that they were assaulted by individuals that have no affiliation or relationship with President Trump. Finally, they alleged that these same assaulters used a racial slur against him. President Trump is in no way responsible for the actions or language used by others, as vile as they might be. These pleadings do not and cannot meet the rigorous standard for extreme and outrageous conduct against President Trump.

41

## CONCLUSION

For the foregoing reasons, President Trump respectfully requests this Court dismiss Plaintiffs' Amended Complaint in its entirety with prejudice.

Dated: June 24, 2021                    Respectfully submitted,


/s/ Jesse R. Binnall
Jesse R. Binnall (VA022)
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, VA 22314
Tel: (703) 888-1943
Fax: (703) 888-1930
jesse@binnall.com
*Attorney for Donald J. Trump*

## CERTIFICATE OF SERVICE

I certify that on June 24, 2021, a copy of the foregoing was filed with the Clerk of the Court using the Court's CM/ECF system, which will send a copy to all counsel of record.


Dated: June 24, 2021                                    /s/ Jesse R. Binnall
                                                        Jesse R. Binnall
                                                        *Attorney for Donald J. Trump*