**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JAMES BLASSINGAME and SIDNEY HEMBY, | Case No. 1:21-cv-858-APM |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, | |
| Defendant. | |

## BRIEF OF AMICI CURIAE FLOYD ABRAMS, ERWIN CHEMERINSKY, MARTHA MINOW, AND LAURENCE H. TRIBE IN SUPPORT OF THE PLAINTIFFS

STEVEN A. HIRSCH - #171825
shirsch@keker.com
NIC MARAIS - # 277846
nmarais@keker.com
*Counsel of Record*
MATAN SHACHAM - #262348
mshacham@keker.com
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone:        415 391 5400
Facsimile:        415 397 7188

*Attorneys for Movants and Proposed Amici Curiae Floyd Abrams, Erwin Chemerinsky, Martha Minow, and Laurence H. Tribe*

## <u>TABLE OF CONTENTS</u>

**Page**

I.     STATEMENT OF INTEREST ........................................................................... 1

II.    INTRODUCTION ......................................................................................... 3

III.   ARGUMENT ............................................................................................... 5

      A.    Section 1985(1) is one of a suite of statutes, developed since the Civil
            War, prohibiting acts of political intimidation that sometimes are carried
            out by means of speech. ..................................................................... 5

      B.    Although they likely apply here, the incitement and true-threat exceptions
            to First Amendment protection are too narrow to preserve the
            effectiveness of the political-intimidation statutes. ............................... 10

      C.    The Court's ruling on the defendants' motions to dismiss should clarify
            that § 1985(1), like the other political-intimidation statutes, proscribes
            speech that falls within the historically unprotected category of "speech
            integral to a crime or tort." ................................................................ 12

      D.    The integral-speech exception furnishes additional grounds for rejecting
            the defendants' overbreadth and vagueness assertions. .......................... 20

IV.    CONCLUSION .......................................................................................... 22

1714971

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Barr v. Clinton*,
370 F.3d 1196 (D.C. Cir. 2004)........................................................................18, 19

*Brandenburg v. Ohio*,
395 U.S. 444 (1969)...........................................................................................4, 10, 16

*Broadrick v. Oklahoma*,
413 U.S. 601 (1973).........................................................................................20, 21

*Buckeye Check Cashing, Inc. v. Cardegna*,
546 U.S. 440 (2006)..............................................................................................9

*Cox v. Louisiana*,
379 U.S. 559 (1965)...............................................................................................13

*Giboney v. Empire Storage & Ice Co.*,
336 U.S. 490 (1949)...............................................................................................13

*Griffin v. Breckenridge*,
403 U.S. 88 (1972)................................................................................................17

*Jennings v. Rodriguez*,
138 S. Ct. 830 (2018)..............................................................................................17

*League of United Latin Am. Citizens v. Public Interest Legal Found.*,
No. 1:18-cv-00423, 2018 WL 3848404 (E.D. Va. Aug. 13, 2018) ........................9

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964)...............................................................................................19

*Nat'l Coalition on Black Civic Participation v. Wohl*,
498 F. Supp. 3d 457 (S.D.N.Y. 2020).................................................................11, 12

*Nat'l Org. for Women v. Operation Rescue*,
37 F.3d 646 (D.C. Cir. 1994)................................................................................13

*New York Times Co. v. United States (Pentagon Papers Case)*,
403 U.S. 713 (1971)...............................................................................................16

*New York v. Ferber*,
458 U.S. 747 (1982).............................................................................................13, 21

1714971

*Rumsfeld v. FAIR*,
    547 U.S 47 (2006) ......................................................................................13

*Spagnola v. Mathis*,
    809 F.2d 16 (D.C. Cir. 1986), *on reh'g*, 859 F.2d 223 (D.C. Cir. 1988) ................................17

*Stern v. U.S. Gypsum, Inc.*,
    547 F.2d 1329 (7th Cir. 1977) ......................................................................6, 18

*United States v. Alvarez*,
    567 U.S. 709 (2012) .....................................................................................13

*United States v. Nguyen*,
    673 F.3d 1259 (9th Cir. 2012) .........................................................................11

*United States v. O'Brien*,
    391 U.S. 367 (1968) .....................................................................................20

*United States v. Price*,
    951 F.2d 1028 (9th Cir. 1991) .........................................................................19

*United States v. Rowlee*,
    899 F.2d 1275 (2d Cir. 1990) ..........................................................................13

*United States v. Stevens*,
    559 U.S. 460 (2010) .....................................................................................16

*United States v. Weiss*,
    475 F. Supp. 3d 1015 (N.D. Cal. 2020) .........................................................14, 15

*Vill. of Hoffman Estates. v. Flipside, Hoffman Estates, Inc.*,
    455 U.S. 489 (1982) .....................................................................................21

*Virginia v. Black*,
    538 U.S. ..............................................................................................10, 13

*Virginia v. Black*,
    538 U.S. 343 (2003) ..............................................................................4, 12, 19

*Virginia v. Hicks*,
    539 U.S. 113 (2003) ................................................................................20, 21

*Windsor v. The Tennessean*,
    719 F.2d 155 (6th Cir. 1983) ..........................................................................19

**State Cases**

*State v. Shackelford*,
    825 S.E.2d 689 (N.C. App. 2019) .....................................................................14

*Matter of Welfare of A. J. B.*,
   929 N.W.2d 840 (Minn. 2019) ........................................................................................14

**Federal Statutes**

3 U.S.C. § 15 ..............................................................................................................................5

18 U.S.C. § 372 ..........................................................................................................................6

18 U.S.C. § 1505 ......................................................................................................................18

42 U.S.C. § 1985(1) ........................................................................................................... *passim*

42 U.S.C. § 1985(3) ................................................................................................... 3, 6, 9, 19

§ 131(b) of the Civil Rights Act of 1957, 52 U.S.C. § 10101(b) .................................... 6, 8, 9, 20

§ 11(b) of the Voting Rights Act of 1965, 52 U.S.C. § 10307(b) ........................................ *passim*

**Miscellaneous**

Ben Cady & Tom Glazer, *Voters Strike Back: Litigating Against Modern Vote
   Intimidation*, 39 N.Y.U. REV. OF L. & SOCIAL CHANGE 173 (2015) .............................. *passim*

ERIC FONER, RECONSTRUCTION: AMERICA'S UNFINISHED REVOLUTION (updated
   ed. 2014) .................................................................................................................................8

