## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JAMES BLASSINGAME and SIDNEY HEMBY,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP,<br><br>Defendant. | Civil Action No.  1:21-cv-858-APM<br>Judge Amit P. Mehta |
| HON. BENNIE G. THOMPSON, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>Defendants. | Civil Action No.  1:21-cv-400-APM<br>Judge Amit P. Mehta |
| HON. ERIC SWALWELL,<br><br>Plaintiff,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>Defendants. | Civil Action No.  1:21-cv-586-APM<br>Judge Amit P. Mehta |

**BRIEF OF *AMICUS CURIAE* CAMPAIGN LEGAL CENTER ACTION IN SUPPORT
OF THE BRIEFS IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................ii

INTRODUCTION ............................................................................................................... 1

STATEMENT OF INTEREST ............................................................................................ 2

SUMMARY OF ARGUMENT ........................................................................................... 2

    I.    The Federal Officials are covered under Section 1985(1)'s broad substantive
    scope ......................................................................................................................... 3

        A.    Defendants' standing arguments are erroneous ................................................ 5

        B.    Congress broadly designed Section 1985(1) to protect federal officials .......... 6

        C.    The Federal Officials are covered under Section 1985(1)'s substantive
        scope ............................................................................................................. 11

            1.    The Federal Officials are covered under the "office, trust, or place of
            confidence under the United States" language in Section 1985(1) ..... 14

            2.    Members of Congress and the Vice President are additionally covered
            as "any officers of the United States" under Section 1985(1) ............ 18

    II.    The First Amendment does not shield Defendants' involvement in the
    conspiracy ............................................................................................................... 24

CONCLUSION ................................................................................................................... 25

# TABLE OF AUTHORITIES

## Cases

*Baron v. Carson*, 410 F. Supp. 299 (N.D. Ill. 1976) .................................................5

*Barr v. Clinton*, 370 F.3d 1196 (D.C. Cir. 2004).............................................8, 25

*Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731 (2020).....................7, 16

*Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993).............8, 11

*Brnovich v. Democratic National Committee*, No. 19-1257 (2021) .................2

*Brown v. Hartlage*, 456 U.S. 45 (1982)...........................................................24

*Cockrum v. Donald J. Trump for President*, No. 3:18-cv-00484 (E.D. Va. 2018).....................2

*Cooper v. Harris*, 137 S. Ct. 1455 (2017) ........................................................2

*Evenwel v. Abbott*, 136 S. Ct. 1120 (2016).......................................................2

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000)....................9

*Gill v. Whitford*, 138 S. Ct. 1916 (2018)............................................................2

*Goodman v. Svahn*, 614 F. Supp. 726 (D.D.C. 1985).....................................5, 8

*Griffin v. Breckenridge*, 403 U.S. 88 (1971).................................................7, 9

*Husted v. A. Philip Randolph Institute*, 138 S. Ct. 1833 (2018).......................2

*Jones v. DeSantis*, 975 F.3d 1016 (11th Cir. 2020) (en banc) ..........................2

*King v. Burwell*, 576 U.S. 473 (2015) ...............................................................8

*Kush v. Rutledge*, 460 U.S. 719 (1983)...........................................4, 5, 7, 11

*Lamar v. United States*, 240 U.S. 60 (1916).........................................13, 20, 23

*Lawrence v. Acree*, 665 F.2d 1319 (D.C. Cir. 1981) ........................................4

*Lewis v. News-Press & Gazette Co.*, 782 F. Supp. 1338 (W.D. Mo. 1992) ............................8, 15

*Loughrin v. United States*, 573 U.S. 351 (2014).............................................14

*LULAC v. Public Interest Legal Foundation*, No. 1:18-cv-00423 (E.D. Va. 2018).......................2

*McCord v. Bailey*, 636 F.2d 606 (D.C. Cir. 1980).........................................1,7, 9, 13

*Milner v. Department of Navy*, 562 U.S. 562 (2011)......................................10

*Mollnow v. Carlton*, 716 F.2d 627 (9th Cir. 1983) ..........................................8

*New York Immigrant Coalition v. Rensselaer County Board of Elections*,
No. 1:19-cv-920 (N.D.N.Y. 2019) ............................................................................2

*Pope v. Bond*, 641 F. Supp. 489 (D.D.C. 1986)...............................................................4, 8

*Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989)..........................................................25

*Ross v. Blake*, 136 S. Ct. 1850 (2016) ...............................................................................9

*Scales v. United States*, 367 U.S. 203 (1961) ...................................................................24

*Sculimbrene v. Reno*, 158 F. Supp. 2d 8 (D.D.C. 2001)...................................................25

*Shelby County v. Holder*, 570 U.S. 529 (2013) .................................................................2

*Spagnola v. Mathis*, 809 F.2d 16 (D.C. Cir. 1986)........................................................7, 9

*Steele v. United States*, 267 U.S. 505 (1925)...................................................................19

*Stern v. U.S. Gypsum, Inc.*, 547 F.2d 1329 (7th Cir. 1977) .....................4, 5, 7, 8, 17, 24

*Stith v. Barnwell*, 447 F. Supp. 970 (M.D.N.C. 1978).................................................8, 17

*Thomas v. United States*, 213 F.2d 30 (9th Cir. 1954) ...................................................23

*United States v. Barber*, 442 F.2d 517 (3d Cir. 1971)..............................................10, 17

*United States v. Carlson*, 946 F. Supp. 2d 1115 (D. Or. 2013) ......................................23

*United States v. Chansley*, No. 21-cr-3-RCL, 2021 WL 861079 (D.D.C. Mar. 8, 2021)..............25

*United States v. Gerhard*, 615 F.3d 7 (1st Cir. 2010)....................................................17

*United States v. Hall*, 342 F.2d 849 (4th Cir. 1965) .....................................................17

*United States v. Hartwell*, 73 U.S. 385 (1867) .............................................................15

*United States v. Hanson*, 618 F.2d 1261 (8th Cir. 1980)...............................................17

*United States v. Hendee*, 124 U.S. 309 (1888) .............................................................20

*United States v. Julian Elie Khater and George Pierre Tanios*,
Case No. 1:21-cr-222 (D.D.C. Mar. 17, 2021) ...........................................................17

*United States v. Mouat*, 124 U.S. 303 (1888) ...............................................................20

*United States v. Rakes*, 510 F.3d 1280 (10th Cir. 2007).................................................17

*United States v. Stevens*, 559 U.S. 460 (2010)...............................................................24

*United States v. Tomsha-Miguel*, 766 F.3d 1041 (9th Cir. 2014)....................................23

*United States for Use of Crawford v. Addison*, 73 U.S. 291 (1867)................................15

*Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) (en banc)................................................2

*Windsor v. The Tennessean*, 719 F.2d 155 (6th Cir. 1983) ....................................................8, 25

*Wisconsin v. Mitchell*, 508 U.S. 476 (1993) ................................................................................25

*Worthy v. Barrett*, 63 N.C. 199 (1869) .......................................................................................15

## Constitutional Provisions

U.S. Const. art. I § 6, cl. 2 ............................................................................................................12

U.S. Const. art. II § 1, cl. 2 ...........................................................................................................12

U.S. Const. art. II § 2, cl. 2 ...........................................................................................................12

U.S. Const. art. VI, cl. 3 ...............................................................................................................13

U.S. Const. amend. XII .................................................................................................................11

## Statutes, Rules & Regulations

3 U.S.C. § 15 .................................................................................................................................11