Eugene Volokh, *The Speech Integral to Criminal Conduct Exception*, 101
   CORNELL L. REV. 981 (2016) .................................................................................... 15, 16, 17

KEITH WERHAN, FREEDOM OF SPEECH: A REFERENCE GUIDE TO THE UNITED
   STATES CONSTITUTION (2004) .............................................................................................12

Nicholas Mosvick, *Looking Back at the Ku Klux Klan Act*, CONSTITUTION DAILY,
   NATIONAL CONSTITUTION CENTER (Apr. 20, 2021) ...............................................................8

Note, *The Support or Advocacy Clause of § 1985(3)*, 133 HARV. L. REV. 1382
   (2020) .....................................................................................................................................7

Richard Primus & Cameron O. Kistler, *The Support-or-Advocacy Clauses*, 89
   FORDHAM L. REV. 145 (2020) ................................................................................................6

1 RODNEY A. SMOLLA, SMOLLA AND NIMMER ON FREEDOM OF SPEECH § 10.35
   (2021) ...................................................................................................................................14

1714971

## I.      STATEMENT OF INTEREST[1]

Amici curiae are Constitutional and First Amendment scholars and practitioners who have an interest in the courts' striking an appropriate balance between, on the one hand, the First Amendment rights of free speech, association, and petition, and on the other, the government's ability to carry out its functions—which include preventing the political intimidation of federal officials, voters, and those who seek to support and advocate for candidates for federal office.[2]

**Floyd Abrams** is Senior Counsel at Cahill Gordon & Reindel in New York, a Visiting Lecturer at Yale Law School, and a Lecturer in Law at Columbia Law School. For 15 years he taught as well at the Columbia Graduate School of Journalism as the Willian J. Brennan Jr. Visiting Lecturer in First Amendment law. For the last half century he has been counsel or co-counsel in numerous First Amendment cases of note including, among others, *New York Times Co. v. United States (Pentagon Papers Case)*, 403 U.S. 713 (1971); *Landmark Communications Inc. v. Virginia*, 435 U.S. 829 (1978); *Smith v. Daily Mail Publishing Co.*, 443 U.S. 97 (1979); *Herbert v. Lando*,   441 U.S. 153 (1979); *McConnell v. Federal Election Commission*, 540 U.S. 93 (2003); and *Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010). He has written three books about the First Amendment—*Speaking Freely: Trials of the First Amendment* (2005); *Friend of the Court: On the Front Lines with the First Amendment* (2013); and *The Soul of the First Amendment* (2017). He has published numerous articles about the First Amendment and received numerous awards for his work in the area.

**Erwin Chemerinsky** is the Dean of the University of California Berkeley School of Law, where he holds the title of Jesse H. Choper Distinguished Professor of Law. He frequently argues appellate cases, including in the United States Supreme Court. He is the author of 14 books, including leading casebooks and treatises about constitutional law, criminal procedure,

---

[1] No party's counsel authored this brief in whole or in part; and no person, party, or party's counsel contributed money that was intended to fund preparing or submitting this brief, which was prepared on a *pro bono* basis.

[2] Amici have moved the Court under Local Civil Rule 7(o)(2) for an order granting leave to file this brief.

1

and federal jurisdiction, and has authored over 200 law-review articles. His most recent books are *Presumed Guilty: How the Supreme Court Empowered the Police and Subverted Civil Rights* (2021) and *The Religion Clauses: The Case for Separating Church and State* (2020) (with Howard Gillman). In 2017, *National Jurist* magazine again named Dean Chemerinsky as the most influential person in legal education in the United States. In 2016, he was named a fellow of the American Academy of Arts and Sciences.

**Martha Minow** is the 300th Anniversary University Professor at Harvard University and former dean of Harvard Law School. She is the author or editor of 18 books and has authored over 200 law-review articles. Her most recent books are *Saving the News: Why the Constitution Calls for Government Action to Preserve Freedom of Expression* (2021) and *When Should Law Forgive?* (2019). Her many public lectures include the 2017 Alexander Meikeljohn Lecture on the First Amendment at Brown University. A fellow of the American Academy of Arts and Sciences and a fellow of the American Philosophical Society, she has received nine honorary degrees from universities in three nations as well as numerous awards, including the Sacks-Freund Award for Excellence in Teaching, Harvard Law School. She currently serves on the board of public media entity GBH, and previously served on the board of the CBS Corporation.

**Laurence H. Tribe** is the Carl M. Loeb University Professor and Professor of Constitutional Law *Emeritus* at Harvard. He has written over 115 articles and books, including his treatise, *American Constitutional Law*, cited more than any other legal text since 1950. He has prevailed in numerous cases that he argued in the U.S. Supreme Court, including the following First Amendment cases: *United States v. United Foods*, 533 U.S. 405 (2001) (First Amendment precludes forcing mushroom growers to pay for generic advertising campaign unrelated to substantive regulation of mushroom market); *Sable Communications of California, Inc.. v. FCC*, 492 U.S. 115 (1989) (Congress may not abolish non-obscene "dial-a-porn" services where methods of keeping children from accessing such services are not shown to be unavailable); *Board of Education of Oklahoma City v. National Gay Task Force*, 470 U.S. 903 (1985) (First Amendment protects gay-rights advocacy in public schools); *Richmond*

*Newspapers v. Virginia*, 448 U.S. 555 (1980) (press and public have right to attend criminal trials). He also prevailed without argument in *Boston v. Anderson*, 439 U.S. 951, 1389 (1978) (state court may not prohibit free speech by municipality on referendum issue pending before the people in statewide election). Professor Tribe helped write the constitutions of South Africa, the Czech Republic, and the Marshall Islands. He was elected to the American Academy of Arts and Sciences in 1980 and was elected to the American Philosophical Society in 2010. He holds 11 honorary degrees.

## II.    INTRODUCTION

The defendants in all three January 6 Suits[3] pending before this Court have moved the Court to dismiss claims that the plaintiffs have asserted under 42 U.S.C. § 1985(1), originally part of the Ku Klux Klan Act of 1871. Broadly speaking, § 1985(1) creates a civil cause of action against persons who conspire to use force, intimidation, or threats to prevent federal officials from carrying out their duties. The defendants argue that § 1985(1), at least as applied here, violates their First Amendment right to engage in "political speech." Amici believe that it is important not only to reject plaintiffs' spurious and thinly developed First Amendment defenses, but to do so on grounds that preserve the effectiveness of political-intimidation statutes generally.