10 U.S.C. § 2648 ...........................................................................................................................23

18 U.S.C. § 372 ...................................................................................................................5, 17, 18

18 U.S.C. § 912 ........................................................................................................................20, 23

18 U.S.C. § 1114 ...........................................................................................................................23

31 U.S.C. § 1355 ...........................................................................................................................23

42 U.S.C. § 1983 .............................................................................................................................9

42 U.S.C. § 1985 .....................................................................................................................*passim*

42 U.S.C. § 1985(1) ................................................................................................................*passim*

42 U.S.C. § 1985(3) ................................................................................................................*passim*

## Other Authorities

1 Joseph Story, *Commentaries on the Constitution of the United States*, § 454
        (2d ed. 1858) .....................................................................................................................13

Bouvier Law Dictionary (14th ed. 1871).................................................................................16, 21

Abbott, Dictionary of Terms and Phrases Used in American or English Jurisprudence (1879) ...21

Black's Law Dictionary (1st ed. 1891) .........................................................................................21

Black's Law Dictionary (14th ed. 1871)........................................................................................16

Burrill Law Dictionary and Glossary (2d ed. 1867) .....................................................................16

Cong. Globe, 37th Cong., 1st Sess. 227 (1861)............................................................................18

Cong. Globe, 42nd Cong., 1st Sess. 334 (1871) ................................................................... *passim*

*Conspiracy to Impede or Injure an Officer of the United States,*
    *18 U.S.C. S 372*, 1 Op. O.L.C. 274, 276 (1977) ...................................................................18

Eric Foner, *Reconstruction: America's Unfinished Revolution* (2d ed. 2014*)* ..................... *passim*

*Inside the Capitol Riot: An Exclusive Video Investigation*, N.Y. TIMES (June 30, 2021),
    www.nytimes.com/2021/06/30/us/jan-6-capitol-attack-takeaways.html........................................5

Jennifer L. Mascott, *Who Are "Officers of the United States"?,*
    70 STAN. L. REV. 443 (2018) ...................................................................................................21

KKK Act of Apr. 20, 1871, Ch. 22, § 1, 17 Stat. 13-15 ................................................................9

*Officers of the United States Within the Meaning of the Appointments Clause,*
    31 Op. O.L.C. 73 (2007)...........................................................................................................23

Rapalje & Lawrence, Dictionary of American and English Law (1888) .....................................16

Scalia & Garner, Reading Law (2012) .......................................................................................13

Wharton, Law Lexicon or Dictionary of Jurisprudence (2d ed. 1860).........................................16

## INTRODUCTION

Congress enacted the Ku Klux Klan ("KKK") Act in 1871 to address the "wave of counterrevolutionary terror" that swept over the Reconstruction Era.[1] At the behest of elected officials and prominent political figures in the postbellum South, violent white mobs banded together to disrupt the proper functioning of government and forestall the expansion of American democracy through terror and lawlessness. The KKK's attacks were as widespread as they were vicious, targeting newly empowered Black voters and candidates with oppressive fury. Southern state governments either acquiesced to this chaos or were too overwhelmed to counteract it, and the federal government lacked the tools to protect government officials discharging their duties in the aftermath of the Civil War. The KKK Act, codified in part at 42 U.S.C. § 1985, was the answer.

The Capitol insurrection on January 6, 2021, was reminiscent of the KKK reign of terror that animated this vital civil rights statute. Provoked by former President Trump's frenzied campaign of disinformation and anti-democratic rage, a mob of predominantly white subversives and organized militias stormed the seat of the federal government to disrupt the peaceful transition of power. Trump's unrelenting lies about the 2020 election and rallying cry to "fight like hell" and "stop the steal" converted threats into violence. Heeding this call to action, the mob attacked the Capitol to prevent federal officials from performing their constitutional duties, mauling any law enforcement officers who bravely stood in their way. The aftermath left five people dead and countless more injured, and delayed the electoral count process for hours. This attack on the federal government is precisely what Congress intended to prevent with the KKK Act, and its protections apply here just as forcefully as they did in their original context 150 years ago.

---

[1] Eric Foner, Reconstruction: America's Unfinished Revolution 425 (2d ed. 2014); *see also McCord v. Bailey*, 636 F.2d 606, 615 (D.C. Cir. 1980) (summarizing history).

## STATEMENT OF INTEREST

*Amicus curiae* Campaign Legal Center Action ("CLC") is a nonpartisan, nonprofit organization that has been working for more than fifteen years to advance democracy through law. *Amicus* CLC and its affiliates have litigated many voting rights cases in federal courts, including as arguing counsel for the plaintiffs in the United States Supreme Court in *Gill v. Whitford*, 138 S. Ct. 1916 (2018) and *Husted v. A. Philip Randolph Institute*, 138 S. Ct. 1833 (2018), and as counsel for plaintiffs in *Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) (en banc) (challenging Texas's photo ID law), and *Jones v. DeSantis*, 975 F.3d 1016 (11th Cir. 2020) (en banc) (challenging Florida's felony disenfranchisement law). CLC has filed *amicus curiae* briefs in every major voting rights case before the Supreme Court in recent years, including *Brnovich v. Democratic National Committee*, No. 19-1257 (2021), *Cooper v. Harris*, 137 S. Ct. 1455 (2017), *Evenwel v. Abbott*, 136 S. Ct. 1120 (2016), and *Shelby County v. Holder*, 570 U.S. 529 (2013).

CLC also submitted *amicus curiae* briefs in recent district court cases involving claims of voter intimidation brought under 42 U.S.C. § 1985(3) and Section 11(b) of the Voting Rights Act of 1965. *See New York Immigr. Coal. v. Rensselaer Cty. Bd. of Elections*, No. 1:19-cv-920 (N.D.N.Y. 2019); *Cockrum v. Donald J. Trump for President*, No. 3:18-cv-00484 (E.D. Va. 2018); *LULAC v. Public Interest Legal Foundation*, No. 1:18-cv-00423 (E.D. Va. 2018). *Amicus* CLC has a demonstrated interest and expertise in the protection of voting rights and the health of our democracy, and the interpretation of laws that protect the functioning of the democratic process.

## SUMMARY OF ARGUMENT

*Amicus* CLC submits this brief to clarify several issues related to the interpretation and proper application of 42 U.S.C. § 1985(1). Specifically, CLC seeks to explain why—based on the

plain meaning of the text, relevant precedent, legislative history, and other sources—Defendants'
violent conspiracy to disrupt the counting of electoral ballots fits squarely within that provision.

The Court should reject Defendants' contrary arguments for multiple reasons. First, the
substantive scope of Section 1985 covers the conduct alleged in Plaintiffs' Complaint, with
subsection (1) defining the statutory prohibition and subsection (3) providing the civil cause of
action. Defendants' jurisdictional arguments are misplaced and contrary to the overwhelming
counterweight of precedent. Second, Congress in 1871 broadly designed Section 1985(1) to
extinguish political violence that seeks to impede the federal government, and the Court should
reject Defendants' cramped reading of the statute. Third, the conspiracy to impede the
constitutional duties and roles of federal officials—including members of Congress counting the
Electoral College votes, the Vice President as presiding officer over the count, and the President-
and Vice President-elect (together, the "Federal Officials")—implicates Section 1985(1) in two
ways. It constitutes interference with "any person from accepting or holding" or "discharging any
duties" of "any office, trust, or place of confidence under the United States." 42 U.S.C. § 1985(1).
And it triggers the statute's protection of "any officer of the United States" in the "lawful discharge
of [their] duties" from "injur[ies to] his person or property." *Id.* Defendants' contrary arguments
attempting to use the Constitution as a universal dictionary are unavailing. Finally, Defendants'
assertion that the First Amendment provides an absolute defense for their participation in the
violent January 6 conspiracy is baseless and should be rejected. In sum, Plaintiffs in the three
related cases have stated colorable claims under the proper interpretation of Section 1985(1).