Section 1985(1) is one of a suite of political-intimidation statutes enacted at critical turning points in the nation's history—the post-Civil War Reconstruction and the civil-rights movement of the 1950s and 1960s. Among other things, these statutes prohibit threatening federal officials to prevent them from carrying out their duties, threatening citizens to prevent them from voting freely, and threatening anyone for supporting or failing to support federal candidates. To say that these statutes were hard-won would be a gross understatement. It took the

---

[3] Throughout this brief, **(1)** "January 6 Suits" refers collectively to Thompson v. Trump, No. 1:21-cv-00400-APM, Swalwell v. Trump, No. 1:21-cv-00586-APM, and Blassingame v. Trump, No. 1:21-cv-00858-APM; **(2)** unless otherwise indicated, emphases were added to quotations and internal punctuation, footnotes, and citations were omitted from them; and **(3)** for convenience, we refer to 42 U.S.C. §§ 1985(1) and 1985(3) as "statutes," although they are actually clauses of the same statute.

bloodiest war of the Nineteenth Century and a violently opposed civil-rights movement to put these laws on the books.

Because the political-intimidation statutes share common terms that implicate speech—"conspire," "intimidate," "threat"—they are collectively vulnerable to erosion by inapt interpretations and applications of the First Amendment. Here, for example, the defendants assert that the plaintiffs' § 1985(1) claims cannot survive First Amendment scrutiny unless they fall within one of two carefully circumscribed exceptions to First Amendment coverage: the "incitement" exception for speech that is "directed to inciting or producing imminent lawless action and is likely to incite or produce such action," *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969), and the "true threat" exception, which denies First Amendment protection to "statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Virginia v. Black*, 538 U.S. 343, 359–60 (2003). Amici do not dispute that the incitement and true-threat exceptions apply to the facts alleged in the January 6 Suits. But many modern forms of political intimidation do not involve inciting imminent lawless action or threatening to inflict physical violence; and there is uncertainty about the degree of intent that a litigant must prove in order to invoke the true-threat exception. Although both exceptions very likely apply here, a ruling that limited the political-intimidation statutes to those circumscribed scenarios would sharply curtail the reach of these statutes at a time when voting, and the public officials who administer voting, are under relentless partisan attack—as the facts of January 6 attest.

Amici therefore suggest that, in addition to determining whether the incitement and true-threat exceptions apply here, the Court should rely upon the long-recognized, categorical exception to First Amendment coverage for speech that is integral to the commission of a crime or tort—speech, in other words, that is the very vehicle by which a crime or tort is committed. That exception is peculiarly appropriate here, where the speech in question is integral to antidemocratic conduct that federal law has proscribed for 150 years. Below, amici accordingly urge the Court to apply a categorical First Amendment exception for speech integral to the forms

4

of political intimidation proscribed by § 1985(1). We believe that this approach not only accords with relevant First Amendment principles but also helps to ensure the continued efficacy of the nation's legal infrastructure for controlling political intimidation. As the facts of January 6 make clear, that infrastructure is as important to the survival of our democracy as it has ever been.

## III.    ARGUMENT

### A.    Section 1985(1) is one of a suite of statutes, developed since the Civil War, prohibiting acts of political intimidation that sometimes are carried out by means of speech.

Section 1985(1) is one of a suite of political-intimidation statutes, enacted between 1871 and 1965, encompassing the intimidation of federal officials and voters. Each of these statutes targets the use, or threat to use, *coercion* to intimidate federal officials or voters or both. Since each of these statutes contains terms describing forms of intimidation that are sometimes carried out by means of speech—i.e., "conspire," "intimidate," "threaten"—they are all potentially vulnerable to ill-considered First Amendment defenses.

**Federal-official intimidation.** 42 U.S.C. § 1985(1), originally part of the Ku Klux Klan Act of 1871 ("Klan Act"), protects federal officials from intimidation aimed at preventing them from carrying out their duties—including, in this case, the duty of Congresspersons under the Twelfth Amendment and the Electoral Count Act of 1887[4] to engage in the process of certifying the Electoral College vote. Section 1985(1) thus creates a civil cause of action (including a damages remedy) against persons who

> *conspire* **[1]** to prevent, by force, *intimidation*, or *threat*, any person from accepting or holding any office, trust, or place of confidence under the United States, or from discharging any duties thereof; or **[2]** to induce *by like means* any officer of the United States to leave any State, district, or place, where his duties as an officer are required to be performed, or **[3]** to injure him in his person or property on account of his lawful discharge of the duties of his office, or while engaged in the lawful discharge thereof, or **[4]** to injure his property so as to molest, interrupt, hinder, or impede him in the discharge of his official duties . . . .[5]

---

[4] 3 U.S.C. § 15.

[5] Bracketed numbers added.

Notably, the "force, intimidation, or threat" requirement, potentially implicating speech, applies only to clauses [1] and [2]; it is absent from the "injury" clauses, [3] and [4]. *See Stern v. U.S. Gypsum, Inc*., 547 F.2d 1329, 1336 (7th Cir. 1977). A criminal counterpart to § 1985(1) exists at 18 U.S.C. § 372.

**Voter intimidation.** Three federal statutory provisions create civil causes of action for voter intimidation.[6]

1.     42 U.S.C. § 1985(3), another provision that was originally part of the Klan Act, features two so-called "support-or-advocacy clauses."[7] The first such clause protects voters from intimidation aimed at preventing them from giving support or advocacy to electors or candidates in federal elections. (Henceforth, we will use the shorthand "§ 1985(3)" to refer to this first support-or-advocacy clause.) Section 1985(3)—which, like § 1985(1), is phrased as a conspiracy statute—creates a civil cause of action, including a damages remedy, against persons who

> *conspire* to prevent by force, *intimidation*, or *threat*, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States.

2.     Unlike §§ 1985(1) and 1985(3) of the Klan Act, § 131(b) of the Civil Rights Act of 1957, 52 U.S.C. § 10101(b), does not require proof of a conspiracy. Instead, it provides:

> No person, whether acting under color of law or otherwise, shall *intimidate*, *threaten*, coerce, or *attempt to intimidate, threaten*, or coerce any other person for the purpose of interfering with the right of such other person to vote or to vote as he may choose, or of causing such other person to vote for, or not to vote for, any candidate for [federal] office . . . .