## I.  The Federal Officials are covered under Section 1985(1)'s broad substantive scope.

The Federal Officials are within the scope of individuals protected under Section 1985(1),
and Plaintiffs are authorized to bring a claim under Section 1985(3). Section 1985(1) is a

Reconstruction-era law that provides a civil remedy "designed to protect against . . . conspiracies seeking to impede the operations of government by interfering with an official in the discharge of his official duties." *Lawrence v. Acree*, 665 F.2d 1319, 1328 (D.C. Cir. 1981) (Wald, J., concurring). It prohibits, in relevant part, two or more people conspiring together to (A) "prevent, by force, intimidation, or threat, any person from accepting or holding any office, trust, or place of confidence under the United States, or from discharging any duties thereof;" or (B) to "injure" "any officer of the United States" "in his person or property on account of his lawful discharge of the duties of his office, or while engaged in the lawful discharge thereof[.]" 42 U.S.C. § 1985(1).

Thus, "[t]o state a cause of action under § 1985(1), a plaintiff must allege and prove a conspiracy (1) to prevent any person by force, intimidation or threat from holding federal office or (2) to injure him in his person or property on account of his lawful discharge of the duties of his office, or while engaged in the lawful discharge thereof." *Pope v. Bond*, 641 F. Supp. 489, 497 (D.D.C. 1986). In safeguarding "the performance of official duties by federal officers," *Kush v. Rutledge*, 460 U.S. 719, 724 (1983), Section 1985(1) is "a necessary incident of sovereignty" because it guarantees "the inherent governmental power of self-protection" and "advances the important federal interest in the effective operation of government," *Stern v. U.S. Gypsum, Inc.*, 547 F.2d 1329, 1338 (7th Cir. 1977) (citations and internal quotations omitted).

The January 6 insurrectionists—under the direction and at the provocation of the Defendant co-conspirators—used force, threats, and intimidation to disrupt the counting of the Electoral College votes that would ratify the election of the pro-Trump mob's disfavored presidential ticket. In doing so, they violated Section 1985(1) and caused the injury that gives rise to Plaintiffs' causes of action under Section 1985(3). But Defendants erroneously argue that the Federal Officials do not qualify as holders of any "office, trust, or place of confidence" or "any officers of the United

4

States," and contend that Plaintiffs therefore lack statutory standing under Section 1985. This argument is mistaken, both in its framing in terms of jurisdiction and on its merits. Defendants have fundamentally misinterpreted the KKK Act's statutory scheme, its plain text, and Congress's broad remedial purpose, and their motions to dismiss should be rejected.

### A.      Defendants' standing arguments are erroneous.

In pressing their jurisdictional arguments, Defendants ignore that Section 1985(1) provides the substantive prohibition while Section 1985(3) provides the cause of action. The Supreme Court has put this issue beyond doubt, holding that Section 1985(1) is "[o]ne of the five classes of prohibited conspiracy" in the KKK Act, the civil action for which "is found at the end of § 1985(3)." *Kush*, 460 U.S. at 724.[2] The end of Section 1985(3) provides that an individual "injured or deprived" of a legal right as a result of a prohibited conspiracy listed elsewhere in Section 1985 has "an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators." 42 U.S.C. 1985(3). Thus, "Section 1985(1) defines conspiracies, for which Section 1985(3) establishes a private right of action," *Stern*, 547 F.2d at 1331 n.2, and individuals have statutory standing if they are "injured or deprived" as a result of the conspiracy to deter someone from acting as a federal officer, *see* 42 U.S.C. 1985(3).

Plaintiffs have pled sufficient facts to satisfy these statutory standing elements, along with Article III requirements. As alleged in the three complaints, Defendants formed a conspiracy[3] with the January 6 insurrectionists to violently impede the Federal Officials from performing their

---

[2] Multiple courts, including this Court, have likewise explicitly recognized this relationship between Section 1985(1) and the last sentence of Section 1985(3). *See, e.g.*, *Goodman v. Svahn*, 614 F. Supp. 726, 730 (D.D.C. 1985); *Baron v. Carson*, 410 F. Supp. 299, 300 (N.D. Ill. 1976).

[3] Taking the pleaded facts as true, *amicus* CLC examines the Section 1985(1) framework without discussing the elements of a conspiracy. But it notes that the catalogued footage of the January 6 insurrection speaks for itself. *See Inside the Capitol Riot: An Exclusive Video Investigation*, N.Y. Times (Jun. 30, 2021), www.nytimes.com/2021/06/30/us/jan-6-capitol-attack-takeaways.html.

duties. As a result of this conspiracy, the Plaintiffs in the three related cases—themselves Federal Officials or federal Capitol Police Officers sworn to protect them—were "injured" and "have an action for the recovery of damages against . . . the conspirators." 42 U.S.C. § 1985(3). For example, the Blassingame Plaintiffs allege that they suffered injuries because they were beaten and experienced severe mental distress from the January 6 conspiracy. Blassingame Compl. ¶¶ 100-137 (Officer Blassingame), ¶¶ 138-145 (Officer Hemby). The Thompson Plaintiffs allege they experienced both bodily and mental injuries from the trauma of that day. Thompson Compl. ¶¶ 151-258. And Representative Swalwell pled similar allegations. Swalwell Compl. ¶¶ 5-8, 11, 149, 242. These are sufficient injuries to confer statutory standing under Section 1985(3) for the three Plaintiffs groups to press their Section 1985(1) conspiracy claims.

**B.      Congress broadly designed Section 1985(1) to protect federal officials.**

Congress broadly designed the KKK Act to address the dire threat that anti-democratic, white supremacist groups posed to the proper functioning of the federal government after the Civil War. In 1871, President Grant made an explicit appeal to Congress to pass legislation that would equip the federal government to address the severe "condition of affairs [that] now exists" in the postbellum South, and specified the need to protect federal officials. Cong. Globe, 42d Cong., 1st Sess. 236, 244 (1871) (hereafter "Cong. Globe") (legislative history included in Appendix B). Congress compiled a lengthy legislative record detailing the rampant terror and intimidation that was sweeping the country, *see, e.g.*, *id.* 245-48, 320-21, 369, 374, 428, 436, with one leading lawmaker summarizing the fact that "lawless bands of men, amounting to hundreds, . . . have been roaming over the country independent and unchallenged, committing these atrocities, without fear of punishment, cheered by their neighbors, and despising your laws and your authority. We are called upon to legislate in regard to these matters," *see id.* at 820 (Sen. Sherman). Congress

answered this call by enacting the KKK Act of 1871, "creat[ing] a broad remedy to address [its] broad concerns" of attacks on civil rights and the proper functioning of the federal government, *see McCord*, 636 F.2d at 615.