3.     Another voter-intimidation statute gaining increasing attention in voting-rights circles is § 11(b) of the Voting Rights Act of 1965, 52 U.S.C. § 10307(b).[8] Section 11(b)

---

[6] Ben Cady & Tom Glazer, *Voters Strike Back: Litigating Against Modern Vote Intimidation*, 39 N.Y.U. REV. OF L. & SOCIAL CHANGE 173, 177 n.17 (2015) [hereinafter *Voters Strike Back*].

[7] *See* Richard Primus & Cameron O. Kistler, *The Support-or-Advocacy Clauses*, 89 FORDHAM L. REV. 145, 156 (2020) (identifying the support-or-advocacy clauses).

[8] *See Voters Strike Back* at 176–77.

prohibits the intimidation *both* of voters *and* of public officials engaged in vindicating voting rights:

> No person, whether acting under color of law or otherwise, shall *intimidate, threaten*, or coerce, or *attempt to intimidate, threaten*, or coerce any person for voting or attempting to vote, or *intimidate, threaten*, or coerce, or *attempt to intimidate, threaten*, or coerce any person for urging or aiding any person to vote or attempt to vote, or *intimidate, threaten*, or coerce any person for exercising any powers or duties under [federal laws relating to election monitoring and litigation].

In passing these laws, "Congress act[ed] with a keen awareness of history." Ben Cady & Tom Glazer, *Voters Strike Back: Litigating Against Modern Vote Intimidation*, 39 N.Y.U. REV. OF L. & SOCIAL CHANGE 173, 182 (2015) [hereinafter *Voters Strike Back*]. Congress "understood itself to be correcting the nation's past mistakes iteratively, by building and expanding on solutions it had tried before but had not quite gotten right." *Id.* at 181–82. Of particular note, Congress passed the Klan Act in 1871 during Reconstruction and passed the Voting Rights Act during the civil-rights era of the 1960s. "These were defining national episodes. And these statutes were correspondingly ambitious in scope, seeking a real way to define the terms of national citizenship. In doing so, these laws grappled directly with the long history of exclusion in American politics." *Id.* at 181.

During Reconstruction, when the Klan Act became law, "sweeping changes" in the ability of African Americans to vote and hold office prompted southern whites to respond with a "sustained campaign of voter intimidation through terrorism and violence," directed not only at African Americans but also at white Republicans and Union sympathizers. *Voters Strike Back* at 184–85; *see also* Note, *The Support or Advocacy Clause of § 1985(3)*, 133 HARV. L. REV. 1382, 1389 (2020). "During the debates over the Klan Act, the bill's supporters repeatedly described the reign of terror imposed by the Klan upon black citizens and their white sympathizers in the southern states. These violent acts went unpunished, legislators asserted, because Klan members and sympathizers were powerful enough that law enforcement would not arrest them, juries

7

1714971

refused to convict, and judges would not hold fair trials."[9] Nicholas Mosvick, *Looking Back at the Ku Klux Klan Act*, Constitution Daily, National Constitution Center (Apr. 20, 2021). The Act's overall purpose, therefore, was "to protect individuals' rights of national citizenship, including the right to vote," and its supporters understood that its provisions creating a wide range of federal penalties "entailed a newly expansive view of federal power." *Voters Strike Back* at 1985–86. "By 1872, the federal government's evident willingness to bring its legal and coercive authority to bear had broken the Klan's back and produced a dramatic decline in violence throughout the South." Eric Foner, Reconstruction: America's Unfinished Revolution 617 (updated ed. 2014) [hereinafter Reconstruction].

But Reconstruction ended in 1877 with a political compromise to resolve the contested 1876 presidential election. *Voters Strike Back* at 1985–86. As part of that compromise, federal troops stationed in the South were ordered to withdraw from southern political affairs. *Id*. At that point, the entire nation—North and South—effectively colluded to abandon the fate of its black citizens to those who would abolish their democratic rights. *See generally* Reconstruction at 762–94.

Southern states rushed into the void, again erecting barriers to black voters and ushering in the Jim Crow era. *Voters Strike Back* at 187. Post-Reconstruction, "an elaborate system of poll taxes, literacy tests, grandfather clauses, and other discriminatory policies barred many African Americans from even registering to vote." *Id*. at 187. In response, Congress enacted the Civil Rights Act of 1957 as "a compromise measure designed to pass through Congress without driving a wedge between the Northern and Southern factions of both parties." *Id*. at 188. Although § 131(b) (quoted above) barred interference with the right to vote in all federal elections, the law was hobbled by lack of federal enforcement power and a judicially imposed requirement that claims be supported by a showing of "purposeful discrimination." *Id*. at 189.

---

[9] *Available at* https://constitutioncenter.org/blog/looking-back-at-the-ku-klux-klan-act.

1714971

The South's violent (and televised) response to the 1960s civil-rights movement altered the political landscape, giving impetus to the Voting Rights Act of 1965. *Id*. at 189–90. Section 11(b) represented "a deliberate attempt to expand the existing laws against voter intimidation" by eliminating § 131(b)'s requirement of purposeful racial discrimination. *Id*.; *see League of United Latin Am. Citizens v. Public Interest Legal Found.*, No. 1:18-cv-00423, 2018 WL 3848404, at *3 (E.D. Va. Aug. 13, 2018) (contrasting §§ 11(b) and 131(b) to establish that § 11(b) doesn't require proving racial animus or specific intent to intimidate). And unlike the Klan Act, § 11(b) requires no proof of a conspiracy. *Id*. at 192.

The statute at issue in the January 6 Suits—§ 1985(1)—thus should be viewed as part of a powerful suite of statutes that plays a vital role in stamping out all forms of political intimidation, old and new. But all four statutes remain potentially vulnerable to the type of excessively protective and legally erroneous First Amendment defenses raised in this case. In particular, all four statutes refer to *intimidation* (a type of conduct *often* carried out through the use of speech)[10] and to *threat* (a type of conduct *nearly always* carried out through the use of speech).[11] And both Klan Act provisions (§§ 1985(1) and 1985(3)) additionally require proof of *conspiracy*—again, conduct effectuated through speech, using the mechanism of a conspiratorial agreement. *See generally Voters Strike Back* at 206.