The anti-democratic forces that drove Congress to pass the KKK Act are legally indistinguishable from those that once again threatened the country on January 6, 2021, and Congress's broad statutory design applies with equal force to address some of the injuries this insurrection caused. The text, structure, and legislative history of Section 1985(1) confirm this broad application, and like other "Reconstruction civil rights statutes," the Court should "accord [the statute] a sweep as broad as [its] language." *Griffin v. Breckenridge*, 403 U.S. 88, 97 (1971) (citation omitted); *Spagnola v. Mathis*, 809 F.2d 16, 29 (D.C. Cir. 1986) (applying "broad sweep" rule to Section 1985(1)); *Stern*, 547 F.2d at 1335–37 (same); *accord Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1747 (2020) (instructing that "courts apply the broad rule" when the text so dictates).

First, Congress's broad intent is manifest in the plain text of Section 1985(1), which represents a comprehensive protection of federal officials discharging their duties. Although "[t]he length and style" of the statute "make[s] it somewhat difficult to parse[,]" "its meaning becomes clear" if "its several components are carefully identified." *Kush*, 460 U.S. at 724. Through "four infinitive phrases, . . . set off from each other with the disjunctive 'or,' to state the types of conspiracies covered," *Stern*, 547 F.2d at 1336, the statute targets any conspiracy using "force, intimidation, or threat" as a means to:

> (1) "prevent … any person from accepting or holding any office, trust, or place of confidence under the United States, or from discharging any duties thereof; or"
> (2) "induce by like means any officer of the United States to leave any State, district, or place, where his duties as an officer are required to be performed; or"
> (3) "injure [any federal officer] in his person or property on account of his lawful discharge of the duties of his office, or while engaged in the lawful discharge thereof," or

(4) "injure [any federal officers'] property so as to molest, interrupt, hinder, or impede him in the discharge of his official duties[.]"

42 U.S.C. § 1985(1). As this Court summarized, "[t]he wording [of Section 1985(1)] is designed to protect against all conspiracies seeking to impede the operation of government through interference with an official in the discharge of his official duties." *Pope*, 641 F. Supp. at 497. The text shields "*any* person" holding "*any* office, trust, or confidence" or "*any* officer" in the "discharg[e of] *any* duties" of their federal function. 42 U.S.C. § 1985(1) (emphasis added). This text is "cast in general language of broad applicability . . . and unlimited duration," *Stern*, 547 F.2d at 1335, and inclusively "prohibits conspiracies to prevent 'any person' from 'discharging any duties' of an office under the United States," *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 300 (1993) (Souter, J., concurring). For that reason, courts have consistently applied the statute expansively, both in terms of its substantive reach and the range of covered persons.[4]

Second, the expansive application of the Section 1985(1)'s text is further reinforced in the context of the KKK Act as a whole, as well as the history of Congress's prior failed efforts to protect the federal government from attack. To confirm the breadth of Section 1985(1)'s text, the words "must be read in their context and with a view to their place in the overall statutory scheme." *King v. Burwell*, 576 U.S. 473, 492 (2015) (citation omitted). The expansive reach of the KKK

---

[4] In one D.C. Circuit case, for example, the court examined a former Congressman's Section 1985(1) lawsuit, replacing the federal officials described in the statute with the shorthand general term "public office," without questioning that it included a member of Congress. *See Barr v. Clinton*, 370 F.3d 1196, 1200 (D.C. Cir. 2004). Other courts have similarly read the statute's coverage to apply to a range of federal (and even some state) actors. *See, e.g.*, *Windsor v. The Tennessean*, 719 F.2d 155, 161 (6th Cir. 1983) (AUSA); *Stern*, 547 F.2d at 1334–35 (IRS agent); *Mollnow v. Carlton*, 716 F.2d 627, 630 (9th Cir. 1983) (Air Force pilot); *Bryant v. Mil. Dep't of Miss.*, 597 F.3d 678, 687 (5th Cir. 2010) (national guard); *Lewis v. News-Press & Gazette Co.*, 782 F. Supp. 1338, 1342 (W.D. Mo. 1992) (state judge applying federal law); *Pope*, 641 F. Supp. at 497 (FAA whistleblower); *Chocallo v. Bureau of Hearings & Appeals, SSA*, 548 F. Supp. 1349, 1360 (E.D. Pa. 1982) (legal service providers); *Goodman*, 614 F. Supp. at 730 (SSA administrative law judge); *Stith v. Barnwell*, 447 F. Supp. 970, 971 (M.D.N.C. 1978) (HUD official).

Act's other provisions establish that Congress sought to fully eradicate the KKK and safeguard American democracy, providing further structural "support for a generous interpretation of § 1985(1)" to comprehensively protect federal officials in that endeavor. *See Spagnola*, 809 F.2d at 29; *see also Griffin*, 403 U.S. at 98 (stating that the Court's "construction of Section 1985(3) is reinforced when examination is broadened to take in its companion statutory provisions").

For example, the KKK Act established an unprecedented private right of action for violations of constitutional rights (now codified, as amended, at 42 U.S.C. § 1983), and dramatically expanded protections against voter intimidation. *See* KKK Act of Apr. 20, 1871, Ch. 22, § 1, 17 Stat. 13 (private right of action), § 2, 17 Stat. at 13-14 (voter intimidation provisions). The 1871 Congress also reached even further by authorizing President Grant to engage the military to confront the massive private lawlessness in the South and permitting the temporary suspension of the writ of habeas corpus. *See id.* § 3, 17 Stat. at 14 (military authorization), § 4, 17 Stat. at 14-15 (habeas suspension). This ranging overall statutory scheme confirms that in drafting Section 1985(1), Congress legislated at the height of its power to release the KKK's stranglehold on the South and guard the federal government from attack. *See* Foner, *supra* n.1, at 455. Section 1985(1) should be read broadly in accord with this statutory context.

Moreover, the history of Congress's prior enactments to protect against extremist groups "underscores the . . . nature of" Section 1985(1)'s coverage. *See Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016); *see also Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000) (reaffirming the "classic judicial task of reconciling many laws enacted over time, and getting them to 'make sense' in combination" (citation omitted)). Given the events of the Reconstruction period, the "[r]estoration of civil authority" in the federal government remained "a major concern" for Congress in 1871. *McCord*, 636 F.2d at 615. The KKK Act was the third in a

series of increasingly stringent Enforcement Acts that were designed to stop the severe threats to the Nation's democracy that prior enactments had failed to address. *See* Foner, *supra* n.1, at 454. The Act also arose to fill gaps from Congress's other prior enactments, such as the Civil Rights Act of 1866. *Id.* at 455. Where these prior laws fell short was in protecting the federal government itself from threats and attacks, an increasingly common concern in 1871 and necessary to achieve the ultimate goal of restoring order in the South. *See id.* at 455–59. Congress designed Section 1985(1) to completely fill this gap, and it should be given the expansive reach its language requires.