Under an expansive application of the "whole code canon" of statutory interpretation, courts might hold that these shared terms should be construed consistently, even across different acts or titles of the United States Code. *See Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 448 n.3 (2006); *see also Voters Strike Back* at 195 n.143 (suggesting that § 1985(1) is *in pari materia* with §§ 11(b) and 131(b)). And on that basis, courts might apply the same ill-

---

[10] To "intimidate" is "to make timid or fearful; inspire or affect with fear; frighten, especially to compel action or inaction (as by threats)." *Voters Strike Back* at 196–97 (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1184 (1961)).

[11] A "threat" is "an expression of an intention to inflict evil, injury, or damage on another, usually as punishment for something done or left undone." *Voters Strike Back* at 197 (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2382 (1961)).

considered defenses—rooted in a misreading of the First Amendment—to each of the political-intimidation statutes. Thus, the way the Court approaches the defendants' First Amendment defenses in this case could have repercussions for the entire suite of political-intimidation statutes—not just § 1985(1).

   B.   **Although they likely apply here, the incitement and true-threat exceptions to First Amendment protection are too narrow to preserve the effectiveness of the political-intimidation statutes.**

The political-intimidation statutes' shared references to conduct that is typically carried out through speech ("conspire," "intimidate," "threaten") enable future defendants to argue—as the defendants here do—that cases brought under these statutes violate the First Amendment *unless* the facts of the case can be shoehorned into either of two closely cabined First Amendment exceptions: the *Brandenburg* "incitement" exception and the so-called "true threat" exception. Although both exceptions very likely apply here, a ruling that limited the political-intimidation statutes to those circumscribed scenarios would sharply curtail the reach of these statutes at a time when they have never been more important.

Under the incitement exception, speech lacks First Amendment protection if it was "directed to inciting or promoting imminent lawless action and [was] likely to incite or produce such action." *Brandenburg*, 395 U.S. at 447. Under the true-threat exception, no First Amendment protection attaches to "statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Virginia v. Black*, 538 U.S. at 359–60. This prohibition on true threats "protects individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur." *Id.* "Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death." *Id.*

Amici harbor little doubt that § 1985(1), as applied to the facts of the January 6 insurrection, falls within the incitement and true-threat exceptions; and we expect that the plaintiffs in those litigations will be able to establish as much. But that is not all that the Court should say on the subject, because many forms of modern political intimidation do *not* fall into either exception, and a judicial opinion that made those exceptions the test of whether political intimidation can be punished could have unintended consequences harmful to our democracy.

Although the January 6 insurrection may be the most spectacular example of incitement and "true threat" in American history, modern political intimidation often takes subtler forms that these statutes can address effectively—if they do not become neutered by a mistaken application of First Amendment principles. Today, for example, "voters are rarely overtly threatened with physical or economic harm as they were during the civil rights era; instead, voters are deterred from voting through subtler tactics, such as aggressive poll-watching, anonymous threats of harm, frivolous and excessive voter registration challenges, and coercion by employers." *Voters Strike Back* at 178; *see also id.* at 215–25. Modern political intimidation embraces a wide and ever-expanding range of coercive tactics, including onsite voter harassment and legally baseless offsite threats of legal harm. *Id.* at 214; *see, e.g., United States v. Nguyen*, 673 F.3d 1259 (9th Cir. 2012) (concerning threats of adverse immigration actions); *Nat'l Coalition on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 465 (S.D.N.Y. 2020) (concerning robocall threats that mail-in voters would face adverse actions by police and credit-card companies, as well as mandatory vaccinations). Section 11(b), in particular, places in the hands of both voters and federal officials a potentially powerful weapon for challenging and overcoming these "softer" forms of political intimidation.

Confining the efficacy of these statutes to cases in which plaintiffs can prove an intent to incite imminent lawlessness or to credibly threaten violence against a specific person or group would deal a devastating blow to Congress's successive and increasingly effective attempts to eliminate political intimidation. For example, because the incitement exception traditionally has

11

been restricted to advocacy before an audience,[12] it may lack relevance to any "secret plotting" that went on beforehand. And the true-threat exception poses a particular risk to the political-intimidation statutes, as a circuit split exists on the question whether the exception merely requires proof that a reasonable observer would perceive the threat as real, or also requires proof that the speaker subjectively intended the speech to be taken as a threat. *See Voters Strike Back* at 209–10. If the latter position were to prevail, the true-threat exception could work to undermine important statutory protections for our democratic system. *See id*. at 208 (observing that true-threat ruling in *Virginia v. Black* "presents a potential difficulty for § 11(b), as Congress apparently meant to prohibit intimidation that occurs without regard to the speaker's intent."). In addition, the courts have not settled whether the true-threat exception covers threats of nonviolent or nonphysical harm. *See Wohl*, 498 F. Supp. 3d at 479.

The incitement and true-threat exceptions almost certainly apply here; but they are not enough on their own. A better approach would set the political-intimidation statutes on firmer constitutional ground, the better to safeguard American democracy. Amici suggest such an approach below.

> **C.    The Court's ruling on the defendants' motions to dismiss should clarify that § 1985(1), like the other political-intimidation statutes, proscribes speech that falls within the historically unprotected category of "speech integral to a crime or tort."**

The Court's ruling on the defendants' First Amendment defenses to the plaintiffs' § 1985(1) claims will have to grapple with the application of the incitement and true-threat exceptions to First Amendment coverage. But the political-intimidation statutes are constitutionally defensible on broader grounds that we set forth below.

The protections afforded by the First Amendment "are not absolute," and the Supreme Court has "long recognized that the government may regulate certain categories of expression" that "are 'of such slight social value as a step to truth that any benefit that may be derived from

---

[12] *See* KEITH WERHAN, FREEDOM OF SPEECH: A REFERENCE GUIDE TO THE UNITED STATES CONSTITUTION 66 (2004).

them is clearly outweighed by the social interest in order and morality.'" *Virginia v. Black*, 538 U.S. at 358–59 (quoting *Chaplinsky v. New Hampshire,* 315 U.S. 568, 571–72 (1942)). These "content-based restrictions on speech have been permitted, as a general matter, only when confined to the few historic and traditional categories of expression long familiar to the bar. Among these categories are . . . speech integral to criminal conduct." *United States v. Alvarez*, 567 U.S. 709, 717 (2012).[13]

The leading case on this "integral-speech exception" to First Amendment coverage is *Giboney v. Empire Storage & Ice Co*., 336 U.S. 490 (1949). In an often-cited opinion, the Supreme Court rejected "the contention that conduct [that is] otherwise unlawful is always immune from state regulation [merely] because an integral part of that conduct is carried on by" means of speech. *Id*. at 498.