Third, the Section 1985(1) "legislative history" also provides "clear evidence of congressional intent" to situate this provision within the overall statutory scheme as a foundational bulwark against attacks on the federal government. *See Milner v. Dep't of Navy*, 562 U.S. 562, 572 (2011). As the bill sponsor Representative Shellabarger acknowledged, without the broad protections for federal officials listed in Section 1985(1), chaos and violence could "literally and self-evidently strip the United States of every attribute of government." Cong. Globe at 751. Federal officials faced no idle threat at the time. Representative Butler, a champion of the bill and author of an earlier version, emphasized that the KKK and similar groups' "inspired and stimulated" violence perpetrating their "bitter hate of the Government and malice toward free institutions" had already "broke out in the form of lawless oppression" and attacks in the South. Cong. Globe at 442. This included "murders [of] legislators and judges, . . . murders [of] mail agents, . . . hinder[ing] the collection of the revenue and outrages its officers, and lev[ying] a stealthy war upon the United States." *Id.* at 443 (Rep. Butler). The newly elected Black legislators in Congress appreciated the dire need to protect federal officials, including themselves, better than anyone. *See* Foner, *supra* n.1, at 455–56; *see also* Cong. Globe at 389 (Rep. Elliott). Accordingly, South Carolina's first Black member of Congress, Representative Joseph Rainey, implored that

the "demands of the present emergency" call for Congress to place "so broad and liberal a construction . . . upon its provisions" to protect the promises of American democracy. Cong. Globe at 395. These leading lawmakers expressed a clear objective to enact a sweeping law that would safeguard the federal government in expanding civil rights, and Section 1985(1) did just that.

In sum, Section 1985(1)'s language is vast, and its statutory context, history, and purpose confirm its expansive application. To read it fairly is to read it broadly, and the Court should interpret specific aspects of Section 1985(1) in accordance with its broad sweep and Congress's firm intent to protect a range of federal officials in the discharge of their federal duties.

### C.  The Federal Officials are covered under Section 1985(1)'s substantive scope.

Section 1985(1)'s broad application protects the Federal Officials that the pro-Trump insurrectionists targeted on January 6 because the "text of § 1985(1) . . . prohibits conspiracies to prevent 'any person' from 'discharging any duties' of an office under the United States." *Bray*, 506 U.S. at 300; *see also Kush*, 460 U.S. at 724 ("In general terms, [Section 1985(1)] proscribe[s] conspiracies that interfere with the performance of official duties by federal officers.").

Through intimidation and violence, the Capitol insurrection disrupted the Federal Officials from carrying out their duty to ratify the results of the presidential election on January 6, 2021. The Twelfth Amendment and the Electoral Count Act assigned former Vice President Pence, as the presiding officer of the Senate, the duty to "open all the certificates" of the Electoral College votes to "then be counted." U.S. Const. amend. XII; *see also* 3 U.S.C. § 15. The same legal framework also specifies that this process must happen "in the presence of" Congress, *see* U.S. Const. amend. XII, and members of Congress must make any "objection . . . in writing" to whether an elector slate was "regularly given" and then "withdraw" to the House and Senate chambers to vote on any such objection, *see* 3 U.S.C. § 15. The aim of this process is to formalize the results

of the election for the newly selected President and Vice President—federal offices that Joe Biden and Kamala Harris sought and lawfully attained through the 2020 election.

In the wording of Section 1985(1), these are federal officials holding or performing federal duties: Vice President Pence and all members of Congress were tasked to "discharg[e their] duties" to manage and ratify the Electoral College votes, and Vice President-elect Harris and President-elect Biden were seeking to "accept[] or hold[]" federal office as a result of that process. 42 U.S.C. § 1985(1). The Defendants and the insurrectionists conspired together through violence and intimidation to obstruct these federal functions, and successfully delayed them for over five hours. *See supra* n.3. Section 1985(1) prohibits precisely this type of conspiracy to interfere with these Federal Officials' duties on January 6, and persons injured in the course of that conspiracy are entitled to Section 1985(3)'s cause of action. Thus, Section 1985(1) applies here, and Plaintiffs have properly invoked their rights under that statute.

Defendants argue that the Capitol insurrection does not activate Section 1985(1) because none of the Federal Officials are considered a "person . . . holding any office, trust, or place of confidence under the United States" or "any officer of the United States." *See, e.g.*, Trump's Thompson Br. at 16-18; Trump's Blassingame Br. at 29-31; Trump's Swalwell Br. at 18-22. Their core argument is that scattered parts of the U.S. Constitution—the Ineligibility Clause in Article I, § 6, cl. 2; the Presidential Electors Clause in Article II, § 1, cl. 2; and the Appointments Clause in Article II, § 2, cl. 2—each provide purportedly authoritative definitions for what the words in Section 1985(1) mean, and do so to the exclusion of the Federal Officials. Defendants' contention builds from the unsupported and flawed premise that the Constitution is an unyielding dictionary for the language it contains, providing an absolute definition of certain words even when they are used in different phrases and even when the terms are applied in a distinct statutory context.

12

This premise is mistaken because "of course words may be used in a statute in a different sense from that in which they are used in the Constitution." *Lamar v. United States*, 240 U.S. 60, 65 (1916) (Holmes, J.) (citation omitted). Indeed, Defendants' argument ignores that even the Constitution itself uses the same key words to convey different meanings based on context and usage. As Justice Story famously illustrated, the Constitution uses the word "state" to mean four different things. *See* Scalia & Garner, Reading Law 170–71 (2012) (citation omitted). Justice Story concluded that "it is by no means a correct rule of interpretation to construe the same word in the same sense, wherever it occurs," a canon of construction well known to Congress by 1871. *See* 1 Joseph Story, *Commentaries on the Constitution of the United States*, § 454, at 323 (2d ed. 1858)). The same has been repeated in the Section 1985 context specifically: "Where the subject matter to which the words refer is not the same in the several places where they are used, or the conditions are different, or the scope of the legislative power exercised in one case is broader than that exercised in another, the meaning may well vary to meet the purposes of the law." *McCord*, 636 F.2d at 617 n.15. This rule is even more applicable when extrapolating between different source types, such as the words in a statute compared to in the Constitution. *Lamar*, 240 U.S. at 65.

Thus, the Court should reject Defendants' Constitution-as-dictionary arguments, which rely on the faulty premise that a *statutory* phrase automatically takes on the *constitutional* definition of the words it uses.[5] Instead, Congress meant for Section 1985(1) to broadly apply to

---

[5] Even taking Defendants' constitutional definition argument at face value, it stands on shaky ground. For example, Defendants' narrow reading of the words "Trust or Profit" in the Presidential Electors Clause does not hold for other parts of the Constitution. The Oath or Affirmation clause in Article VI uses similar phrasing and states in full: "The Senators and Representatives before mentioned, and the Members of the several State Legislatures, and all executive and judicial Officers, both of the United States and of the several States, shall be bound by Oath or Affirmation, to support this Constitution; but no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States." U.S. Const., art. VI, cl. 3. Defendants would add

all federal officials, writing in inclusive terms that it protects "any person" holding "any office, trust, or place of confidence under the United States" and/or "any officer of the United States" as they "discharg[e] any duties" of their federal function. 42 U.S.C. § 1985(1). The statute covers the Federal Officials because they are accepting or holding "any office, trust, or place of confidence" and/or are classified as "any officer of the United States," and the January 6 conspiracy to violently disrupt their functions is subject to Section 1985's remedial reach.

### 1. The Federal Officials are covered under the "office, trust, or place of confidence under the United States" language in Section 1985(1).

The Federal Officials are "any person[s]" who are "accepting," "holding," or "discharging" an "office, trust, or place of confidence under the United States" in Section 1985(1). But Defendants ask the Court to ignore this plain text application by isolating only the words "office" and "trust" and giving those two words the meaning the Constitution does in dissimilar contexts using entirely different phrases. Specifically, Defendants ask the Court to read "office, trust, or place of confidence" in Section 1985(1) as synonymous with how "Office" is understood in the Constitution's Ineligibility Clause, and "Trust or Profit" in the Presidential Electors Clause. This slice-and-dice approach violates the "[c]ardinal principle[s]" of statutory interpretation that courts must "give effect, if possible, to every clause and word of a statute," and recognize that material variations in phrasing between sources suggests a variation in meaning. *See Loughrin v. United States*, 573 U.S. 351, 358 (2014) (citations omitted).