Following *Giboney*, courts repeatedly have held that making a "course of conduct" illegal "has never been deemed an abridgment of freedom of speech . . . merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Cox v. Louisiana*, 379 U.S. 559, 563 (1965) (quoting *Giboney*, 336 U.S. at 502)). Thus, "[i]t rarely has been suggested that the constitutional freedom for speech . . . extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute." *New York v. Ferber*, 458 U.S. 747, 761–62 (1982) (quoting *Giboney*, 336 U.S. at 498). "Put another way, speech is not protected by the First Amendment when it is the very vehicle of the crime itself." *United States v. Rowlee*, 899 F.2d 1275, 1278 (2d Cir. 1990). For example, the fact that aiding and abetting an illegal act "may be carried out through speech" is "no bar to its illegality." *Nat'l Org. for Women v. Operation Rescue*, 37 F.3d 646, 656 (D.C. Cir. 1994). The exception applies not only to speech integral to proscribed criminal conduct but also to speech integral to civilly actionable conduct. *See Rumsfeld v. FAIR*, 547 U.S 47, 62 (2006).

---

[13] The Court should not construe our use of this quotation as a concession that all or any of the political-intimidation statutes enact content-based speech restrictions, a question better left for another day.

1714971

Examples of speech integral to a recognized crime or tort abound. In the United States, a person may be guilty of a crime if he or she, for example, (1) agrees with or offers to agree with another to commit, requests another to commit, orders another to commit, threatens harm unless another commits, or otherwise induces another to commit, a crime; (2) puts another in fear of imminent serious injury by physical menace; (3) participates in a criminal endeavor by communicating—for example, by telling thieving friends the combination of the employer's safe; (4) warns a criminal how to escape from the police; (5) threatens harm if someone does not turn over his or her wallet, submit to intercourse, or perform some other act that he or she is free not to perform; (6) offers to bribe someone or offers to receive a bribe for performing an act that should be performed, if at all, free of inducements; (7) successfully encourages someone to commit suicide; (8) entices a child from custody; (9) perjures himself or engages in other falsehoods with respect to officials; (10) acquires property or some other material advantage by deception; or (11) falsely pretends to hold a position in public service with the aim of getting someone else to submit to pretended authority or act otherwise to his or her prejudice. 1 RODNEY A. SMOLLA, SMOLLA AND NIMMER ON FREEDOM OF SPEECH § 10.35, at 10-42.30–10-42.31 (2021) (citing KENT GREENAWALT, SPEECH, CRIME, AND THE USES OF LANGUAGE 6–7 (1989)). Speech is likewise integral to many recognized torts. A person may commit an actionable tort by making fraudulent representations with the intent that they be relied upon, by defaming someone, by inducing a contracting party to break their contract, by making statements that intentionally inflict severe emotional distress, and by many other means.

At first glance, then, the reach of the historical integral-speech exception would appear to be broad. But courts and commentators alike have observed that it would be "fatally circular"[14]—and destructive of First Amendment protections—to hold that speech is unprotected merely *because* some law pronounces it illegal or tortious, thereby making it "integral" to a

---

[14] *United States v. Weiss*, 475 F. Supp. 3d 1015, 1033 (N.D. Cal. 2020); *see also Matter of Welfare of A. J. B.*, 929 N.W.2d 840, 853 (Minn. 2019); *State v. Shackelford*, 825 S.E.2d 689, 703 (N.C. App. 2019) (Murphy, J., concurring).

crime or tort. In other words, the integral-speech exception "can't justify treating speech as 'integral to illegal conduct,'" and thus unprotected, "simply because the speech is illegal under the law that is being challenged. That should be obvious, since the whole point of modern First Amendment doctrine is to protect speech against many laws that make such speech illegal." Eugene Volokh, *The Speech Integral to Criminal Conduct Exception*, 101 CORNELL L. REV. 981, 987 (2016) [hereinafter *Speech Integral*]. This conclusion flows ineluctably from the fact that "[t]he First Amendment limits Congress; Congress does not limit the First Amendment." *United States v. Weiss*, 475 F. Supp. 3d 1015, 1035 n.9 (N.D. Cal. 2020).

Accordingly, the "best understanding" of the integral-speech exception is this: "When speech tends to cause, attempts to cause, or makes a threat to cause some illegal conduct (illegal conduct *other than the speech itself*)—such as murder, fights, restraint of trade, child sexual abuse, discriminatory refusal to hire, and the like—this opens the door to possible restrictions on such speech." *Speech Integral* at 986–87. In this view, the integral-speech exception "should be seen less as a single exception than as a guide to generating other exceptions" which themselves must be defined "separately and narrowly, to protect potentially valuable speech." *Id*. at 987.

Here, the integral-speech exception "opens the door" to the recognition that, while the political-intimidation statutes' use of the terms "conspire," "threaten" and "intimidate" implies conduct typically carried out by means of speech, such conduct warrants no First Amendment protection. Granting Constitutional protection to the statutorily proscribed acts of political intimidation in the guise of "speech" would render the government incapable of carrying out its functions, including its core democratic function of protecting the ability of all eligible citizens to engage freely and without coercion in the democratic process, whether by voting or by supporting and advocating for candidates. As the history of these statutes demonstrates, throughout much of our national existence it has been *government policy* to allow white-supremacist terrorism to prevail over the democratic rights of minorities, particularly in the South. It took a bloody Civil War and a hard-fought Civil Rights movement to end that policy and to establish the government's democracy-protecting function as a fundamental attribute of,

and justification for, federal power. The political-intimidation statutes were part and parcel of

that revolution. And, like the *Brandenburg* incitement and true-threat exceptions, the exception

for historically unprotected speech integral to political intimidation is defined "separately and

narrowly, to protect potentially valuable speech." *Speech Integral* at 987. It takes the precise

shape of the conduct proscribed by long-standing political-intimidation statutes and is therefore

inherently incapable of escaping its narrow confines and affecting speech that is otherwise

protected.