In any event, Defendants' argument should also be rejected because it runs counter to how courts have examined the terms Section 1985(1) uses, how contemporaneous dictionaries defined them, how members of Congress understood them in 1871, and how the terms are applied in a

---

an unwritten exception permitting members of Congress to be subject to religious tests. But the Framers' plain text proves they viewed members of Congress as holding offices of public trust.

related statute. Properly defined and in view of Congress's broad remedial language and design, *see supra* Part I.B., the phrase "office, trust, or place of confidence" in Section 1985(1) covers the Federal Officials here and protects them from a violent conspiracy to disrupt their duties.

First, courts have understood the terms "office, trust, or place of confidence" to have meanings apart from how the Constitution uses two of those isolated words in distinct contexts. In 1867, for example, the Supreme Court interpreted "office" broadly to mean "a public station, or employment, conferred by the appointment of government." *United States v. Hartwell*, 73 U.S. 385, 393 (1867). It specified that "[t]he term embraces the ideas of tenure, duration, emolument, and duties," and could not have meant only constitutional officers because, in that case, it covered "a clerk in the office of the assistant treasurer." *See id.* at 393, 397. Also in a *quo warranto* proceeding that same year, the Court held that a local mayoral office was considered "a public office of personal trust and confidence," and clarified that such a position simply holds "duties [that] are not purely ministerial or clerical." *U.S., for Use of Crawford v. Addison*, 73 U.S. 291, 297–98 (1867). Moreover, the Supreme Court of North Carolina—Congress's focal point in enacting the KKK Act, *see* Foner, *supra* n.1, at 440-41—had also then recently interpreted Section 3 of the Fourteenth Amendment to conclude that members of the legislature hold "*places* of trust and profit[.]" *Worthy v. Barrett*, 63 N.C. 199, 201 (1869).[6] This precedent at least supports that the terms "office, trust, or place of confidence" did not have a uniform meaning in precedent in 1871, and surely did not reflexively derive their meanings from how the Constitution uses "office" and "trust" in distinct contexts. Other sources, including dictionaries, legislative history, and usage in related statutes, confirm that Defendants' constitutional definition equation does not add up.

---

[6] More contemporary cases have also interpreted "office, trust, or place of confidence" as noncongruent with the constitutional usage of some of those terms, including applying Section 1985(1) to a state judge based on this phrase. *See Lewis*, 782 F. Supp. at 1342 & n.5.

Second, the "roughly contemporaneous dictionaries" of legal terms prevalent in 1871 are a useful aid to determine the statute's meaning, *see Bostock*, 140 S. Ct. at 1738–39, and here suggest that "office, trust, or place of confidence" includes the Federal Officials. One prevailing Reconstruction-era dictionary defined "office" as "[a] right to exercise a public function or employment, and to take the fees and emoluments belonging to it." Bouvier Law Dictionary 255 (14th ed. 1871) (dictionaries included in Appendix A). It further specified that such an "office" can be "*[p]olitical* offices" which "are not connected immediately with the administration of justice or the execution of the mandates of a superior officer" and include "the office of the president of the United States, of the heads of departments, of the members of the legislature, are of this number." *Id.* Another dictionary defined "office" as a "function by virtue whereof a person has some employment in the affairs of another," which explicitly could comprise "legislative" functions. Wharton, Law Lexicon or Dictionary of Jurisprudence 537 (2d ed. 1860). Others defined "offices of trust" as "public offices . . . which cannot be performed by deputy," Rapalje & Lawrence, Dictionary of American and English Law 895 (1888), and "trust" as "a confidence reposed in one person for the benefit of another," Burrill Law Dictionary and Glossary 548 (2d ed. 1867). These sources inform what Congress meant when it wrote "office, trust, or place of confidence," and the roles of the Federal Officials fit each of these consistent definitions.

Third, legislative history further supports that "office, trust, or place of confidence" covers the Federal Officials. "To ferret out [] shifts in linguistic usage" that bear on the ordinary meaning of a text, the Court has "consulted the understandings of the law's drafters" as evidence. *Bostock*, 140 S. Ct. at 1750. The KKK Act debates reveal the law's drafters understood "office, trust, or place of confidence" to include a range of federal actors. For example, multiple members of Congress intimated that they themselves held "legislative power" that constituted an office of

"trust for the benefit of the people." Cong. Globe at 412 (Rep. Van Trump); *see also id.* at 439 (Rep. Cobb); *id.* at 420 (Rep. Bright); *id.* at 479 (Rep. Leach). During the floor debates, Senator Fenton also criticized a state legislator and stated that his "betrayal of *the confidence and trust reposed in him* is not less startling to myself and the country than it must be to the patriotic and intelligent constituency who commissioned him to a seat in the Legislature." *Id.* at 754 (Sen. Fenton) (emphasis added). These statements reinforce that Congress considered legislators, including themselves, to be individuals holding an "office, trust, or place of confidence."

Fourth, the settled broad scope of Section 1985(1)'s nearly identical precursor criminal statute—originally enacted in 1861 and now codified at 18 U.S.C. § 372—also supports an inclusive understanding of this phrase. The KKK Act's author, Representative Shellabarger of Ohio, explicitly stated during the debates that he modeled Section 1985(1)'s language after this criminal statute predecessor, *see* Cong. Globe at 478, and courts have since analyzed the two laws as "counterpart[s]" of each other, *Stern*, 547 F.2d at 1339; *see also Stith*, 447 F. Supp. at 972 (stating that Section 1985(1) "is derived from a virtually identical criminal statute" in 18 U.S.C. § 372). Section 372 has been employed more frequently as compared to Section 1985(1), with courts upholding criminal convictions for conspiracies against a range of federal officials that exceeds any limited constitutional definition.[7] Indeed, the January 6 conspiracy has also given new life to criminal cases based on Section 372, with the federal government currently prosecuting multiple Capitol insurrectionists under that statute for their attacks on federal officials. *See, e.g.*, Indictment at 1–3, *United States v. Julian Elie Khater and George Pierre Tanios*, Case No. 1:21-cr-222

---

[7] *See, e.g.*, *United States v. Gerhard*, 615 F.3d 7, 12 (1st Cir. 2010) (U.S. Marshals); *United States v. Rakes*, 510 F.3d 1280, 1282 (10th Cir. 2007) (AUSA); *United States v. Hanson*, 618 F.2d 1261 (8th Cir. 1980) (BIA officers); *United States v. Barber*, 442 F.2d 517 (3d Cir. 1971) (FBI agents); *United States v. Hall*, 342 F.2d 849 (4th Cir. 1965) (IRS agent).

(D.D.C. Mar. 17, 2021) (ECF No. 8). Defendants' uphill argument that this term in Section 1985(1) can only mean a limited constitutional definition likewise contradicts this Section 372 precedent.