Amici therefore urge the Court to hold that speech integral to the types of political

intimidation barred by these statutes falls squarely within the historically unprotected category of

speech integral to a crime or tort. It is true that the Supreme Court has disclaimed any

"freewheeling authority to declare *new* categories of speech outside the scope of the First

Amendment," at least where such declarations are based solely on a "highly manipulable

balancing" of "the value of the speech against its societal costs." *United States v. Stevens*, 559

U.S. 460, 470, 471, 472 (2010) (invalidating federal statute banning animal-cruelty depictions).

But the ban on speech integral to political intimidation is anything but "new." There are at least

two compelling reasons to conclude that the approach suggested here is properly "grounded" in a

"previously recognized, long-established category of unprotected speech." *Id*. at 471.

***First***, the statutes defining and proscribing political intimidation are themselves

"historical," as they date back as far as 1871—after the Civil War, when the nation was

effectively re-established on new constitutional principles. Reconstruction historian Eric Foner

has written that the changes wrought by the Thirteenth, Fourteenth, and Fifteenth Amendments

were "[s]o profound . . . that the amendments should be seen not simply as an alteration of an

existing structure but as a 'second founding,' a 'constitutional revolution,' . . . that created a

fundamentally new document with a new definition of both the status of blacks and the rights of

all Americans." ERIC FONER, THE SECOND FOUNDING: HOW THE CIVIL WAR AND

RECONSTRUCTION REMADE THE CONSTITUTION xx (2019). It may therefore be said that these

16

prohibitions date all the way back to the nation's constitutional "re-founding"; yet they have weathered those 150 years without encountering significant First Amendment obstacles.

**Second**, the Supreme Court has long afforded Reconstruction-era civil-rights statutes "a sweep as broad as their language." *Griffin v. Breckenridge*, 403 U.S. 88, 97 (1972) (citing *United States v. Price*, 383 U.S. 787, 801 (1966), and *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 437 (1968)). Recognizing this, the D.C. Circuit has observed that "§ 1985(1) is not a narrow and limited remedy but rather a statute cast in general language of broad applicability and unlimited duration," and that the overall scope of § 1985 has been called "enormous." *Spagnola v. Mathis*, 809 F.2d 16, 29 (D.C. Cir. 1986), *on reh'g*, 859 F.2d 223 (D.C. Cir. 1988). Courts never would have adopted these maximalist interpretations of the political-intimidation statutes had they harbored concerns that those statutes infringe upon protected speech. Instead, they would have applied the constitutional-avoidance canon to trim those statutes back.[15] But they haven't done so.

Applying the integral-speech exception disposes of the defendants' First Amendment defenses to § 1985(1) liability in this case, while also ensuring the continued efficacy of the other political-intimidation statutes. To the extent that the political-intimidation statutes implicate speech, they do so mainly with respect to speech that "tends to cause, attempts to cause, or makes a threat to cause . . . illegal conduct *other than the speech itself*." *Speech Integral* at 186–87. In the case of § 1985(1), the "other illegal conduct" that the affected speech tends to cause, attempts to cause, or makes a threat to cause, is the use of coercion (physical or non-physical) to (1) "prevent . . . any person from accepting or holding any [federal] office . . . or from discharging any duties thereof"; (2) "induce . . . any [federal] officer . . . to leave [the locale] where his duties as an officer are required to be performed"; (3) "injure [a federal officer] in his

---

[15] "Under the constitutional-avoidance canon, when statutory language is susceptible of multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems." *Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018).

1714971

person or property on account of his lawful discharge of the duties of his office"; or (4) "injure [a federal officer's] property so as to . . . impede him in the discharge of his official duties."

The First Amendment presents no obstacle to Congress's prohibition of this plainly illegal conduct. Like other conspiracy statutes, § 1985(1) does not proscribe speech as such, except insofar as speech is employed to effectuate an agreement to take unlawful action. Certainly, the statute targets no identifiable political or social viewpoint. Rather, § 1985(1) requires plaintiffs to allege, "[a]mong other things, . . . the elements of civil conspiracy, including . . . an agreement to take part in an unlawful action or a lawful action in an unlawful manner." *Barr v. Clinton*, 370 F.3d 1196, 1200 (D.C. Cir. 2004).

Moreover, § 1985(1)'s purpose is the "[p]rotection of federal officials from force, intimidation, threat, or injury at the hands of those who would disrupt, obstruct, or prevent the formulation and execution of federal functions[.]" *Stern*, 547 F.2d at 1338. As such, the statute is "but a necessary incident of sovereignty. It is akin to the inherent governmental 'power of self-protection' which has been consistently recognized in other contexts, . . . and it advances the important federal interest in the effective operation of government." *Id*. Congress's power to invoke this "necessary incident of sovereignty" cannot be doubted.[16]

And § 1985(1) is by no means the only statute that bars coercive conduct aimed at impeding the federal government—even when that conduct involves speech. For example, 18 U.S.C. § 1505 makes anyone guilty of a crime who "corruptly, or by threats or force, or by any threatening letter or communication . . . endeavors to influence, obstruct, or impede the due and proper administration of the law under which any pending proceeding is being had before any department or agency of the United States . . . ." Section 1505 sweeps more broadly than the true-threat exception: One court has held that § 1505 is violated when a threat to a government

---

[16] The foregoing discussion also shows why it would be pointless for the Court to grant defendant Trump's circular request that it "recognize [that] § 1985 only regulates conspiracies where there is an agreement to perform an overt act extending beyond protected political speech." Protected political speech is, by definition, protected. By contrast, speech integral to political intimidation has been historically unprotected, and it is the only type of speech that § 1985(1) affects.

agent is communicated to an intermediary with the intent to obstruct or impede an agency proceeding—whether or not the defendant intended the intermediary to pass the threat on to the agent. *See United States v. Price*, 951 F.2d 1028 (9th Cir. 1991). By contrast, under the true-threat exception, the threat must be communicated to the victim "with the intent of placing the victim in fear of bodily harm or death." *Virginia v. Black*, 538 U.S. at 360.