Section 372's legislative history additionally informs Congress's understanding that "office, trust, or place of confidence" includes the Federal Officials. In defending Section 372 in 1861, Senator Trumbull stressed that its purpose was "to punish persons who conspire together to commit offenses against the United States," referencing the violence that interfered with federal land agents and postal workers to emphasize the need for the additional federal protections. *See* 56 Cong. Globe, 37th Cong., 1st Sess. 277 (1861). From this and other statutory clues, the Department of Justice's Office of Legal Counsel in 1977 "review[ed] . . . the legislative history" for Section 372 and concluded "that a reading broader than that demanded by the constitutional usage must prevail" when examining the contours of the word "office." *See Conspiracy to Impede or Injure an Officer of the United States, 18 U.S.C. S 372*, 1 Op. O.L.C. 274, 276 (1977). Just as Congress's "broad purpose of protecting the Federal presence as fully as possible" in Section 372 "supports a broad, rather than narrow, reading of the word 'office,'" *see id.*, so too should this Court read the same terms in the civil counterpart in Section 1985(1) broadly to also cover the Federal Officials.

In sum, the Court should reject Defendants' effort to superimpose the limited constitutional meaning of different terms in different contexts onto Section 1985(1). Accepting Defendants' invitation would frustrate Congress's deliberately broad meaning behind the statutory phrase "office, trust, or place of confidence" that is confirmed in precedent, Reconstruction-era dictionaries, legislative history, and the use of the term in an identical statute.

### 2. Members of Congress and the Vice President are additionally covered as "any officers of the United States" under Section 1985(1).

Members of Congress and Vice President Pence are additionally covered under Section 1985(1) as "any officers of the United States." 42 U.S.C. § 1985(1). Defendants conspired to

prevent these statutory officers from performing "the discharge of [their] official duties," and Section 1985(3) provides relief for the injuries Plaintiffs suffered as a result of this conspiracy. Defendants' contrary argument again rests on its flawed assumption that the statutory phrase "officers of the United States" must have the same meaning as its constitutional usage in the Appointments Clause. Once more, this contention runs headlong into precedent, dictionary definitions, legislative history, and Congress's common practice in other statutes.

First, although both Section 1985(1) and the Appointments Clause use the phrase "officer of the United States," precedent instructs that they need not and should not have the same meaning. As Chief Justice Taft recognized for the Court in *Steele v. United States*, "[i]t is quite true that the words 'officer of the United States,' when employed in the statutes of the United States, is to be taken usually to have the limited constitutional meaning," but this is not an unyielding rule; instead, the phrase must be "given . . . an enlarged meaning" if the "consideration of the context" and Congress's "intention" for the statute so dictate. 267 U.S. 505, 507 (1925).

The Supreme Court has read a different meaning into statutory uses of "officer" compared to its constitutional definition on numerous occasions. In *Steele*, for example, a prohibition-era statute authorized certain search warrants that "must be issued to a civil officer of the United States." *Id.* at 506 (quotations and citations omitted). The Court held that these individuals "were not to be confined to constitutional officers" because Congress "had no intention thus to limit" the eligibility based on the statute's context and history. *Id.*; *see also id.* at 507–08 (stating that "it is not to be supported that Congress wished to exclude from those empowered to receive and execute search warrants persons usually called officers who are in their duties most widely employed to enforce or assist in enforcing laws"). Thus, the Court held that the statutory reference

to "civil officer" was not restricted to "an officer in the constitutional sense" because of the individual statute's context and purpose. *Id.* at 507.

Justice Holmes writing for the Court in *Lamar v. United States* came to a similar conclusion, stating the same rule in clearer terms that "words may be used in a statute in a different sense from that in which they are used in the Constitution." 240 U.S. at 64–65. The *Lamar* case involved a criminal impersonation prohibition, now codified as 18 U.S.C. § 912, that punishes any person who "falsely assumes or pretends to be an officer . . . acting under the authority of the United States[.]" The Court dismissed out of hand the argument that this statutory use of the word "officer" had the same meaning as its constitutional definition. *Id.* at 65 ("As to the construction of the Constitution being involved, it obviously is not."). It then held that the defendant in that case, who had impersonated "a member of the House of Representatives," was properly convicted for impersonating an "officer of the government of the United States," *id.* at 64–65, thereby rejecting any congruency with the Appointment Clause meaning of "officer."

Other earlier cases reached similar conclusions, ruling that "[u]ndoubtedly [C]ongress may have used the word 'officer' in some other connections in a more popular sense" than it is used in the Appointments Clause. *United States v. Mouat*, 124 U.S. 303, 308 (1888). Applying this rule in *United States v. Hendee*, for example, the Court reinforced that Congress may statutorily use officer "in a less strict sense" than in the Constitution, "and in the passage of certain statutes might have intended a more popular signification to be given to that term." 124 U.S. 309, 313 (1888). The *Hendee* Court concluded that a "paymaster's clerk" in the navy was an "officer" under the U.S. compensation statute, even though he was "not, in the constitutional sense of the word, an officer of the United States." *Id.* Together, these cases support that the term "officer of the United States" in a statute does not adopt the same definition as the Appointments Clause by default; the

20

court must look to other sources to divine its meaning.

Second, as stated *supra* Part I.C.1., extant dictionary definitions are a useful source to examine Section 1985's terms. These sources underscore that Congress meant for "any officer of the United States" to expansively cover members of Congress and the Vice President performing their January 6 duties. For instance, one leading dictionary published in 1871 defined "officer" broadly to mean "[h]e who is lawfully invested with an office." Bouvier, *supra*, at 255. The same source further illustrated that "*[e]xecutive* officers are those whose duties are mainly to cause the laws to be executed" including "[t]he president of the United States of America, and the several governors of the different states, are executive officers," and stated that "*[l]egislative* officers are those whose duties relate mainly to the enactment of laws, such as members of congress and of the several state legislatures." *Id.* (emphasis in original). Other dictionaries reinforce that "[a] representative in the state legislature is a public officer." Abbott, Dictionary of Terms and Phrases Used in American or English Jurisprudence 203 (1879). And more still, including the first edition of Black's Law Dictionary, expansively defined "officer" to mean "[t]he incumbent of an office; one who is lawfully invested with an office. One who is charged by a superior power (and particularly by government) with the power and duty of exercising certain functions." Black's Law Dictionary 844 (1st Ed. 1891); *accord* Warton, *supra*, at 538 (defining "Officer" as "a man employed by the public, of whom there is a multitude"). Members of Congress and the Vice President, as presiding officer of the Joint Session on January 6, meet these definitions, and the 1871 Congress enacted the KKK Act in accord with this widespread understanding of the terms.[8]

Third, legislative history points in the same direction. In a notable exchange with Senator

---

[8] *See also* Jennifer L. Mascott, *Who Are "Officers of the United States"?*, 70 Stan. L. Rev. 443, 454 (2018) (stating textualist research for expansive reading of the word "officer" in statutes).

Trumbull during the KKK Act debates, proponents of the bill defended its broad scope to include members of Congress. Senator Trumbull stated that he opposed an amendment to the bill because he believed it would cover a conspiracy against a federal officer even if the conspiracy did not have a clear nexus to the officer's federal duties. In making this point, Senator Trumbull used fellow Senators as an illustration of a federal officer in two different parts of the debate. He first pondered whether it would fall under Section 1985(1) in a situation where "the Senator who sits before [him] has a very valuable farm over in Maryland" and "[s]uppose while he is here in the discharge of the duties of his office . . . two or three persons get together and make a combination for the purpose of breaking into his barn and stealing his grain." Cong. Globe at 580. Later in the debates, Trumbull repeated the same concern that his hypothetical would fall within Section 1985(1) but made the illustration using Senator Edmunds from Vermont as the federal officer. *See id.* at 694. Senator Thurman of Ohio concurred with Senator Trumbull's point, but did not question that Senators would be considered officers under those illustrations. *See id.* at 652. To Trumbull and Thurman, the concern was that Section 1985(1) would cover conspiracies loosely connected to the Senators' federal functions, not that it protected members of Congress.