With respect to § 1985(1), however, the cases do reveal one exception-to-the-exception: When a public official alleges a conspiracy to use defamatory speech to hound them out of office or otherwise hinder their performance of their duties, the defendant must be permitted to invoke the First Amendment-based protections of the *New York Times v. Sullivan* doctrine.[17] *See Barr*, 370 F.3d at 1202–03; *Windsor v. The Tennessean*, 719 F.2d 155, 162 (6th Cir. 1983). Such claims really are not § 1985(1) claims at all, but defamation claims disguised as something else in order to evade the constitutional limitations that *New York Times v. Sullivan* places on defamation claims. Allowing that end-run to succeed would transform § 1985(1) into a vehicle by which individual federal officials could effectively squelch criticisms of their job performance or their fitness for office—a result far removed from the intentions of the Reconstruction-era drafters.[18]

The other political-intimidation statutes fare equally well under an integral-speech analysis because—like § 1985(1)—to the extent that they affect speech, it's mainly speech that tends to cause, attempts to cause, or makes a threat to cause plainly illegal conduct other than the speech itself. As for § 1985(3), that "other illegal conduct" is the use of coercion to "prevent . . . any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner" to a candidate in a federal election. The relevant "other illegal conduct" targeted by

---

[17] *See N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964) (holding that a public official cannot recover "damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not.").

[18] The defendants in the January 6 Suits have not made, and thus have waived, any argument based on this holding in *Barr* or *Windsor*.

§ 131(b) is the use of coercion to "interfer[e] with the right of [another] person to vote or to vote as he may choose" in a federal election. And the "other illegal conduct" targeted by § 11(b) is coercive interference with (1) "voting or attempting to vote," (2) "urging or aiding any person to vote or attempt to vote," or (3) "exercising any powers or duties under" specified statutes that facilitate voting.[19]

The historically grounded integral-speech exception thus preserves the effectiveness of our nation's hard-won political-intimidation statutes while giving due regard to free-speech principles. Accordingly, amici urge that, besides considering the incitement and true-threat exceptions, the Court should hold that the First Amendment does not protect speech integral to the forms of political intimidation proscribed by § 1985(1).

### D. The integral-speech exception furnishes additional grounds for rejecting the defendants' overbreadth and vagueness assertions.

Applying the integral-speech exception also disposes of defendants' undeveloped, ipse dixit assertions that, after 150 years in existence, § 1985(1) now should be found to be both overbroad and vague.

"[T]here are substantial social costs *created* by the overbreadth doctrine when it blocks application of a law to constitutionally unprotected speech, or especially to constitutionally unprotected conduct." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003) (emphasis in original); *accord Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973). The overbreadth doctrine's applicability "attenuates as the otherwise unprotected behavior" that a defendant seeks to protect under the

---

[19] An alternative to the historically grounded categorical exception urged here would involve applying the *O'Brien* intermediate-scrutiny test. Under that framework, one would first have to establish that the political-intimidation statutes are "content neutral" and then show that they withstand First Amendment scrutiny because they (1) are "within the constitutional power of the Government" and (2) "further[] an important or substantial governmental interest" that is (3) "unrelated to the suppression of free expression" and that (4) "the incidental restriction on alleged First Amendment freedoms is not greater than is essential to the furtherance of that interest." *United States v. O'Brien*, 391 U.S. 367, 376 (1968). Here, however, there is simply no First Amendment freedom to engage in speech integral to the forms of political intimidation that these statutes proscribe. Thus, there is no First Amendment freedom capable of being restricted, even incidentally. Accordingly, we venture no opinion on whether the plaintiffs' § 1985(1) claims would pass muster under *O'Brien* intermediate scrutiny.

doctrine "moves from 'pure speech' toward conduct and that conduct—even if expressive—falls within the scope of otherwise valid criminal laws that reflect legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct." *Id*. "To ensure that these costs do not swallow the social benefits of declaring a law 'overbroad,'" the Supreme Court has "insisted that a law's application to protected speech be 'substantial,' not only in an absolute sense, but also relative to the scope of the law's plainly legitimate applications before applying the 'strong medicine' of overbreadth invalidation." *Hicks*, 539 U.S. at 119–20 (quoting *Broadrick*, 413 U.S. at 613).

To the extent that they affect speech, the political-intimidation statutes mainly affect unprotected speech integral to political intimidation, which is itself a species of unprotected conduct. Accordingly, defendants cannot establish that § 1985(1) is "substantially" overbroad, either in any "absolute sense" or "relative to the scope of the law's plainly legitimate applications." *Hicks*, 539 U.S. at 120. Rather, here, as in *Hicks*, "[n]either the basis for the . . . sanction . . . nor its purpose . . . has anything to do with the First Amendment." *Id.* at 123. Thus, this is at most "the paradigmatic case of a . . . statute whose legitimate reach dwarfs its arguably impermissible applications." *Ferber*, 458 U.S. at 773.

The integral-speech exception also helps dispose of the defendants' vagueness challenge. "[P]erhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights." *Vill. of Hoffman Estates. v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 499 (1982). There is an even higher burden for proving vagueness where, as here, a statute is not directed to protected speech but instead to conduct or unprotected speech. *See id.* at 496, 499 ("The ordinance is expressly directed at commercial activity promoting or encouraging illegal drug use. If that activity is deemed 'speech,' then it is speech proposing an illegal transaction, which a government may regulate or ban entirely."). Here, the political-intimidation statutes are not directed to protected speech but instead to conduct and unprotected speech. No vagueness challenge could succeed

21

here, even if the defendants had identified which aspect of the statute they deem vague—which they have not done.

## IV.   CONCLUSION

For all the reasons stated above, when ruling on the defendants' purported First Amendment defenses to the plaintiffs' § 1985(1) claims, the Court should hold that the First Amendment does not protect, and historically has not protected, speech integral to the forms of political intimidation proscribed by § 1985(1). Such a ruling will not only accord with applicable law but also will preserve the efficacy of the political-intimidation statutes on which the health of our democracy depends.

Respectfully submitted,

KEKER, VAN NEST & PETERS LLP

Dated: July 8, 2021

By:   */s/ Steven A. Hirsch*
STEVEN A. HIRSCH

*/s/ Nic Marais*
NIC MARAIS
*Counsel of Record*

STEVEN A. HIRSCH
NIC MARAIS
MATAN SHACHAM
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone:  415 391 5400
Facsimile:  415 397 7188

*Attorneys for Amici Curiae Floyd Abrams,
Erwin Chemerinsky, Martha Minow, and
Laurence H. Tribe*

1714971

## CERTIFICATE OF SERVICE

I certify that on July 8, 2021, a copy of the foregoing was filed with the Clerk using the

Court's CM/ECF system, which will send a copy to all counsel of record.

*/s/ Nic Marais*
NIC MARAIS
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone:  415 391 5400
Facsimile:  415 397 7188
nmarais@keker.com

1714971