To assuage these concerns, Senator Edmunds responded that Senator Trumbull had supported a prior bill that was "certainly as broad, for punishing everybody who undertook to assault the person or destroy the property of an officer while he was engaged in performing the duties." *Id.* at 580. And Representative Shellabarger responded by adopting an amendment to the bill that clarified the conspiracy must be connected to the federal officer "while engaged in the lawful discharge of the duties of his office, or to injure his property so as to molest, interrupt, hinder, or impede him in the discharge of his official duty." *Id.* at 750. But no member of Congress in 1871 questioned the premise of Senator Trumbull's hypothetical that "officer"

applied to members of Congress. *See id.* These exchanges—core to the finalization of the statute's language—strongly support that Section 1985(1) was thought to, and designed to, apply its protections to a variety of federal officials that included members of Congress.[9]

Fourth, diverging from the constitutional definition of "officer" is not exclusive to Section 1985(1) because Congress routinely includes itself in statutory definitions of that term. As discussed above concerning *Lamar v. United States*, Congress did so in the criminal impersonation law now codified as 18 U.S.C. § 912. Numerous defendants have since been convicted under that statute for impersonating members of Congress or their agents. *See Thomas v. United States*, 213 F.2d 30, 31 (9th Cir. 1954) (U.S. Senator); *United States v. Tomsha-Miguel*, 766 F.3d 1041, 1046 (9th Cir. 2014) (aide to Congressman). Likewise, the statute that punishes "attempts to kill any officer . . . of the United States," 18 U.S.C. § 1114, also applies to protect members of Congress, *see United States v. Carlson*, 946 F. Supp. 2d 1115, 1117 (D. Or. 2013) (prosecution of threats to kill U.S. Senator and Representatives). Congress includes itself as "officers" in more benign federal laws, too. The statute that allows certain officials to fly on military aircraft includes "Members of Congress" in the list of "[o]ther officers of the United States." 10 U.S.C. § 2648. And the prohibition of using federal funds for painted portraits applies to "an officer . . . of the Federal Government, including the President, the Vice President, [and] a Member of Congress[.]" 31 U.S.C. § 1355. Thus, it is far from unusual for Congress to include itself in a definition of "officer of the United States," as the 1871 Congress intended to do in Section 1985(1).[10]

---

[9] Other legislative history reinforces the same conclusion. *See, e.g.*, Cong. Globe at 484 ("officers are elected by the people" (Rep. Wilson)); *id.* at 486 ("A citizen of the United States, in any State of the Union, has a right to vote for any officer of the United States Government" (Rep. Cook)).

[10] The Department of Justice has also noted that the constitutional meaning of "officer" "does not prevent Congress from treating a position that is not, in the constitutional sense, an office under the United States as nevertheless subject to statutory restrictions on offices or officers." *Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. 73, 116 (2007).

In sum, the phrase "officers of the United States" in Section 1985(1) does not have the same meaning as in the distinct Appointments Clause context in the Constitution. Congress's broad text and purpose, precedent, contemporaneous dictionaries, legislative history, and common use in other statutes all support this conclusion. As such, members of Congress and Vice President Pence are covered under this portion of Section 1985(1) because they were "discharge[ing their] duties" as statutory "officers of the United States" to open, count, and ratify the Electoral College votes on January 6. The violent conspiracy to impede the performance of these duties injured Plaintiffs, and they have Section 1985(3) available as a remedy to right those wrongs.

## II.     The First Amendment does not shield Defendants' involvement in the conspiracy.

The First Amendment's protection of free speech does not excuse communications and conduct forming a conspiracy to attack the federal government. That an "agreement[] to engage in illegal conduct . . . necessarily takes the form of words does not confer upon it, or upon the underlying conduct, the constitutional immunities that the First Amendment extends to speech." *Brown v. Hartlage*, 456 U.S. 45, 55 (1982); *accord Scales v. United States*, 367 U.S. 203, 229 (1961) ("[K]nowing association with the conspiracy is a proper subject for criminal proscription as far as First Amendment liberties are concerned."); *United States v. Stevens*, 559 U.S. 460, 493 (2010) ("The First Amendment protects freedom of speech, but it most certainly does not protect violent criminal conduct, even if engaged in for expressive purposes."). Although "[t]he public criticism of governmental policy and those responsible for government operations is at the very core of the constitutionally protected free speech area," that right is not absolute and must yield to "the indisputable governmental power to protect federal officers against harassment and injury on account of the performance of their duties." *Stern*, 547 F.2d at 1342, 1344. Accordingly, multiple courts have rejected a First Amendment defense to involvement in a Section 1985(1) conspiracy.

*Id.*; *see also Windsor*, 719 F.2d at 164. Decisions going the other way involve attempts by plaintiffs to use Section 1985(1) to circumvent "the constitutional requisites of a defamation claim" and application of the *New York Times v. Sullivan* doctrine, a distinct context not at issue here. *See Barr*, 370 F.3d at 1202–03; *Sculimbrene v. Reno*, 158 F. Supp. 2d 8, 18 (D.D.C. 2001).

Moreover, Defendants' speech is essential evidence of their involvement in the conspiracy and the First Amendment "does not prohibit the evidentiary use of speech to" establish the elements of a Section 1985(1) violation. *See Wisconsin v. Mitchell*, 508 U.S. 476, 489–90 (1993); *accord United States v. Ring*, 706 F.3d 460, 471 (D.C. Cir. 2013). Plaintiffs do not allege that the speech itself is punishable, but identify it as constitutionally unprotected evidence that Defendants engaged in conspiratorial action with the January 6 insurrectionists. *See United States v. Chansley*, No. 21-cr-3-RCL, 2021 WL 861079, at *9 (D.D.C. Mar. 8, 2021) (holding in Capitol insurrectionist's criminal case that "courts *may* consider otherwise-protected speech to establish a defendant's motive or intent during the commission of some other unlawful conduct"). While "[s]uch [evidence] is to be scrutinized with care to be certain the statements are not expressions of mere lawful and permissible difference of opinion with our own government," the Defendants' "statements . . . clearly were admissible on the question of" involvement in the conspiracy. *See Mitchell*, 508 U.S. at 489–90 (citation omitted). That this evidence is being used to prove a conspiracy in the civil context rather than a criminal case makes no difference. *See, e.g.*, *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251–52 (1989) (allowing evidentiary use of speech in Title VII discrimination claim). The First Amendment does not shield Defendants' provocations from being used to establish the Section 1985(1) conspiracy to violently attack the federal government.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny the Defendants' motions to dismiss.

Date: July 8, 2021

Respectfully submitted,

/s/ Paul M. Smith

CAMPAIGN LEGAL CENTER ACTION
Paul M. Smith (D.C. Bar No. 358870)
Adav Noti (D.C. Bar No. 490714)
Mark P. Gaber (D.C. Bar No. 988077)
Jonathan Diaz (D.C. Bar No. 1613558)
Hayden Johnson (*pro hac vice forthcoming*)
1101 14th Street, NW, St. 400
Washington, D.C. 20005
(212) 736-2000

*Attorneys for Amicus Campaign Legal Center Action*