# APPENDIX B
# LEGISLATIVE HISTORY

## Index of Legislative History Sources

<u>Source:</u>                                                                    <u>Page:</u>

Cong. Globe, 37th Cong., 1st Sess. 277 (July 26, 1861)          2

Cong. Globe, 42d Cong., 1st Sess. 236 (Mar. 23, 1871)           4

Cong. Globe, 42d Cong., 1st Sess. 244 (Mar. 23, 1871)           6

Cong. Globe, 42d Cong., 1st Sess. 245 (Mar. 23, 1871)           7

Cong. Globe, 42d Cong., 1st Sess. 246 (Mar. 23, 1871)           8

Cong. Globe, 42d Cong., 1st Sess. 247 (Mar. 23, 1871)           9

Cong. Globe, 42d Cong., 1st Sess. 248 (Mar. 23, 1871)           10

Cong. Globe, 42d Cong., 1st Sess. 320 (Mar. 28, 1871)           12

Cong. Globe, 42d Cong., 1st Sess. 321 (Mar. 28, 1871)           13

Cong. Globe, 42d Cong., 1st Sess. 369 (Mar. 31, 1871)           15

Cong. Globe, 42d Cong., 1st Sess. 374 (Mar. 31, 1871)           16

Cong. Globe, 42d Cong., 1st Sess. 389 (Apr. 1, 1871)            17

Cong. Globe, 42d Cong., 1st Sess. 395 (Apr. 1, 1871)            18

Cong. Globe, 42d Cong., 1st Sess. 412 (Apr. 3, 1871)            20

Cong. Globe, 42d Cong., 1st Sess. 420 (Apr. 3, 1871)            21

Cong. Globe, 42d Cong., 1st Sess. 428 (Apr. 3, 1871)            22

Cong. Globe, 42d Cong., 1st Sess. 436 (Apr. 4, 1871)            23

Cong. Globe, 42d Cong., 1st Sess. 439 (Apr. 4, 1871)            24

Cong. Globe, 42d Cong., 1st Sess. 442 (Apr. 4, 1871)            25

Cong. Globe, 42d Cong., 1st Sess. 478 (Apr. 5, 1871)            26

Cong. Globe, 42d Cong., 1st Sess. 479 (Apr. 5, 1871)            27

Cong. Globe, 42d Cong., 1st Sess. 484 (Apr. 5, 1871)       28

Cong. Globe, 42d Cong., 1st Sess. 486 (Apr. 5, 1871)       29

Cong. Globe, 42d Cong., 1st Sess. 580 (Apr. 11, 1871)       31

Cong. Globe, 42d Cong., 1st Sess. 652 (Apr. 13, 1871)       33

Cong. Globe, 42d Cong., 1st Sess. 694 (Apr. 14, 1871)       34

Cong. Globe, 42d Cong., 1st Sess. 750 (Apr. 18, 1871)       36

Cong. Globe, 42d Cong., 1st Sess. 751 (Apr. 18, 1871)       37

Cong. Globe, 42d Cong., 1st Sess. 754 (Apr. 18, 1871)       38

Cong. Globe, 42d Cong., 1st Sess. 820 (Apr. 19, 1871)       39

 

DATE DOWNLOADED: Thu Jul  8 12:12:48 2021
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
37 Cong. Globe 273 (1861).

ALWD 6th ed.
, , 37 Cong. Globe 273 (1861).

APA 7th ed.
(1861). Congressional Globe, 37, 273-288.

Chicago 17th ed.
"," Congressional Globe 37 (1861): 273-288

AGLC 4th ed.
'' (1861) 37 Congressional Globe 273.

OSCOLA 4th ed.
'' (1861) 37 Cong Globe 273

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

Mr. SUMNER. I would ask whether such a paper is in order?

The PRESIDENT *pro tempore*. The question of order cannot be raised on any paper until it is read for the information of the Senate.

Mr. SUMNER. The paper, by its title, shows that—

The PRESIDENT *pro tempore*. The Chair decides it to be in order at present.

The Secretary continued the reading, as follows:

The Government of the United States is a Government of specially delegated powers; and though treason is one of the highest crimes known to the law, it is a political offense. To guard against the abuses which in times of high excitement had, in the history of England previous to the revolution of 1688, so often sacrificed able, virtuous, and innocent men on charges of treason and kindred offenses, unaccompanied by acts, the Constitution of the United States expressly defines the crime of treason in the following terms:

ART. 3, SEC. 3. "Treason against the United States shall consist only in levying war against them, or in adhering to their enemies, giving them aid and comfort."

It further provides that "no person shall be convicted of treason unless on the testimony of two witnesses to the same overt act, or on confession in open court."

The intent to restrict Congress in the creation of crimes of the nature created by this bill seems obvious; for in treason all are principals, and in any conspiracy of the kind stated in the bill, an overt act in pursuance of it, proved by two witnesses, would be treason against the United States.

Thus the creation of an offense, resting in intention alone, without overt act, would render inoperative the provision last quoted, and the door would be opened for those similar oppressions and cruelties which, under the excitement of political struggles, have so often disgraced the past history of the world. The undersigned can conceive no possible object in defining the crime of treason by our ancestors, and requiring proof by two witnesses to the same overt act to justify the conviction of the accused, unless it be to restrict the power of Congress in the creation of a political crime kindred to treason, and charged as resting in intent alone, which would, if accompanied by an overt act, be treason.

It matters not that the punishment prescribed in the law is not death, but imprisonment; for the passage of the bill, though it might not affect the life of an innocent man, would give, from the uncertainty of the offense charged, and the proof requisite to sustain it, the utmost latitude to prosecutions founded on personal enmity and political animosity and the suspicions as to intention which they inevitably engender.
　　　　JAMES A. BAYARD,
　　　　L. W. POWELL,
　　　　J. D. BRIGHT.
　　　　W. SAULSBURY,
　　　　TRUSTEN POLK,
　　　　J. A. PEARCE,
　　　　A. KENNEDY,
　　　　JOHN C. BRECKINRIDGE,
　　　　WALDO P. JOHNSON.

Mr. TRUMBULL. I do not know what the practice of the Senate has been in regard to papers of this kind. I have no sort of objection to gentlemen who are opposed to this bill presenting their views in any shape which they may desire, so that it is not inconsistent with the ordinary rules and proceedings of the Senate. If they suppose they can make the people of the United State believe, or have persuaded themselves, that the Congress of the United States have no right to punish persons who conspire together for the purpose of seizing public property, because there is such a crime as treason, I certainly have no objection to their making that effort. Now, sir, I do not suppose it would constitute treason if half a dozen persons conspired together to seize an article of property belonging to the United States. That is not what I understand to be treason. That consists in levying war against the United States, or aiding and abetting its enemies in time of war. This bill provides punishment against persons who conspire together for the purpose of seizing any property of the United States, or who come together or purpose, by force, or intimidation, or threat, to prevent any person from accepting or holding an office under the Government of the United States. I do not suppose that constitutes treason. If you could, if they carried it out, that you could indict them for the overt act of treason. Suppose a land officer in one of our Territories, where there is a great deal of excitement in regard to the entry of public land, is driven off by the settlers who are opposed to any sale of the public lands taking place; suppose a number of the settlers meet together, and, by threats and intimidation, deter the officer from performing his duty: I would like to know if the Senator from Kentucky who presents this protest would call that treason?

Not long ago, I think, a case occurred somewhere in the State of Missouri, where a number of persons, by threats of violence and intimidation, prevented a postmaster from performing the duties of his office. I think that these persons

ought to be punished; but I do not suppose it was treason on their part; and for my life I cannot see the similitude between the offense there provided against and that of treason. The object of this bill is not under another name to punish traitors, but it is to punish persons who conspire together to commit offenses against the United States not analogous to treason. In the very case I have instanced, you could not punish those parties for treason when they had carried out their purpose. Take the very case that occurred at St. Joseph, in the State of Missouri, where a number of men got together and by threats and intimidation drove off the postmaster and would not let him discharge his duties; I should like to know if you could indict and convict those persons for treason. Other instances have occurred where route agents upon some of the railroads have been deterred from performing their duties.

That, however, is not the question before the Senate; and in fact I scarcely know what the question before the Senate is. I am not aware whether the Senator from Kentucky made any motion at all. We have already passed the bill, and the Senator from Kentucky has presented a paper, for the consideration of the Senate, I suppose, in some shape; but what his precise motion was, I am not advised.

Mr. POWELL. The motion is, that the protest be entered upon the Journal of the Senate.

Mr. TRUMBULL. I understand, then, the motion of the Senator from Kentucky to be, to enter upon the Journal of the Senate his reasons why he thinks this bill ought not to be passed. Is there any precedent for such a proceeding as that? Is it usual? Has it ever been done? If there is any precedent for it, I have no objection to it; but if it is an innovation, and the adoption of a new practice in the Senate of the United States, for members who are opposed to the passage of a bill, after it has passed, to come in with a written speech against its passage and place it upon the Journal, I am opposed to establishing that precedent now. As I am not aware of any precedent, or any authority for such a proceeding, I should like to be referred to one, if there is one.

Mr. POWELL. It is not my purpose to reply to the arguments of the Senator from Illinois. If the Senate were always to consider the matter contained in a paper presented in the shape of a protest, when the only question pending is as to whether the protest shall be entered on the Journal, I suppose no protest ever would be entered; because, of course, the majority do not concur in the opinions and reasons set forth by the minority. I believe that it has been usual to allow the minority in cases like this to have their protest entered on the Journal. I understand from Senators, who have long served in this body, that it has been done on more occasions than one; and in conformity with that custom, the minority in this case desire to have their protest against the passage of this bill entered on the Journal of the Senate. I hope it will be done.

The PRESIDENT *pro tempore*. The question is upon the motion of the Senator from Kentucky, that this protest be entered on the Journal of the Senate.

Mr. BRIGHT. I suggest that as the paper was prepared by the Senator from Delaware, [Mr. BAYARD,] who is not in his seat, there will be great propriety in allowing the question to rest until he comes in, if there is opposition to the motion that is made to enter it upon the Journal. I think he ought to be allowed to state the reasons for preparing the paper. Let the question lie over until he shall be in his seat.

Mr. COLLAMER. The words of the paper, I believe, are respectful enough; I do not see anything improper in them; and I shall not object to the delay which is asked being granted for the purpose of enabling the Senator from Delaware to furnish us a precedent for this proceeding, if he can. I have understood that in our country, where the right to call for the yeas and nays and enter them on the record is secured by the Constitution, the entering of a protest is not a matter of course at all, but has always been protested against. If, however, a precedent can be found, I shall submit to it; otherwise, I shaN not.

Mr. BRIGHT. I recollect distinctly that protests have been offered since I have been a member of this body—two certainly. Whether they have been spread on the Journal, I do not know.

However, I suggest that the matter lie over until the Senator from Delaware shall come in. That, I think, is due to him.

Mr. TRUMBULL. I hope that course will be taken, and let the precedents be looked into. If the request made in this case is usual in the Senate, I have no objection to its being granted.

Mr. POWELL. I have no objection to its lying over until to-morrow.

The PRESIDENT *pro tempore*. There being no objection to the course suggested, the paper presented by the Senator from Kentucky will lie over for further consideration until to-morrow.

ARMORED SHIPS.

The Senate proceeded to consider the amendments of the House of Representatives to the bill (S. No. 36) to provide for the construction of one or more armored ships and floating batteries, and for other purposes, disagreed to by the Senate and insisted on by the House; and,

On motion of Mr. HALE, it was

*Resolved*, That the Senate insist on its disagreement to the amendments of the House of Representatives to the said bill, insisted on by the House, and agree to the conference asked by the House on the disagreeing votes of the two Houses thereon.

On motion of Mr. HALE, the President *pro tempore* was authorized to appoint the committee on the part of the Senate; and Mr. HALE, Mr. GRIMES, and Mr. THOMSON, were appointed.

SUPPRESSION OF REBELLION.

The PRESIDENT *pro tempore*. The next bill in order on the Calendar is the bill (H. R. No. 20) to provide for the suppression of rebellion against, and resistance to, the laws of the United States, and to amend the act entitled "An act to provide for calling forth the militia to execute the laws of the Union," &c., passed February 28, 1795; which is before the Senate as in Committee of the Whole.

The bill provides that whenever, by reason of unlawful obstructions, combinations, or assemblages of persons, or rebellion against the authority of the Government of the United States, it shall become impracticable, in the judgment of the President, to enforce, by the ordinary course of judicial proceedings, the laws of the United States within any State or Territory of the United States, it shall be lawful for the President to call forth the militia of any or all the States of the Union, and to employ such parts of the land and naval forces of the United States as he may deem necessary to enforce the faithful execution of the laws of the United States, or to suppress such rebellion. Whenever, in the judgment of the President, it may be necessary to use the military force thus directed, to be employed and called forth by him, he is forthwith, by proclamation, to command the insurgents to disperse and retire peaceably to their respective abodes within a limited time. The militia so called into the service of the United States are to be subject to the same rules and articles of war as the troops of the United States, and be continued in service until discharged by proclamation of the President; but such continuance in service is not to extend beyond sixty days after the commencement of the next regular session of Congress, unless Congress shall expressly provide by law therefor. Every officer, non-commissioned officer, or private of the militia, who shall fail to obey the orders of the President of the United States in the cases recited in the bill, is to forfeit a sum not exceeding one year's pay and not less than one month's pay, to be determined and adjudged by a court-martial; and such officer is to be liable to be cashiered by a sentence of court-martial, and to be incapacitated from holding a commission in the militia for a term not exceeding twelve months, at the discretion of the court; and such non-commissioned officer and private are to be liable to imprisonment, by a like sentence, on failure of payment of the fines adjudged against them, for one calendar month for every twenty-five dollars of the fine. Courts-martial for the trial of militia are to be composed of militia officers only.

The bill further provides that marshals of the several districts of the United States, and their deputies, shall have the same powers in executing the laws of the United States as sheriffs and their deputies in the several States have, by law, in executing the laws of their respective States. It also repeals sections two, three, and four, of the




DATE DOWNLOADED: Thu Jul  8 11:48:47 2021
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
42 Cong. Globe 231 (1871).

ALWD 6th ed.
, , 42 Cong. Globe 231 (1871).

APA 7th ed.
(1871). Congressional Globe, The, 42, 231-249.

Chicago 17th ed.
"," Congressional Globe, The 42 (1871): 231-249

AGLC 4th ed.
" (1871) 42 Congressional Globe, The 231.

OSCOLA 4th ed.
" (1871) 42 Cong Globe 231

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
  Conditions of the license agreement available at
  *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

### MESSAGE FROM THE HOUSE.

A message from the House of Representatives, by Mr. McPherson, its Clerk, announced that the House had passed a resolution providing for the adjournment of the House, with the consent of the Senate, from Monday next, until the 1st of December next at eleven o'clock a. m., in the following words:

Whereas the Senate has adopted a resolution declaring "that the Senate will consider at the present session no other legislative business than the deficiency appropriation bill, the concurrent resolution for a joint committee of investigation into the condition of the States lately in insurrection, and the resolution now pending instructing the Committee on the Judiciary to report a bill or bills that will enable the President and the courts of the United States to execute the laws in said States, and the report that may be made by the Committee on the Judiciary on that subject," thereby refusing to consider any business which may originate in the House of Representatives, therefore,

*Resolved*, (the Senate permitting,) That the House will adjourn, when it adjourns on Monday next, until the first Monday of December next, at eleven o'clock a. m.

### PROTECTION OF LIFE, ETC., AT THE SOUTH.

The Senate resumed the consideration of the following resolution, submitted by Mr. Sherman on the 16th instant:

*Resolved*, That as organized bands of lawless and desperate men, mainly composed of soldiers of the late rebel armies, armed, disciplined, and disguised, and bound by oath and secret obligations, are proven to exist in the State of North Carolina, and have, by force, terror, and violence, defied civil authority in that State, and by organized perjury have rendered the courts powerless to punish the crimes they have committed, thus overthrowing the safety of person and property, and the rights which are the primary basis of civil government, and which are guarantied by the Constitution of the United States to all its citizens; and as there is good reason to believe that similar organizations exist, and have produced similar results in many parts of the late insurrectionary States; therefore, the Judiciary Committee is instructed to report a bill or bills to enable the President and the courts of the United States to execute the laws, punish and prevent such organized violence, and secure to all citizens the rights so guarantied to them.

Mr. SCOTT resumed, and concluded his speech commenced yesterday. [It will be published in the Appendix.]

During the delivery of Mr. Scott's speech the following message was received from the President of the United States:

*To the Senate and House of Representatives:*

A condition of affairs now exists in some of the States of the Union rendering life and property insecure, and the carrying of the mails and the collection of the revenue dangerous. The proof that such evils exist is plain and palpable in some localities is now before the Senate. That the power to correct these evils is beyond the control of the State authorities I do not doubt; that the power of the Executive of the United States, acting within the limits of existing laws, is sufficient for present emergencies is not clear. Therefore I urgently recommend such legislation as in the judgment of Congress shall effectually secure life, liberty, and property, and the enforcement of law in all parts of the United States. It may be expedient to provide that such law as shall be passed in pursuance of this recommendation shall expire at the end of the next session of Congress. There is no other subject on which I would recommend legislation during the present session.

U. S. GRANT.

WASHINGTON, D. C., *March* 23, 1871.

Mr. CONKLING. I move that the message lie on the table and be printed.

The motion was agreed to.

Mr. MORTON. Mr. President, I desire to detain the Senate for a short time for the purpose of answering the Senator from Kentucky, [Mr. STEVENSON,] who I am sorry is not now in his seat, in reference to the act of the Postmaster General taking the mail off the line from Louisville to Lexington, in that State. And in saying what I shall say in vindication of the Postmaster General it becomes necessary for me, in the first place, very briefly to review the condition of Kentucky as it is presented by the evidence before me.

The Senator from Kentucky, in his remarks last Saturday, used the following language:

"Perhaps during the last three and a half years that I administered the affairs of the government of that State half a dozen instances of violence did occur, not more."

I will remark that the three and a half years of his administration that he speaks of ended on the 13th of February last; and he says that during that period there were half a dozen cases of violence, "not more"—

"And what did they amount to? I know not of any secret political organization in that State. I know there are bad men in both parties; but I say, as I hope to answer at the great bar of God, as I would say at the bar as a witness, that there is no such organization in Kentucky composed of sixty men, throughout the Commonwealth, and that I do not believe it is political in its tendency."

He first says that during the three and a half years ending on the 13th of February last there were not to exceed half a dozen cases of violence, and that there were not concerned in these cases of violence to exceed sixty men throughout the entire Commonwealth.

I desire to remark here that if he is correct in that, the condition of Kentucky is remarkably good; that statement would be made of but very few States in this Union. The Senator says further on:

"Mr. President, these outrages exist everywhere. I admit frankly and freely that half a dozen instances occurred in Kentucky while I was Governor of the State which gave me great pain. Bad men, whose politics were unknown to me, did go secretly, sometimes masked, and attempt to offer indignity to negroes; but I say that such things were confined to a mere neighborhood, were wholly inconsiderable in numbers, and the political complexion of the parties was unknown. I state further, upon my own information, that no outrages received prompter or more indignant reprobation than those did from the distinguished and gallant men who were in the confederate service."

In regard to neighborhood affairs, inconsiderable in number, and the reiteration of the statement of but six cases in three and a half years, less than two cases per annum! Now, I submit to the distinguished Senator that if he is correct in his statement in regard to the condition of affairs in Kentucky there was no occasion for him to send to the Legislature of Kentucky the two messages from which I will read. If he is right in his statement now, he was all wrong in his messages. If he was right in his allegations in the messages, he is all wrong now. From this conclusion there is no possible escape. I am not calling in question at all his sincerity, but I shall compare the statement that he has made on this floor with the message that he sent to the Legislature of Kentucky. I believe on the 27th day of January last; and I ask the attention of the Senate to the language of that message:

"During and immediately following the war Kentucky, from its geographical position as a border State, was subjected to a more severe ordeal from this cause than her neighbors and, accordingly, during the first years of my administration law-lessness in some portions of the Commonwealth manifested itself in formidable organization, which defied the local authority, and perpetrated deeds of open violence under the pretext of regulating order and punishing crime."

He here talks about formidable organizations that defied the local authority. That does not sound like six cases in three and a half years and only sixty men or less that sixty men in all the Commonwealth concerned in them, inconsiderable in numbers, as he says, and mere neighborhood affairs! But he goes on in the message to say:

"By the use of the militia at my command, and the exhibition of my firm purpose to suppress such practices at all hazards, tranquillity was restored, and there has not been for some time in the localities which had suffered from such lawlessness any demonstrations having the semblance of organized resistance of the law. Still, in various portions of the State, there have been committed by lawless persons, acting in bodies generally under cover of night and sometimes in disguise, acts of violence upon individuals, either wholly innocent of offense or only subjects of criminal prosecution through the courts, most of which class of violators of the law have escaped detection and punishment."

Now, I submit that taking together the whole extract from his message it sounds more like half a thousand cases than half a dozen cases in three years and a half. He speaks of having called out the militia, of lawless violence that defied the civil authorities, and he goes on further to say that as the law then stood in Kentucky, I believe on the 27th of January last, he had no power to preserve the peace in Kentucky. But I will read his language:

"The other agency at my command, in the suppression of violence or in the execution of the law, is through the militia of the State. In its use I am, however, quite as much restricted as in the matter of proclamations. My authority extends no farther than to order out the militia of a county, upon the application of the local authority setting forth the necessity of their use in support of the civil power, or in case of imminent danger of riot. The same authority is vested in the judges of the various courts and the sheriffs and mayors of cities. Upon several occasions, when applied to, I have ordered out the local militia, but without authority, in ordinary cases, to act, except in response to the call of the local officers charged with the execution of the laws. Little good has resulted in these latter cases, save in the moral effect of such demonstrations."

"What is the most efficient remedy for the suppression of these growing evils rests exclusively with you. Whether in the establishment of a well-organized police system, under an efficient head, or in some other way, must be determined by the law-making power. I am quite sure that no measure can be completely successful without conferring upon the Executive additional discretionary power, in any sudden emergency, to act where the public security requires it."

Here, in view of the condition of Kentucky, he asks that extraordinary powers of a military character shall be conferred upon him. I ask how that compares with the declaration on this floor of only half a dozen cases in three and a half years!

"In this connection I desire to repeat my suggestions, as set forth in previous communications, of the absolute necessity of a thorough reorganization of the militia as an important adjunct in the enforcement of law."

The condition of Kentucky is such that there must be a reorganization of the militia to maintain the public peace. The Senator talks in this message of crimes that defy the civil power, that require the military power; and he speaks of these growing evils; ay, that is the language he uses, "these growing evils." What was the character of the crimes that the Governor of Kentucky refers to in this message? He does not mention their character, but I will tell the Senate what I understand the character of these crimes to be. It is the shooting, and the hanging, and the whipping of negroes all over that State, with more indifference than dogs are shot and whipped.

Then, Mr. President, if I judge from the message of the distinguished Senator while acting as Governor of Kentucky, he confirms all that has been said by the Louisville Courier-Journal; he confirms all that has been said in the public prints for the last eighteen months in regard to murder, crime, and outrage of every kind in the State of Kentucky. It comes in aid of that great volume of evidence that pours in upon the country from day to day

In legislation, or a ratified treaty, the employment of the Navy in the maintenance of the Government there is without any excuse of national defense, as also, without any excuse of a previous declaration of war by Congress.

*Resolved*, That in any proceedings for the acquisition of part of the island of St. Domingo, whatever may be its temptations of soil, climate, and production, there must be no exercise of influence by superior force, nor any violation of Public law, whether international or constitutional; and therefore the present proceedings, which have been conducted at great cost of money, under the constant shadow of superior force, and through the belligerent intervention of our Navy, acting in violation of International law, and initiating war without an act of Congress, must be abandoned, to the end that justice may be maintained and that proceedings so hostile to correct principles may not become an example for the future.

*Resolved*, That instead of seeking to acquire part of the island of St. Domingo by belligerent intervention, without the authority of an act of Congress, it would have been in better accord with the principles of our Republic, and its claims of peace and beneficence, had our Government, in the spirit of good neighborhood and by friendly action, instead of belligerent intervention, striven for the establishment of tranquillity throughout the whole island, so that the internal dissensions of Dominica and its disturbed relations with Hayti might be brought to a close, thus obtaining that security which is the first condition of prosperity, all of which, being in the nature of good offices, would have been without any violation of International law, and without any usurpation of War Powers under the Constitution of the United States.

 

DATE DOWNLOADED: Thu Jul  8 10:43:54 2021
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
42 Cong. Globe 231 (1871).

ALWD 6th ed.
, , 42 Cong. Globe 231 (1871).

APA 7th ed.
(1871). Congressional Globe, The, 42, 231-249.

Chicago 17th ed.
"," Congressional Globe, The 42 (1871): 231-249

AGLC 4th ed.
'' (1871) 42 Congressional Globe, The 231.

OSCOLA 4th ed.
'' (1871) 42 Cong Globe 231

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

Mr. FINKELNBURG. I object to this bill, unless the amendment which I desire to offer shall be adopted.

Mr. SNYDER. When I called up this bill last Friday objections were made by the gentleman from Michigan [Mr. CONGER] and the gentleman from Missouri, [Mr. FINKELNBURG.] Those objections have been met and reconciled by private consultation, the amendments which they desire to offer being assented to by the friends of the bill. The gentleman from Ohio [Mr. BINGHAM] made the other day an inquiry whether the bill was amendatory of the only act providing for the construction of a bridge across the Arkansas river at Little Rock. I answer that inquiry in the affirmative. This bill is amendatory of the only act providing for the construction of a bridge across Arkansas river at the city of Little Rock. Therefore the connection and relation of the original act and this bill cannot be misunderstood.

Mr. BINGHAM. Does the gentleman mean to say that the act of which this bill is amendatory provides only for a bridge on that river?

Mr. SNYDER. On that river, at the city of Little Rock.

The SPEAKER. The Clerk will read the amendment sent to the desk by the gentleman from Michigan, [Mr. CONGER.]

The Clerk read as follows:

Strike out in the second line of the bill the words "said act," and insert in lieu thereof "an act to authorize the construction of a bridge across the Arkansas river at Little Rock, Arkansas, approved July 1, 1870."

Mr. FINKELNBURG. I move to amend by adding at the end of the first section "The piers of said bridge shall be parallel with the current of said river."

Mr. SNYDER. I will merely state that these amendments are perfectly agreeable to the friends of the bill, and I hope they will be adopted without objection.

Mr. HOLMAN. I ask that the second section of the bill be again read. I desire to hear the proviso.

The Clerk read the second section of the bill.

Mr. HOLMAN. I suggest the insertion of the additional words "by the Secretary of War," in the first part of that proviso. It has been usual to put these bridges under the control of the War Department; otherwise it would not seem that any person was authorized to require this to be done.

Mr. CONGER. These matters are still left under the control of Congress, so far as any action is to be had.

Mr. HOLMAN. It is customary to put these bridges under the control of the Secretary of War, and I hope the words I have suggested will be inserted, in order to remove all ambiguity.

Mr. CONGER. I have no objection to the amendment.

Mr. SNYDER. Nor have I any objection to the amendment.

The amendment was agreed to; and the bill, as amended, was ordered to a third reading; and it was accordingly read the third time, and passed.

Mr. SNYDER moved to reconsider the vote by which the bill was passed; and also moved that the motion to reconsider be laid on the table.

The latter motion was agreed to.

LIFE-SAVING STATIONS.

Mr. HILL, by unanimous consent, presented the following resolutions of the Legislature of the State of New Jersey; which were referred to the Committee on Commerce when appointed, and ordered to be printed:

Whereas N. Broughton Devereux, chief of the revenue marine, in his report of December, 1870, to the honorable the Secretary of the Treasury, recommended additional appropriation to the life-saving stations for the protection of life and property upon the New Jersey coast; and whereas Henry W. Sawyer, superintendent of the stations, and the commissioners of pilotage have recommended additional stations, with crews at each station, and improved surf-boats, for the reason that the present boats are unsafe and worn out: Therefore,

1. *Be it resolved by the Senate and General Assembly of the State of New Jersey,* That our Senators and Representatives in Congress be urged to secure an appropriation of $300,000 for the year 1871, for the purpose of more effectually securing life and property upon the New Jersey coast.

2. *And be it resolved,* That the Governor be requested to furnish a copy of the foregoing preamble and resolution immediately to the members of Congress from New Jersey.

ORDER OF BUSINESS.

Mr. HOOPER, of Massachusetts. I hope there will be no objection to going to business on the Speaker's table.

The SPEAKER. The regular order of business would be the morning hour for reports.

Mr. HOOPER, of Massachusetts. I hope the bills on the Speaker's table will be taken up in their order.

Mr. COX. I call for the regular order.

The SPEAKER. The regular order of business being called, for the morning hour now begins at three minutes to two o'clock, and reports are first in order from the Regents of the Smithsonian Institution.

Mr. COX. I do not intend to consent to any bills from the Senate until they consent to an adjournment.

Mr. ELDRIDGE. No bills should be passed from the Senate until we have committees appointed.

PROFESSOR JOSEPH HENRY.

Mr. POLAND. I am directed by the Regents of the Smithsonian Institution to report a joint resolution (H. R. No. 42) giving the consent of Congress to Professor Joseph Henry, secretary of the Smithsonian Institution, to accept the title and regalia of a commander of the Royal Norwegian Order of St. Olaf, conferred upon him by the king of Sweden and Norway, grand master of said order.

The joint resolution was read a first and second time. It provides that the consent of Congress is given to Professor Joseph Henry, secretary of the Smithsonian Institution, to accept the title and regalia of a commander of the Royal Norwegian Order of St. Olaf, conferred upon him for his distinguished scientific services and character by the king of Sweden and Norway, grand master of said order.

Mr. FINKELNBURG. I would like to know if this is a title of nobility.

Mr. POLAND. I propose to make a brief explanation.

Mr. ELDRIDGE. Is there liberty to be given to this gentleman to become a saint?

Mr. POLAND. Professor Henry, who has been for many years at the head of the Smithsonian Institution, and has brought it into a high state of credit, both in this country and abroad, visited Europe during last season; and while there this compliment—the appointment to this order with its decorations and regalia—was granted to him by the king of Sweden, who is the grand master of this Order of St. Olaf. I have endeavored to ascertain what this Order of St. Olaf means, what it is. Nothing is to be found on the subject in any of the encyclopedias in the English language, but the Librarian, having at my suggestion made some examination of the subject, found in a German encyclopedia an article in regard to this order, which I will ask the Clerk to read. It gives all the information which I have on the subject.

Mr. PETERS. Is it in the German language?

Mr. POLAND. It is translated.

The Clerk read as follows:

"Not very long ago, 21st August, 1847, a Norwegian civil order was established by King Oscar I of Sweden and Norway, in honor of St. Olaf, and is composed of three classes: grand cross, commander, and knights. It has as regalia a white enameled cross, with the arms of the kingdom, a golden lion crowned, holding the halberd of St. Olaf, on a red field, bordered by an enameled red ring with blue and double white borders. In each of the four corners of the cross is a crowned golden O, which commemorates the founder of the order, i. e., Oscar.

On the obverse there is an enameled red shield with the device, '*Ret og sandhed,*' (right and truth.) The ribbon of the order is watered, bright red, with blue and double white border."—*Meyer's News Conversations Lexicon,* xlii., p. 255, 1855.

Mr. SCOFIELD. I desire to ask the gentleman from Vermont [Mr. POLAND] a question: whether he will bring in his name here with all his regalia upon him, so that we may see what they are before we pass the bill?

Mr. POLAND. When that shall be the regular order I shall endeavor to see that done.

Mr. CONGER. I would like to inquire what there is in the Constitution of the United States to prevent this gentleman receiving the order and the title without an act of Congress. There is nothing, so far as appears before this House, which shows that he holds any office of profit or trust under this Government.

Mr. POLAND. It may be somewhat doubtful whether the secretary of the Smithsonian Institution is such an officer under the United States, though I am inclined to think he is. But Professor Henry is also a member of the Coast Survey.

Mr. SCOFIELD. I hold that it is his constitutional right to make himself ridiculous, if he has a mind to do so, without a law of Congress.

The previous question was seconded and the main question ordered; and under the operation thereof the joint resolution was ordered to be engrossed and read a third time; and being engrossed, it was accordingly read the third time.

The question recurred on the passage of the joint resolution; and being put, there were—ayes 56, noes 41; no quorum voting.

The SPEAKER, under the rule, ordered tellers; and appointed Mr. POLAND and Mr. HOLMAN.

The House again divided; and the tellers reported—ayes 99, noes 19.

MESSAGE FROM THE PRESIDENT.

A message, in writing, from the President of the United States was communicated to the House by Mr. HORACE PORTER, his Private Secretary.

PROFESSOR JOSEPH HENRY.

Mr. GETZ. I call for the yeas and nays on the passage of the joint resolution.

Mr. HOLMAN. I hope the House will not pass a joint resolution giving effect to these titles of nobility.

Mr. COX. This is not a title of nobility.

Mr. WOOD. Would it be in order to move that the House adjourn?

Mr. BINGHAM. Let us have the message read.

CONDITION OF THE SOUTH.

The SPEAKER. The Chair lays before the House a communication from the President of the United States.

The Clerk read as follows:

*To the Senate and House of Representatives:*

A condition of affairs now exists in some States of the Union rendering life and property insecure and the carrying of the mails and the collection of the revenue dangerous. The proof that such a condition of affairs exists in some localities is now before the Senate. That the power to correct these evils is beyond the control of State authorities I do not doubt; that the power of the Executive of the United States, acting within the limits of existing laws, is sufficient for present emergencies is not clear. Therefore, I urgently recommend such legislation as in the judgment of Congress shall effectually secure life, liberty, and property, and the enforcement of law in all parts of the United States. It may be expedient to provide that such law as shall be passed in pursuance of this recommendation shall expire at the end of the next session of Congress. There is no other subject upon which I would recommend legislation during the present session.

U. S. GRANT.

WASHINGTON, D. C., *March 23, 1871.*

Mr. SHELLABARGER. Mr. Speaker, I move that the message just read be referred to a select committee of this House of nine members, to be appointed by the Chair, and upon that motion I ask the previous question.

Mr. COX. I move to lay that motion on the table.

Mr. ELDRIDGE. On that motion I demand the yeas and nays; and now I move that the House adjourn.

Mr. ACKER. I rise to a privileged question. I move that then the House adjourns to-day it adjourn to meet on Monday next at eleven o'clock.

The SPEAKER. That motion cannot be entertained.

Mr. RANDALL. I suggest to my colleague that he modify his motion and say Saturday.

The SPEAKER. That motion is not in order.

Mr. BROOKS, of New York. I call for the yeas and nays on the motion to adjourn, because the previous question is demanded by the gentleman from Ohio.

The SPEAKER. The Chair will state to the gentleman from Ohio [Mr. SHELLABARGER] who makes the motion that the debate on the motion that he has made to refer the communication from the President to a select committee is debatable in the widest sense.

Mr. SHELLABARGER. I rose, having that in my mind, for the purpose of proposing to gentlemen upon the other side of the House to name some reasonable time during which the motion I have made may be discussed, dividing the time equitably between the two sides of the House. If it is agreeable to gentlemen that we shall take a vote upon my motion at some reasonable day they suggest, I shall be earnestly in favor of acceding to such a proposition, and will withdraw the demand for the previous question.

Mr. BROOKS, of New York. If the gentleman from Ohio will permit me——

Mr. ELDRIDGE. Is debate in order?

The SPEAKER. The Chair supposed that this conversation was proceeding for the purpose of accommodation.

Mr. ELDRIDGE. I object to debate unless the previous question is withdrawn.

Mr. SHELLABARGER. I do not withdraw it. I only make a suggestion if it is agreeable to gentlemen on the other side.

Mr. ELDRIDGE. It does not look as if the gentleman desires debate here, when he moves the previous question the first thing.

The SPEAKER. The gentleman from Wisconsin will surely allow the gentleman from Ohio to make his proposition.

Mr. ELDRIDGE. I object to debate unless he withdraws the previous question.

Mr. SHELLABARGER. I will, then, for the purpose of making a statement——

Mr. ELDRIDGE. I object to debate.

The SPEAKER. The Chair will hear the gentleman from Ohio, as it relates to the order of business.

Mr. ELDRIDGE. He should then withdraw the previous question.

The SPEAKER. The Chair will not be dictated to on that point. The gentleman from Ohio is on the floor, not to debate at all, but to do that which it is the universal custom of this House to entertain, to make remarks in relation to fixing the order of business. The Chair does not waive the right of any gentleman in any motion which has been made, or will be made, but within brief limits he will hear the gentleman from Ohio.

Mr. ELDRIDGE. I desire to say that my right to make objection is unquestionable under the rule. The gentleman had the power to debate——

The SPEAKER. He is not debating. He has a right to make an explanation.

Mr. ELDRIDGE. I insist upon my rights under the rule to object unless he withdraws the previous question.

Mr. DAWES. Cannot he withdraw the previous question and hold the floor himself?

The SPEAKER. That, of course, he can do.

Mr. ELDRIDGE. That is the only right he has.

Mr. SHELLABARGER. I was simply attempting to do what for six years it has been the practice of the House to permit, to make a proposition.

Mr. ELDRIDGE. I call the gentleman to order.

Mr. SHELLABARGER. I now withdraw the demand for the previous question and retain the floor for the purpose of making a proposition, which I now do, like the one which I made the other day. As the Speaker suggested, and as we all know, this motion opens up in all its largest and most unlimited sense debate on the subject-matter to which the message refers. I now propose that by unanimous consent we fix a day during which we shall debate the subject-matter of this message, dividing the time between the two sides of the House equitably, and so far as I am concerned I would say equally. If that, then, be agreeable to gentlemen on the other side, I now propose that, by unanimous consent, we fix such reasonable time for debate——

Mr. BROOKS, of New York. Will the gentleman allow me a moment?

Mr. SHELLABARGER. I will yield for a suggestion.

Mr. BROOKS, of New York. I think we cannot agree to the proposition of the honorable gentleman from Ohio, [Mr. SHELLABARGER.] I state so with all frankness, because we do not agree with him that this is so important a matter of legislation as many others that are before the country.

For example, there are some of us who believe that we are now collecting annually from twenty to fifty million dollars of taxes more than are necessary for the support of this Government. There are others among us who believe that among the coal miners and the coal operators and the railroad operators of the State of Pennsylvania there are disturbances involving more danger to the people of the United States, and to the great manufacturing and consuming interests of the country, than are involved in any disturbances which may exist in the southern country. If the President had sent a message here embracing all these troubles in all parts of the United States we should be prepared then to enter upon some discussion.

Mr. SHELLABARGER. I must resume the floor.

Mr. WOOD. Will the gentleman allow me a question?

Mr. SHELLABARGER. A question, yes.

Mr. WOOD. I desire to ask whether the gentleman feels authorized to make any proposition for the other side of the House?

Mr. SHELLABARGER. I feel authorized always, in exercising my rights as a member upon this floor, to make any reasonable suggestion to gentlemen on both sides of the House, and to ask for unanimous consent to any proposition. That authority I have exercised with all due modesty. And now, as it seems not to be agreeable to gentlemen upon the other side to enter upon this debate——

Mr. WOOD. If the gentleman from Ohio will permit me to say one word further.

Mr. SHELLABARGER. Certainly.

Mr. WOOD. I will say this: that I do not think there is any gentleman on this side of the House that possesses the power that he assumes to have in speaking for what we concede to be the majority of that side of the House. I doubt whether any gentleman here is prepared to make any statement, to reach any conclusion, or to make or to receive any proposition, which shall be conclusive upon his political friends.

I will say further, for myself personally, that I am sure I have no disposition to shrink from an investigation of this subject, or to avoid any discussion of this subject. But I do think that there are so many other questions pending before Congress of graver importance to the people of the United States, that they should be disposed of by proper legislation in advance of any further effort to agitate and inflame the public mind.

Mr. SHELLABARGER. I ask the gentleman from New York [Mr. WOOD] whether he now declines to name a time during which we may debate this subject?

Mr. WOOD. I have no power to do so.

Mr. SHELLABARGER. For himself he has the power.

Mr. WOOD. For myself individually——

Mr. SHELLABARGER. Will the gentleman state whether he objects to naming the time during which we may debate this subject?

Mr. WOOD. I have no power to speak for anybody but myself.

Mr. SHELLABARGER. What does the gentleman say for himself?

Mr. WOOD. I am ready now to act upon this proposition without any debate at all.

Mr. COX. Allow me to say a word.

Mr. SHELLABARGER. Certainly.

Mr. COX. I desire to say to my former colleague [Mr. SHELLABARGER] that after the remarks which have been made I cannot speak for any one except myself, only so far as I may assume to do so from the action which this side of the House has heretofore taken. This side of the House has supported the honorable gentleman from Massachusetts, [Mr. DAWES,] not only in his reasoning, but in his resolutions of the past ten days, without regard to party affiliation, and with a sole view to the tranquillization of our southern country.

The gentleman from Ohio [Mr. SHELLABARGER] who has submitted the pending motion for the reference of this message made the other day some very earnest and impressive remarks, to the effect that he desired a committee of investigation to be instituted to go down South and inquire into the facts. He now, with the same inconsistency (if he will allow me to say it) in which he indulged the other day, proposes to act in this House upon common clamor, upon newspaper rumor, to crystallize into legislation some form of punishment and afterward to ascertain the facts; to hang the man and then to find the evidence, to give him a new trial after he has been convicted and executed.

Now, Mr. Speaker, I want to come to my conclusion.

Mr. SHELLABARGER. Come quickly. [Laughter.]

Mr. COX. I will as quickly as I can drive it to you. My conclusion is that when we have in the most solemn manner voted committees of investigation as the basis of future legislation, when such resolutions are now pending between the Senate and House, it is irrational, it is unkind toward this side of the House to demand that we should now enter into a discussion with a view to legislation at this session. That is my point.

Mr. BUTLER, of Massachusetts. I desire to ask a single question of the gentleman from New York, [Mr. Cox.] What "honorable gentleman from Massachusetts" has the Democracy supported?

Mr. COX. I spoke of the honorable gentleman from Massachusetts, [Mr. DAWES.] [Laughter.]

Mr. SHELLABARGER. Mr. Speaker, I have now submitted to the other side of the House the proposition that we should unanimously consent to fix some not unreasonably distant day on which to vote upon this matter, that we might in the mean time discuss the question which has been alluded to by the gentleman from New York [Mr. Cox] as a most grave one. As that proposition is declined, I have nothing further to say at this moment than that the legislation pointed to and invited by the message of the President, is not invited to proceed upon "clamor." If it were not unparliamentary I would say that the remark of the gentleman from New York was unfit to be made. Why, sir, to-day a sworn officer of the United States comes to us

from the South covered with the marks of lashes, gored with the scourge of the murderous class that infest one half of the Republic. Yet gentlemen come here and venture to say that we invite legislation upon mere "rumor" or "clamor." Mr. Speaker, I go no further with the debate at this time.

Mr. McHENRY. Who is the officer the gentleman has referred to?

Mr. SHELLABARGER. I now yield to the gentleman from Massachusetts, [Mr. DAWES.]

Mr. DAWES. Mr. Speaker, the gentleman from New York [Mr. Cox] has been pleased to say that he has supported me in all the suggestions and all the propositions I have made. The gentleman will bear in mind that while I have been fully convinced of the importance of the earliest possible adjournment of this Congress, and while every proposition I have submitted to the House has tended directly to that end, yet I have at all times pledged myself to coöperate in any legislation which the condition of things in any part of the country may demand. It is my belief that we ought to have—as I have no doubt we shall have under the concurrent resolution pending between the two Houses—a joint committee of such character and composition as will command for its conclusions as to facts and measures the assent of all sides in this House and all parties in the country. At the same time my friend from New York will recollect that I have stood here pledging myself to coöperate in any measure of legislation which would tend to restore peace to the country. Under these circumstances the President of the United States, whose duty under the Constitution requires him "from time to time to give to the Congress information of the state of the Union, and recommend to their consideration such measures as he shall judge necessary and expedient," has, under the obligations of his oath and his sense of duty, submitted to Congress a message, for which he is responsible in the discharge of his duty.

The ordinary proposition is made to refer that message for consideration to a select committee of this House in the absence of all regular standing committees. What less could be done? What ought we to do less than refer that message to such a committee, and to await its candid consideration of its recommendations? I do not understand why any gentleman on either side of this House shrinks from such a reference or from such conclusions as may be arrived at by a committee appointed by the Chair under the grave responsibility of the subject-matter under the attention of this House, to which the President has in his message invited our consideration. Why my friend from New York or any other gentleman shrinks from such a reference I cannot understand.

Mr. ELDRIDGE. Will the gentleman allow me to reply to his inquiry?

Mr. DAWES. I wish only to say, in reply to my friend from New York, that I do not deviate, in urging upon the House the adoption of the motion of the gentleman from Ohio, one particle from the line which he has been pleased to say he has given me his support in following thus far, and in which I have had the coöperation of a majority of my own political associates as well as of gentlemen on the other side.

Mr. ELDRIDGE. Will the gentleman yield to me to reply to his inquiry?

Mr. DAWES. I will yield to the gentleman by the consent of the gentleman from Ohio, by whose courtesy I hold the floor.

Mr. ELDRIDGE. The gentleman charges us with shrinking from the appointment of a committee to consider the message just received from the President. There is no such feeling on this side of the House. That is not the occasion of the motions made which seemed to be dilatory. The gentleman from

Ohio, [Mr. SHELLABARGER,] a moment after the message was read, moved to refer it to a committee, and called the previous question. It was supposed he intended to act on that. He had the right to make all the explanation which he has made without calling the previous question, all the explanation he desired in reference to the order of business; but he called the previous question at once, and the steps which were taken here were taken because it was supposed he intended to close the mouths of gentlemen on this subject.

I will say further to the gentleman that the steps taken by us were not because of the proposed reference of the message, but because we think there ought to be committees of this House, and that this matter should be referred to a standing committee. We insist it should not be referred to a special committee or to a select committee, and if we are to legislate here all summer, if we are to continue in session, the committees of the House should be appointed and the regular and appropriate committee should consider this subject, and not any select committee made up for the occasion.

Mr. DAWES. Then I understand the gentleman's first objection is that the gentleman from Ohio called the previous question, and alarmed him lest he was going to call for a vote without discussion. But the gentleman forgets that the gentleman from Ohio withdrew his demand for the previous question, and yielded to the demand for discussion.

The other objection of the gentleman from Wisconsin is that he wants the message referred to a standing rather than to a select committee. There is no standing committee to which it can be referred. And is there anything better in a standing than in a select committee appointed for the purpose of considering this particular subject, which, in the opinion of the President, is of such great importance as to require at his hand a special message?

Mr. RANDALL. I want it distinctly understood that I do not speak for any one but myself; and I say for one member on this side that I do not object to any proper reference of a message of the President of the United States on any subject upon which he may choose to speak. I believe, however, that now is not the time for this discussion at all.

Mr. DAWES. Then let us refer it and wait for the report.

Mr. RANDALL. For myself I would discuss the subject when I know what I am to discuss. When I hear the propositions which may emanate from the gentlemen appointed on the committee, if they be vindictive in their character, then will be the time for us to strike at them. Then will be the time to discuss them. Therefore, for myself, when the question comes, I will vote for the reference. However, relying mainly and in no inconsiderable degree upon the fairness heretofore exhibited by the Speaker in his appointments, I would just remark that we in numerical force are entitled to four members out of the nine. [Laughter.]

Mr. WOOD. I ask the gentleman from Ohio [Mr. SHELLABARGER] to yield to me for a few moments.

Mr. SHELLABARGER. I will by and bye. I have promised to yield now to my colleague, [Mr. GARFIELD.]

Mr. GARFIELD, of Ohio. I desire to say a few words only, the opportunity to do so having been afforded to me by the courtesy of my colleague. The House will probably remember that in a little discussion which was had here a few days since, when we were voting for the appointment of a joint committee, instead of proceeding to direct legislation, I made this point, that I wanted first of all to know whether the Executive of this Government needed any more legislation in order to enable him to keep the peace throughout the country, and that he had given us no sign that

any further legislation was needed. And I said then that until such sign was given I did not feel that anything more was needed than for this House to prepare for an inquiry into the whole question.

Now, however, there has come from the President of the United States a very temperate, a very prudent, and, as it seems to me, a very judicious message, in which he says, first of all, that he has undoubted authority for the assertion that there are outrages and combinations which the State authorities are not able to put down; and that he is in doubt, as the Chief Executive of this nation, whether he is empowered by existing laws of the United States to render such aid as the necessities of the case require. And therefore, to help him to resolve his doubts, he asks this Congress to stay here long enough to examine, first, the facts of the case, then the law of the case, and then to help him in its wisdom by such legislation as it may think the case requires. He also, to be very careful and very prudent about it, suggests that it may only be necessary to make a law to last until the next session of Congress ends. I think, therefore, the message is eminently temperate and eminently prudent. I do not, for my part, see how any man belonging to either side of this House can dare, with that paper on our desks, to vote for going away without first giving all the attention, all the consideration, and all the thought that we are capable of giving a request coming from the Chief Executive of the nation.

Mr. MORGAN. Will the gentleman yield to me for a question?

Mr. GARFIELD, of Ohio. In a moment I will. I take it that few statements on this subject can be more reliable than what a gentleman says of his own district, of his own constituents, of his own people, with whom he is well acquainted. Now, I do not believe that our friends on the other side will, I do not think they can stand before the country, did they desire to do so, in a resistance to a full, fair, and candid investigation of the facts and propositions that may be brought forward as has been stated by the President in his message.

I hope the fullest examination will be made of the constitutional question, and that the facts in regard to the condition of affairs in the South may be most amply debated. I do not want to go into that examination and that debate in any party spirit. The question to my mind is full of doubts. I want to resolve my own conscience, and I desire the matter to be dealt with in no factious or party spirit.

Mr. SHELLABARGER. I now yield to the gentleman from New York, [Mr. WOOD.]

Mr. WOOD. I am very much surprised that gentlemen on the other side should assume that there is any objection here to afford every facility and opportunity for a full, free, and thorough investigation as to these alleged outrages in the southern States. Why, sir, within ten days, by the vote of the Democratic party in this House, we have already provided for the appointment of two committees to investigate this very subject referred to by the President.

In the first instance, the committee was not only raised by the vote of the House, but absolutely has been appointed, and is now in existence as a committee of this House to investigate this very subject; and subsequently to that, after the Senate had passed a concurrent resolution providing for a joint committee of investigation, we coöperated with the Senate, and by the united vote of the Democratic side

of the House carried that resolution and sent it back to the Senate, and they have really rejected it by refusing to concur in our amendment.

When, therefore, it is alleged or implied that there is any opposition on this side of the House to a full, fair, and entire investigation, it appears to me that the gentlemen who make that allegation are not generous, certainly are not truthful, if they allege that we stand in the way of investigation.

As to the gentleman from Ohio [Mr. GARFIELD] who has just spoken, and has advocated a committee for the purpose of considering the message of the President, he himself but a few days ago sent up to the Clerk's desk and had read an extract from the existing law, by which he proved conclusively that the President already possesses all the power necessary over the whole subject; and now, forsooth, he comes here and lectures us, and attempts to make the country believe that the Democrats in this House are opposed to an investigation, when he himself is upon record as saying that the President has all the power he need have or which Congress can give him over this whole question. No, sir; the truth is that these gentlemen do not really want an investigation; the truth is that they want to create an artificial condition of the public mind for a wicked purpose; that there is an object beyond the restoring of one section of the Union to its peaceful and harmonious relations to the other sections of the Union or to the Federal Government. They know, as the country knows, that the stimulant that warmed their party into existence is subsiding, and that it is necessary to apply more stimulant, so as to revive their sunken fortunes and to prevent their total political annihilation; and they wish to keep Congress here that we may be excited, that the people may become excited, that the country may be made to believe that some legislation at the hands of Congress is absolutely necessary to preserve life and protect property in the southern States.

Sir, we challenge investigation. We are ready to vote for this committee or for a dozen committees, expressing confidence in the Speaker that he will so constitute them as to give us a really truthful and impartial statement of the facts.

Mr. GARFIELD, of Ohio. Does the gentleman speak for his friends now?

Mr. WOOD. I speak for myself; but I have no doubt what the vote on this side of the House will be when the proper time comes.

Mr. SHELLABARGER. I yield now to the gentleman from Massachusetts, [Mr. BUTLER.]

Mr. BUTLER, of Massachusetts. Some days ago, Mr. Speaker, I was by a number, and I believe a majority of the Republicans on this floor, intrusted with the presentation of a bill, approved by them, which had for its object to remedy the state of disorder and wrong at the South. That bill I have persistently tried, as gentlemen upon both sides of the House know, to get before the House. I ask my friends upon the other side of the House to do me the justice to say that in doing so I offered to them when the bill came up, if it should come up, any time for debate that they desired; that they should fix their own time, so that we might have the subject fully discussed, and when the whole question was before the House and the country we could ascertain whether there was cause for legislation. I also call their attention and the attention of the country to the fact that my attempts have been met by motions of delay, of adjournment, of attempting to adjourn to some possible time, carried steadily by the Democratic majority. They have ever insisted upon not having a hearing upon that bill; and it will not do for them to say that the provisions of the bill were faulty, because it would have been open to amendment. There was no attempt on my part and no desire that the bill should not be amended in the fullest

possible manner that the judgment of the House should dictate; so that we could have had the measure discussed for at least two weeks past, if it had not been for the dilatory motions of the gentlemen upon the other side.

Mr. MORGAN. Allow me a moment. I may perhaps have misunderstood the gentleman. I understood the gentleman from Massachusetts [Mr. BUTLER] to say that the bill which he introduced and asked to have referred to a committee met the approval of a majority of the Republicans on this floor. Am I right?

Mr. BUTLER, of Massachusetts. I will restate what I said, so that there shall be no mistake. I understand that the bill which I presented and which is in print does meet the approval of a majority of the Republicans on this floor. That it is perfect nobody dreams of claiming. Everything human is imperfect; everything human needs amendment, and nothing more and nobody more than my friends on the other side, except, perhaps, my bill.

Mr. NIBLACK. One moment. The gentleman will relieve us on this side of the House from some embarrassment if he will cease to call us his friends. [Laughter.]

Mr. BUTLER, of Massachusetts. Ah!

Mr. NIBLACK. We never recognize such relations.

Mr. BUTLER, of Massachusetts. There was a time when the Democratic party recognized me as a friend, ay, and as a leader; and they were very cross when I left them. [Laughter.] And, as a friend near me suggests, they have not got over it yet, but have been mad with me ever since. [Laughter.]

Mr. MORGAN. How many of us followed the gentleman, when at the Charleston convention he voted more than fifty times for Jefferson Davis for President of the United States?

Mr. BUTLER, of Massachusetts. Certainly, I then voted for the representative man of the Democracy. Subsequent events have proved that the difference between the gentleman and myself is that he would not vote for Jeff. Davis then but would now, and I did then but would not now. [Laughter.] There is no trouble about understanding this matter at all.

Mr. MORGAN. If the choice was between the member from Massachusetts and the gentleman from Mississippi the country would certainly justify me in making such a choice.

Mr. BUTLER, of Massachusetts. Will the gentleman repeat his statement? There is so much confusion here that I did not hear him. [After a pause.] I repeated my words for the gentleman when he did not hear me. Is he ashamed to repeat his? I did not hear him. [After another pause.] Then I will grant him the mercy of my silence as to what I did not hear.

I was about to say, when interrupted, that we offered the fullest opportunity for debate, and I trust that we may now, as men, as statesmen, as members of the House of Representatives, with a great evil before us, without heat, without acrimony of debate, and in pure and calm reason, discuss, first, of the question of law, then of the question of fact, and then of the question of remedy; try to find out what is best for the country. I trust that the fullest discussion will be allowed, and when every man has had his say on all those questions, that we shall then come to a direct vote, and show whether or not we care for the safety of the country and for the protection of life, liberty, and property.

Mr. LAMISON. Will my colleague [Mr. SHELLABARGER] yield to me for a few moments?

Mr. SHELLABARGER. How much time have I left?

The SPEAKER. There are twenty-two minutes of the hour remaining.

Mr. SHELLABARGER. I will yield to my colleague [Mr. LAMISON]—how much time?

Mr. LAMISON. But a minute or two.

Mr. SHELLABARGER. Very well.

Mr. LAMISON. I will detain the House

but a moment with what I desire to say. We have now been in session for twenty days, including to-day. During that time we have been notified from the other end of the avenue that there was nothing upon which the President desired this Congress to legislate; that there was no such condition of the country as required our longer presence here. To-day we have communicated to us a message from the President in which he says that the condition of the country requires legislation upon the subject named in his message. Sir, if there be any new incidents, if there be any new evidences of tumult and disorder in the South, if there be now anything in the condition of the South that did not exist twenty days ago, that did not exist even ten days ago, I think it would be but fair to members of this Congress that that information should be laid before them. I therefore desire to offer the following resolution.

Mr. SHELLABARGER. I did not yield to have any resolution offered.

Mr. LAMISON. At least let it be read as a portion of my remarks.

Mr. SHELLABARGER. I am willing to have it read.

The Clerk read as follows:

*Resolved,* That, if not incompatible with the public interests, the President of the United States furnish to this Congress of the United States all facts and documents now in the executive department touching the condition of public order in the States lately in rebellion, and to which reference is made in his message to the Senate and House of Representatives of March 23, 1871.

Mr. SHELLABARGER. That is a very good resolution, which we shall have pleasure in voting for when the proper time comes. I yield to the gentleman from Pennsylvania, [Mr. KELLEY.]

Mr. KELLEY. Mr. Speaker, I take the floor for a moment only, to reply especially to the gentleman from Ohio, [Mr. LAMISON,] who tells us that twenty-three days ago the President did not see such a condition of the country as required any recommendation of legislation or demanded to be brought particularly to public attention. During those twenty-three days, sir, the majority of the members of this House have declared to the people of the South their indisposition to strengthen the President's hands or to deal resolutely with the crimes which are now disgracing not only our country but republicanism and the age. This declaration expressed by the conduct of Congress has emboldened organized bands of lawless men in the South, and they to-day do what they did not dare do three weeks ago. Not content with hunting the poor negro, not content with scourging the "carpet-bagger," as they call the immigrant from the North, or the "scalawag," as they call the Union man who happens to have been born in the South, they now enter your mail-cars to assassinate or scourge the officers of the Government.

Mr. BECK. Where was that done?

Mr. KELLEY. It was done in Kentucky.

Mr. BECK. Let me tell the gentleman the facts of the case to which he refers, as I understand them. The mail-car was entered by one man, a Republican and a Union soldier, who was entitled to the place given to a negro. A grand jury at Louisville, I have heard, investigated the case till they found the facts to be as I state, and then, for that reason, they abandoned the investigation. This occurrence was in January last.

Mr. ELDRIDGE. The 26th of last January.

Mr. KELLEY. Let me tell the gentleman that there are two sides to that story, and that he makes a statement resting in part upon the testimony of a man who gave his evidence with a pistol at his head.

Mr. BECK. I have in my hand a resolution which I have desired to offer, calling for all the facts.

Mr. KELLEY. There are facts in reference to that case which will yet come out. But again, sir, the collection of the revenue of the

Case 1:21-cv-00858-APM   Document 16-4   Filed 07/08/21   Page 13 of 42

Government is interrupted. Officers charged with their collection, men who served in the Union Army and who bear the commission of the United States Government, come here showing the scars inflicted upon them by masked men at midnight. The inability or indisposition of Congress to make the laws of the United States potent throughout our national limits has invited these outrages, has given a premonition of what will be the condition of affairs between now and December, and has justified the President of the United States in asking us to give him power to protect life on every inch of our soil. I thank the gentleman from Ohio [Mr. SHELLABARGER] for his courtesy.

Mr. SHELLABARGER. How much time have I remaining, Mr. Speaker?

The SPEAKER. Fifteen minutes.

Mr. FARNSWORTH. I hope the gentleman does not intend to call the previous question on his motion.

Mr. SHELLABARGER. I yield to the gentleman from Alabama, [Mr. BUCKLEY.]

Mr. BUCKLEY. Mr. Speaker, I take the floor simply for the purpose of making one statement in reply to the gentleman from Kentucky, [Mr. BECK.] If he wants to know where the mails of the United States are interfered with I can tell him upon very good authority. Last autumn a United States mail agent named Frank Diggs, traveling officially in the mail car upon the Selma and Meridian railroad, was shot dead in broad daylight by a man who, as he took aim with his double-barreled shotgun threw from his face his mask; and this mail agent was engaged at that time in assorting the United States mails.

Mr. BECK. I spoke of the Kentucky case.

Mr. BUCKLEY. And yet this Government has never put forth one particle of power to arrest that murderer, nor can it under existing laws. The local authorities are either unable or unwilling to do it.

Mr. BECK. More shame, then, to the present administration of the Government.

Mr. BUCKLEY. The Government does not protect its own lawfully accredited agents there. But the fault is not with the Administration. The President, in the message just read, has asked of Congress additional legislation to enable him to suppress such lawlessness and murder.

Mr. BECK. Has not the Government of the United States the power to arrest anybody guilty of these outrages; and let me ask the gentleman why these men are not arrested?

Mr. BUCKLEY. Wait a moment. The successor of the man who was shot at that place was a confederate soldier who had served four years in the war of the confederacy and was afterward appointed agent on that same route; and the first trip he made he was warned by a man in disguise, who leaped into the mail car with pistol in hand, to leave that route or change his politics, or he would be shot the next trip he made. But I do not propose at the present time to go into these facts.

A MEMBER. What were his politics?

Mr. BUCKLEY. He was a Republican, of course. But, as I have said, I do not intend to go into the facts. I rose merely to answer the statement of the gentleman from Kentucky. Hereafter a more befitting occasion will be afforded, when this committee shall report their action, to lay before the House the facts in connection with these southern outrages, and to urge upon the attention of the House and country the necessity of promptly doing something to rescue our endangered liberties and to protect the citizens of the southern States in their persons, their property, and their lives.

Mr. SHELLABARGER. I will yield now for five minutes to the gentleman from Illinois.

Mr. FARNSWORTH. Mr. Speaker, I do not see what there is in the present stage of this matter to create such or so much excitement. The President has sent us a letter to-day in which, however, I understand he does

not profess to have any information which was not in possession of the House before. He refers the House to facts in the possession of the Senate, alluding, no doubt to a report made some weeks since on investigations made by the Senate committee. That report we have all seen. No new facts are presented to the House. There is now no stats of the case different from that which we have had ever since the 4th of March. There is nothing now. There is simply a sort of half and half recommendation on the part of the President that we should do something. He is in some doubt as to the power he has now under the law; and the Congress of the United States is the very last tribunal to appeal to for the purpose of settling doubts in reference to points of law.

Mr. DAWES. I ask the gentleman from Illinois whether under those circumstances this ought not to be referred, for the very purpose of solving those doubts?

Mr. FARNSWORTH. I was about to speak of that. I do not agree, however, to the suggestion. I was about to say that the last tribunal to solve a legal doubt in the mind of the President is a committee of the House of Representatives. The President is furnished with an officer at the head of the Department of Justice to whom should be referred this question, if he has doubt as to whether the law is sufficient now for his purpose.

As to the facts, we have no new facts, and this House has resolved and reresolved five times since we met here on the 4th of March that it is not worth our while to remain here and legislate, but we should adjourn *sine die* at the earliest possible moment.

I allude the necessity for all this excitement over the message which has been sent to us by the President? As I have stated, he adds nothing to our information on this subject. Gentlemen have created doubts in his mind, upon which, it seems, he has sent us a letter expressing in some sort his opinion that we should legislate. We have expressed our opinion over and over again that we had better not legislate on the question now. The more we legislate the more harm we will do and the more these evils will continue. Instead of doing good we are doing harm. This House has wisely so resolved repeatedly in the present aspect of this question; and I see nothing to change my resolution in that regard.

Mr. SHELLABARGER. I now yield for one minute to the gentleman from Indiana.

Mr. SHANKS. The gentleman from Illinois has stated to this House that there is nothing new in this message, that there is nothing in it which the House did not know before. I ask his attention to this fact, that the House has been divided on the very question which the President makes plain in his message, and that is, whether he has the power to enforce the law and protect these parties in the South.

Mr. FARNSWORTH. Do I understand the gentleman to ask me a question?

Mr. SHANKS. Wait a moment. I wish to say to the House that whatever an executive officer believes the law to be, that is a law to him; and if the President believes there is no power in his hands to protect these people in the South he will not exercise a power which he believes he does not possess.

Mr. FARNSWORTH. He does not say that.

Mr. SHANKS. He does say that as clearly as language can express it.

Mr. FARNSWORTH. He only expresses a doubt.

Mr. HOAR. It seems to me that that gentleman has studied slightly the principles of constitutional liberty who does not see that in a grave and momentous crisis like this it is proper that every extraordinary exercise of power should, if possible, instead of being left to the discretion of the Executive, be distinctly authorized beforehand by the Representatives of the people. From the time Congress adjourns until its reassembling next winter the remedy for such wrongs, so far as it depends

upon executive action, must of course be in accordance with the law, but the Executive himself has doubts as to what is the law and the extent of his power under it. Therefore, when the President informs us that, in his judgment, his powers are not clear, for this Congress to depart hence without making them clear is on the one hand to surrender the people to the executive interpretation of doubtful powers, and on the other hand to abandon the Executive to be denounced by every gentleman on the other side of the House for usurping power in every act he may do.

Mr. Speaker, it is not true that there has been no change since the 4th of March. The evidence comes to us by every mail and by every pulsation of the telegraph from day to day that these outrages are continuing and increasing. The Meridian outrage has been since the 4th of March. The outrage on Palmer the teacher, a man of culture, of education, of character, who, simply for teaching a colored school, was seized, held down by his hair, and scourged with fifty lashes, and has just come to Washington to tell the story of his wrongs, that outrage took place on the 8th of this very month. A few days subsequently the superintendent of schools in the county adjacent to that in which Palmer resided was driven away by these fiends, simply for exercising his duties. Since Congress assembled, some of the high State officers of the State of South Carolina have received notice from these secret bands to lay down their functions and depart. It is idle then for the gentleman from Illinois [Mr. FARNSWORTH] to get up here and say that nothing new has happened since Congress assembled.

Mr. FARNSWORTH. Did we not know all these facts before we voted to adjourn?

Mr. HOAR. No, sir. Any man who knew these facts and voted to adjourn has on his head the blood of those loyal men in the South who may fall victims to these outrages.

Mr. FARNSWORTH. I do not feel that. With a knowledge of the facts mentioned by the gentleman from Massachusetts, a large majority of this House has repeatedly voted to adjourn. The Governor of Mississippi, himself a Republican, has stated that the State authorities have power to deal with these outrages.

Mr. SHELLABARGER. I now yield to the gentleman from Maine, [Mr. PETERS.]

Mr. PETERS. As I have voted for adjournment, and have not given in my adherence to the so-called BUTLER bill, I desire to say a word, and only a word, on the motion before the House. We have received a message from the President. We are bound to give it a respectful consideration of some kind. It is usual to refer executive communications like this to some committee, and the implied assent of the House is usually given for the Speaker to make such references of his own accord. We have no standing committees. The only reference, therefore, which we can make is to a special committee. Courtesy, usage, justice, and every other consideration demand it.

The question before the House is not as to the merits of any particular bill. The committee may report that no action shall be had. We cannot tell in advance what kind of a bill it may recommend. Therefore it seems to me that the discussion in advance of the reference needs to be only of a very limited and unimportant character. With these views, I have no other alternative, and I do not see how other gentlemen can do otherwise than to vote for a reference of this bill to a special committee, as the gentleman from Ohio [Mr. SHELLABARGER] has moved.

Mr. SHELLABARGER. Now I have but a moment or two left.

The SPEAKER. The gentleman has three minutes.

Mr. SHELLABARGER. I wish to say this, that by no action or vote of mine shall the previous question be called upon any measure that




DATE DOWNLOADED: Thu Jul  8 11:50:35 2021
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
42 Cong. Globe 309 (1871).

ALWD 6th ed.
, , 42 Cong. Globe 309 (1871).

APA 7th ed.
(1871). Congressional Globe, The, 42, 309-322.

Chicago 17th ed.
"," Congressional Globe, The 42 (1871): 309-322

AGLC 4th ed.
" (1871) 42 Congressional Globe, The 309.

OSCOLA 4th ed.
" (1871) 42 Cong Globe 309

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

treason should be prohibited from again holding office under the Government; and even this disability has been asked for in good faith. Under these circumstances we have a right to expect and demand at least a quiet submission to just and wholesome laws from our late enemies. Unfortunately, however, our reasonable expectations have not been realized. There exists at this time in the southern States a treasonable conspiracy against the lives, persons, and property of Union citizens, less formidable it may be, but not less dangerous, to American liberty than that which inaugurated the horrors of the rebellion. The existence of this organization and its treasonable character are proved by the sworn testimony of an array of witnesses from all parts of the South, which must carry conviction to the minds of the most skeptical.

The evidence taken before the Senate committee in relation to the outrages, lawlessness, and violence in North Carolina establishes the following propositions:

1. That the Ku Klux organization exists throughout the State, has a political purpose, and is composed of the members of the Democratic or Conservative party.

2. That this organization has sought to carry out its purposes by murders, whippings, intimidation, and violence against its opponents.

3. That it not only binds its members to execute decrees of crime, but protects them against conviction and punishment, first by disguise and secrecy, and second, by perjury, if necessary, upon the witness-stand and in the jury-box.

4. That of all the offenders in this order, which has established a reign of terrorism and bloodshed throughout the State not one has yet been convicted.

James E. Boyd, a witness before this committee, against whom nothing can be alleged except that he was a confederate soldier, a supporter of Seymour and Blair in 1868, and initiated into the Ku Klux Klan as an auxiliary of the Democratic party, testifies, in answer to a question as to the designs and regulations of that order, as follows:

The meetings were to be held in secret places—in the woods, or some other place distant from any habitation, in order to avoid detection. The disguise prescribed was a long white gown, and a mask for the face. No applicant could be admitted as a member of the organization until his name had first been submitted to a regular camp. A county was divided into a certain number of districts, and each district composed a camp, which was under the command of a captain. The whole county constituted a klan, under the command of a chief. No person could be initiated as the member of any camp until his name had been submitted to the camp and his application unanimously agreed to by the members of the camp. The manner of making raids was prescribed by the regulations. No raid was to be made, no person punished, no execution done, unless it had first been unanimously agreed upon in a regular meeting of a camp of the klan and duly approved by the officers and the chief of the klan. The sign of recognition of the White Brotherhood was by sliding the right hand down along the opposite lappel of the coat. If the party to whom the sign was made was a member of the organization he returned it by sliding the left hand in the same manner down along the opposite lappel of the coat. The word of distress was "Shiloh." There was a sign of distress to be made when a brother was in distress and wanted assistance. I do not remember the sign; it was some sign made by the hand. But if the person was so situated that the sign made by the hand could be seen, then the word "Shiloh" was used to denote distress.

Question. Upon the oath administered, the mode of procedure prescribed, and the government of the organization, so far as you have observed, are the members bound to carry out the decrees of the order, if they involve murder and assassination?

Answer. I think so, sir. If it was decided to take the life of a man a camp is ordered to execute the sentence, and is bound to do it.

Question. What would be the penalty if any member refused?

Answer. I do not know that any penalty was prescribed for that. A member could excuse himself from attendance at meetings or from going upon raids if he had a proper excuse. The penalty prescribed in the regulations for the punishment of any member who should disclose the secrets of the order was death. Each member was informed upon his initiation that if he disclosed the secrets of the organization he should be the first victim.

Question. If any arrests should be made by the civil authorities for murders or other crimes committed in pursuance of the decrees of a camp, to what extent did the obligations of members bind them to assist and protect each other?

Answer. To whatever extent was in their power.

Question. Did it go to the extent of giving testimony in behalf of each other or of acquitting if upon a jury?

Answer. I think that was one of the objects and intentions of the organization, that a person on the witness-stand or in the jury-box should disregard his oath in order to protect a member of the organization.

Question. Do you know of any instances of wrong or outrage perpetrated upon persons in pursuance of the decrees or orders of this organization?

Answer. I do not know of any decrees or decisions they made. I know of punishments that were inflicted by the organization.

Question. State any of them that you now remember.

Answer. The most serious instance in my county, I believe, was the hanging of a negro man by the name of Outlaw, who was taken from his house, in the town where I live, about one o'clock at night, by a band of from eighty to a hundred men, and hung upon an elm tree, not very far from the courthouse door.

Question. When was this?

Answer. On the night of the 26th of last February.

Question. What was the offense charged against him?

Answer. I never heard of any. The newspapers have said that he was guilty of having shot at a band of Ku Klux that passed through the town some time previous, but that was not true. * * * *

Question. What is your knowledge of the object and extent of this organization throughout the State?

Answer. I can only state from hearsay—what I have heard from members of the organization. The number of the members of the organization is supposed to be forty thousand. That object was the overthrow of the reconstruction policy of Congress and the disfranchisement of the negro. There are two other organizations besides that of the White Brotherhood, as I said before. I was a full member of one of them and partly a member in the other. I cannot say that I considered myself really a member of the other. One organization was called the Invisible Empire. There is another organization which rather superseded the White Brotherhood in my county, after it had gone on for some time, and was called the Constitutional Union Guard, whose oaths and manner of operation were about the same. There was very little difference; some change in the signs. The sign of recognition was by crossing the hand on the breast. * * * *

Question. In speaking about the punishing of men, on these raids, in the first part of your testimony, what do you mean?

Answer. Whatever punishment was passed upon in the camp.

Question. For what were they punished?

Answer. I do not know; just whatever they saw proper. If they thought the man ought to be killed for being too prominent in politics, they would have a meeting and pass sentence upon him. I have no doubt in my own mind though I have no information from others that such was the case; but what their aim was killed in order to break up the organization of the colored voters in my own county, or frighten them away from voting.

Question. Were other punishments inflicted in your county besides this?

Answer. Yes, sir. In consequence of Outlaw's murder, a negro by the name of William Puryear, a half simple fellow, who, it was said, saw some of his neighbors parading in disguise from Graham the night that Outlaw was hung, was drowned in the mill-pond.

Question. Were there any whippings in the county?

Answer. Yes, sir. I believe there were one hundred or one hundred and fifty in the last two years in the county, white and black. Some have been whipped two or three times.

I have quoted largely from the testimony of this witness for the purpose of showing the dangerous character of this organization. I also make an extract from the testimony of Hon. Thomas Settle, one of the judges of the supreme court, showing the same state of things and strongly corroborating the material statements of Mr. Boyd:

By the Chairman:

Question. Give us your belief as to the true position of the political organizations with reference to this organization.

Answer. Well, sir, I must think that the present Democratic party there, judging from the circumstances, are encouraging it. I do not think it is accidental. In the course of our investigation last summer it leaked out in the testimony that Hamilton C. Jones, present member of the Legislature, gave the signs of the Invisible Empire to James E. Boyd, who was then a Democratic candidate for the house of commons for Alamance county. Dr. Moore, also, who had been a member of the previous house, gave the signs of the Invisible Empire. Mr. Boyd had belonged to the White Brotherhood, and there was a proposition to make it more compact, it was said. After Dr. Moore had given the signs to Mr. Boyd they walked down to the Yarboro hotel and went into the room of Colonel Jones, who also gave Mr. Boyd the signs. It was not proved that they were members, but Mr. Boyd said in his

testimony that Mr. Jarvis was in the room when Hamilton C. Jones gave him the signs. It was further stated by Mr. Boyd that he learned from Dr. Moore that Frederick N. Strudwick, a grandson of a former chief justice, Frederick Nash, was on his way to assassinate Senator Shoffner, who had introduced the stringent militia bill. Well, at the next session of the Legislature, Mr. Jarvis was made speaker. He is speaker of the present house. No person swore positively that Mr. Jarvis was a member of the organization, but Mr. Boyd swore that Dr. Moore informed him that Jarvis was a member, and that Jarvis was in the room when Jones gave the signs. Mr. Jones is a prominent member of the senate, and Judge Warren, who is presiding officer, belongs to the public health. Mr. Jones frequently presides in that body. It is notorious that the resolution of impeachment of Governor Holden was passed in caucus. Mr. Strudwick was charged with introducing, and did introduce, the resolution. He was also prominent in bringing forward a bill, which passed and became a law forthwith, to repeal the act which had been passed, introduced by Mr. Shoffner. I draw from these facts the inference that the Legislature must be controlled by those men who were honored by the party, and who were elected last summer as members of the party, and I think that is the general opinion.

Question. Do I understand you, then, to say that the weight of what is known as the Conservative or Democratic party at present gives encouragement to this organization, and that those of that party who denounce it are exceptions?

Answer. Yes, sir; that is the general opinion there.

Question. What has been the effect on the public mind with reference to the security of person and property, of these outrages, and the difficulty in the way of punishment?

Answer. Well, sir, I suppose any candid man in North Carolina would tell you it is impossible for the civil authorities, however vigilant they may be, to punish those who perpetrate these outrages. The detection not so much with the courts as with the jurist. You cannot get a conviction; you cannot get a bill found by the grand jury, or, if you do, the petit jury acquits the parties. In my official capacity I sit with Judge Pearson and Judge Dick. Judge Pearson issued a bench warrant last summer for some parties, and had them brought before him at Raleigh. He requested Judge Dick and myself to meet him. We did so, and the trial extended over three weeks, and there it came to our knowledge that it was the duty and obligation of members of this secret organization to put themselves in the way to be summoned as jurors, to acquit the accused, or to have themselves summoned as witnesses to prove an alibi. This they swore to; and such is the general impression. Of course it must be so, for there has not been a single instance of conviction in the State.

Question. Upon investigations made before you in your official capacity, have you any doubt that a state of things exists requiring men to shield themselves in the way you have mentioned?

Answer. None whatever. I am satisfied, from their own declarations and from the effect visible in all the courts, that it is so.

Question. Where they are charged with offenses, is there any probability of securing justice against them in counties where the organization exists at all?

Answer. Well, sir, my belief is that the organization extends to every county in the State. I am satisfied that the organization is a very extensive one. I have no doubt it is much more numerous in some counties than others, and I believe the middle or Piedmont region of the State is the chief nucleus, and that there the outrages have been the most numerous.

Judge Logan, of the ninth district, and Judge Henry, of the eleventh district, express substantially the same views. Their opinions are mainly founded upon the effects visible in the courts over which they preside and about which they can neither be mistaken nor deceived. Certain it is that these criminals are able to baffle and set at defiance all the ordinary appliances of the law. The testimony of Thomas W. Willeford, formerly a member of the Ku Klux Klan, throws additional light upon the secret workings of this order and discloses the means by which these results are brought about in the State and local courts. This witness testifies as follows:

Question. Did they tell you what the object was?

Answer. Yes, sir; in the first meeting. I was initiated in Kennedy's barn.

Question. Did you take the oath?

Answer. Yes, sir; and then the next Saturday went to the meeting.

Question. What did they tell you then was the object of the organization?

Answer. They told me it was to damage the Republican party as much as they could—burning, stealing, whipping niggers, and such things as that.

Question. Murder?

Answer. The leading men it was to murder. * * * * * * *

Question. Have you ever heard of a Ku Klux being convicted of any offense there?

Answer. No, sir.

Question. Was there anything in the obligation you took or the rules of the order as to your being obliged to defend men by your oaths, or otherwise?

*Answer.* Yes, sir; if he could get you in as a witness you had to swear him out, let you be swearing a lie or not. If you swore against him, why you might just as well be a-traveling at once.

*Question.* You mean by that you would be in danger of your life from the order?

*Answer.* Yes, sir.

*Question.* Anything about getting on the jury?

*Answer.* Yes, sir; if we could get on the jury we could save him, do what you please.

*Question.* No matter what the proof?

*Answer.* Yes, sir; you could not bring proof enough to convict.

The following testimony of Caswell Holt, a poor and ignorant, but honest and conscientious negro, who was twice visited by the Ku Klux, will show the manner in which these outrages are executed:

By the Chairman:

*Question.* Were these men disguised?

*Answer.* Yes, sir.

*Question.* How?

*Answer.* They all had long white robes on, all of them, hoops gowns, and caps on their heads with three horns. I went to my house; my wife said, "What did they do to you?" I said, "Don't talk to me: they pretty nigh killed me." She kept on at me, and asked me what they said and did to me. At last she said, "Man I go down to the house for Mr. Holt?" I told her, "Yes, you may go down there and tell him to come up; I want to see him." I could neither sit, lie down, nor stand; I was up and down all night, trying to get some ease some way.

*Question.* To what extent was your back injured?

*Answer.* It was cut all to pieces; and my wife pulled a splinter out of me here [putting his hand on his right hip] as long as my finger, from one of the sticks they hit me with.

*Question.* Now go on and tell us about the time when you were visited again.

*Answer.* I went on in that way until the crop was gathered again; it was about two weeks before Christmas. I had done gathered the crop and moved a little wheat on the place. I was going to move the next week. I would have left the week before they shot me, but there was a little road they wanted to cut out from Gun Creek to Company Shops, and I went there on Saturday and worked on that. I had been chopping very hard, and came home that night and laid down on the bed. The boys were all up there that night. The dog broke out after I laid down. There was a hole in the walls of the house; it was a log house; and the boys peeped out and said, "Here, pap, the Ku Klux are all around the house." I said, "They are?" They said, "Yes." By this time they were at the door, and said, "Open the door." They already made it to the door with a stick, or something—bang against the door. I said, "No, sir; I don't open my door for no man, unless he tells me who he is and what he wants." He said, "God damn you, open the door." I thought when he come that way he wouldn't get me to open it, sure. I said, "No, sir." He said, "Strike a light before you open it." I said, "I've nothing to make a light of, and if I had I wouldn't do it, and I won't open the door." I then went to the door; it was a little thin poplar door, about three quarter inch plank. I stood at the door. My biggest boy was standing a little piece off from me. There was an ax sitting there, and I picked it up and went to reach it to him, so that if they should break in we would hurt some of them before they did too much mischief. I had a bowie-knife in my hand, standing there at the door. I was standing there as close as I am now to this table. They said, "Open the door." I said I shouldn't do it. Then one said, "Blow his brains out." Just as he said that they all fired through the door, just red-hot, just flaming red when they came through. I didn't think it was but one crack; but they said they shot a half a dozen times or more. I clapped my hand on here [placing his hand on his breast] and said, "There, they've shot me." My boy knew where there were some loose planks in the floor. He jerked up two of them, and they all run through under the house—all the biggest of them; all but the three little girls I had.

*Question.* What occurred afterward?

*Answer.* The next morning I sent for the doctor to come and take out the balls, Dr. Montgomery. He came and took out the balls, and told them they had better move me to Graham, if I was to be moved, or else they wouldn't move me at all. That evening they carried me to Graham, and got me there just at night.

*Question.* How many balls did they fire into you?

*Answer.* [The witness indicated where he had been shot—in both arms and in his chest.] There were five balls and two shot.

*Question.* What has been the effect of such proceedings upon the colored people of that county; do they feel safe?

*Answer.* They don't feel safe there at all, I can tell you that; and a great many of them have taken the notion to leave; they could hardly stay about there. They wanted to run them all off because the principal part of them voted the Radical ticket.

By Mr. Nye:

*Question.* Wanted to run all off who voted the Radical ticket.

*Answer.* Yes, sir.

*Question.* Did you hear that said?

*Answer.* Yes, sir; I heard it talked, and I saw them try it. They tried to turn me from voting the Republican ticket; but I did'nt turn, and that is what they shot me for I reckon. That is the case every election that has been there. They have been

trying to get us to vote the Conservative ticket; some they would get to vote it, and some they wouldn't.

*Question.* Were those that would not vote the Conservative ticket the ones that had these outrages committed on them?

*Answer.* Yes, sir. You never saw one bothered at all that voted the Conservative ticket.

Can any one, Mr. Speaker, contemplate these disclosures without surprise and well-founded alarm? Yet, sir, the Democratic party have from the first denied, and then palliated and excused these outrages. In Tennessee and other southern States the laws which had been passed by Republican Legislatures to suppress and punish the Ku Klux were repealed as soon as the Democratic party came into power. The relation of the Democracy to this order is precisely that of the receiver of stolen property to the thief. The murder of leading Republicans, terrifying the colored population, and putting whole neighborhoods in fear so that the Ku Klux can control an election, is heralded as a Democratic victory.

For the purpose of showing that it is well understood where these outrages are committed that the Democratic party is willing and anxious to receive the benefits of murder and rapine, I cite the testimony of W. P. Bynam, the solicitor of the ninth judicial district of North Carolina, found on page 54 of the Senate report:

*Question.* Do the political parties divide in their sentiments in regard to the outrages committed by this organization, or do those of the same political party differ with each other in regard to them? I give us the true state of feeling on that subject.

*Answer.* I think the Republican party, as a party, are universally opposed to these klans; they are regarded by them as confined to the Democratic party, or the Conservative party, as it is called there.

The difficulty with me has been that I apprehend they are tacitly countenanced by the Conservative party, who are willing to derive the benefits that may result from their operations.

We may as well concede, Mr. Speaker, that if this system of violence is to continue in the South the Democratic party will secure the ascendency. If political opponents can be marked for slaughter by secret bands of cowardly assassins who ride forth with impunity to execute the decrees upon the unarmed and defenseless, it will be fatal alike to the Republican party and civil liberty. But, sir, we may well ask where this will end. How long will it be before the Tammany Hall Democracy, who are now furnishing arms to the Ku Klux of the South to murder southern Republicans, will introduce this new element of Democratic success into northern politics?

The report, Mr. Speaker, to which I have referred shows over one hundred and fifty authenticated cases where persons have either been murdered, brutally beaten, or driven away at the peril of their lives. And the same deplorable state of things exists in South Carolina, Georgia, Mississippi, Louisiana, Kentucky, Tennessee, and Texas. Jails have been broken open, the officers of the law killed while attempting to discharge their sworn duty, and the criminals turned loose upon the community. Revenue officers and mail agents of the United States have in some instances been murdered, and in others driven away from their posts. But a few days ago, over a hundred Alabama Ku Klux made a raid upon Meridian, Mississippi, and carried off their victims for execution. A meeting of the citizens was called to protest against these outrages. The Ku Klux became alarmed. At their instigation warrants were issued for the arrest of peaceable and well-disposed negroes upon the charge of "using seditious language." When the court convened they again assembled in force, and commenced the work of death. Judge Bramlette, the presiding magistrate, was shot and the scene closed by driving the Republican mayor out of the city. I copy the following statement of the exiled mayor from the New York Tribune:

The Ku Klux will endeavor to make the people of the North believe that Judge Bramlette was killed by a negro. They may make some believe it. But I do not believe that any of the arrested negroes

had any weapon other than a pocket-knife, as I was present at the trial for some time and sat close to the accused, and saw none. But in a direct line from the sheriff's office door to the main hall there sat one of those negroes; and I believe, although I saw not the shooting, that one or more of the Ku Klux, in carrying out their design, shot Judge Bramlette. After the negro was shot he jumped out of the two-story window; after which he was killed. George Dennis, colored, was shot in the court-room, after which he was thrown from the two-story window on to the brick pavement below, and as that did not kill him, they then cut his throat. After they had killed J. A. Moore they went and burned his house; and so they continued their hellish barbarities. They surrounded my brother's house. They were all armed with double-barreled shot-guns, and, as I was told, two hundred in number.

Many good citizens of Meridian plead for me, as well as many in the Ku Klux columns, who were in them, not from choice but from necessity. They appointed committee after committee to wait upon me and to inform me that I must leave by ten o'clock next day. Their principal commanders visited me. I wanted to know the whys and wherefores, but they said they cannot to argue any question of right; the verdict had been rendered. They treated me respectfully, but said that their ultimatum was that I must take a northern-bound train. I yielded. At about half past twelve o'clock at night perhaps three hundred came and escorted me to the cars. Some difficulties and dangers presented themselves, but I got here in safety.

I am much a sufferer in pain and feeling; but I believe that the State of Mississippi is able to indemnify me. Let me urge the necessity of having martial law proclaimed through every southern State. The soldiery to be sent there should be quartered on the rebels. Leniency will not do. Gratitude they have none. Reciprocation of favors they never dream of.     WM. STURGES.

New York, *March* 15, 1871.

The Democracy have eagerly seized upon a telegram of Governor Alcorn for the purpose of concealing the enormity of this affair. But, sir, a careful analysis of that remarkable dispatch will furnish conclusive evidence of all the weakness, imbecility, and indifference of the State authorities which has ever been charged. Governor Alcorn says, "A riot occurred recently at Meridian, but was promptly suppressed." What is this statement worth in face of the facts that there were two riots, and neither suppressed until the rioters had accomplished their murderous designs? The Governor continues: "Some minor outrages have been committed on other points of the Alabama border in the night by parties in disguise." The murder of Union people all along the Alabama border is termed "minor outrages." When, a few years ago, Martin Koszta, a Hungarian refugee, who had declared his intention to become a citizen of the United States, was seized upon foreign territory by an Austrian press-gang, our Government exhibited her glory and greatness by demanding his release, even at the risk of war. But at this day, with the lessons of the rebellion before us, the Union people of the South are murdered morning, noon, and night; and when we propose to legislate in their behalf, we are told by gentlemen on the other side of this House that Congress has no power under the Constitution to protect the lives of the citizens of the Republic. Hear this humane Governor of Mississippi a little further: "My only difficulty," he says, "in these cases is to discover the wrong-doers." Here is a confession of the whole case. It presents the singular spectacle of a Governor of a State apologizing for the murder of American citizens and acknowledging his inability to even discover the offenders.

The whole South, Mr. Speaker, is rapidly drifting into a state of anarchy and bloodshed, which renders the worst Government on the face of the earth respectable by way of comparison. There is no security for life, person, or property. The State authorities and local courts are unable or unwilling to check the evil or punish the criminals. It is not a question of power or numbers. If the cowardly miscreants who conceal their crimes by hideous disguises, the dark pall of night and the darker pall of perjury, would give the loyal people of the South an open field and a fair fight they would protect themselves. But, sir, the Ku Klux system is ingeniously devised for the





DATE DOWNLOADED: Thu Jul  8 11:56:04 2021
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
42 Cong. Globe 358 (1871).

ALWD 6th ed.
, , 42 Cong. Globe 358 (1871).

APA 7th ed.
(1871). Congressional Globe, The, 42, 358-376.

Chicago 17th ed.
"," Congressional Globe, The 42 (1871): 358-376

AGLC 4th ed.
" (1871) 42 Congressional Globe, The 358.

OSCOLA 4th ed.
" (1871) 42 Cong Globe 358

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

always more developed in the southern people than in the northern. Slavery induced this propensity, as it led them into a war against the nation. I regard the present manifestations as the receding of the waves which were produced by that storm of blood which prevailed for four years, and spent its main force upon six hundred battle-fields.

There is a struggle in the South on the part of those who ruled before the war to recover their lost domination. It is legitimate for any class of people to seek control or power if the means employed are consistent with the laws of the land. I think the Democratic party of the South do, in many instances, resort to appliances which cannot be justified and are pointedly in conflict with that just and celebrated sentiment of Thomas Jefferson, that "error of opinion may be safely tolerated when reason is left free to combat it." They have not always left reason free to combat their principles. That the condition of those at the close of the war who had joined their fortunes with the confederacy was uncomfortable, I well understand. It is as hard to bear misfortunes which are self-imposed as it is to endure those which are brought upon us by others. Soldiers keenly appreciate the sting of defeat. The southern people had lost their cause, and were broken up in their property. They had been unus'd to labor. The whole social fabric had become a scattered wreck. Although these calamities were the results of their own wrongful acts in warring against the nation, still the prospect was uninviting, and required the exercise of the greatest philosophy to pass out of such a state peacefully and successfully. It will take time and patience and industry and the subduing of prejudices and passions to bring them out; and it is the duty of the nation to lend every aid legitimately in its power to hasten the day when the wrongs and disasters of the past shall be effaced from memory.

The white people of the South are most strongly prejudiced against the colored people. Not so much, however, against them for their color as for their previous condition. The sudden and radical change which has made the slave a coequal citizen does not commend itself so readily to the mind of the whilom slaveholder as to those of us who were reared and educated under other circumstances. While the war was progressing Federals and Confederates learned to regard each other as enemies, and it was a feeling that pervaded the minds of the entire population of both sections. This feeling unhappily did not die away with the sound of the last discharge of fire-arms, and it is hardly a law of mind that it should cease instantaneously. Hence northern soldiers and northern men who settled in the South were regarded as inimical, and the feeling as a rule was reciprocal. While we believe that the people of the South were criminally wrong in engaging in the rebellion, still we must concede the fact that the great mass of them were sincere. Their opinions resulted from false political teachings of thirty years' duration.

Observation has shown us that conscience is largely the creature of education. Hence, the people of the South look upon laws for the punishment of treason and restrictions upon political privileges and immunities as unkind and oppressive. These are some of the facts which we are to consider and apologize from which are some of the causes from which the present condition of the South has resulted.

When the war closed there were two elements of population in the South whose future status was undetermined: the blacks, who had never enjoyed citizenship, and the large mass of the whites, who for their acts might be deprived of citizenship. The solution of the problem, so far as it enfranchised and citizenized both classes, was a wise policy. Whether the nation ought to have gone further and made citizens of all need not now be discussed. Whatever may have been best then, it is clear to my mind

what course should now be pursued. I would grant amnesty at once. It will not be followed by any dangerous consequences. Good only will flow from such an act.

Why not grant amnesty? Is it withheld from fear of adding strength to a political foe? For such a reason it would be ignoble to withhold it. But it will not add a feather's weight to the one side or the other. All can vote now. Disqualification at best is only a limitation on the number of men who may hold Federal offices. It has been urged that amnesty should be withheld because violence and outrages are perpetrated in the South. Disfranchisement incites to acts of violence. That men feel wronged when their political privileges are restricted is rather natural in America. One such man embitters a whole community if he attempts it, and if he does not make complaint himself, his neighbors and friends do it for him. This is an age and a country of enfranchisement rather than of disfranchisement. It is morally and physically impossible to maintain tranquillity in any State, in any section, when any considerable portion of the people of that State or section are disfranchised. You may send your Army to capture, and your courts to try and punish offenders, but you had better send also the full guard of citizenship to those who are without it. I would use force, if necessary, to quell disorders, but I would remove every exciting cause of discontent.

But it is said that the white people of the South are opposed to the conferring of political privileges upon the blacks. The assertion is true. I do not believe, however, that they will attempt to annul or abrogate the fifteenth amendment any sooner than the Democrats will everywhere. Whether opposition to it shall cease depends entirely upon the action of the Democratic party. If that party says that the amendment shall not be executed, their partisans in the South will obey the mandate. If, on the contrary, the decision is to submit to it, the advice will be followed. The exercise of political franchises by the blacks will be more tolerable to the hostile whites if they are permitted to enjoy as much themselves. Turn this question over as you will, and look at it from every stand-point, to my mind the arguments for amnesty are unanswerable.

Tennessee disfranchised more than a third of her adult male population. That the State government should speedily fall into the hands of the friends of those who were affected by this proscriptive policy was inevitable. No other result could have been expected. It required more than the legacy of fifteen hundred State troops left by Governor Brownlow to Governor Senter to prevent the popular uprising. The result in that State is to be most deeply deplored, for she gave more of her sons to the Union Army than any or perhaps all of the States which seceded, and she furnished many of the ablest, most unflinching, and self-sacrificing patriots of the South. Missouri had her proscriptive laws and the ties of party were not strong enough to bind men to their support. The Republican party cannot afford to continue disabilities. Wherever a liberal policy has been adopted victory has perched upon the Republican standard; the opposite policy has been followed only by disasters.

Mr. Speaker, my own State has had her carnivals of blood, more bloody than any other State or all other States combined. Her crescent condition is a source of congratulation to my party for the wise course which has been pursued. The New Orleans Republican of a recent date holds the following language:

"There is no complaint as to Louisiana, thanks to the superior intelligence and greater industry of our people, who have found more profit in accepting the laws and in attending to their material interests than in defending their ancient prejudices and in resisting the manifest will of the nation."

The profoundest peace there prevails. It is as quiet as Vermont. This result is largely

due to the liberal policy adopted by the Republican party of the State. I would do injustice not to say that something is also due to the advanced grounds taken by the Democratic party in that State, and I must commend their example to their brethren in other States. The Republicans planted themselves squarely upon the platform of amnesty, and struck from the State constitution and abrogated all disfranchisements for participation in the rebellion by a nearly unanimous vote at the ballot-box. The Democratic party in their State convention passed resolutions accepting the principles of the fifteenth amendment, and invited negro delegates to sit in convention with them on terms of equality. After these occurrences there was no war of races threatened or predicted. Peace has smiled upon the people ever since, and if the two political parties of the nation would follow the examples which have been furnished them in the State of Louisiana we might confidently look for an early dawn of a halcyon period throughout the South and the whole country.

The people of the southern States are anxious to recover from the losses of the war and to resuscitate their broken fortunes. They appreciate fully the advantages of works of internal improvement, and are turning their attention to the subject to the best of their ability. Every act of the Government which encourages the development of resources creates a feeling of satisfaction. Legislate as you will, and enforce order and obedience to law with as strong a hand as you may, still you will accomplish more in the way of removing exciting causes and in softening animosities, by general amnesty acts and by generous and well-adapted legislation to promote the development of the material resources of the South.

But, sir, I do not expect such marked results from the action of the General Government as do gentlemen of more sanguine temperaments. By far the most depends upon the action and efficiency of local governments. The people themselves must sooner or later rise up in their might and put an end to crimes and disorders. I deplore turbulence everywhere and am willing to grant the requisite forces for its suppression whenever it may be practically and safely employed. But I do not despair of the Republic nor of the South, nor do I totally believe in the efficacy of force, and force alone. Time, tolerance, and education are potent remedies for American evils. May I venture to say, in conclusion, that, with all the terrible facts before us, and with all the exaggerations which are so likely to occur, there is not a man of intelligence and thought who did not at the close of the war fear more extensive and obstinate disorders in the South than any which have been experienced?

I yield whatever time I have left to the gentleman from Ohio, [Mr. MONROE.]

Mr. MONROE. Mr. Speaker, I do not propose in the few words which I have to offer to enter upon an examination of the condition of affairs in our southern States. Enough, I suppose, will be admitted in that respect to justify the entertainment and discussion of this bill. I think it must be generally admitted that there exists in that portion of our country an extensive and powerful secret organization, which has become the occasion of very general complaint. Without assuming anything in regard to the character of this organization, as political or otherwise, without assuming anything in regard to the ultimate object which it seeks to accomplish, the plain fact remains that members of this organization, with its approval, by means of murder, burning, and scourging, have established in many neighborhoods a reign of terror.

It is well known that there are large districts in which life, liberty, and property are, to a portion at least of the people, insecure to an extent which is most alarming, and that yet the authors of this criminal disorder are not convicted, and the State whose laws they vio-

lowed by a second, and a third, and so on, until constitutional restraints are soon broken down. "Eternal vigilance is the price of liberty," a maxim as true as trite. On this subject, Junius, in his advice to the English people, expresses himself in language as forcible as it is beautiful, and it will apply to us with even greater force. He says:

"If an honest, and I may truly affirm, a laborious zeal for the public service, has given me any weight in your esteem, let me exhort and conjure you never to suffer an invasion of your political constitution, however minute the instance may appear, to pass without a determined, persevering resistance. One precedent creates another. They soon accumulate and constitute law. What yesterday was fact to-day is doctrine. Examples are supposed to justify the most dangerous measures; and when they do not suit exactly, the defect is supplied by analogy."

This was the advice of a great statesman to his countrymen, and it seems the English people appreciate its value, for at a much later period Macaulay says:

"We have been taught by long experience that we cannot without danger suffer any breach of the constitution to pass unnoticed."

A short experience ought to have been sufficient to have taught us the same thing. We have a written Constitution, prescribed by the sovereign power, the people, containing suitable limitations and restrictions on the known tendency of power to transcend its proper limits; but we do not profit by either the lessons of philosophy or the advice of patriot statesmen.

Our people seem to labor under the delusion that liberty is indestructible. If they will continue, they will soon find a sad end to their delusion. We have seen bad precedents followed by worse. We have seen invasions repeated, and each succeeding one magnified. This bill is the last and greatest of these innovations. We have seen act follow act, until all the original rights of the States have been absorbed and centered in Congress, and Congress now proposes to pass all the power thus absorbed into the hands of one man. Let this bill pass, and then farewell to the Republic.

Although the people have until the last elections been silent and passive, I pray God they may yet reclaim the lost ground; and the hope of every patriot now rests on them. I appeal to them to correct these abuses and to restore the Government to its original beauty.

Men who knowingly err will generally justify themselves on some pretext, and though they have to do so by appealing to some popular prejudices. Revenge is one of the base passions of human nature, and, no doubt, has great weight in shaping public sentiment at the North against the southern people. And there are those who would pander to this vicious passion by justifying the extreme measures of Congress as a proper punishment to the people of the South for their errors.

Such a motive may have influence with some, but it is an aggravation of the wrongs. Congress has no right to inflict punishment on individuals or on whole communities. How blind and misguided is that policy which undertakes to bring back a misguided people by oppressing and punishing them! Was ever a people brought to love or even respect a government which oppressed them? Man can never be brought to love those who oppress him. Religion may teach it, but in vain. And if there be any such thing as a free government which does not command the respect and approbation of the people, statesmen have failed to show us how it can be maintained. Punishment was not the object; it was a shallow pretense, used to deceive the people. The veriest rebel or secessionist at the South becomes at once a loyal citizen, purged of his offense, by joining the party and sustaining its extreme measures. Many of its most prominent men at the South, from Governors down, were the most zealous and active secessionists. They are rewarded and not punished. There is great joy over their conversion to the Republican party.

This proves that punishment was not the object. If the southern people are disloyal, as they are charged with being, oppression has made them so, and the Radical party is responsible therefor. At the close of the war they acknowledged their error, they had suffered grievously for it, and were anxious to be restored to their relations with the Government, and did all in their power to place themselves right. They were repulsed with scorn and consigned to punishment under military despotisms.

That old Roman was wise who said in the Roman Senate the way to attach a conquered people to their conquerors is to treat them with kindness. And it was said that Romulus was very wise, with respect to the people he subdued, by making those who were his enemies the same day citizens. The southern people are even yet treated as enemies, and such treatment is very sure to make them so. Kindness is the fountain from which attachment springs as well for Governments as for individuals.

A Roman emperor made a conspirator against his life his warm friend by forgiveness and kindness. Had the Republican party pursued this policy after the war closed it would have given renewed strength and renewed attachment to the Government. Besides, sir, the secessionists had some claims to forgiveness, especially from New England. It was a plant of northern origin, as early as 1796, under the nurture of the Hartford Courant, and upon the acquisition of Louisiana it received a new stimulus and bid fair to bring forth its fruits. Its spread was encouraged by public journals, public meetings, legislative bodies, and from the pulpits. It was fostered by such names as Plummer Pickering, Tillhouse, Hunt, Otis, Griswold, and others, and culminated in that Hartford convention which sent delegates to Washington as its advocates. Its prospects, however, were blighted by the general joy produced by General Jackson's brilliant defense of New Orleans.

To say nothing of the effect of this bill on the South, what of the northern people? By sustaining the Radical party they but forge the chains that ere long will encircle them in the toils of slavery. They have encouraged precedents which this day by this bill threaten to break up their State governments and place them under a one-man, military despotism, which will subject their lives, liberties, and property to military tribunals. And what of the western people, that great community of noble men whose minds should be as free as the air they breathe, will they too crouch before the tyrant's scepter, voluntarily surrender their rights, and willingly take upon themselves the yoke of slavery?

Will they quietly stand by and see a military satrap, with licentious soldiery, take possession of their States and State governments? Will they calmly see the standard of military supremacy erected on the ruins of civil power? The North, the West, and Middle States had better beware. They will but fill the chalice which ere long will be applied to their own lips. When it comes they will have but themselves to blame. In adhering to the Republican party, they have but fostered the monster which is now about to crush them.

I yield for twenty minutes to the gentleman from Pennsylvania, [Mr. STORM.]

Mr. STORM addressed the House in remarks which will appear in the Appendix.

Mr. ARCHER. I yield now to the gentleman from Missouri, [Mr. McCORMICK.]

Mr. McCORMICK, of Missouri, and Mr. MOORE addressed the House in speeches which will appear in the Appendix.

Mr. LOWE. Mr. Speaker, the questions presented for consideration upon the bill before the House are of the very first importance. We are confronted with the two inquiries whether the proposed legislation is needful and whether it is lawful. If these conditions con-

cur, if the exigencies of the public welfare demand it, and if the bill may be constitutionally enacted into a law, then there can be no doubt of the duty of the House and of Congress to provide such redress as this bill proposes. Individual and personal rights are insecure and systematically invaded in several of the States may be palliated, but cannot be successfully denied. The evidence is contained in the voluminous report of the Senate committee elicited from a crowd of witnesses; and it is also brought to us by the public press and by the mouths of those who speak of what they know and have seen.

While murder is stalking abroad in disguise, while whippings and lynchings and banishment have been visited upon unoffending American citizens, the local administrations have been found inadequate or unwilling to apply the proper corrective. Combinations, darker than the night that hides them, conspiracies, wicked as the worst of felons could devise, have gone unwhipped of justice. Immunity is given to crime, and the records of the public tribunals are searched in vain for any evidence of effective redress. If there is no remedy for this, if the rights of citizenship may be denied without redress, if the Constitution may not be enforced, if life and liberty may not be effectively protected, then, indeed, is our civil Government a failure, and instead of enjoying liberty regulated by law, its subjects may live only by the sufferance of lawless and exasperated conspirators. The cardinal doctrine of our institutions is that all citizens are equal before the law, and that the law shall equally secure to all, their natural and inalienable rights.

It is well to remember these fundamental doctrines. It is well to remember for what purpose Government is organized, that it may be so administered as to secure its appropriate ends. It is for the purpose of practically enforcing these cardinal principles that this bill is proposed. The President has advised the House that the condition of the country in certain districts is such that life and property are insecure and the carrying of the mails and the collection of the revenue dangerous, and that the power to arrest these evils is, in his judgment, beyond the control of State authority. If this condition does not anywhere exist, if there is nothing, in fact, for this bill to operate upon, if there are no outrages committed, if there are no organized bands of disguised conspirators, why such opposition to this measure? If there is nothing for the bill to apply to, nobody can be inconvenienced by its passage. If there are no Ku Klux organizations conspiring to banish and destroy, then nobody's rights, whether real or fancied, can be injured by a bill to put them down.

It is not impossible that in some instances exaggeration of the violations of law may have been made in reporting them to the public, but it must be a very stubborn incredulity which after perusing the report of the Senate committee, after hearing the credible narrations of eye-witnesses, would deny the substantial fact that in many districts in the South there is a demand for some further safeguards to life, liberty, and property, safeguards that may involve the element of sufficient power and force to carry into execution the guarantees of the Constitution in favor of personal security and personal rights.

It is claimed with great vehemence and pertinacity on the other side of the House that there is no constitutional authority in Congress to pass this law ; that, even admitting the facts to be true as alleged, Congress is powerless to grant relief within the scope of the just powers of the Federal Government. If I were of that opinion, I should never give my vote for the bill, for there is no evil so great but that the obligations of the Constitution are paramount to any necessity for the removal of the evil.

But this is not the first time the Constitution

Case 1:21-cv-00858-APM   Document 16-4   Filed 07/08/21   Page 20 of 42

Mr. ELLIOTT. Mr. Speaker, the argument upon the pending bill has proceeded thus far upon a question of constitutional law and a question of fact. The opponents of the bill deny that its provisions are warranted by the Constitution of the United States, and also deny the alleged facts upon which the proposed bill is founded. The probable efficacy of the bill, as a measure of relief and protection for the loyal men of the South from the extraordinary system of oppression to which they are now subjected, has not been assailed.

I shall therefore confine myself to a necessarily brief consideration of the law and the facts. I will endeavor to prove that the pending bill is not obnoxious to the spirit of the Constitution, and that it is founded in right reason, and that, as a measure of repression and protection, this bill is not only fully warranted, but it is imperatively demanded by the present posture of affairs in the southern States. The issue of constitutional law evolved thus far by the discussion of the bill resolves itself into the question, has the Government of the United States the right, under the Constitution, to protect a citizen of the United States in the exercise of his vested rights as an American citizen by the exercise of a direct force through its Army and Navy, or the assertion of immediate jurisdiction through its courts, without the appeal or agency of the State in which the citizen is domiciled? Those who oppose this bill answer this question in the negative, founding their opposition on section four, article four of the Constitution, which the gentleman from Indiana [Mr. KERR] made the burden of his very able and elaborate but specious argument the other day upon this subject. This, then, in the judgment of our opponents, is the pivot upon which this whole matter revolves, and to this point I shall address myself at the outset.

The language of the section which the gentleman from Indiana has made the substratum of his ingenious argument is as follows:

"The United States shall guaranty to every State in this Union a republican form of government, and shall protect each of them against invasion, and on application of the Legislature, or of the Executive, (when the Legislature cannot be convened,) against domestic violence."

Upon this the gentleman from Indiana observes:

"The obligation of the Federal Government to protect the States of this Union against invasion is clear and obvious and it interferes with no question of State jurisdiction or of State autonomy. It is external to the State itself; it is protection against dangers from without, not within."

In this interpretation I fully concur with him, and I also agree with him that the term "domestic violence" refers to a force exerted within the State, as the term "invasion" relates to a power moving from without. But, sir, I totally dissent from the conclusion the gentleman that this clause—

"I intended only to make it the duty of the Federal Government to go to the relief of the States of the Union against domestic violence when the States appeal for such aid, being unable by their own powers to maintain the public order, to protect themselves and their citizens, and enforce their laws in the peaceful course of administration."

I deny that it forbids Federal interposition except upon the call of the Executive or Legislature of the State. It is a sound maxim of the law that where a power is given the necessary means for its execution are implied.

In this case the duty imposed upon the Federal Government is to protect the States "against domestic violence." The clause is not inhibitory but mandatory. It was evidently not designed to restrict the rights, but to enlarge the duties of the Government. Hence, when it declares that the Government shall protect the States against domestic violence on application of the Legislature, or of the Executive, when the Legislature cannot be convened, it means not that such "application" shall always be an essential condition-precedent, but simply estops the United States from refusing to give protection when the appli-

cation is made. Otherwise a faithless and undutiful Executive, giving his personal aid to or covertly bestowing his official sanction upon the insurgent authors of the "domestic violence," might, by withholding his "application," render the Government of the United States torpid and paralyzed spectator of the oppression of its citizens and the violent dissolution of the State by the overthrow of the authorities constituted pursuant to its organic law.

Those who defend this construction and its logical consequences imitate, in their ideas of governmental duty, but on a grander and graver scale, the rigid etiquette of the Frenchman, who, on being upbraided for not saving the life of a fellow-passenger whom he saw drown before his eyes, attempted to justify himself by pleading that he had "not been introduced to him." No, sir; there are paramount duties devolved upon individuals and upon Governments that in the very nature of things demand prompt performance. No broader or clearer vindication of this view is required than that found in the noble preamble to the Constitution itself, which declares that:

"We, the people of the United States, in order to form a more perfect Union, establish justice, insure domestic tranquillity, provide for the common defense, promote the general welfare, and secure the blessings of liberty to ourselves and our posterity, do ordain and establish this Constitution for the United States of America."

How, sir, shall one of the great objects of the Constitution, the securing "the blessings of liberty to ourselves and our posterity," be achieved if it be true, as virtually contended by the opponents of this bill, that the majority of the citizens of a State may, by domestic violence, be deprived of "the blessings of liberty," and yet the Federal Government, established chiefly for this object, shall remain a passive observer of the great crime against its fundamental law unless invited to "protect" its own citizens by the "Executive" of the State?

That is not a very violent presumption that the majority of the people of a State may be oppressively subordinated to the minority through "domestic violence" is shown by the following remarks of Justice Story. His comments upon this very section, in the forty-first chapter of his great work upon the Constitution, a work to which the gentleman from Indiana frequently recurred with profound reverence throughout his cogent effort to "make the worse appear the better cause." I think that to quote Justice Story in defense of the position assumed by the gentleman from Indiana and his political coadjutors on this floor is to "steal the livery of Heaven to serve the devil in." Says Justice Story:

"At first view it might seem not to square with the republican theory to suppose, either that a majority have not the right, or that a minority will have the force, to subvert a government, and, consequently, that the Federal interposition can never be required but when it would be improper. But theoretic reasoning in this, as in most other cases, must be qualified by the lessons of practice. Why may not illicit combinations for purposes of violence be formed, as well by a majority of a State, especially a small State, as by a majority of a county or a district of the same State; and if the authority of the State ought in the latter case to protect the local magistracy, ought not the Federal authority in the former to support the State authority? Besides, there are certain parts of the State constitutions which are so interwoven with the Federal Constitution that a violent blow cannot be given to the one without communicating the wound to the other. Insurrections in a State will rarely induce a Federal interposition, unless the number concerned in them bear some proportion to the friends of government. It will be much better that the violence in such cases should be repressed by the superintending power than that the majority should be left to maintain their cause by a bloody and obstinate contest. The existence of a right to interpose will generally prevent the necessity of exerting it."

"Is it true that force and right are necessarily on the same side in republican Governments? May not the minor party possess such a superiority of pecuniary resources, of military talents and experience, or of secret sucoors from foreign Powers as will render it superior also in an appeal to the sword? May not a more compact and advantageous position turn the scale on the same side against a superior number so situated as to be less capable of a prompt and collected exertion of its strength? Nothing can be more chimerical than to imagine

that, in a trial of actual force, victory may be calculated by the rules which prevail in a census of the inhabitants or which determine the event of an election. May it not happen, in fine, that the minority of citizens may become a majority of persons by the accession of alien residents, of a casual concourse of adventurers, or of those whom the constitution of the State has not admitted to the rights of suffrage?"

"In cases where it may be doubtful on which side justice lies, what better umpires could be desired by two violent factions, flying to arms and tearing the State to pieces, than the representatives of confederate States, not heated by the local flame? To the impartiality of judges they would unite the affection of friends. Happy would it be, if such a remedy for its infirmities could be enjoyed by all free Governments; if a project equally effectual could be established for the universal peace of mankind!"

It is worthy of remark, Mr. Speaker, that the gentleman from Indiana, in treating this section of the Constitution, which he has made the text of the most fervid portion of his able but ill-timed speech, should have omitted all notice of its opening, and, in this discussion, its most pregnant clause. I refer to the words:

"The United States shall guaranty to every State in this Union a republican form of government."

Here, then, sir, is a duty imposed without a condition-precedent, even under the very strict construction asserted by the gentleman from Indiana. The mandate is absolute, recognizing and permitting no discretion, either in the State or the United States. It vests in the Federal Government the right to act in the premises, whenever, in its judgment, "a republican form of government" may be endangered in a "State in this Union" from whatever cause, whether by "invasion" or "domestic violence."

To make this clear, let us consider what is "a republican form of government" within the meaning of the Constitution? To furnish a substantial and comprehensive definition of this term, we need not consult the publicists. It must be defined by its attributes. It is a government having a written constitution, or organic law, which provides that its executive and legislative functions shall be exercised by persons elected by the majority of its citizens. In other words, it is a government for the people and by the people.

Assuming this definition to be correct in substance, I ask, how can a republican government be maintained in a State if the majority of the electors are prevented from exercising the elective franchise by force of arms, or if members of the majority, having that exercised it according to their consciences, are, for that cause, put in terror and subjected to murder, exile, and the lash, through "domestic violence," organized and operated by the minority for the sole purpose of acquiring a political domination in the State? To deny that it would be the absolute and unconditional right and duty of the United States to interpose for the protection of its citizens "against domestic violence" thus directed, in advance of the "application of the Executive" of a State, and even in defiance of his expressed will, would be to make the United States an absolute guarantor of a "republican form of government" "to every State in this Union," and yet deprive the United States of the power to determine when to execute its "guarantee," or, in other words, when the "republican form of government," which it has guarantied, is endangered. To argue thus is to violate every sound principle of legal and logical interpretation, and to suppose a great wrong without a remedy in our political system. Upon this point I commend to the gentleman's attention the following from Story on the Constitution, (chapter forty-one, pages 559, 560.) Says Justice Story:

"The want of a provision of this nature was felt as a capital defect in the plan of the Confederation, as it might, in its consequences, endanger, if not overthrow, the Union. Without a guarantee the assistance to be derived from the national Government in repelling domestic dangers which might threaten the existence of the State constitutions could not be demanded as a right from the national Government. Usurpation might raise its standard and trample upon the liberties of the people, while the national Government could legally do nothing more than

alone. I take the ground that, in my opinion, lies far above the interpretation put upon the provisions of the Constitution. I stand upon the broad plane of right; I look to the urgent, the importunate demands of the present emergency; and while I am far from advocating any step not in harmony with that sacred law of our land, while I would not violate the lightest word of that chart which has so well guided us in the past, yet I desire that so broad and liberal a construction be placed upon its provisions as will insure protection to the humblest citizen, without regard to rank, creed, or color. Tell me nothing of a constitution which fails to shelter beneath its rightful power the people of a country!

I believe when the fathers of our country framed the Constitution they made the provisions so broad that the humblest, as well as the loftiest citizen, could be protected in his inalienable rights. It was designed to be, and is, the bulwark of freedom, and the strong tower of defense, against foreign invasion and domestic violence. I desire to direct your attention to what is imbodied in the preamble, and would observe that it was adopted after a liberal and protracted discussion on every article composing the great American Magna Charta. And like a keystone to an arch it made the work complete. Here is what it declares:

"We, the people of the United States, in order to form a more perfect Union, establish justice, insure domestic tranquillity, provide for the common defense, promote the general welfare, and secure the blessings of liberty to ourselves and our posterity, do ordain and establish this Constitution for the United States of America."

If the Constitution which we uphold and support as the fundamental law of the United States is inadequate to afford security to life, liberty, and property—if, I say, this inadequacy is proven, then its work is done, then it should no longer be recognized as the Magna Charta of a great and free people; the sooner it is set aside the better for the liberties of the nation. It has been asserted on this floor that the Republican party is answerable for the existing state of affairs in the South. I am here to deny this, and to illustrate, I will say that in the State of South Carolina there is no disturbance of an alarming character in any one of the counties in which the Republicans have a majority. The troubles are usually in those sections in which the Democrats have a predominance in power, and, not content with this, desire to be supreme.

I say to the gentlemen of the Opposition, and to the entire membership of the Democratic party, that upon your hands rests the blood of the loyal men of the South. Disclaim it as you will the stain is there to prove your criminality before God and the world in the day of retribution which will surely come. I pity the man or party of men who would seek to ride into power over the dead body of a legitimate opponent.

It has been further stated that peace reigned in the rebellious States from 1865 until the enactment of the reconstruction laws. The reason of this is obvious. Previous to that time they felt themselves regarded as condemned traitors, subject to the penalties of the law. They stood awaiting the sentence of the nation to be expressed by Congress. Subsequently the enactments of that body, framed with a spirit of magnanimity worthy a great and noble nation, proved that, far from a vindictive course, they desired to deal with them with clemency and kindness. This merciful plan of action proved to be a mistake, for cowardice, emboldened by the line of policy of the President, began to feel that judgment long delayed meant forgiveness without repentance. Their tactics were changed, and again a warlike attitude was assumed, not indeed directly against the General Government, but against those who upon southern soil were yet the staunch supporters of its powers. Thus is it evident that if only the props which support

such a fabric could be removed the structure must necessarily fall, to be built again by other hands. This is the animus of the Ku Klux Klan, which is now spreading devastation through the once fair and tranquil South.

If the country there is impoverished it has certainly not been caused by the fault of those who love the Union, but it is simply the result of a disastrous war madly waged against the best Government known to the world. The murder of unarmed men and the maltreating of helpless women can never make restitution for the losses which are the simply inevitable consequence of the rebellion. The faithfulness of my race during the entire war, in supporting and protecting the families of their masters, speaks volumes in their behalf as to the real kindliness of their feelings toward the white people of the South.

In conclusion, sir, I would say that it is in no spirit of bitterness against the southern people that I have spoken to-day. There are many among them for whom I entertain a profound regard, having known them in former and brighter days of their history. I have always felt a pride in the prestige of my native State, noted as she has been for her noble sons, with their lofty intellect or tried statesmanship. But it is not possible for me to speak in quiet and studied words of those unworthy her ancient and honorable name, who at this very day are doing all they can do to deface her fair records of the past and bring the old State into disrepute.

I can say for my people that we ardently desire peace for ourselves and for the whole nation. Come what will, we are fully determined to stand by the Republican party and the Government. As to our fate, "we are not wood, we are not stone," but men, with feelings and sensibilities like other men whose skin is of a lighter hue.

When myself and colleagues shall leave these Halls and turn our footsteps toward our southern homes we know not but that the assassin may await our coming, as marked for his vengeance. Should this befall, we would bid Congress and our country to remember that 'twas—

"Bloody treason flourish'd o'er us."

Be it as it may, we have resolved to be loyal and firm, "and if we perish, we perish!" I earnestly hope the bill will pass.

Mr. RICE, of Illinois. Mr. Speaker, being for the first time a member of this body I had not expected to participate actively in its discussions during the short session that we all expected we should have, and but for the change in events that has occurred within the last few days I should have adhered to my purpose to have been silent and simply a voter. But I cannot allow the opportunity to pass when I see a measure fraught with evils and with the mischief that I believe are embodied in the bill now under consideration; I cannot, I say, allow the opportunity to pass without offering my humble protest against its enormities.

If there has been one fact settled more distinctly than another by the judgment of this House, it is that there is nothing in the condition of the country, nothing in the facts that have been charged and reiterated as to outrages in the South, that requires or demands the adoption of any such measure. This was manifested by some four repeated resolutions of this House to adjourn, in which the Senate failed or refused to concur. It was again manifested by the appointment of a committee of this House to investigate the subject and inquire into the truth of the charges that had been made as furnishing that necessity and the occasion for the passage of this bill. The appointment of this committee was an expression of the House that no law should be passed upon this subject, unless these charges, after full investigation, should be sustained by evidence.

Why, sir, men who are now the most zealous,

the most earnest, the most uncompromising advocates for the passage of this bill, are the very men in the main who, when the opportunity was afforded and the means furnished to prove the truth of these charges, shrunk from doing so, and opposed every proposition for investigation. On the other hand, I myself, and the gentlemen on this side of the House, so far as I have been able to learn their views, while we believe that there was no necessity for this committee and for this investigation, while we believe that it was irregular for Congress to take such a course in reference to the States, at the same time did not wish to seem even to shrink from investigation or to give color to the charge that we were wishing to cover up or conceal crime. And above all, we desire to put these earnest advocates of the measure, those men who never tire of repeating these charges, to the test of proving them. How they have shrunk from that task is upon the record and before the country. They do not desire investigation; they are unwilling to undertake to establish these charges. Why they are unwilling to do so is easily understood: it is the fear of failure.

And if this House now, after a minority of this body has been overruled at every point in their efforts to force this mischievous measure upon the House and adopt it without making an investigation, will this House now allow that minority by the reinforcement of an executive message to overrule the judgment of the majority? The message, as coming from the Executive, is entitled to respectful consideration. But I feel authorized to say, and no man either in this House or out of it will question the correctness of the statement, that the President's message is not accompanied by a single fact, a single document, or single paper furnishing any information that was not as well known to this House before as it is now.

And while I am on this point I wish to express my high appreciation of the course of two of my colleagues who belong to the other side of the House. I refer to General FARNSWORTH and Colonel MOORE. They have spoken words of manly independence in vindication of the Constitution and in vindication of right; they have refused to bend the supple hinges of the knee; they have set an example worthy of imitation, and have shown us all how a man can be a partisan without ceasing to be a patriot.

The first section of this bill is one to which I shall give little attention, although I disapprove it. It is a provision for dragging persons from their homes, from their neighbors, and from the vicinage of the witnesses for the redress of private grievances to the Federal courts. Such a law, in instances where the parties and the witnesses are poor, amounts practically to a denial of justice. Without the means to support themselves or their witnesses to travel or in stay around the Federal courts, they will be brought like lambs to the slaughter.

The second section of this bill is but a provision for the punishment of crimes known to the common law and are punished by the laws and the tribunals of every State.

The third section is an attempt to convert the acts of individuals into crimes of State, and makes such acts a pretext for usurping the powers of a State and subverting its authority and its right to protect its own citizens. The third section is a qualified war power, and provides for the administration of justice in time of peace with the bayonet and the sword.

The fourth section proposes to give the Executive an unlimited and unqualified war power; to give to him the right, under circumstances to be judged of by himself, to suspend all civil law and to establish martial law, which every lawyer and every intelligent citizen knows is but the will of the commander, growing out of the necessities of the case; and all civil law is at an end. That is what the fourth section proposes.

Mr. Speaker, I propose now to address my-





DATE DOWNLOADED: Thu Jul 8 12:01:12 2021
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
42 Cong. Globe 401 (1871).

ALWD 6th ed.
, , 42 Cong. Globe 401 (1871).

APA 7th ed.
(1871). Congressional Globe, The, 42, 401-432.

Chicago 17th ed.
"," Congressional Globe, The 42 (1871): 401-432

AGLC 4th ed.
" (1871) 42 Congressional Globe, The 401.

OSCOLA 4th ed.
" (1871) 42 Cong Globe 401

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from uncorrected OCR text.

Mr. SHELLABARGER. I beg the gentleman's pardon; the Constitution uses no such words.

Mr. VAN TRUMP. Where does the gentleman find the power: in the legislative article or in the executive article?

Mr. SHELLABARGER. It is a question of interpretation between my colleague and myself. The Constitution does not say that Congress shall have the power; it does not say that the President shall have the power. It is a question of interpretation. The gentleman interprets the power to be in Congress. On the question as to which interpretation is right I refer the gentleman to the most learned treatise on the subject in the English language, from one of the ablest lawyers that America has ever produced; I mean Horace Binney.

Mr. VAN TRUMP. I understand that. I cannot yield for a speech.

Mr. SHELLABARGER. Very well, then; I will say that I take the other view.

Mr. VAN TRUMP. If this is not to come out of my time, of course I have no objection.

The SPEAKER. It must come out of the gentleman's time.

Mr. VAN TRUMP. I merely asked the gentleman where he found the power which he states.

Mr. SHELLABARGER. The bill proceeds upon the theory of the gentleman that the power is in Congress. The bill assumes that it is in Congress.

Mr. VAN TRUMP. Then I ask the gentleman, if that power can be thus delegated, why not the power to levy taxes, to make appropriations, to declare war, to raise and support armies, and to coin money, as well? It is a legal deduction from which there can be no escape that if Congress has the constitutional authority to delegate to the President any portion of their legislative functions, they have the same authority to remit to him the entire mass of their legislative power. And the converse of the proposition must be equally true, that if they have no authority to delegate their *whole* power, they are in like manner powerless to delegate any *portion* of it.

The whole question is settled by the well-known maxim that a power created in the nature of a *trust* cannot be delegated by the agent in whom the trust was originally reposed. The people, in their primary capacity, are the original and exclusive source of all legislative power; as a matter of convenience it is delegated by them, through the instrumentality of constitutions, to their representatives, as *agents*, who hold it in trust for the benefit of the people. This great power is intrusted to them to be exercised in *their* discretion, in *their* judgment, and not in that of others not selected by the people for that purpose. In a constitutional Government like ours, when the people have once delegated their power, it cannot be *redelegated* back to them, even by their agents created by themselves. A familiar instance of this doctrine is to be found in those cases where a Legislature has passed an act to be submitted to the people for adoption or rejection at the ballot-box. There is scarcely a State in the Union whose supreme judicial tribunal has not decided these submissions unconstitutional and absolutely null and void. Said Chief Justice Marshall, in the case of Wyman *vs.* Southard:

"It will not be contended that Congress can delegate to the courts, *or to any other tribunals*, powers which are strictly legislative."

But, Mr. Speaker, I maintain the proposition that not even Congress has the power to suspend the writ upon the facts presented by the President in his message. The Constitution declares that—

"The privilege of the writ of *habeas corpus* shall not be suspended, unless when, in cases of *rebellion* or invasion, the public safety may require it."

Now, this language was carefully considered and adopted by the framers of the Constitu-

tion. The term "rebellion" is here used in plain and palpable contradistinction to those of "insurrection" and "domestic violence," in other and separate parts of the Constitution, and for very different objects. That the Constitution contemplates the "rebellion" of a State or States, *as such*, and not a mere combination of persons as individuals in a state of "insurrection" against the authority of either the particular State itself or the United States, I think is quite manifest. This construction is in harmony with the whole theory of the Federal Constitution, in marking the line of distinction and separation between the jurisdiction of the Federal and State authority. If the public disorder sought to be overcome amounts to less than a "rebellion," in this assumed constitutional sense of the term, and therefore an "insurrection" only, as provided for in section four of the fourth article of the Constitution, the sovereign power of the State, in which the authority to suspend is also lodged, can apply the remedy by a suspension of its own writ, and thus accomplish every end which could be reached by a Federal exercise of the same power, as was done by the State of Massachusetts during the Shay insurrection.

The simple definition of the two terms will sustain this view of constitutional interpretation. All the leading philologists concur in the rendition of the meaning of the term "insurrection" as an uprising of *individuals* against the authority of Government, in relation to some particular law or grievance. As, for example, the insurrection in the western counties of Pennsylvania grew out of the popular objection to the excise law; and Shay's insurrection, in Massachusetts, from the public opposition to the collection of private debts by judgment and process in the courts, as well as a most bitter animosity to impost duties and poll-taxes. Rebellion is an armed resistance to the authority of Government, *with an intention to overthrow it*. Now, if these premises are sound, in relation to the true interpretation of these terms as used in the Constitution, it is in my opinion quite clear that even Congress itself could not constitutionally suspend the writ at this time, and in relation to the character of the disturbances which exist in the South, as alleged by those who demand its suspension.

The facts are as claimed, either by the President himself or his most excited partisans, do not call for any higher exertion of power or any more stringent remedy than that which is provided for in the fourth section of the fourth article of the Constitution, to wit, upon due notice and requisition, either by a State Legislature, or, when such Legislature is not in session or cannot be convened in time for the emergency, then by the State Executive, the United States, (whether through Congress or the Executive is not defined by the Constitution,) shall protect such State against "*domestic violence*," not by the suspension of the writ of *habeas corpus*, but by force of arms, either by the regular Army or by calling forth of the militia, as is provided for in the fifteenth clause of the eighth section of the first article of the Constitution. In no event, therefore, except in the specified cases of rebellion or invasion, can the writ of *habeas corpus* be suspended by the General Government, whether to do so belongs to Congress or the President. This is very clear to my mind because of the significant discrimination made by the Constitution between the classified wrongs of rebellion, insurrection, and domestic violence. But, sir, even if this interpretation were in doubt, that doubt, by the well-known canons of legal construction, would have to be resolved against an exertion of the power, for the reason that such suspension is in derogation of common right, as well as against the personal liberty of the citizen upon mere suspicion of guilt, and in order to uphold and protect both the common right and the individual liberty an equitable

construction is to be put upon the terms used in the Constitution.

And now, Mr. Speaker, why is it that the Republican leaders are so blind as not to see, or so reckless as not to take heed, of the storm of public indignation which must surely follow these gross usurpations of executive power, whether committed by the President himself or accomplished by congressional instrumentality? Sir, I appeal to those gentlemen on this floor who were once Whigs but are now Republicans, whether it does not shock their Whig recollections to find themselves ranged as apologists and defenders of the unconstitutional extension of the executive power in this Government? Have they not taken a wide departure from their former principles, as announced from many a stump and declared through many a platform of that grand old constitutional party to which we once in common belonged and felt a common pride in its high-toned and national principles?

What, Mr. Speaker, was the great and leading principle in the creed of that party? Was it not the question of executive power in this Government and uncompromising opposition to all usurpation, whether civil or military? What was it but this question which made these Halls ring with the intellectual thunders of a Webster or the indignant and impassioned eloquence of a Clay? The gentleman from Massachusetts [Mr. DAWES] smiles. I say to him that I can smile with a better grace than he, for I stand now where I stood then.

Mr. DAWES. So do I.

Mr. VAN TRUMP. Then you have a very curious way of showing it. I beg the gentleman from Massachusetts to remember, now that he is a Republican, what he would have recognized as sound doctrine when he was a Whig, that "power, like water, is ever working in its own way," and that the most aggressive of all political power is the executive power of a nation, whether republican or monarchical.

[Here the hammer fell.]

Mr. BUCKLEY addressed the House. [His remarks will be found in the Appendix.]

Mr. ELLIS H. ROBERTS. Three facts combine to show the necessity for a bill substantially like that now under consideration. First, the violence and lawlessness, for which it is proposed to provide a remedy, occur in many widely separated districts; second, the character of the victims selected and the methods of outrage, indicate a common source and purpose, an organized conspiracy; and, third, the organization to which they are traced is political in its origin and aims, and is military in form.

That great soldier and good man, General Thomas, was one of the first to expose the existence and dangerous nature of the Ku Klux organization; and in his report for 1868, pointed out its effects in Tennessee. The minority of the Senate committee concede that these outrages have been committed in six or eight counties of North Carolina. The application of Governor Scott for help reveals the condition of South Carolina. Ex-Governor Stevenson, by a message, declared that dangerous lawlessness prevailed in Kentucky. Governor Alcorn on Saturday sent a message to the Legislature, bringing into prominence the arson and massacres in Mississippi. In Arkansas, the repressive measures of Governor Clayton have exposed while they have checked the crimes. In Alabama, the gubernatorial applications for national troops prove the necessity for relief. The exposures of the situation of Georgia, made by Governor Bullock, are startling and forcible. From Florida, the story is yet fresh in our ears of the murder of Yearty, a deputy marshal of the United States and a member of the Legislature of Florida.

These acts of violence are not directed against colored citizens only, although if they were that would be no palliation of their enormity; for the nation is under especial obliga-

But all this vast power is claimed under two articles of the Constitution of the United States; one the second section of article four, which provides that—

"The citizens of each State shall be entitled to all the privileges and immunities of citizens in the several States."

This clause was rather a limitation upon than a grant of power to the Federal Government. It was founded in a jealousy between the larger and smaller States, lest the Federal Government, unrestrained, might make invidious or arbitrary discriminations between the citizens of the different States. It provided simply for a general citizenship, not intending to supersede the rights of the citizens under the different laws of the States, (3 Sto. Com., s. 1800.) But whatever deficiency of power there may be in that clause, it is insisted that it is supplied in the fourteenth amendment to the Constitution of the United States, which, like Aaron's rod, is intended to swallow up all the other powers. Section one provides that—

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the States wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of the citizens of the United States; nor shall any State deprive any person of life, liberty, or property without due process of law ; nor deny to any person within its jurisdiction the equal protection of the laws."

Mark the language: "No State shall make or enforce any law," &c.; hence the prohibition is on the State. Now, I deny that Tennessee has made or enforced any law which abridges the immunities and privileges of the citizens of the United States. I deny that she has deprived any person of life, liberty, or property without due process of law. I deny that she denies the equal protection of the laws to any person within her jurisdiction.

If there were such denial the question is open to civil remedy, and the judicial power of this Government is the only power to decide the question. Whenever the Supreme Court of the United States shall decide any clause of the constitution or any law of Tennessee in conflict with the fourteenth amendment, I think I may safely pledge the State to bow to that high supremacy.

But really the fourteenth clause was only intended to bring the African up to the political level of the Caucasian race. Ours is the only Government upon earth which has attempted the political consolidation of these two races. England emancipated her slaves in the islands, in the distance, but stopped at emancipation. When she did so, she never dreamed that her freedmen would invade her soil and demand the elective franchise, demand for seats in her Parliament and aspire to her woolsack.

But here we did not stop at emancipation, but opened the Constitution of the United States to let them in ; opened all the State constitutions to let them in ; reformed all our civil and criminal codes to accommodate them to their altered condition. After granting them these exalted privileges of constitutional and civil liberty, how bold, how arrogant, to claim that the power of a military despotism lay coiled, like a python, beneath the artful phraseology of the fourteenth amendment. But I deny the necessity of giving such enormous power to the President. He already has the power which Washington had to suppress the whisky rebellion in Pennsylvania. He has all the power of the law of July, 1861, with which President Lincoln encountered the rebellion of the eleven southern States. He has all the power of the enforcement act of 1870.

But after the proclamation of peace, after the insurgent government and armies were scattered to the four winds and quietly pursuing the arts of peace, after he is already bloated with military power, like the horse-leech, he still cries, "Give, give." He does not deign to tell Congress what new attribute of power

is wanting. Shall Congress, with blind fatuity and exhaustive liberality, lay all the plunder at his feet ? What does he want with armies ? Let him march them to the South. They may leave the slime of their dragon folds on the country, but as armed rebellion, like the mirage of the desert, will never be found. All Governments are matters of trust. Why trust the President rather than the States and the people of the States ? There is but one answer. The advocates of the bill are afraid of the people.

The bill is nothing but "a mere, sheer, ribald" confessional of infidelity respecting the capacity of the people for self-government. The people made the Government; it belongs to them ; and why should it be wrested from them and given to a master ? Has party frenzy driven the advocates of the bill to such a pitch of madness that they are afraid to trust the liberties of the country to maintain the supremacy of their party ? Let us beware. Cæsar hesitated at the Rubicon, but he took the fatal plunge when he saw that Rome could be swallowed up in Cæsar.

I have endeavored feebly to uncover and strike down the despotism of the bill. If it is pregnant with the direful reality claimed for it, then the distinguished draftsman will have the somber renown of indicting the epitaph of American liberty. If I can do nothing more, I will stand at my post and "ring the bell as the ship goes down."

But, to change the figure to a more hopeful one, if republican freedom is to appearance dead, its still hope. We have the corpse with us, though the grave be dug. Give us a committee of pall-bearers, an equal number from North and South, and, with undying faith in the capacity of the people for self-government, let us sadly bear the corpse to the grave of Washington and let it down to touch his bones, that it may be revived, as the corpse of the man when let down on the bones of the prophet Elisha.

Let us inquire what has impelled us to this dire extremity. Is it the demon of sectionalism? Mr. Madison, our most sagacious prophet, in the Convention which formed the Constitution, foresaw the danger, and said :

"The great danger to our General Governments, is, the great southern and northern interests of the continent being opposed to each other. Look to the votes in Congress, and the most of them stand divided by the geography of the country, not according to the size of the State."—*Secret Proceedings of Federal Convention*, p. 205.

The history of our congressional legislation, in the main, furnishes a sad verification of the prediction. But I have not time for critical review ; besides, the wounds are too sensitive for the probe. But grant me a word, not to harrow, but to heal. The South regarded the Government as sectionalized in the election of President Lincoln. The ship of State careened and drifted upon the dark cliff of African slavery. The shock precipitated many of us overboard, and how the craft was shattered we all know too well.

Although war generally executes its own judgments, (and how terribly they fell upon the South none but they do know ;) yet Congress has continued to afflict us with rapid installments of vengeance. More than one hundred thousand of our southern sons lie sleeping on the battle-field ; our maimed and wounded soldiers hobble on their crutches unpensioned by a friendly government ; our lands are ravaged, burned, and blackened with desolation, as if swept with a "whirlwind of fire;" famine breathed through her shriveled lips misery upon the children of poverty and want; our State authorities disfranchised the mass of our citizens, and, in some instances, drove from the ballot-box the old pioneers who had driven out the savages; and had wrestled with the old oaks of the forest to subdue the country for the coming generations.

The Federal Government came and partitioned the country into military districts, dis-

mantled some of the Legislatures, expelled the judiciary, disfranchised the citizens, and dragged the rugged harrow of reconstruction through the bowels of our State constitutions. Some of the States were denied representation in the Electoral College for President, and some were held off in political quarantine and denied representation in Congress until they adopted the fourteenth amendment, old Virginia among the number. Yes, old Virginia, who, when ancient liberty was to be won, furnished a Henry to thunder in her forum, a Washington to roll the tide of war, successive Presidents to guide the helm, and brought as dowry to the Union the vast domain in the West out of which has grown up giant States like children around her feet. Surely western Representatives will not forget that they have a mother, and surely will not vote for her further humiliation.

Nearly every act of Congress has a sting for the southern man. When, willing to bury the memories of the past, he treads his way into the far West, upon the rough and perilous edge of Indian warfare, even there he finds the sectional presence of his Government, denying him the benefit of the homestead unless he can take the test-oath.

The old soldier in our second war of independence, who followed General Jackson, who, in the language of a great statesman of Tennessee—

"Silenced the roar of the British lion on the plains of New Orleans, and the American eagle took its loftiest flight and uttered its loudest note of exultant liberty"—

these old soldiers now come and hold out their hands, trembling with the palsy of age and want, and ask the pittance of a pension in remembrance of an ancient debt of gratitude, and they are refused unless they can pass the purgatorial ordeal.

We have not only felt the finger, but the pressure of the loin of the Government upon us. We have been war-ridden, tax-ridden, debt-ridden, poverty-ridden, League-ridden, Ku-Klux-ridden, militia-ridden, State-ridden, Congress-ridden; and now to be President-ridden, with the halter of the *habeas corpus*, and his military rowels dashed into our lacerated flanks, it would overleap all the bounds of mercy.

Let me assure the Republicans that they are greatly abused by the mendacious rumors of oppression which come pealing to them from the South. As the keeper of the lion rowels him up in his cage with his iron bar until he provokes a defiant growl, so some political miscreant may gall the rebel to utter a murmur, which enters a sort of Dionysius ear, reaching from Congress into the South, and as it travels it swells into appalling thunder as it opens into the Hall of Congress. And then you begin to cry out "Rebellion!" "Reconstruction!" and all your resentments flare up toward the South like the quills of the porcupine.

Let me appeal to you of the North to dignify your great triumph over your southern brethren with magnanimity and mercy. Cease to play with the thunders, change your line of policy, expunge your sectional legislation, and strike the fetters from your disfranchised brethren. Let us, North and South, bring our sectional prejudices and sacrifice them as burnt offerings on the common altar of our country. Let the compassion of Congress be stretched out like the wings of a mighty angel and shake the odors of forgiveness on the land. Let us try and imitate the sublime divinity of Him who, with the gall upon his lips, looked up to Heaven through his crown of thorns and invoked the benediction of forgiveness on his foes. Then our land will have rest ; then will we have universal peace, brotherhood, and prosperity.

Mr. CRITCHER was granted unanimous consent to have printed in the Globe some remarks he had prepared on the pending bill. [See Appendix.]

428    THE CONGRESSIONAL GLOBE.    April 3,

"With all the concealment which cunning could invent or perjury secure, or bribery purchase, or the fear of punishment inspire, or the dread of violence from bands of conspirators and Democratic desperadoes could command, or the blandishments of more accomplished knaves could entice, or the hope of office could buy, or fear of the loss of place could bring, all of which would naturally conspire to throw obstacles in the way of or defeat the investigation of the committee, it is by no means possible that the extent of these frauds has been revealed even in any one-award; but this may be approximated from the proof as to election districts in various parts of the city, and by statistical tables showing the voting population at previous periods, with the average increase in these periods, from which the actual voting population of 1868 may be computed with reasonable certainty."

"It has already been shown that illegal or fraudulent certificates of naturalization were issued, probably to the extent of 68,343, on most of which votes were cast, and the 'repeaters' cast many thousand illegal votes in addition." * * * *

"Challenging illegal voters was so far prevented by terrorism and violence that it was of rare occurrence either at the registry or on the day of the election, and in many districts no challenge were made. It would be impracticable here to describe fully the means resorted to to prevent challenges, but they are abundantly shown in the evidence."

In the light of these facts, and the volume of sworn testimony by which they are verified, how puerile indeed appear the suggestions of the gentleman in reference to the aspirations of the President. My colleague says:

"The power proposed by this bill to be conferred on the President is despotic. It is to place him on a footing with the Czar, the Sultan, and the Mogul."

What sort of footing the Czar, Sultan, and the Mogul are on the honorable gentleman did not stop to explain, but the footing which the Republican members of this House propose to place the President on, if I understand the tenor of their speeches and the scope and bearing of the bill and amendments under discussion, is a footing which will enable him to suppress disorder, violence, and bloodshed, and protect the citizen in the enjoyment of his constitutional rights. Is it for this reason that the legislation proposed strikes terror to the hearts of the Ku Klux Democracy of the South and arouses the indignation of Democratic leaders everywhere?

The object of the Republican members of Congress, so far as I know, is to prevent murder, manslaughter, mayhem, robbery, and criminal obstruction of legal process:

To put down insurrection, domestic violence, unlawful combinations, or conspiracies. To secure to all men, white and black, the "inalienable rights of life, liberty, and the pursuit of happiness."

To give to all the equal protection of the laws. This is the scope and tenor of the bill and amendments under consideration. Do gentlemen cry out because they fear justice will be done to them and their constituents? Is it the fear that the halter will draw which gives them so poor an opinion of the law? Is there anything in the proposed legislation to make my colleague wax hot and exclaim—

"Do you intend to break down all the barriers which protect your constituents; to place the President above the Constitution, and unscance to the world that this is a Government of force and not of law?"

Surely not. We propose simply to have a government of both force and law; forceguided by law. We propose to raise up barriers to protect our constituents in the enjoyment of their constitutional rights and privileges. We propose to leave the President where he is, under the Constitution, the executor of the laws and the servant of the people. We propose to clothe him with full power to protect the weak, preserve the peace, maintain order, and "put down unlawful combinations to overthrow or set at defiance the constituted authorities of the States." If he abuses the trust, the people through their Representatives in Congress will impeach him, will expel him from the Executive Mansion, and make him as powerless for harm as the poorest beggar on the street. The President is required by the Constitution to "take care that the laws are faithfully executed." We propose simply to enable him to discharge the duty imposed on him by the Constitution; nothing less, nothing more.

My colleague thinks the Constitution does not authorize such legislation. In the opinion of our Democratic friends the Constitution forbade the coercion of rebel States, the suppression of the rebellion, the preservation of the Union, and the emancipation of the slave. It is not strange, therefore, that they should now find constitutional objections to any interference on the part of the General Government for the suppression of treasonable organizations, and the protection of loyal citizens in the enjoyment of their constitutional rights and privileges.

I quote from my colleague's speech in reference to this point:

"Now, sir, I deny that there is in the fourteenth article of amendments to the Constitution of the United States any power conferred which authorizes the President to use the Army, the Navy, and the militia against the people of a State without having been first called upon by the Legislature, or the Governor of that State, there being no time to convene the Legislature. The fourteenth article of amendments, under which it is claimed by the advocates of this bill that this power is given, is as follows:

'No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property without due process of law.'

Is there any power conferred there, unless it be to go into the courts for redress against a violation of these rights?"

It will be observed that in his anxiety to make out his case he fails to quote the Constitution fairly, by omitting the concluding paragraph of section one, article fourteen, which reads as follows:

"Nor deny to any person within its jurisdiction the equal protection of the laws."

That is to say, the Constitution declares that—

"No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

Now, certain States have denied to persons within their jurisdiction the equal protection of the laws. The proof on this point is voluminous and unquestionable. It consists of the sworn testimony of ministers of the Gospel who have been scourged because of their political opinions, of humble citizens who have been whipped and wounded for the same reason, of learned judges within whose circuits men were murdered, houses were burned, women were outraged, men were scourged, and officers of the law shot down; and the State made no successful effort to bring the guilty to punishment or afford protection or redress to the outraged and innocent. The State, from lack of power or inclination, practically denied the equal protection of the law to these persons. It is to remedy this evil and cover these proscribed and outraged citizens with the shield of the Constitution that we propose to authorize the President to send military aid to the local authorities in these lawless sections. As to our constitutional right to do this, I cannot do better than read from a speech of my learned colleague from the seventh district, [Mr. SHELLABARGER:]

"My answer is that the President may, under such circumstances, send military aid; and to make this answer complete, I now again go back to the first section of the fourteenth article. That section provides two things which I wish to notice. The first provision is that—

'No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States.'

'This provision requires that the laws on their face shall not 'abridge' the privileges or immunities of citizens. It secures equality toward all citizens on the face of the law. It provides that these rights shall not be 'abridged;' in other words, that one man shall not have more rights upon the face of the law than another man. By that provision equality of legislation, so far as it affects the rights of citizenship, is secured. But the section does not stop there. It contains two other provisions, only one of which I need now notice. It provides:

'Nor shall any State deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws.'

"The laws must be, first, equal, in not abridging rights; and second, the States shall equally protect, under equal laws, all persons in them. Therefore, under the provisions of the fourteenth amendment, when these clauses are put in juxtaposition, in order to bring the idea together, Congress shall have power to make and enforce all proper legislation which shall be necessary to require of the States that they shall not abridge the rights of citizenship, and also that they shall protect all persons equally. Nothing can be plainer. The thing is so absolutely self-evident that it admits of no enforcement by argument. Two things are provided—equal laws and protection for all; and whenever a State denies that protection Congress may by law enforce protection. The amendment does not say that in such case the laws of Congress must be made so that the protection cannot be furnished to the people until it is invited by the Legislature or Executive of the very State which is denying it. To say in such a case as that that Congress cannot protect until it is invited to protect by the State, which is doing the mischief, which is making the denial, is to attribute absurdity to the provision."

It is true, as my colleague from the thirteenth district [Mr. MORGAN] has affirmed, that General Halleck while admitting, "that there may be special organizations of outlaws in particular localities under the name of Ku Klux," denies the necessity for military interference; but this after all is simply the opinion of one man, whose judgment may have been biased very naturally by social intercourse with wealthy and educated rebel sympathizers, who control public opinion and manufacture public sentiment in his military district. His simple statement, therefore, cannot invalidate the fact patent to all eyes, sworn to by hosts of witnesses, corroborated by thousands of well-authenticated outrages, sustained by the indelible scars of those who have been scourged and maimed, that in certain sections of the South freedom of speech and of political action is no longer tolerated.

There may, indeed, be States in the South not cursed by this proscriptive spirit, where oath-bound murderers and scourgers do not meet in conclave to pass sentence upon inoffensive men. It may be true, as Governor Warmoth says, that in Louisiana there is "a growing spirit of harmony and good-will." It is probable that Governor CLAYTON spoke truthfully of Arkansas when he said that "law and order, peace and security reign throughout our borders;" but you cannot prove there was no shedding of innocent blood by armed Ku Klux in Mississippi by showing that Arkansas is peaceful. You cannot wipe out the damning record of Ku Klux outrages in North Carolina by showing that there is a growing spirit of harmony in Louisiana. You cannot prove that men have not been murdered, scourged, and outraged in one section upon the decree of an organization whose sole object is the intimidation or death of their political opponents, by evidence that in certain other sections the Ku Klux Klan is unknown. In the trial of a criminal you do not summon as witnesses those who did not see him commit the offense alleged; you call those who did. It is by the mouth of these that that the fact is established. My colleague [Mr. MORGAN] says, in reference to the South:

"Mr. Speaker, no gentleman upon this floor will deny that one month after the close of the war peace and security existed from Maine to the Rio Grande. I wait for a reply. No gentleman contradicts my statement; but I will produce my authority, a letter written May 25, 1865, by General Sherman to Colonel Bowman. He says:

'I do want peace and security, and the return to law and justice from Maine to the Rio Grande; and if it does not exist now, substantially, it is for state reasons beyond my comprehension.'

I hold in my hand another authority, for which my friends on the other side will have respect. It is a report made on the 22d of July, 1865, and signed 'U. S. Grant, Lieutenant General.' General Grant says:

'General Lee's great influence throughout the whole South caused his example to be followed, and to-day the result is that the armies lately under his leadership are at their homes, desiring peace and quiet, and their arms are in the hands of our ordnance officers.'

He says that the armies of the confederacy were at their homes, desiring 'peace and quiet,' and 'their arms are in the hands of our ordnance officers.'

borne in mind that the constitution now limits the debt of the State to $25,000,000. Our present bonded indebtedness must now preclude us from making further appropriations as subsidy or other assistance to works of internal improvement. I do not forget that it is the policy of the State to use all proper means to assist and protect every enterprise calculated to increase facilities for production and transportation. The railroads, canals, and other public works so fostered will, I doubt not, inure to the incalculable benefit of the whole people. Still, I think that we have granted such aid about as far as we safely can. We must now strive to live within our income. If we reduce the taxes to the least amount necessary to conduct the government upon an economical basis, in a short time the problem of the payment of the debt will solve itself. With peace and prosperity, with untold agricultural and mineral wealth, with a system of improvements carefully fostered by the State, our capital will soon double; and, without increasing the tax, the bonds can be rapidly retired."

Now comes a paragraph which is, perhaps, more applicable to the comments made by the Senator from Indiana, [Mr. MORTON,] in his recent remarks upon the efforts of Democrats in the very State Legislatures of the South to promote and carry to a successful issue various schemes of plunder. Here is what the Governor says in reference to that style of gentlemen:

"I warn you, gentlemen, against certain schemes of plunder which are already organized, and will continue to be organized and presented to you for your votes. These are propositions which, under the guise of public improvements or of claims against the State, are simply plans to rob the treasury and fill the pockets of unprincipled speculators. The persons who will probably importune you most pertinaciously for the most barefaced of these speculations are well-dressed gentlemen, claiming to be the representatives of the most respectable of our people. It is these pleasant gentlemen in broadcloth, with their gigantic swindles, embracing millions, and not the poor and needy applicant for some long-delayed but petty act of justice, who have most depleted the public till in the past and will endeavor to do so again."

The Democratic press of the city of New Orleans daily publish their reliance and confidence in his protection of the public purse. By his statesmanship he has evolved order out of chaos, by his determination he has subdued the spirit of misrule, by his conciliation and magnanimity he has disarmed political enmity of much of its rancor, and by his fidelity to the high duties of his office he has set a noble example to the Chief Magistrates of other States which it would be well for the peace and welfare of our country should be followed. He is himself the impersonation of the success of the reconstruction measures of Congress and Republican principles when faithfully and ably administered.

The Senator from Mississippi [Mr. AMES] truthfully said that over eight hundred political outrages had been perpetrated in Louisiana in the sixty days preceding the election of 1868. He could have doubled that number without exaggeration.

Would that I could blot out from history the record of the deeds of blood of which her people have been guilty within a few years past; but I bear willing testimony that peace now reigns within her borders, and that persecution of political opinion has been in a great degree modified. Her people have ceased to the fact that their welfare is best subserved by devotion to their material interests rather than by lawless defense of old opinions and prejudices. Our chief Executive has, by the exercise of courage and statesmanship, so met the occasion as to evoke peace, good will, and prosperity out of lawlessness, prejudice, and distress, while our people are entitled to every credit for their submission to the laws and for their efforts to subdue the passions of the past.

We have extended the mantle of amnesty over all political offenses, with the result of greater toleration of opinion and an awakened interest in the affairs of the Commonwealth and of the nation. Louisiana needs not such legislation as is now proposed, but I mistake her people if they do not cheerfully give it their assent, and if they shall not court its application within her limits should future events render such application necessary.

My remarks, Mr. President, have had very little reference to the issue that is now before this body; but there having been a direct attack made upon my State with reference to the administration of its public affairs, with reference to the conduct of the party in power, and with particular reference to the character of the man who has done more than any other man there to retrieve it from the rule of misfortune and Democracy, I felt it incumbent on me to make my remarks particularly pertinent in the way of a reply to these charges.

Mr. EDMUNDS. I move that the Senate proceed to the consideration of executive business; but I desire it to be understood that I do not wish to occupy the floor to-morrow in this debate.

The VICE PRESIDENT. The Chair understands that the Senator from New Jersey [Mr. FRELINGHUYSEN] desires to occupy the floor; but he is not at this moment in the Chamber.

Mr. WILSON rose.

The VICE PRESIDENT. Does the Senator from Massachusetts claim the floor?

Mr. WILSON. I understood that the Senator from North Carolina [Mr. POOL] desired specially to take the floor to-morrow.

The VICE PRESIDENT. If the Senator from Vermont yields for that purpose, the Chair will recognize the Senator from North Carolina.

Mr. EDMUNDS. Certainly. I merely made the motion as a matter of business; not to get the floor.

The VICE PRESIDENT. The Chair recognizes the Senator from North Carolina.

Mr. POOL. I do not desire to go on now, but I wish to submit some remarks to-morrow.

Mr. EDMUNDS. The Senator from North Carolina having the floor; I renew my motion.

PAPERS WITHDRAWN.

Mr. PRATT. Before that motion is put, I wish to have an order entered for the withdrawal of papers.

The VICE PRESIDENT. If there be no objection, the Chair will receive the proposition.

On motion of Mr. PRATT, it was

*Ordered,* That J. B. Chipman have leave to withdraw his petition and papers from the files of the Senate.

PETITIONS AND MEMORIALS.

Mr. PATTERSON. I present the petition of Worcester Willey, a missionary among the Cherokee Indians, praying compensation for property taken by United States troops during the late war; if there be no objection, I should like to have the petition referred to the committee.

The VICE PRESIDENT. The Senator from Rhode Island [Mr. ANTHONY] gave notice this morning that he would object this day to receiving any business which was not in order under the restrictive rule adopted by the Senate.

Mr. EDMUNDS. I object at any rate. I promised the Senator from Rhode Island that I would do so.

The VICE PRESIDENT. The petition will lie on the table.

EXECUTIVE BUSINESS.

On motion of Mr. EDMUNDS, the Senate proceeded to the consideration of executive business. After fifty-six minutes spent in executive session, the doors were reopened; and (at four o'clock and thirty-three minutes p. m.) the Senate adjourned.

## HOUSE OF REPRESENTATIVES.

TUESDAY, *April 4,* 1871.

The House met at eleven o'clock a. m. Prayer by the Chaplain, Rev. J. G. BUTLER, D. D.

The Journal of yesterday was read and approved.

ENFORCEMENT OF FOURTEENTH AMENDMENT.

The SPEAKER. The House resumes the consideration of House bill No. 820, to enforce the provisions of the fourteenth amendment to the Constitution of the United States, and for other purposes, upon which the gentleman from North Carolina [Mr. COBB] is entitled to the floor.

Mr. COBB. Mr. Speaker, before I proceed to discuss the question before the House, I desire to express my regret at the absence of my colleague, Mr. SHOBER; for it has been my intention to confine my remarks almost exclusively, by way of reply, to expressions which fell from him in his speech here last Saturday. I am sorry he is not present.

Mr. Speaker, it will be readily perceived that I shall speak under very great disadvantages. Serious and continued ill-health has prevented my attendance upon the sittings of the House during the past week, and nothing less than a sense of duty, "the performance of a sacred filial duty to my mother State," could have induced me to disregard the remonstrance of my physician and bring me from my chamber, at the risk of a relapse, to raise my feeble voice in defense of the State of North Carolina and her people. I have felt a deep interest in these proceedings, and whenever my strength has permitted have read with attention the remarks delivered for and against the bill proposed by the gentleman from Ohio, [Mr. SHELLABARGER.] This deep interest brings me here this morning.

My Republican colleague, [Mr. THOMAS,] who is a member of the select committee reporting the pending bill, is not in the city; no doubt detained at home either by sickness in his family or his own illness, else I should transfer to his able management the conduct of the argument this morning. But, sir, there being no other upon this side of the House from my State to speak for the people of North Carolina, I accept the responsibility, and ask the attention of the House to what I have hurriedly prepared upon the subject. As one of the Representatives of North Carolina upon this floor, I deem it incumbent on me to say a few words in defense of the people of that State and in condemnation of the acts of violence and crime which reckless and lawless men, banded together, have committed, to the common disgrace of us all.

The investigation which has recently taken place was necessary to separate the people from the lawless bands who commit these crimes and to place the reproach and dishonor of them upon the real perpetrators. This was positively necessary to the vindication of the people of the State before the country. The people of North Carolina are law-abiding, indisposed to violence, and disposed to industry and domestic tranquillity; but they have been beset by banded organizations of murderers and assassins who, in the interest of still rebellious leaders, and I believe with their sanction and support, have committed numberless atrocities and crimes at which humanity is shocked. I rise to call attention to the fact that these banded assassins do not number exceeding forty thousand men, while there are two hundred thousand voters in the State. I rise to defend one hundred and sixty thousand freemen against the base imputations thrown out upon this floor, and to fix the guilt upon the forty thousand Ku Klux, who alone, it seems, have found apologists and defenders here from North Carolina Representatives.

Every good man in the land must be horrified at and must condemn the scourging of women and men, the hanging and assassination of citizens, and other untold outrages, which the country now knows have been committed in thirty, and perhaps more, counties of the State, and have gone entirely unpunished in the courts of justice. Sir, I confess my surprise and pain to see those professing to represent that good State in this House attempting to confound its good people with the murderous bands who have perpetrated these crimes, and thus cast reproach and disgrace upon the whole State. Those who have endeavored

pelled to make these assertions and back them up with proof; but a conviction of duty compels me to do so. My colleague has not and cannot have a closer attachment to North Carolina than I have, or a stronger incentive to speak the praises of that good State. I would be glad if I could maintain here, with truth, that peace and order reign supreme, as in days of old, within her borders; but such is not the fact, such is not the testimony before the committee to whose report my colleague refers, such is not the information I receive from my correspondents; and I should be unfaithful to my trust as a Representative of a district whose people are and have been undisturbed by these outrages, who have steadily pursued the avocations of peace and industry since the close of the war, and who desire that the same good order which prevails there should extend itself throughout the State, if I neglect to inform this House of the true condition of affairs in North Carolina.

But, Mr. Speaker, my colleague, in his manifest zeal to serve the party which sent him here, (and which, by the way, on his own statement, is now in a minority in North Carolina, for he says that "thousands of Republicans, both white and black, absented themselves from the polls" in the late election, and the majority of the Democracy was five thousand or less,) after declaring that these outrages no longer exist, proceeds to assert, in speaking of the Ku Klux Klans:

"This whole subject was thoroughly examined last summer by the judges of our supreme court. The testimony as to the purpose of the Ku Klux organization was subjected to a rigid scrutiny, but it completely failed to give it a political significance."

Mark the language:

"But it failed completely to give it a political significance."

In replying to this extraordinary statement I shall not refer to the Senate report, but direct the attention of the House to the proceedings held before the judges of the supreme court of North Carolina during last summer, when this "subject was thoroughly examined." And I refer, first, to the testimony of Dr. John A. Moore, of Alamance county, and its representative in the Legislature of the State, and, by his own evidence, a member of the "White Brotherhood," an alias for Ku Klux Klan, and a reluctant witness, still occupying a high seat in the Democratic chamber:

"Chief Justice. State the oath, if you please?
"Witness. Well, I just swore to secrecy; that was all.
"Chief Justice. Did they declare the purpose of it?
"Witness. Well, they told me it was to strengthen the Conservative party. That was my understanding of it."

"Conservative," Mr. Speaker, in North Carolina is another name for Democratic. I suppose my colleague will not demand proof for this:

"Mr. Battle. Did you know of the existence of an organization known as the Union League?
"Witness. Nothing but from hearsay.
"Mr. Battle. It is generally believed there is such an organization, composed of both white and colored, but mainly of colored?
"Witness. Yes, sir.
"Mr. Battle. It was understood that it was a political association?
"Witness. Yes, sir.
"Mr. Battle. And yours was also?
"Witness. Yes, sir. I went into it just the same as I went into the Know Nothing movement.
"Mr. Battle. If you will permit me to give you a little advice, you will never join another secret society.
"Witness. I don't think I ever shall, sir.
"Mr. Battle. What was the object of these Leagues?
"Witness. It was to carry elections.
"Mr. Battle. And what was the object of the other; the same?
"Witness. Yes, sir."

I shall not read farther from the testimony before the court. I am satisfied my colleagues will not question the accuracy of the statement of Dr. Moore, who confesses himself a member of the organization and ought to know its purposes, but proceed to give extracts from the opinion of the judges. In the case of The State vs. Wiley and others, decision in chambers,

at Raleigh, August 29, 1870, by Chief Justice Pearson and Justices Settle and Dick, the following language occurs:

"No motive is assigned for this murder except 'political animosity.' The circumstances show it was done on premeditation, with fatal skill, and by a number of conspirators, (either taking part in the killing, or else keeping watch and being on the look-out,) to whom the unsuspecting victim was led up for sacrifice."

Later, sir, in the case of Tarpley, Gray, and others, September 1, 1870, the chief justice, after saying "probable cause has been made out," proceeds, in referring to the evidence of Long, to add:

"It was the subject of remark between us that in our experience as lawyers and as judges we had never known a witness on the examination-in-chief to expose himself more fully to contradiction (unless he was telling the truth) by stating in detail as to place, time and the persons present, the whipping of Sellars, in which he was an actor, the whipping of Holt, and of Trollinger and Corliss, all of which he narrated as reported by members of the Klan; the burning of the school-house, in which he took part, the conlemplated murder of Holt and of Shoffner and the actual murder of Outlaw and Puryear by the Ku Klux, or White Brotherhood; and by stating, in the general, from reports made to his camp, that the number of members in Alamance was between seven and eight hundred, in Guilford twelve hundred, in Orange, Chatham, Rockingham, and other counties, not informed as to the number, but the order extended over the State and amounted to forty thousand; was said to have originated with ex-President Johnson, and to extend over the whole South for the political purpose of preventing negro equality by whipping, hanging, and other acts necessary to effect that object; and by stating the oath not to reveal any secrets of the order; to obey the commands of the chief, to go to the rescue of a member, and to swear for him, as a witness and acquit him as a juror. In short, this witness disclosed a condition of things showing, if true, that the civil authorities were unable to protect life or property, confirmed by the fact that in no one instance have the perpetrators of these crimes and 'known felonies' been brought to justice. It was a further subject of remark that this witness sustained himself under a most searching cross-examination, as well as any person we had ever seen in similar circumstances. This witness was not contradicted in a single particular, either in the detail or in the general."

This decision is also signed by the same judges, Pearson, Settle, and Dick, who sat upon the investigation.

I have, in the beginning of these remarks, read from the oath requiring members of these klans to swear that they are not members of "the Red String Order, Union League, Heroes of America, Grand Army of the Republic, or any other organization whose aim and intention is to destroy the rights of the South," &c., and, further, that the candidate "will never assist in initiating, or allow to be initiated, if you can prevent it, any one belonging" to these several orders, "or any one holding Radical views or opinions." And now I give the opinion of the judges to whom my colleague refers, sustained by Democratic testimony that these klans were organized for party purposes. Sir, I felt amazed that my colleague should boldly announce such an untenable proposition. I can only commend him to a careful reading of the testimony before the Southern Outrage Committee of the Senate, and the testimony before the justices of the supreme court of North Carolina in August last, to both of which he refers in his speech, and neither of which, I very much fear, has he read with care and attention.

I shall now notice one other statement of my colleague, which carries with it its own reply. Asserting that the Ku Klux societies were organized as correctives to the outrages of the Loyal League, he assures you that the former have existence in only six or eight counties of the State. The League is known to exist in every county of the State. Where are the Ku Klux in the remaining counties? Why not organize in every county in which the League had existence? But I do not propose to follow these inquiries. The statement of my colleague is altogether "too thin."

Now, Mr. Speaker, the State government has failed in every instance to punish these Ku Klux crimes, and the liberty amendments are

already a practical nullity where these klans operate. The Government of the United States must abandon its reconstruction policy, or it must now enforce it by appropriate legislation of sufficient stringency and power to overcome the thousands of banded conspirators who have raised a new rebellion against the execution of the laws and the rights of the citizen.

The colored men of the South, and those who have supported them in their rights as guarantied by the Constitution of the country, look to the national Government to enforce by "appropriate legislation" what is declared to be necessary for the future peace and security of the Republic. It is not wonderful that those who gained political preferment by means of these lawless organizations should resist any and every effort of the national Government to enforce its authority and its laws. It is to be expected that they will denounce those who advocate such enforcement. But common caution ought to admonish them that over-zeal and manifest violence of temper in the discussion of the question would betray an interest, partisan or otherwise, in the continuance of the operations of the Ku Klux conspiracy, which has been invoked in aid of their party. Why is it that no man can aim a blow at a Ku Klux without having it returned by the whole Democratic party? This of itself should admonish the Government that it is dangerous longer to delay a stringent and resolute dealing with a conspiracy as wide-spread and powerful as that which existed in the early part of the year 1861.

Having started with broad denials of established facts, shutting their eyes to published testimony that is undeniable and irrefutable, denouncing all who stand in their way, the opponents of the pending bill finally descend to constitutional scruples and quibbles upon words, and feign to forget the fundamental principles upon which the Government is founded, that of the protection of the lives and liberty of the American people. Sir, if the Constitution does not authorize this Government to protect the liberty and lives of its citizens it were well that the Constitution were amended or the Government changed in its character or powers. A Government that cannot afford safety and protection to citizens who give it love and allegiance is unworthy of their love or allegiance !

In conclusion, Mr. Speaker, we hear complaints of political disabilities imposed by national authority upon men recently engaged in rebellion. My colleague concludes his speech by an appeal to you to remove these disabilities and to extend universal amnesty to the people of the South. Sir, does my colleague forget that hundreds of thousands of the loyal people of the United States, who never engaged in rebellion, black men and white men, who had the misfortune to reside in the territory which recent destroyers of the Government claimed as peculiarly their own, are under far greater social and political disability, imposed by violence and lawlessness? And allow me to say that his allegation, that the continuance of disability has given rise to the Ku Klux, is a confession that the leading men of the Democratic party are the originators and contrivers of the movement.

This confession may be startling to the country; but we who see and know of the practical operations of these klans need not this to convince us that they had their origin, their motive-power, and their impunity from punishment, and all upon which they rely to protect them in their crimes, from the hands of the leaders of that party, which, in 1868, announced as its platform that the reconstruction acts of Congress should be overturned by the bayonet and the Army made to undo what the Army had done in suppressing the rebellion and keeping down those who had manifested a disposition to continue to disturb and

Case 1:21-cv-00858-APM   Document 16-4   Filed 07/08/21   Page 28 of 42

great fact, proved by sworn testimony before your Committee of Elections, sent there to investigate, now on your files, that more than two thousand felonious assaults and murders were committed upon Union men in seven parishes of the State of Louisiana during the elections of 1868, and that in the New Orleans riot, previously, a peaceful convention was attacked for political reasons only, and many of its members slain, including the Rev. Mr. Horton, even as he prayed God to forgive his murderers.

And, with deepest sorrow, I am compelled to state the fact still more disgraceful to the country and the Government, that to this day and this hour, although many of the murderers are well known, no man has yet been brought to justice for any one of these very many diabolical crimes.

But the spirit of patriotism, fired by the war, still animated the hearts of the people, and the beaten and dismayed hordes of the Democracy again went down before the patriotic hosts by a more than Waterloo defeat.

The election of President Grant, and the magic words which accompanied his assumption of the reins of power, "Let us have peace," carried quiet for a season into all the borders of the South, so far as organized riot, outrage, and bloodshed were concerned, and for a time we heard only of sporadic crimes of the dagger or pistol, which had ever been the distinguishing insignia of southern society and the necessary offshoot of a social condition where slavery and a disregard of the rights of man were the rule of action.

Following Grant's inauguration, the arts of peace, the renewal of the industries of the laborer, the influx of northern capital, with its consequent immigration, were again turned toward the southern States, and again substantial quiet, observance of law and order prevailed there, as we have already seen was the case after the surrender at Appomattox. And for precisely the same reason.

Four new years of Republican rule must again supervene, and the success of the Democracy in the country seemed once more hopeless. Once more it seemed that though treason as a crime might not be punished, still traitors at least would be restrained if not subdued, and the fourteenth and fifteenth amendments of the Constitution would insure the equality of right and equality of protection under the laws to all men who bore allegiance to the flag of the Union.

But the unhappy and, in my judgment, mistaken policy of Congress, in our haste to reconstruct the southern States and give to all her citizens, however disloyal, equal political power in the Government, still prevailed. Again Congress gave wholesale relief from traitorous disabilities. Again States that had stood firm under conditions providing for disfranchisement of rebels gave way, and permitted to their rebellious citizens an equal share of power with the most loyal and true.

The struggle for political power lost by the arbitrament of arms was therefore renewed in the rebel States; and again, instead of argument, debates, and appeals to the principles of liberty under constitutional law as reason for political action, the white men of the South resorted to their favorite and oft-tried means of political success—fraud, coercion, and force.

Hate of the Union, malice toward free institutions, and all the bad passions, the *sequela* of civil war, heretofore smothered from fear and necessity, becoming strengthened, engendered anew, and fostered by mourning for the "lost cause," by social ostracism of every man and woman, however pure, high, and good, who had remained devoted to the country, broke out afresh and were brought into action, reinforced by assertion of the doctrine that the States when reconstructed were supreme in their power over those who were within their limits, and that the General Government was powerless to protect even her soldiers who had fought to save the life of the nation and were denizens of the soil they had won for their country, all conspired to convince the southern men that they might once again control the country, as their fathers for a generation had done, and as their hopes arose even in so much they organized wrong and murder to accomplish them.

The traditional and ever-recurring effects of disappointment in appointment to office by a new Administration; differences upon measures of government in the party dominant for so many consecutive years; the ambitions and jealousies of the leaders of that party; the burdens of taxation consequent upon the war, had caused serious disaffection and divisions among the best and most patriotic of the people, who, believing the war in fact ended deemed it impossible that any of the fundamental issues therein settled could be reopened again, revived the hopes of the Democratic party; local successes in the late elections and an increase of its representation in Congress, although less than attended any other Administration in time of peace since the formation of parties, gave still great hopes to the Democracy of the North that by the aid of their allies at the South power might again pass into the hands of those who had once sought to destroy the nation.

In Democratic State Legislatures attempts were made to declare the constitutional amendments insuring equality of powers and rights to all men not binding.

At the assembling of Congress in December last exultant speeches were made that the Democracy would soon be in power; that the Republican Administration was broken down and divided in its counsels. Proclamations were made from this Hall that in such cases all reconstruction was to be held invalid and unconstitutional, and that every step taken since the war would be retraced, saving always those steps which released traitors from peril and removed disabilities from those who had forfeited all rights under the Government.

All this had its necessary and apparently intended results. It increased and intensified and organized the lawlessness already existing in the South from more remote but kindred causes. Young men had grown up during the war, taught by their mothers hatred to the Federal Union, and by their fathers that it was not honorable to labor with their own hands for their own support. They saw the negro, whom they had deemed their inheritance, now their equal in rights, and in all that makes good citizens their superior. They saw churches and institutions of learning, despised by themselves, frequented by the black man with eager desire to raise himself in the scale of social life and fit himself for his privileges.

Thus inspired and stimulated, their bitter hate of the Government and malice toward free institutions broke out in the form of lawless oppression of the negro, who, when the war was raging, protected and served their own mothers, and themselves as infants, in loyal kindness to the helpless and unarmed; and these chivalric sons of the South, in armed and cowardly numbers, brutally outrage at midnight the faithful nurses in whose arms they had been fondled in infancy, disguised, in very shame, lest their victims should recognize their butchers as the babes they had nurtured at their breasts. These felons had never loved the national Government. Fear of its power, which had restrained them, was being relieved from their minds, under Democratic teachings, and they thus gave vent to the lawlessness and disregard of the rights of others, inherent in their education, in impartial hostility to the school-house, the church, and the negro. They desecrated and burned the first two, and whipped and murdered the men. At first these crimes were political only in so far as all of the objects of their rage were instruments in the hands of the Republican party, by which good government was to be preserved, laws vindicated, knowledge disseminated, and their benighted localities regenerated, and because of the further necessity that as the Democratic party is now organized all lawless violence essentially tends to further its purposes.

Encouraged by the supineness of Congress to repress these crimes, their leaders conceived the bold design of retaking by stealth and midnight force the control of the State governments, which they had lost in open war, and for that purpose reorganized large numbers of the soldiers of the confederacy into camps, divisions, and districts, under their late officers. These they bound together by horrid oaths, secret signs, grips, and passwords, for mutual protection, with the design, to use the words of General Kershaw, "to retake by the midnight dagger of Brutus what they had lost" in the trenches before Richmond.

Let me not, however, do injustice to all confederate soldiers. There were numbers of good men and true, who, misled by their convictions, fought mistakenly but persistently for the cause which they believed to be just, upon the battle-fields of the confederacy.

But go to the morning reports of Lee's army in the latter days of the rebellion, and you will find two men "absent" to one man "present for duty." It is those absentees who shirked the contest with soldiers of the Union in arms who are now prominent in the bands so cruel, so murderous, and so unheard-of in their atrocities, that the term "Ku Klux" had to be invented to cover up the nature of the combination, as disguises and masks conceal their persons while they carry on by armed banditti a cowardly midnight war upon defenseless, unarmed people sleeping in their peaceful homes. Therefore, if asked, who are the Ku Klux? I reply, call the roll of absentees of the rebel armies and the half-fledged boys who follow and the newspaper "bummers" who egg them on, and you will muster the rank and file.

The testimony taken before the committee of the Senate shows that these bands so organized number forty thousand men in the State of North Carolina alone, and by their power they overturned the State government elected by the people of that State, impeached the Governor for executing the laws, and have only been prevented by the veto of the Lieutenant Governor from overturning the constitution of the State itself through a convention to be controlled by their daggers. In Tennessee, as appears by the testimony taken before the Committee on Reconstruction during the last session, a Legislature elected through the terrors of their outrages had passed laws in derogation of common right, had overturned their State constitution in defiance of its provisions, and deposed the judiciary, and thus rendered the execution of the laws, even of the United States, so unsafe that almost weekly reports came to us of the necessity for the employment of troops of the United States in the collection of just revenues from its own citizens.

The neglect of Congress to pass enabling laws to give power to the Executive to protect life and property; the successes of the organization in North Carolina, Tennessee, Alabama, and Georgia; the aid and comfort and support received from the Democratic party on this floor by their denials of the existence of these murderous organizations; by palliation of these atrocities; by their opposition to every proposition for legislation for their suppression, whereby that party has made itself, both in morals and law, participant and principal in the wrong—for whosoever attempts to conceal or cover up a crime becomes accessory thereto in fact as well as in law—have so far encouraged and emboldened these reckless, wicked men, that, too impatient to wait for an election, but preparing for the one in 1872, they have undertaken by force of these horrible organizations to overturn the government of the neighboring State of South Carolina, and have begun their hellish work with most systematic effort in the

article of amendments to the Constitution of the United States; and in all such cases it shall be lawful for the President, and it shall be his duty, to take such measures, by the employment of the militia or the land and naval forces of the United States, or of either, or by other means, as he may deem necessary for the suppression of such insurrection, domestic violence, or combinations; and any person who shall be arrested under the provisions of this and the preceding section shall be delivered to the marshal of the proper district to be dealt with according to law: *Provided*, That the President of the United States be, and he is hereby, authorized, if in his judgment it should be deemed expedient, to direct voluntary enlistments of any of the militia of the United States in lieu of all or any part of the forces herein authorized, to be employed for the purposes aforesaid, for a term of service not exceeding thirty days, after the final adjournment of the next session of Congress.

SEC. 4. That whenever in any State or part of a State the unlawful combinations named in the preceding section of this act shall be organized and armed, and so numerous and powerful as to be able, by violence, to either overthrow or set at defiance the constituted authorities of such State, and of the United States, within such State, or when the constituted authorities are in complicity with, or shall connive at the unlawful purposes of, such powerful and armed combinations; and whenever, by reason of either or all of the causes aforesaid, the conviction of such offenders and the preservation of the public safety shall become in such district impracticable, in every such case such combinations shall be deemed a rebellion against the Government of the United States, and during the continuance of such rebellion, and within the limits of the district which shall be so under the sway thereof, such limits to be prescribed by proclamation, it shall be lawful for the President of the United States, when in his judgment the public safety shall require it, to suspend the privilege of the writ of *habeas corpus*, to the end that such rebellion may be overthrown : *Provided*, That the President shall have first made proclamation, as now provided by law, commanding such insurgents to disperse: *And provided also*, That the provisions of this section shall not be in force after the 1st day of June, A. D. 1872.

SEC. 5. That nothing herein contained shall be construed to supersede or repeal any former act or law except so far as the same may be repugnant thereto ; and any offenses heretofore committed against the tenor of any former act shall be prosecuted, and any proceeding already commenced for the prosecution thereof shall be continued and completed, the same as if this act had not been passed, except so far as the provisions of this act may go to sustain and validate such proceedings.

Mr. SHELLABARGER. I ask that the amendment which has just been read may be ordered to be printed, so that the House may be in possession of it as soon as possible. I shall state, as well as I can in ten minutes, the effect of this amendment. It will have been observed by the reading of it that it leaves the first section of the bill as reported by the committee unaffected. The second, third, and fourth sections are stricken out, and are supplied by the amendment.

That which is substituted in the place of the second section will be found in substance in what was printed and laid on the desks of members this morning as the proposition submitted yesterday by the gentleman from Illinois, [Mr. COOK,] with some verbal amendments, and striking out of Mr. COOK's proposed amendment that part of it which relates to the matter of voting, that being supplied now more fully in the existing law of 1870. By looking, therefore, at the proposed amendment of the gentleman from Illinois the members of the House will have before them what is to be supplied in place of the second section of the bill of the committee, the two sections proposed by Mr. COOK being embodied in what is here the second section, and the two are put into one.

Now, I shall not attempt, in the ten minutes allowed me, to analyze that section. I will first state that the first part of the section, down to the end of line fourteen, is now the law of the United States, having been enacted in 1861. Therefore the provisions of this section that are new are included in the portion following the fourteenth line.

The change which the amendment proposes to make in section two of the original bill as reported by the committee, so far as it relates to disputed grounds, so far as it is not confined to infractions of right which are clearly independent of the fourteenth amendment, referable to and sustainable by the old provisions of the Constitution, is to be found in those portions of the section which are contained in the part beginning at line twenty-five, I think; I cannot state exactly the place now :

To infringe the verdict of any juror in any court of the United States, or to injure such person or property on account of any verdict lawfully assented to by him, or shall conspire together for the purpose, directly or indirectly, of depriving any person or any class of persons of the equal protection of the law.

There, sir, is brought into notice that which is supposed to be the distinction between the original second section as proposed by the bill and the section as proposed in this amendment. The object of the amendment is, as interpreted by its friends who brought it before the House, so far as I understand it, to confine the authority of this law to the prevention of deprivations which shall attack the equality of rights of American citizens; that any violation of the right, the *animus* and effect of which is to strike down the citizen, to the end that he may not enjoy equality of rights as contrasted with his and other citizens' rights, shall be within the scope of the remedies of this section.

Now, there is much other detail here that I need not allude to. But so far as I now comprehend the effect of it I have stated it. There is force in the point of distinction that is made ; and without undertaking to enter into it, I will now state some other changes proposed by the amendment.

In the third section of the bill as reported by the committee, at the end of the third line, are added the words "and of the United States ;" so that the obstructions or combinations which effect the obstruction of the "laws thereof" (meaning the State laws) shall be so extended as to include obstructions of the laws of the United States. That is rather a verbal amendment. Then at the end of the section is added what will be stated more fully by the gentleman from Massachusetts, [Mr. BUTLER,] my colleague on the committee.

In the fourth section of the bill as originally reported by the committee is this, which is deemed an important change. As reported by the committee the section provides that the violence must be such as to set at defiance the constituted authorities of the State. To that is added by this amendment a provision that the violence must also be a defiance of the authorities of the United States that shall be present in the district ; thus widening the scale of violence and of danger required before the interposition provided for in the fourth section can be resorted to. It must be so very imposing as to defy both the authority of the State and the authority of the United States ; that is, of the marshals of the United States present in the district.

The amendment further strikes out that part of the section reported by the committee which authorized the declaration of martial law, and leaves no other express power granted except that express power which is found in the right of the President to suspend the privileges of the right of *habeas corpus*.

These, then, are the changes made by the proposed amendment.

I will repeat. The first section stands as reported by the committee. The second section is as reported in the proposed amendment of the gentleman from Illinois, [Mr. COOK.] The third section is so changed as to require that the authority of the United States must also be invaded and defied. The fourth section is so changed that the privileges of the right of *habeas corpus* cannot be suspended unless the authorities of the United States, as well as of the State, are unable to cope with the violence ; and it excludes also the provision in regard to the declaration of martial law.

I wish to make this general statement in explanation of the action of the members of the committee who are friendly to this bill. The amendment is not one proposed from the committee, but is one prepared simply upon consultation of those who desire to make the bill

conform to the wishes of such members as believe that some such measure should be passed.

Your committee, when charged with this exceedingly grave and difficult duty, had not only to enter upon a field of investigation new, untried and exceedingly important, but they were also compelled to do it in the absence of that discussion in the House that would enable them to be possessed of the views and wishes of this House. We were also under the further embarrassment of being required to do it either with a great deal of haste or else to keep the House in waiting. We therefore preferred to take and bring together, so far as we could, the measures presented in the two Houses, and embodying the views of members desirous of effecting legislation of this kind. Taking these as our guide, and also consulting our general sense of duty in this regard, we reported this measure for the purpose of obtaining the sense of the House upon the subject. The debate has in its results been exceedingly satisfactory. Its character has been in general manly, fair, and just. We have availed ourselves of the benefits of the discussion ; and we desire to express our gratitude for the light the debate has furnished.

Mr. LEACH. Mr. Speaker, the Constitution of the United States, when observed in all its provisions and administered in its integrity, is worth more to this great nation, infinitely more, than all the political parties and politicians in the world. Parties and party successes alternate and change, politicians and ephemeral local policies pass away ; but the Constitution, framed as it was for all time, in the exercise of the loftiest statesmanship the world has ever witnessed, was based upon principles so just and grand, so sacred and ever-living in their character and object, as to render them indissoluble and perpetual, as they were intended to be by their illustrious founders. As, sir, the Constitution, respected and restored, must survive, and I believe will survive (though now undergoing an ordeal painful to contemplate) all parties, all the politicians, all covert and open attacks, all dynasties, and live forever.

Sir, the sacred precincts of the Constitution ought never to be invaded ; its glorious bulwarks ought never to be ruthlessly pulled down or destroyed by impious hands, because it is the ark of the covenant of the nation's liberties and the great refuge of freedom. And yet, Mr. Speaker, it has been so loosely construed of late years, and its living, sacred principles been so often disregarded, that at last it has come to be considered, by many of those who should be its firm and unflinching supporters and defenders, as an antiquated and obsolete instrument.

In proof of this, the bill now under consideration, conceived in no spirit of patriotism, but savoring so strongly of injustice to my already most grievously oppressed section of country, is, in my opinion, a palpable and flagrant violation of the Constitution of the United States in some of its most delicate and important features, and is therefore a bill of momentous consequence to the whole country—vastly more so, as I conceive, than any bill before this or the late Congress.

This bill is introduced and sought to be fastened on the country in all its hideous features, in the present political conjuncture in public affairs and parties, when the waning fortunes of the dominant party, especially in the South and West, seem to demand some remedy, albeit a desperate one, with the hope of maintaining their ascendency at all hazards and by any means, even at the expense of the liberties of the country. And yet I do know (for long public service has made me acquainted with the sentiments of the people of North Carolina) that if the Republican party were influenced solely by the best policy for success and the recovery of their ascendency in the State, that this bill and other measures directed

against her people are the very surest means that could possibly be adopted to utterly defeat their object, and therefore to increase greatly the majority against them; and, if I did not value the Constitution of our common country and the liberties of the people as far above party, I should witness without regret this wreckless, wicked, and unconstitutional legislation.

Sir, I undertake to say that this bill puts on trial, so to speak, the Constitution of the United States; that in its monstrous provisions it, in effect, annihilates the States of this Union, and if passed and practically carried out it will overthrow the liberties of the people of all the States of this Republic. I do not say that the President of the United States, though the chosen head of his party, is the leader in this wicked, continued raid upon public liberty; for although the conquering chieftain in the late unfortunate internecine war, yet he exhibited to the admiration of the civilized world the grandest attributes of the true hero—generosity and kindness to conquered but brave and noble foes, when they grounded their arms and returned in good faith to their allegiance to their country.

But, sir, the Executive may have evil counselors; ay, sir, he has not only here at the seat of Government, but at the South and in my own State, men who, claiming more acquaintance with civil affairs than himself, are assiduously plying him and poisoning, perhaps, his mind, against the true friends of liberty and law and order. Be this as it may, I assert on this floor, to the people of North Carolina and to the country, that the issue is now being made up in these United States (and this bill but supplements and proves the truth of the assertion) between constitutional liberty and a military despotism; and the country must array itself on one side or the other. The great State of North Carolina, maligned, abused, and basely slandered as she has been, stands as of old for public rights, and firmly plants herself on the side of liberty and law, of right and justice.

Mr. Speaker, the unconstitutionality of this bill has been ably argued and conclusively shown by the distinguished gentleman from Indiana [Mr. KERR] and others. The force and conclusiveness of their arguments have not been weakened, in my judgment, by any speech from the other side of this House; and I call the attention of the country to these able speeches. Why, Mr. Speaker, this bill establishes, as every fair-minded man must see, executive irresponsibility in the fullest sense of the term. All the powers of the Government, if this bill pass unamended, will be absorbed in the hands of one man; and all history, with fatal uniformity, shows that the constant tendency of power is to steal from the many to the few, and where functions belonging to one department are either permitted to be exercised or are usurped by another coördinate department, that this in itself is a long and most dangerous stride toward despotism. And, sir, every member of this Congress knows, and the country will know, that the parallel and analogy is precisely found in this bill.

Sir, what right has Congress, and that, too, in time of profound peace, to delegate to the President, not merely to say when insurrection or war exists, but also to declare a State in insurrection and proclaim martial law—as pend at his will and pleasure the privilege of the great writ of *habeas corpus?* Sir, if the legal principle of *delegatus non delegare* holds good, as it does, where matters of even little importance are involved, how much more so in that most delicate question and great inalienable right, the liberty of the citizen? No, sir; the law learning of the country will declare against the constitutionality of it, and the plain sense of her free people will indignantly denounce it, and will, ere long, rebuke and repudiate alike the men and the devices by which they are now threatened with enslave-

ment. Yes, sir, this bill proposes to delegate to the President the power to suspend the sacred writ of *habeas corpus*; thus surrendering this great and delicate power with which they are invested, and thereby transforming the President of the United States into a dictator, and entirely destroying the sovereignty of the States. This is a grant of power without authority of law, that the Father of his Country never would have allowed himself to have been invested with—a power he never should have been invested with.

Why, sir, according to my recollection, the writ of *habeas corpus* has been suspended in England but three times in one hundred and fifty years, and then by Parliament, and with limitation on the power conferred so as to protect the subject; has never been suspended in this nation but once since the formation of the Government, and in that instance by Congress, and not by the President in virtue of any authority supposed to be delegated to him by Congress. This was done by Congress in 1863, during the most fearful struggle of the late rebellion. And now, sir, Congress, in a time of profound peace, without law or constitutional authority, without a precedent in the history of the nation from its foundation, assumes the right to delegate this tremendous power to the President of the United States; fearful power to be placed by freemen in the hands of any man on earth! Sir, as an American citizen, as a North Carolinian, proud of my native State and loving her people—living as I do in the exercise and enjoyment of civil, political, and religious liberty, I solemnly declare here in my place, on the floor of the American Congress, that God never would give any one man that I would trust with such a high prerogative, or into whose hands I would place such despotic power—never!

But, Mr. Speaker, I come now to some of the circumstances of the origin of this bill, and the arguments used in its favor, as it appears to be in a large degree aimed at North Carolina and at the noble people of my own district—a people dear to me, for a portion of them have trusted me with their public interests for many years, and returned me to office again and again by overwhelming majorities, and they expect me to plead their cause and demand their rights in the language of truth and soberness.

Sir, in North Carolina we have been cursed with an administration of the State government without a parallel for stupidity, recklessness, and corruption; which has sought and still seeks to perpetuate its ascendency by busy slanders of our people. Instead of defending the good name of the State, whose honor they have in trust, many of our office-holders there, and I am sorry to add some of our men in higher places, have leagued themselves with those who are willing to make political capital by manufacturing and publishing to the world the grossest and most unblushing falsehoods, to her discredit.

Our people are unfortunate to a degree that ought to excite sympathy and commiseration here, instead of indifference or hate, in that many of their public servants are their worst enemies, and are willing to thrive by the injury of their State. History has seldom presented such a spectacle. They have destroyed the credit of the State and well-nigh bankrupted the people, fixed a debt of nearly twenty million dollars upon her people, and an immense tax, too grievous to be borne, which the people can never pay; and all this immense debt with less than half a million expended for her benefit. They have placed upon the bench judges both stupid and corrupt. Now, sir, when will our countrymen of the North learn to contemn the stories of these shameless slanderers? When will the honest and intelligent people of the North be able to see, what is so manifest, that these wonderful tales of outrage and horror are almost entirely base falsehoods, manufactured by unscrupulous politicians for the

purpose of "arousing the northern mind and firing the northern heart," all for party and personal aggrandizement?

Why, sir, after the most searching investigation on the part of the respondent, Governor Holden, in the recent impeachment trial at Raleigh, not a single case of what is coming to be technically denominated "outrage" was shown to have occurred in the counties of Alamance and Caswell, the counties and localities where such things are mainly charged to exist, not a single outrage for more than ten months past; but, on the contrary, all such disorders and crimes—and there were unfortunately a number in these counties—were distinctly proven to have wholly ceased there at least two months prior to the occupation of those counties by the Holden-Kirk troops. And let it be remembered those counties are but little more than forty miles from Raleigh, thus affording on that trial every facility of obtaining all the evidence touching on such outrages; and let it be also remembered that even the evidence as to the time of the commission of these alleged offenses, taken before the Senate of this body—one-sided testimony, taken with closed doors, and gotten up for the wicked occasion, for party capital—substantially corroborates that taken, so much fairer and fuller, at Raleigh.

It was further in proof, and not controverted, (I know the truth of what I say, for the testimony was printed and I have it,) that an organization known as the White Brotherhood had once existed in Alamance, (but no proof of any in Caswell,) and that upon the passage of an act of the Assembly making it a crime to go masked or disguised, a meeting of the chiefs of the White Brotherhood was held, and that organization was formally dissolved in April, 1870. It was further shown that every act committed by disguised men after that time was committed without any countenance of any secret society, and solely by improvised squads of both parties and both races, of the character of vigilance committees, and that even these had entirely ended there since April, 1870. And, sir, not a particle of evidence was produced there, or has been here, to raise even a suspicion that any man of note or prominence, either there or in any part of the State, ever, at any time, had given the slightest countenance or approval to these wicked acts and disorders.

It is unnecessary for me to say that I utterly condemn all such violations of the law, and that I deprecated and denounced them on every stump during my canvass with as much vehemence as did my able competitor; and, yet, in the miserable partisanship, and one-sided testimony taken before the Senate committee my name is not mentioned as having denounced lawlessness and outrage, and as having urged the people everywhere to encourage by their votes, and aid by their influence the maintenance of the supremacy of the laws, as well as the cultivation of kind feeling for and generous conduct toward the colored race; and I undertake to say, right here, in this connection, that such is the feeling and conduct of the white toward the colored people of the State, notwithstanding the ineffable meanness of bad men, both natives and northern men, to inflame their passions and excite their feelings against their former owners and best friends.

Sir, they are daily discovering this, and are returning in thousands to their former homes and settling upon the lands they formerly cultivated. And in my district I have never known or heard of one instance of attempts by their employers to influence their votes—not one. They are a kind, docile, grateful, confiding people, and the man who would seek to deceive or mislead them, whether native or "carpet-bagger," is a bad man. And yet this has often been done by these bad, designing men, to the injury and prejudice of the colored man. Generally they vote Republican;

the South disgraceful to the nation and shocking to the civilization of the age.

It seems to me that a man must shut his eyes and close his ears and summon all his prejudices, or he must be convinced that lawlessness and disorder are holding high carnival in a large part of the domain of this nation. He must set at defiance all human testimony, and resolve that he will not believe even though the dead victims of this spirit of diabolism should rise in their bloody garments, and from their watery graves, and bear witness to the fearful fact.

But even let it be conceded that the telegraph is prolific of lies in this regard, let it be conceded that letter-writers exaggerate, let it be conceded that the newspapers are filled with untruths, still here upon this very floor, in our very midst, members of this body are the witnesses who can speak and who have spoken, and who do bear witness to the fact that the lives and property of citizens of the southern States are in peril every hour, and that the State authorities will not or cannot afford them protection, and that they can only be made safe against outlaws by the intervention of Federal authority.

Sir, I am reliably informed that not three days ago a member of this House was urged by an official, who is charged with the important duties in connection with the enforcement of the criminal law, not to vote for this bill, for the reason that he could not safely return to his home if he did. And, sir, what is the purpose of all this bloody work? I assert—and all well-authenticated evidence proves the truth of the assertion—that it is for the express purpose of controlling government in the States where these things are done, by preventing citizens from exercising their legitimate constitutional privileges. It is to overthrow by force and violence political opinion; it is to destroy by violence the freedom of the ballot-box, and therefore it is the most dangerous form of domestic violence and rebellion against the laws. My colleague said:

"The utmost extent of insubordination is confined to a very small number of persons, and they are in a few localities. They are merely common criminals, without politics or higher motives of action than the base aims of individual offenders."

I will let these gentlemen here upon this floor answer whether this "insubordination is confined to a very small number of persons" and a "few localities." "They are merely common criminals," says my colleague. Yes, in one sense they are common, unfortunately very remarkably so; but the character of their criminality is very uncommon everywhere in the wide world except in the localities lately darkened by rebellion.

If my colleague means that they are to be classed with the ordinary criminals of the country, as I suppose he does, I must beg to differ with him. Men who bind themselves together by oaths to do deeds of cold-blooded murder and perpetrate every other crime that has ever been denounced by the laws of God or man, who mask themselves and perpetrate deeds that would shame a savage, are no ordinary criminals. They are men schooled in crime. They are sprouts of that greatest of all crimes, treason. And when my colleague says that they are "without politics" I must differ with him again. What is the purpose of murdering poor and defenseless negroes? Is it for gain or "the base aims of individual offenders?" No. What is the purpose of driving officers from their places? Is it for gain or the "base aims of individual offenders?" No. It is to get rid of votes, to get possession of local and State governments.

My colleague almost admits this, for in the same connection he says:

"It is undoubtedly true that millions of people, good, loyal, and true, dislike some of the southern State governments as now organized. It is not in the power of intelligent and virtuous citizens to do less."

That is by way of apology for these outrages. They "dislike" the "State governments."

Therefore these outrages are committed. What for? I know of but one legitimate deduction from the language, and that is to get rid of either the State governments or those who hold offices under them. This looks as though they were not entirely "without politics." But why do they dislike the "State governments?" These are States with republican forms of government; the officers are elected by the people; what is the matter with these governments that these "intelligent and virtuous citizens" should "dislike" them? I think I can furnish a solution of the meaning of my colleague when he says that they "dislike the State governments as now organized."

Further on he says:

"Remove from them all disabilities, and thus invite them to assume again all the rights, capacities, and responsibilities of freemen; let them organize their local governments in the persons of their best citizens; do not force upon them bad, corrupt, and incompetent officers, nor attempt to govern them by strangers, nor give the legal, moral, or partisan support of Congress to the political plunderers and oppressors who have so long run riot among them. Then you may hope for speedy restoration of law, order, peace, real and enduring, in the South."

That tells the whole story. There must be lawlessness and disorder or there could be no restoration of "law, order, and peace."

But, sir, when is this delightful state of tranquillity to come? It is when these violators of law, these disturbers of the peace, have acquired control of the local governments. Then law, order, and peace are to prevail. Bot the inference is that until then the work of blood shall still go on. Does this look as though there was no politics in this business? No, sir; it is a confession that politics is at the bottom of it all. It means that this is a struggle for political power. It means that it is an effort to get control of government by violence; it means that those who cast ballots must become subservient to the will of those who "dislike the State governments as now organized;" and, failing to do so, this work must go on until death or intimidation shall end the exercise of the highest constitutional rights and privileges of unoffending American citizens.

But suppose it should turn out that these things are exaggerated? Having the constitutional power to do so, what possible harm can there be in placing upon the statute-book a law denouncing such acts as it is charged are being committed, and such organizations as are alleged to exist, as great and heinous crimes to be punished by appropriate penalties? If no scourgings, no burnings, no murders are perpetrated, who will be injured? If there are no such lawless conspirators there will be no one to be punished as such. If all is peace and order there will be no infliction of penalties. Why is it, then, and all Christendom will ask why it is, that there is such a persistent effort to prevent legislation to maintain the equal rights of every citizen before the law?

I remember that there was a time in the history of this nation when its very existence was in peril. I remember that here on the floor of this House, and also in the body that occupies the further end of the Capitol, no measure could be suggested to keep the peace and preserve the Government that did not meet with determined opposition and fierce and bitter denunciation. Can it be that the same spirit that then pervaded these Halls and stalked about through the land is rioting here now? If one half that is told us is true, and protection is not afforded these unoffending citizens by the General Government that owes them protection, the next thing will be a resort to the instincts of all animated nature, to a law that rises high above all human enactments, the law which prompts and justifies self-protection. That involves civil strife and anarchy and the destruction of all law, and the numberless evils that follow in its train.

If it should hereafter become manifest that we have been misinformed; that these troubles only existed in perverted imaginations, no harm will come from the legislation pro-

posed. If they do exist, now is the time to smite them down, now is the time to strike, now is the time to make these disturbers of the peace, these violators of individual rights, feel the power of the Government, and to teach them that there is not of all the thirty-eight millions of the citizens of this nation one so humble that his rights under the Constitution and laws can be lawlessly smitten unnoticed to the ground.

Sir, we ought to learn a lesson from the past. In the State of Indiana, during the rebellion, there existed an organization of oathbound conspirators, working in the dark, drilling in the night for the purpose of seizing the government of that State and plunging it into open rebellion against the Constitution and laws of the nation. The day was fixed when they would "let slip the dogs of war." At the appointed time these conspirators were secretly gathering about the capital, prepared for their desperate work, and but for the vigilance and prompt action of the State and Federal authorities Indiana would have been scourged and blackened with civil strife.

And so it will be now in the South unless the Ku Klux organizations existing there are confronted with the majesty of the law. Let us provide for the punishment of these men for their lawlessness and conspiracies, and then we may confidently hope that "law, order, and peace will be restored to the South" and the nation.

[During the delivery of the foregoing speech, the ten minutes having expired, Mr. PACKARD obtained the floor and yielded his time to enable Mr. WILSON, of Indiana, to conclude his remarks.]

Mr. HARRIS, of Virginia. Mr. Speaker, in the few minutes allotted to me, I do not intend to discuss the general merits of this bill. But there is one feature of it which strikes me as being sufficient to condemn it even in the estimation of its friends, as it must in the judgment of the country. This bill presents an aspect of jurisprudence which I have never seen in any legislation. In the various States of this Union, as in England, there are laws for the punishment of offenses, and also laws to punish attempts to commit offenses; but both in England and America the laws punish the attempt with less severity than the actual commission of the offense. But this bill presents the anomaly of inflicting for the attempt to commit an offense a higher degree of punishment than is allotted to the offense when committed. In other words, by this bill a conspiracy of two or more persons to commit an assault and battery is made a felony, punishable by ten years' imprisonment in the penitentiary and a fine of $10,000, while assault and battery committed by one man is a misdemeanor, and may be punished by a fine of one cent and costs.

I appeal to members of the legal profession to say whether in the history of the law they have ever witnessed such an anomaly as that. And I appeal to gentlemen from the North to say whether their own section of country will stand legislation like that? Are they willing to say that when two men combine together to commit assault and battery, but fail to carry out their intent, fail to hurt a hair of the head of anybody, they shall be convicted of felony, sent to the penitentiary for ten years, and subjected to a fine of $10,000? That is the effect of this bill. Not only that; but if two men conspire and combine for the purpose of committing an offense, yet do not commit it, and do any act toward its commission, the President of the United States, under the third section, is empowered to declare martial law and send troops to that portion of the country. When a man has conceived the design of committing an offense, and has done any act in furtherance of the design, this bill allows him no opportunity to repent of his intention. The offense is then complete with all its horrible consequences to the party and the country.

28

tion to deprive a citizen of a right secured to him by the Constitution of the United States.

Mr. ELDRIDGE. But when it is of that magnitude, does it not amount to an insurrection or rebellion?

Mr. COOK. It might or might not. Suppose the combination in the State is too strong for the State laws to restrain it; and suppose a hundred men not engaged in that combination at all should form a conspiracy, by force, intimidation, or threats to prevent the Governor from calling upon the national power to protect the right of the citizen, that would be an offense against the Constitution of the United States.

Mr. FARNSWORTH. How prevent the Governor from doing that?

Mr. COOK. By intimidation, by threats.

Mr. BINGHAM. By making him a prisoner.

Mr. POTTER. Then the Lieutenant Governor would take his place.

Mr. FARNSWORTH. Does this bill provide for the case of the Governor being so intimidated?

Mr. COOK. No, sir. I use the illustration only in reply to the gentleman from Wisconsin, to show that where individual rights, secured by the Constitution of the United States, are affected by combination, such combinations are offenses against the United States. Let me make an illustration which my colleague [Mr. FARNSWORTH] will appreciate. In our State, not many years ago, there was a law passed which provided that no property should be sold upon a judgment of a court, by virtue of an execution, unless that property should bring two thirds of its appraised value. Now, a citizen of the State of New York sued a citizen of our State, and got a judgment against him, to be discharged under our laws. He appealed to the supreme court of our State, and our supreme court sustained that law. I am narrating a history which my colleague well knows. Then the citizen of the State of New York, claiming that that law was a violation of a right secured to him by the Constitution of the United States, which provided that no State should impair the obligation of contracts, claimed an appeal to the Supreme Court of the United States.

Now, sir, if my colleague and myself, and a hundred others in my State, who desired to pay our debts in real estate at two thirds of the appraised value, which we might be able to get our neighbors to place upon it for that purpose, if we had conspired to prevent the clerk of the court from certifying the case to the Supreme Court of the United States, and thus deprived that plaintiff of a right under the Constitution of the United States, we should have been committing an offense against the United States which might be punished by national law.

I think if the Government of the United States may not protect a citizen in the exercise and enjoyment of a right secured to him by the Constitution of the United States, it cannot rightfully demand of that citizen any allegiance to that Government, in its constitutional sphere. The duty of allegiance and the right of protection cannot be separated.

Now, sir, there are other illustrations of this principle which I might cite. A citizen of the United States, in any State of the Union, has a right to vote for any officer of the United States Government. He has a right to have his cause tried within a United States Federal court where that court has jurisdiction of the case. Now, if there be any combination of men who shall combine and conspire together for the purpose of preventing a legal voter from giving his vote or a witness from testifying in a court of the United States in a proper case, or to compel a jury in a United States court to give a false verdict, or to punish him for giving a true verdict, or to punish a witness for testifying truthfully, that combination is an offense against the United States; for the sim-

ple reason, easily understood, that it seeks to deprive a citizen of the United States of a right guarantied to him by the Constitution of the United States. If you can touch in any point or particle any right of a citizen secured by the Constitution of the United States, you might, upon the same principle and by the same logic, overthrow the entire Constitution and destroy the whole Government. If we have not a right to legislate for the defense of every right secured by the Constitution we have no authority to legislate for the security of any right. That seems to be perfectly plain.

I must hurry on. I cannot amplify as I would like to do. But there is one other illustration which I would like to make. I, as a citizen of a State, have a right to support and advocate the election of any qualified person to any office under the United States Government. That is a right which is secured to me by the Constitution of the United States. Any combination of men who shall conspire to prevent me from advocating the election of any qualified person to any office under the Government of the United States, or to a combination or conspiracy strikes down a right secured to me by the Constitution as a citizen of the United States. The citizen, in the support or advocacy of any qualified person to an office under the national Government, is exercising a right secured to him clearly by the fundamental law of this nation. Hence, a combination to deprive the citizen of that right, or to punish him for its exercise, is an offense against the United States, and may be so declared and punished by national law.

Mr. ELDRIDGE. I would like the gentleman to state how he applies his doctrine to a case which arose a few years ago in the State of Wisconsin—the Booth case—in which the Supreme Court of the United States issued a *certiorari* to the supreme court of Wisconsin requiring the latter court to send up a record. The State court refused to do so. It was a case arising under the fugitive slave law; and the State put itself in direct opposition to the United States. The Supreme Court of the United States did not pretend to say that there was any power to punish those judges of the State court; it simply made an order that some other certificate should be sufficient, and upon that the Supreme Court acted. No prosecution was ever undertaken against those State judges. I ask the gentleman whether that is such a case as he thinks might be punished?

Mr. COOK. I ask the gentleman to state his own view, whether, in his opinion, it is a case which might be punished.

Mr. ELDRIDGE. That is a convenient way of evading my question; but I will say that in my opinion the case presented no offense under the Constitution of the United States.

Mr. COOK. I will answer the gentleman's question. If an attempt had been made to prevent a record being certified to the Supreme Court in a proper case by force, intimidation, or threat, it would have been an act which the national Government might prohibit by law, and if done in violation of a law might punish. We have the right to so frame the law that a man shall not be deprived of a hearing in the Supreme Court of the United States in a proper case by unlawful means.

Mr. ELDRIDGE. The Federal Government had no power in that case to require the action of the State officers; it had no control over them.

Mr. COOK. That is an entirely different question from the one whether the Government of the United States may punish a set of men who combine to prevent, by intimidation, force, or fraud, the exercise of the rights of a citizen. The gentleman must understand that.

Mr. ELDRIDGE. The State officers in the case I mention not only threatened not to

do the act, but refused to do it and did not do it.

Mr. COOK. But they acted judicially; they did not propose to deprive a citizen of his right by violence. There was no force, intimidation, or threat.

Mr. ELDRIDGE. Oh, yes; and they were sustained by the whole Republican party.

Mr. COOK. No matter; I must go on with my argument, for I have but very little time. It does not matter whether a constitutional right is enacted into a law or not, so far as the existence of the right is concerned. And when you come to punish a combination, to deprive a citizen of such right, every lawyer knows that the combination to do any unlawful act may be declared a crime.

The combination may be to do an act not in itself a crime but simply unlawful, but a combination to do that unlawful act is a crime; or, so is a combination to do a lawful act by unlawful means. Every lawyer understands this principle. There are rights secured by the fourteenth article of amendments. What are those rights? The amendment provides that no State shall deny to any portion of its citizens the equal protection of the laws. That is the right which the Constitution secures to every citizen of the United States, to have the equal protection of the laws, the equal protection of the laws through the executive, and through the legislative and the judicial departments of every State government, and every combination of men by force and intimidation or threat to prevent the Governor of a State calling upon the Executive of the United States to secure the aid of the United States to protect the rights of all citizens alike, or to induce the Legislature of a State by unlawful means to deprive citizens of the equal protection of the laws, or to induce the courts to deny citizens the equal protection of the laws under the Constitution of the United States is the offense against the Constitution of the United States, and may be defined and punished by national law. And that, sir, is the distinct principle upon which this bill is founded.

[Here the hammer fell.]

Mr. BIRD addressed the House. [His speech will be published in the Appendix.]

Mr. TYNER. Seven days debate on the pending bill have been sufficient to indicate all of good and to foreshadow all of evil to be accomplished by its passage. The friends and the enemies of the measure ought now to be content to submit it to the ordeal of amendments and a vote. If others were willing to do likewise, I would not be found prolonging this discussion. But I have caught the common infection, and must, in the ten minutes allotted me, sum up as best I can the reasons that will influence my vote. The vote itself will doubtless be satisfactory to those who sent me here and the reasons I shall offer to fortify it may not increase their approval.

I will not commit the silly blunder of discussing in ten minutes the constitutional questions involved. My business is simply to refer to some of the facts on which legislation is now to be based.

The necessity of legislation to protect the life, liberty, property, and immunities of citizens of the States lately in rebellion ought not to astonish any one. It was to have been expected from the unhearing of the foundations on which society there rested. One third of an entire population, in the full enjoyment of all their rights as citizens, with all their privileges undisturbed, and with a representation in the national councils based, not only on their own numbers, but on a part of their property also, for reasons unsatisfactory to the balance of the world, rashly determined to submit their destiny to the arbitrament of the sword. They were defeated, as all armed enemies of a just Government deserve to be. Humiliated by defeat, inflamed by passion, bankrupted in property, and reduced from the




DATE DOWNLOADED: Thu Jul  8 12:27:36 2021
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
42 Cong. Globe 565 (1871).

ALWD 6th ed.
, , 42 Cong. Globe 565 (1871).

APA 7th ed.
(1871). Congressional Globe, The, 42, 565-592.

Chicago 17th ed.
"," Congressional Globe, The 42 (1871): 565-592

AGLC 4th ed.
" (1871) 42 Congressional Globe, The 565.

OSCOLA 4th ed.
" (1871) 42 Cong Globe 565

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

Illinois that never until the Federal Government got right did the people of that State rise high enough to give liberty and protect all men in their liberty. In the State of Illinois they had black laws almost as atrocious as they had in South Carolina.

Mr. TRUMBULL. We did have some objectionable laws in the early history of the State; there may have been mobs in Illinois as there have been in Boston; but, speaking generally, there was always freedom of discussion and of the press in my State.

I beg pardon of the Senate for having taken up so much time. I did not intend when I rose to occupy its attention twenty minutes, and now I would rather finish unless I am wearisome to the Senate. I wanted to call attention to this bill, and if I am not diverted by interruptions I shall be through in a very few moments.

I had stated that I did not suppose the Senator from Vermont was in favor—and I might say I was quite well satisfied he was not—of entering the States to pass a general criminal code for the States, or a general law for the redress of civil injuries in the courts in cases of contest between individuals, where the Constitution and laws of the United States were not directly encroached upon. Assuming that to be so, and that that is the opinion of every member of the Senate, I should like now to get the attention of Senators a moment, and especially of the lawyers of the body, to a single amendment in the seventeenth line of the second section. The Judiciary Committee propose to insert the words "or while engaged in the." I think that changes the whole character of that section. Let me show how.

As the bill originally stood as it came from the House, it provided for the punishment of a conspiracy to injure a person holding a United States office in his person or property on account of his lawful discharge of the duties of his office. That is legitimate. I can vote for a law that punishes a conspiracy to injure a United States officer on account of his lawful discharge of the duties of his office. But what is the amendment? Its effect is to punish a conspiracy to injure his property "while he is engaged in the lawful discharge of his duties." Is not that very different? To illustrate: the Senator who sits before me [Mr. HAMILTON of Maryland] has a very valuable farm over in Maryland, I assume; I suppose he has; if he has not he ought to have half a dozen. Suppose while he is here in the discharge of the duties of his office somebody trespasses upon his farm; suppose two or three persons get together and make a combination for the purpose of breaking into his barn and stealing his grain, if you please; that is made a United States offense, and they are to be punished in the United States courts with imprisonment for not less than six months nor more than six years.

Mr. EDMUNDS. May I ask my friend a question at this point?

Mr. TRUMBULL. Certainly.

Mr. EDMUNDS. This, he will see, applies to officers of the United States. Let me ask him if within the period of two years he has not united with this Senate, without a division of parties, in passing a bill which punished everybody for assaulting or beating any officer of the United States, marshal or collector, or anybody while engaged in performing the duties of his office, and even while going from and returning to his home when he had gone from his home for the purpose of performing those duties, or was returning?

I am not certain in my recollection about this last inquiry; but let me ask my friend if he and I did not vote for a bill two years ago which provided in broader terms than this as to some parts of it, but certainly as broad, for punishing everybody who undertook to assault the person or destroy the property of an officer while he was engaged in performing the duties of the office which his commission under the United States authorized him to perform?

Mr. TRUMBULL. I do not remember whether I voted for that law or not; but I will say to the Senator from Vermont that I am ready to vote and will vote now if it is necessary, if we have not got one already, for a law to punish anybody that obstructs an officer of the United States or makes an assault upon him while engaged in the discharge of his duties.

Mr. EDMUNDS. But you will not punish a conspiracy to do the same thing!

Mr. TRUMBULL. I will punish a conspiracy to assault an officer on account of his being engaged in the duties of his office, or when he is engaged in the duties of his office; but I will not punish a conspiracy to steal his apples out in Illinois when he is performing duties in Washington. I think the cases are very different. This is an injury to his property. My friend from Vermont sees as quickly as any one the distinction between these cases. It is one thing to resist an officer, and another to make an attack upon a man's property.

Mr. EDMUNDS. Is my friend sure that he did not vote for a bill which provided a punishment for attacking his property?

Mr. TRUMBULL. I am not. I do not recollect the provisions of all the bills we have passed. I said that I was willing to protect the officer in the discharge of his duties, but there is no such divinity hedging about a person, because he is an officer of the United States, that when he has a controversy with his neighbors as to the ownership of a tract of land that cause must be brought into the Federal courts, or that when they combine to trespass upon the disputed property, the act having nothing to do with his official duties, that it is to be made a penal offense against the United States.

Mr. President, if I have made myself understood, I have said all I desire to say in reference to this amendment. I wish now to call attention to another amendment in the same section, section two, on lines thirty-six, thirty-seven, thirty-eight, thirty-nine, and forty, which is obnoxious to the same objection that I have made to the other amendment. That amendment proposes to punish two or more persons who "conspire together for the purpose of in any manner impeding, hindering, obstructing, or defeating the due course of justice in any State or Territory, with intent to deny to any citizen of the United States the due and equal protection of the laws."

I do not deny the authority to punish a conspiracy for the purpose of denying to any citizen of the United States the due and equal protection of the laws. We have a right to punish such a conspiracy; but that is not this amendment. This amendment punishes a conspiracy to impede or obstruct the due course of justice in a State. That is the conspiracy that it punishes; not the conspiracy to deny the citizen the equal protection of the laws, but the conspiracy to defeat the due course of justice, with intent, it is true, to deny to any citizen the equal protection of the laws. That must be the intent; but the intent is not the thing that is punished. It is not the substantive part of the offense. If it is, then it is provided for in the four preceding lines. If this clause simply means to punish a conspiracy to deny the equal protection of the laws, that is provided for in the previous lines, commencing with line thirty-four.

Mr. EDMUNDS. Is not that the due course of justice of the State courts?

Mr. TRUMBULL. The language of the amendment is:

For the purpose of in any manner impeding, hindering, obstructing, or defeating the due course of justice in any State or Territory, with intent to deny to any citizen of the United States the due and equal protection of the laws.

A conspiracy to deny to citizens of the United States the due and equal protection of the laws, I submit to the Senator from Vermont, comes within lines thirty-four, thirty-five, and thirty-six, which provide for punishing a conspiracy "for the purpose of preventing or hindering the constituted authorities of any State from giving or securing to all persons within such State the equal protection of the laws." So that if that is all that the Senator means, it is already provided for. If he means more than that, and to punish a conspiracy against the State, then I am opposed to it.

Mr. EDMUNDS. Now will the Senator allow me to say a word if it does not interrupt him?

Mr. TRUMBULL. Certainly.

Mr. EDMUNDS. We are both of us in favor of the general principle of this bill, I have no doubt thoroughly, and we are both of us equally sincere in the desire to make it, as far as it goes, effectual, so that the violent people we design to repress will be taught to behave themselves. Now, I submit to my friend whether those three lines, thirty-four, thirty-five, and thirty-six, beginning in the disjunctive at the end of line thirty-three, do not, in express terms, provide for punishing a conspiracy formed "for the purpose of preventing or hindering the constituted authorities of any State from giving or securing to all persons within such State the equal protection of the laws." What laws? The laws of that State. Therefore the bill as it came from the House, of which I understand my friend to be in favor, expressly provides for punishing a conspiracy to obstruct the State authorities by a general name, (the Executive, the military, the judiciary, every department of the State,) in giving to everybody the equal protection of their own laws.

Now, if my friend will pardon me a little further, I wish to ask him this question: I ask if he does not know that the object of this amendment was, in the same spirit and with the same scope, instead of using those vague generalities, which it might be thought would be difficult in a court of justice to define and enforce, to take up, as another mode of expressing the same general idea, words that are known to previous statutes, that are known to the courts, technically defining an offense that is well known of obstructing the State authorities in the course of executing justice. That was all that we meant, and with the intent we have named, which really, it seems to me, narrows what is the point of the scope of the previous clause.

Mr. TRUMBULL. If this last clause is embraced within the other, as I have said, there is no occasion for it. If it is not embraced within the other then it means something more than the other, and is the punishment of a conspiracy against the execution of a State law, and that I do not think we can punish. If that provision were in the original bill, if it were susceptible of that construction, I think it would be objectionable.

Mr. EDMUNDS. What do you understand that to mean?

Mr. TRUMBULL. I should have to read the whole section back, and I do not care to go into that at this moment.

Section three, I think, is made objectionable by striking out the words in the third line "so to obstruct or hinder the execution of the laws thereof and of the United States as to." In order to make myself understood I will read that section as I now understand it with the amendment that has been made striking out the words I have just read and including the words in lines seven and eight, which are inserted in the bill, or a portion of those words. Of course I cannot be understood in the remarks I am making except by Senators who have the bill before them. The Senator from Vermont will see the point I make. I will read the section, leaving out the surplusage:

That in all cases where domestic violence in any State shall obstruct the impartial course of justice, and the constituted authorities of such State shall from any cause fail in protection of the people in such rights, it shall be lawful for the President to employ the land and naval forces, &c.




DATE DOWNLOADED: Thu Jul  8 12:36:19 2021
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
42 Cong. Globe 626 (1871).

ALWD 6th ed.
, , 42 Cong. Globe 626 (1871).

APA 7th ed.
(1871). Congressional Globe, The, 42, 626-666.

Chicago 17th ed.
"," Congressional Globe, The 42 (1871): 626-666

AGLC 4th ed.
'' (1871) 42 Congressional Globe, The 626.

OSCOLA 4th ed.
'' (1871) 42 Cong Globe 626

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

necessary in themselves, he has not thought fit to state to us. What there is peculiar about this bill that should deprive us of the ordinary right and duty of making it as perfect as possible, I am unable to comprehend. While I think this amendment is of no great importance, it is of importance enough to keep the law, of which I believe my friend from Illinois was the original author and which is now on the statute-book, as it is now; for the House bill as it stands does make a change in the meaning of that law which this amendment is designed to correct.

But all that I rose to say was that I trust the friends of the general scope of this bill, as the House has sent it to us, will stand by the committee in making it as perfect as possible within that scope, and will not allow themselves, upon any idea that does not seem to be of great weight with them, to follow the body of the opponents of the bill in rejecting all amendments. When I say "opponents of the bill," my friend from Illinois will understand that I do not mean him by any means.

The VICE PRESIDENT. Before the roll-call is commenced, the Chair will state, as the Chief Clerk is absent at the moment, that the amendment is in section two, line nine, to strike out the words "against the will and," and in line ten to strike out the words "of the United States" and insert "thereof;" so as to read "or delay the execution of any law of the United States, or by force to seize, take, or possess any property of the United States contrary to the authority thereof, or by force, intimidation," &c. The roll will be called on the amendment.

The Secretary proceeded to call the roll.

Mr. TRUMBULL (who had not voted when his name was called.) My object in asking for the yeas and nays was to see whether the Senate was disposed to amend the bill. I think that this is a proper amendment if the bill is to be amended at all; and that being the sense of the Senate, I vote "yea."

The result was then announced—yeas 41, nays 7; as follows:

YEAS—Messrs. Ames, Anthony, Bayard, Boreman, Buckingham, Caldwell, Carpenter, Casserly, Chandler, Clayton, Cole, Conkling, Corbett, Cragin, Edmunds, Ferry of Michigan, Frelinghuysen, Hamilton of Texas, Hamlin, Harlan, Hitchcock, Howe, Johnston, Kelly, Logan, Morrill of Vermont, Morton, Nye, Osborn, Pomeroy, Pool, Ramsey, Rice, Sawyer, Scott, Spencer, Stockton, Thurman, Trumbull, Wilson, and Wright—41.

NAYS—Messrs. Blair, Cooper, Davis of West Virginia, Hamilton of Maryland, Hill, Stevenson, and Vickers—7.

ABSENT—Messrs. Brownlow, Cameron, Davis of Kentucky, Fenton, Ferry of Connecticut, Flanagan, Gilbert, Kellogg, Lewis, Morrill of Maine, Patterson, Pratt, Robertson, Saulsbury, Schurz, Sherman, Sprague, Stewart, Sumner, Tipton, West, and Windom—22.

So the amendment was agreed to.

The VICE PRESIDENT. The next amendment will be read.

Mr. THURMAN. I hope the second amendment will be disagreed to for the reasons stated so forcibly by the Senator from Illinois [Mr. TRUMBULL] the other day. It is an amendment that proposes that men shall be punished for touching the property of an officer of the United States while engaged in his duty, although he may be so engaged in one State and his property may be his own hundred miles off, and the act complained of may have no connection whatever with the discharge of his official duties. I hope that amendment will be disagreed to.

Mr. CASSERLY. Mr. President, I should like very much to make a motion, if we are to sit here to-night, that we take a recess until half past seven o'clock if it be agreeable all around.

Mr. ANTHONY. Are not the Senators on the other side of the Chamber willing to accede to the proposition which I made some time since, that the Senator in charge of the bill take the floor to conclude the debate to-morrow at one o'clock.

Mr. THURMAN. Make the hour four o'clock and we will agree to it.

Mr. ANTHONY. They will not agree to that on this side.

Mr. POMEROY. I think we had better agree to take the vote to-morrow?

Mr. TRUMBULL. Certainly; I hope there will be no objection to taking the vote to-morrow. I trust some arrangement will be made to-day to do that. There has been thus far no indication on the part of any person here, or of any number of Senators, to talk against time. The debate has been legitimate upon the bill thus far. We ought not to punish ourselves by sitting here through the night when there is no disposition to prolong the time unnecessarily. Why can we not agree on some time to take the vote to-morrow?

Mr. POMEROY. Say to-morrow at three o'clock.

Mr. TRUMBULL. Say to-morrow at three o'clock, or let us agree that the Senator from Vermont shall take the floor at three o'clock. He ought to have an opportunity to close the debate, and I presume he desires it. I hope some hour will be agreed upon when the debate shall cease except so far as he desires to close it.

Mr. THURMAN. I suggest this: that we meet to-morrow at ten o'clock, that the Senator from Vermont take the floor at four o'clock, and at the close of his speech we take the vote.

Mr. CONKLING. I object to that.

Mr. TRUMBULL. Say three o'clock. The Senator from Vermont does not like to take the floor so late as four o'clock. Say three o'clock. That will give five hours for general debate to-morrow.

Mr. ANTHONY. Say two o'clock. Let us meet at ten, and that will give four hours to-morrow and all this evening.

Mr. CONKLING. To the original proposition made by the Senator from Rhode Island, although I should not have made it, that the Senator from Vermont may take the floor to-morrow at one o'clock, I will not object. I do object now once for all to any postponement to a later hour.

Mr. ANTHONY. And let us meet at ten.

Mr. CONKLING. I do not think that is necessary.

Mr. ANTHONY. And have an evening session to-night.

The VICE PRESIDENT. The Senator from California moves that the Senate take a recess until half past seven o'clock.

Mr. ANTHONY. We cannot take a recess unless we settle this question. Will the Senators on the other side agree that the Senator from Vermont shall take the floor at two o'clock to-morrow and let us meet at ten and sit as late this evening as gentlemen wish to speak?

Mr. CONKLING. I shall object if nobody else does. I shall object to anything later than one o'clock.

Mr. ANTHONY. Then will one o'clock suit gentlemen on the other side, the Senate meeting at ten to-morrow?

Mr. CASSERLY. There is a way of getting along with this matter, provided we on this side all agree, without unanimous consent. The Senate can meet at ten o'clock to-morrow without unanimous consent, and without unanimous consent the minority can cease debating at any hour they may agree upon, and then if any gentleman on the other side wants to talk after that against the member of the committee having charge of the bill, he is quite welcome to do it so far as we are concerned.

Mr. ANTHONY. I suppose those who desire to pass this bill will not agree to any recess or any adjournment unless the time at which the vote shall be taken is fixed.

Mr. CASSERLY. The Senator from Rhode Island, I think, does not understand me. I say that if, for instance, the minority here state that they will not debate this bill after a certain hour to-morrow, that amounts to the same thing practically as unanimous consent that debate shall cease at that hour.

Mr. ANTHONY. Certainly.

Mr. CASSERLY. Consequently unanimous consent will not be required to agree upon any hour to-morrow for closing debate. The Senate can without unanimous consent, by a majority I presume, do that.

Mr. ANTHONY. I should not like to risk that if I had charge of the bill.

Mr. EDMUNDS. I wish to say——

The VICE PRESIDENT. The Senator from California is still in possession of the floor.

Mr. EDMUNDS. With his permission, I wish to say——

Mr. CASSERLY. This is a sort of free conference; I do not claim the floor. I wish to arrive at an understanding.

Mr. EDMUNDS. I do not wish to interrupt the Senator; but in carrying out what I supposed to be the wishes of a majority of the friends of this bill, I stated some time ago that I thought we ought to stay here and finish the bill to-night; but if any of our friends, or if the gentlemen on the other side or the most of them prefer to agree to the original proposition of the Senator from Rhode Island to sit so long to-night as anybody wishes, either with a recess or without it, and to meet at ten o'clock to-morrow and close the general debate at one o'clock so that I may then have an opportunity of presenting to the Senate such considerations on this subject as I may think necessary, I for one shall not object. The Senator from New York is unwilling to agree to anything but the original suggestion of the Senator from Rhode Island, with the modification that the other hour, the difference between one and two, be saved by meeting at ten o'clock to-morrow so as still to have three hours to-morrow before the general debate shall close. Notwithstanding the fact that there are a good many friends of the bill who think we ought to dispose of it to-night, I shall not object to that proposition; but beyond that, I shall feel it almost my duty, in correspondence with the wishes of the friends of the bill, to insist upon staying, and as that accomplishes what the gentlemen on the other side seem to have been willing to attain of really having these hours to-morrow for debate, I do not see that there can be any objection to it on their part.

Mr. WILSON. I ask the Senator from Vermont if he did not mean to include in his proposition the idea of having a recess until half past seven to-night? In that way we might have two hours and a half this evening, then meet at ten o'clock to-morrow and let him take the floor at one.

Mr. EDMUNDS. I stated distinctly that a part of the understanding would be, if agreeable to everybody, that the Senate would not adjourn to-night as long as any gentleman desired to have the floor, or would take a recess until half past seven, and then meet and not adjourn as long as any gentleman desired to speak. That is to give everybody all the time he wants to-night and all the time he can have between ten o'clock and one to-morrow.

Mr. THURMAN. I have some delicacy in making any suggestion about this matter, having already spoken on the bill myself; but it does strike me that the proposition of the Senator from Massachusetts [Mr. WILSON] just made is the fairest of all the propositions which have been made; that we take a recess, and that anybody who wants to speak to-night may speak, and we meet at ten o'clock to-morrow, and the Senator from Vermont take the floor at one.

Mr. EDMUNDS. That is the very suggestion I made. ["Agreed!" "Agreed!"]

The VICE PRESIDENT. Is there objection to that proposition? The Chair hears no objection, and it will stand in the language of the Senator from Ohio——

Mr. CASSERLY. I should like to inquire——

Mr. EDMUNDS. I wish to understand what that is. I understand that to imply——

the principles that this bill contains, that of dealing with the people, that of enacting laws, and never that of either by advice or protest, warfare or proclamation, dealing with the States.

I have as a matter of curiosity gone through the ancient statutes as to crimes in order to see, as my friend from Illinois thought we were making a great change in the Government, how largely the founders of the Government, in enacting its crimes acts, have gone into the constant intercourse of the people in their business relations, how much it has done that might have been done by the States, and in many instances how much it has done that has always been done also by the States acting upon the same class of subjects. Here are some of them:

"An act to punish the negligence of steam-boat officers," not on the high seas alone, but anywhere in the United States, by which any person should be injured. Nobody disputes that a State can pass laws to punish that. Nobody disputes that the State have give rights of private action to people for negligence of steamboat owners.

"The embezzlement of goods of the United States." There is a power which it might be said was necessary to protect the interest of the United States. That is true; and while it is perfectly true, it would be lawful for the States to, and many of them do, have statutes under which anybody can be convicted for embezzling the goods of another, whether the United States or a foreign Power, or any person having property within their territorial jurisdiction.

"The forging of powers of attorney to transfer stocks." There is a case of a purely private crime between man and man, nothing else. The power of attorney to transfer stocks is not a Government security. It has no more relation to it than any other power of attorney has, except that the Government security happens to be the subject to which the power of attorney is applied, and it is punished as a private cheat, as all species of counterfeiting and forgery of personal documents are. Nobody ever questioned the propriety of that legislation; and at the same time all the States, without exception, have enacted and enforced laws against the forgery of precisely the same instruments; and yet nobody ever heard that the Union was about to fail to pieces because the United States had invaded the sacred right of the State to regulate the conduct of its own citizens about crimes of this character.

"Conspiracies to cast away vessels," not on the high seas merely, but anywhere within the jurisdiction of the United States.

"Conspiring to plunder stranded vessels." Plundering stranded vessels within the body of a county of a State, which in every State in the Union, I have no fear in saying, is an offense against State laws; and yet nobody has been alarmed at that legislation.

"Assaulting an officer." And here, sir, is the shibboleth on which my friend from Illinois has staggered and fallen. The committee put into this bill an amendment providing that if any man should assault an officer unlawfully and wickedly, or rather conspire to assault him, while in the performance of his duty, he should be amenable to punishment. My honorable friend from Illinois has said that this for him spoils the whole bill.

Mr. TRUMBULL. Not at all. I am in favor of that.

Mr. EDMUNDS. I am very glad that my friend has experienced a sudden conversion. Let me read from his remarks.

Mr. TRUMBULL. While the Senator is hunting it up, I will say that my position was, and I think he will find it the same in the paper—if it is not I did not express what I intended—that the Government had the right to protect its officers in the discharge of their duties; but that the Government of the United States had no right to punish for a conspiracy

to cut down the Senator's apple trees in Vermont, when he is here as a Senator discharging his duties. The bill as proposed to be amended provides for punishing a conspiracy to injure the property of another while the officer is engaged in the discharge of his duties or injures him, if you please, and having no connection with the discharge of his duties.

Mr. EDMUNDS. I am immeasurably happy that in the short course of thirty-five or forty minutes I should have found one convert; I will not say made one. Here is what my honorable friend said:

"I had stated that I did not suppose the Senator from Vermont was in favor—and I might say I was quite well satisfied he was not—of entering the States to pass a general criminal code for the States, or a general law for the redress of civil injuries in the courts in cases of contest between individuals, where the Constitution and laws of the United States were not directly encroached upon. Assuming that to be so, and that that is the opinion of every member of the Senate, I should like now to get the attention of Senators a moment, and especially of the lawyers of the body, to a single amendment in the seventeenth line of the second section. The Judiciary Committee propose to insert these words, 'or while engaged in the.'"

Now, let me read the text of the bill:

Or by force, intimidation, or threat, to induce any officer of the United States to leave any State, district, or place where his duties as such officer might lawfully be performed, or to injure him in his person or property on account of his lawful discharge of the duties of his office, &c.

That is the way the bill read in the first place. The committee propose to amend that so as to make it read:

Or to injure him in his person or property on account of or while engaged in the lawful discharge of the duties of his office.

Or to injure him in his person or property while he is in the lawful discharge of his office.

Now, says the Senator from Illinois:

"I think that changes the whole character of that section. Let me show how.
"As the bill originally stood, as it came from the House, it provided for the punishment of a conspiracy to injure a person holding a United States office in his person or property on account of his lawful discharge of the duties of his office. That is legitimate. I can vote for a law that punishes a conspiracy to injure a United States officer on account of his lawful discharge of the duties of his office. But what is the amendment? Its effect is to punish a conspiracy to injure his property 'while he is engaged in the lawful discharge of his duties.' Is not that very different?"

And then he proceeds to illustrate.

Mr. TRUMBULL. That is exactly what I say now.

Mr. EDMUNDS. Very good. Let us see what kind of a law we have now. The honorable Senator from Illinois made no distinction, for none could be made, in his argument between the case of assaulting the officer while engaged in the discharge of his duties or injuring his property. He put it upon the ground that it must be on account of the act interfering with the discharge of his duties which made the case criminal for our punishment. Now, let us see. Here is the act of 1790, old enough to be outlawed, perhaps, in the estimation of my friend, but it is in force yet:

"If any person or persons shall knowingly and willfully obstruct, resist, or oppose any officer of the United States, in serving or attempting to serve or execute any mesne process or warrant, or any rule or order of any of the courts of the United States, or any other legal or judicial writ or process whatsoever, or shall assault, beat, or wound any officer, or other person duly authorized, in serving or executing any writ, rule, order, process, or warrant aforesaid, every person so knowingly and willfully offending in the premises shall, on conviction thereof, be imprisoned not exceeding twelve months, and fined not exceeding $300."

Mr. TRUMBULL. That is a very proper act.

Mr. EDMUNDS. We have had, Mr. President, for eighty years a statute which made it a crime to assault any officer while engaged in the performance of his duties, not on account of it, but to injure him in his person while he was engaged in the performance of his duties. Now, my honorable friend says that this change, using the same words and only changing the language so as to include property as well as person, is a great departure and alters the whole principle of the bill.

This is not the whole of my friend's connec-

tion with this thing, and I am sorry that he should have been betrayed suddenly into making the opposition to this change that he did, because only three years ago, as I reminded him on that occasion, he himself, as a member of the Judiciary Committee, heartily concurred in and assisted to report a provision of exactly that same character, and which, I think I am safe in saying, at that time met the approval of the Senate from members of all parties and without any differences of political opinion affecting it at all. Here are the sections which my friend's committee reported with his concurrence, the sections which he and I voted for when they were amended in a part of their phraseology. The first making it a crime "if any officer shall be, while in the performance of his official duty, unlawfully assaulted, beaten, or shall have his property unlawfully taken, injured, or destroyed while engaged in the performance of his official duty."

The very language of the amendment which we have proposed to put into this bill was borrowed. I do not mean by saying "borrowed" to say copied from, but the idea was borrowed from our own discussion and recommendation in favor of that bill—which did not become a law, not because it was defeated, but because it was not finally acted upon—in which and for which we had the able and vigorous assistance of my honorable friend. I thought, therefore, that the committee might be justified, acting upon the traditions of the old statutes, acting upon the opinion of my friend so recently expressed to us, in making this amendment. I suppose that when he opposed this amendment the other day, as the Globe certainly says he did oppose it; (for he said that it changed the whole character of the section, and he could not go for it,) my honorable friend had forgotten, in the hurry of the ten thousand things he is pressed with, that this very subject of securing an officer in person and property from unlawful molestation while he is attending to his duties was one which had met his cordial approval, as I think it ought the approval of every one. But, Mr. President, I am taking too much time with that.

As I have said, in all or nearly all of these instances, and I have only given a few of them, where the United States has exercised criminal jurisdiction over the acts of citizens as between each other, in order to carry out the protections which the Constitution has given to the operations of the Government and to the rights of citizens under it, the States, at the same time, as States, have had a criminal jurisdiction which covered almost completely the same class of subjects.

Mr. TRUMBULL. Does the Senator mean to say that I ever expressed any opinions about a bill that he has referred to as having been reported here? I presume we considered it in the Judiciary Committee, but it was never discussed in the Senate. I do not think I ever said a word about it. I do not recollect the circumstances about it now. It was reported by the Senator from Vermont. I may have given my acquiescence to the report without examining it as particularly as I ought to have done; but that I ever expressed any opinions in the Senate in favor of a proposition that would authorize the punishment of a conspiracy to injure the property of a man simply because he was an officer of the United States, when it had no connection with the discharge of his duties, I deny.

Mr. EDMUNDS. Well, Mr. President, on that detail it is a question between the record and the recollection of my friend; that is all.

Mr. TRUMBULL. The bill was not reported by me, was it?

Mr. EDMUNDS. No, it was not; it was reported by the honorable Senator's committee, reported with his concurrence, and the Globe shows no dissent; and I happen to know personally that it was reported with his concurrence. It was taken up in the morning




DATE DOWNLOADED: Thu Jul  8 12:09:29 2021
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
42 Cong. Globe 737 (1871).

ALWD 6th ed.
, , 42 Cong. Globe 737 (1871).

APA 7th ed.
(1871). Congressional Globe, The, 42, 737-787.

Chicago 17th ed.
"," Congressional Globe, The 42 (1871): 737-787

AGLC 4th ed.
'' (1871) 42 Congressional Globe, The 737.

OSCOLA 4th ed.
'' (1871) 42 Cong Globe 737

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

ANNEXATION OF FOREIGN TERRITORIES.

Mr. CAMPBELL. I ask unanimous consent to introduce a concurrent resolution, relating to the annexation of foreign territories to the United States, and that its further consideration be postponed until the second Wednesday in December next, and made the special order for that day after the morning hour.

The resolution was read as follows:

*Resolved by the House of Representatives,* (the Senate concurring,) That with a view to remove all causes which may tend to disturb our relations of peace with the peoples who inhabit other parts of the continent of North America and with European Powers, and to promote a common fraternity and prosperity, the President be requested to cause negotiations to be opened with Great Britain and Mexico to ascertain on what conditions these Governments will consent, respectively, to the annexation of their possessions on the continent to the United States of America.

Mr. WILLARD. I object.

SOLDIERS' BOUNTY.

Mr. HOLMAN, by unanimous consent, introduced a bill (H. R. No. 431) to carry into effect the decisions of the Supreme Court relative to bounty to soldiers enlisted between the 3d day of May to the 22d of July, 1861; which was read a first and second time, referred to the Committee on Military Affairs when appointed, and ordered to be printed.

KNOXVILLE, TENNESSEE.

Mr. MAYNARD. I ask unanimous consent to introduce for action at this time a bill, which I was instructed by the Committee of Ways and Means to report during the last Congress, to reëstablish Knoxville, Tennessee, a port of delivery.

The bill was read for information. It proposes to repeal the act approved July 11, 1862, entitled "An act to abolish certain ports of delivery in the Mississippi valley," so far only as the same relates to Knoxville, in the State of Tennessee.

Mr. SCOFIELD. I would like to have the gentleman explain that bill before we are asked to vote upon it.

Mr. MAYNARD. I will explain it to the gentleman as I explained it in the presence of the House at the last session of Congress. The portion of the law creating ports of delivery which was applicable to the city of Knoxville was repealed during the war. Now, Knoxville being the center of business for a very large region of the surrounding country, to which the people resort for trade, it is important that it should be reëstablished as a port of delivery. The Committee of Ways and Means of the last House, being acquainted with all the facts, unanimously directed this bill to be reported.

Mr. WOOD. For the purpose of reaching the regular order of business, I will object.

Mr. MAYNARD. Then I will ask leave to introduce the bill for printing and reference to the Committee of Ways and Means.

No objection being made, the bill (H. R. No. 432) was introduced, read a first and second time, ordered to be printed, and to be referred to the Committee of Ways and Means when appointed.

RECONSIDERATION OF REFERENCES.

Mr. RANDALL moved to reconsider all votes of reference this morning; and also moved that the motion to reconsider be laid on the table.

The latter motion was agreed to.

ORDER OF BUSINESS.

Mr. SCOFIELD. I will yield to the gentleman from Massachusetts [Mr. BUTLER] if I have the power to yield to him.

The SPEAKER. The gentleman from New York [Mr. WOOD] calls for the regular order of business.

Mr. WOOD. I think we had better proceed with the regular order, so as to dispose of that bill. I will ask what the gentleman from Massachusetts desires to present?

Mr. BUTLER, of Massachusetts. I desire to present a personal explanation.

Mr. WOOD. Kentucky, I believe, objects; she can speak for herself.

Mr. McHENRY. I object.

Mr. BUTLER, of Massachusetts. If that course is to be taken, then it is an end of personal explanations in this House.

Mr. McHENRY. Objection was made yesterday; and, on behalf of my delegation, I now object to the gentleman from Massachusetts making a personal explanation.

Mr. BUTLER, of Massachusetts. Massachusetts seems to be the staple of abuse on the other side of the House. I suppose an arrow from my quiver must have hit Kentucky, as she alone objects to my making a personal explanation.

ENFORCEMENT OF FOURTEENTH AMENDMENT.

Mr. SHELLABARGER. I have presented the report of the committee of conference on the disagreeing votes of the two Houses upon the amendments of the Senate to the bill (H. R. No. 320) to enforce the provisions of the fourteenth amendment to the Constitution of the United States, and for other purposes. If members will refer to the last Senate print of the bill, they will have the best means within our reach of understanding the subject under consideration.

The first matter of difference between the two Houses is found on page 2, in lines seventeen and eighteen of section two of the bill. And I will state the effect of the report of the committee of conference upon that point of difference. The Senate had amended the House bill by inserting in line seventeen of section two of the printed bill the words "or while engaged in the." The effect of that amendment was, as will be noticed, to provide that "if two or more persons within any State or Territory of the United States shall conspire together" "to induce any officer of the United States to leave any State, district, or place where his duties as such officer might lawfully be performed, or to injure him in his person or property on account of, or while engaged in, the lawful discharge of the duties of his office," that should be an offense against the laws of the United States.

To that the objection made was that an attack upon the property of an officer of the United States, however remote that property might be from the sphere of the duties of the officer, was to be an offense against the laws of the United States. It was objected that should not be so provided; that there was no divinity that hedged around an officer or his property in such a way as that it could not be injured, unless the injury in some way prejudiced him in the exercise of official duties. That was the point of difference between the two Houses.

That is avoided by what has been agreed to by the committee of conference, wholly avoided as I understand. The report leaves out the words inserted by the Senate, and inserts after the word "office," in the eighteenth line of the printed bill, the words which I will read: "or to injure his person while engaged in the lawful discharge of the duties of his office, or to injure his property so as to molest, interrupt, hinder, or impede him in the discharge of his official duty." If the section shall be so amended it will then provide, "that if two or more persons" "shall conspire together" "to injure him [an officer of the United States] in his person or property on account of his lawful discharge of the duties of his office, or to injure his person while engaged in the lawful discharge of the duties of his office, or to injure his property so as to molest, interrupt, hinder, or impede him in the discharge of his official duty." It shall be an offense against the laws of the United States. I apprehend that no objection will be made in this House, as none was made in the Senate, to that portion of the report of the committee of conference.

The next point of difference between the two Houses was the amendment of the Senate at the end of section four of the bill. In the provision relative to the time when that act should cease to be in operation, the Senate amended by striking out the words "the 1st day of June, A. D. 1872," and inserting in lieu thereof the words "the end of the next regular session of Congress." The committee of conference assented to this amendment in the form in which the Senate had made it, there being, as was believed, not much difference between the two provisions. The 1st of June, 1872, will no doubt be substantially the time of the close of the next session of Congress.

The next amendment is in section six, line thirteen, of the printed bill. As agreed to by the committee of conference, the Senate amendment is changed by inserting after the word "the," where it occurs in brackets in line thirteen, these words, "the first section of;" so that the repeal of the act in regard to the jurors' test-oath will be confined to the first section of that act, instead of repealing the entire act, as the House bill provided.

The effect of this amendment will be seen by turning to the jury-oath law, which the House bill proposed to repeal and which the Senate amendment would wholly preserve. In that law there are but three sections. The first section (I will state its purport without reading it) gives to parties in any case in the courts of the United States the right of a peremptory challenge for the grounds set forth in that section, those grounds being, in short, that the person challenged has been engaged in some one of the disloyal practices named in the section. Any one of these furnishes good ground for peremptory exclusion from the jury-box, the right of exclusion being placed by the section in the hands of the party to the suit; so that under that section any party to a suit may work the exclusion of a juror by asserting his right of challenge. The conference report proposes to repeal that section entirely, so that the right of challenge exercised in that way will be abolished. If the conference report be adopted, a party to a suit cannot of his own motion exclude anybody from a jury for any of the causes enumerated in the act.

The second section, however, we propose to leave unrepealed. What is the effect of that section? It provides—

That at every term of any court of the United States the district attorney, or other person acting in behalf of the United States in the court, may move and the court in their discretion—

I call attention to this provision. First, the prosecutor may move, and, secondly, the court in their discretion—

may require the clerk to tender to each and every person who may be summoned to serve as a grand or petit juror the following oath or affirmation.

Then follows the form of an oath declaring that the person has not engaged in any of the disloyal practices enumerated, which are substantially the same as those specified in the first section. In other words, if, in the first place, the prosecutor moves, and, secondly, if the court in its discretion sustains his motion, then, and then only, can this oath be tendered to a juror for the purpose of his exclusion. Then at the end of the section it is provided that any person or persons declining to take the oath shall be discharged from service on the grand or petit jury to which he may have been summoned. The third section simply declares that the taking of that oath falsely shall be perjury.

It will thus be perceived that the effect of the amendment is to rest it wholly within the discretion of the officers of the court to determine whether any oath shall be required. The matter is placed completely under the control of the court. Now, as that is the existing law, we have believed it to be safe to rest that discretion where the existing law leaves it. It is believed that as the enactment of this bill may create a large class of cases which may become

political cases, and in which the courts of the United States will have jurisdiction, this fact, instead of furnishing a reason for the repeal of the existing law giving such discretion to the court, furnishes a reason for continuing that provision.

Induced by these reasons, the conferees on the part of the House so far yielded to the views of the Senate as to permit this matter to remain where it seems to me it is always safe and wise to leave challenges of almost any kind, and especially challenges of the kind provided for in this class of cases under existing law.

This, I believe, is the last matter of difference between the two Houses except that relating to what is known as the "Sherman amendment." I have not the means of referring the House to the exact words of that amendment as agreed to by the committee of conference except as they are contained in our report, which, however, is, I understand, printed in the Senate proceedings as published in this morning's Globe.

I will now state, Mr. Speaker, accurately if I can, what the effect of this section will be as agreed to by the committee. First, it does make a liability for a class of damages or injuries which result from riotous disorders. It must be kept in mind no other damages except damages produced by riot are within the section. In all these other damages in the second section by conspiracy or anything of that kind which do not amount to riot—and that has its well-known legal significance, and means two or more persons tumultuously assembled and doing unlawful acts and doing them in an unlawful way, by force and violence—if it comes short of that offense committed tumultuously in the face of the community, then it is not within the section at all. Nothing is in it but such disorder as that.

Next, the amendment agreed to by the committee of conference completely changed the remedy granted for the mischief, by preventing a claimant entitled to recover from resorting to property of individuals at all and confining his right of recovery to the county or city in which the mischief was done. If done in a city, then the action must be against the city. If in a county and outside of a city, the action must be against the county; and of course the people of a city as tax-payers in the county being to that extent liable. Then, as to the method of enforcement of the judgment when recovered, it provides they shall have the remedies applicable in cases of judgments against corporations of this municipal character. It does no more. It provides for enforcing judgments by *mandamus* or by any other appropriate remedy applicable in like cases. It goes to that extent exactly, that such judgments may be enforced in the known and usual methods of the law.

It does more. It permits the parties who did the mischief to be united as defendants along with the municipality sued. It does still more; it requires the municipality shall not be made liable to pay that judgment until there is execution returned showing the money cannot be made out of the individual defendants. It requires two months to elapse before judgment can go against the municipality. It requires at first the exhaustion of the means of collecting the liabilities from the individuals doing the mischief. It puts the city or county in the position of guarantor, provided any other parties are sued. The county or city being interested in having such defendants can move to have any party made defendant to a suit for its own protection. Thus we have guarded, as well as it could be done, the county or city by appropriate proceedings.

The Senate I need not say was exceedingly earnest and positive in insisting there should be something of the character retained in the bill, and it was impracticable to procure the yielding of the Senate from that in some shape.

Now, then, Mr. Speaker, this is the report.

The question now of duty is of course before the House. It is entirely too late to enter on a discussion of a question so intricate in some of its aspects as well as so new in some of its aspects as the question made in regard to the right to pass this Sherman amendment as we call it. I have chosen to put down in writing some statements in behalf of myself, at least, as a member of the committee in vindication of the right of the Government of the United States through its Congress to do the thing provided for in this section, and with the indulgence of the House I will read what I have written in order that I may be short.

My first proposition is, that the making of a community liable for losses by public violence is defended by the court of appeals of New York in Darlington *vs.* New York, (31 New York Reports.) I should like to direct the attention of the House, if I could, to the language of this recent authority, so eminently respectable and so persuasive in its historic allusions and statements. This was a case arising under the riot law of New York, identical in its legal aspects with the Sherman amendment, except that one was enacted by a State, while the other is proposed to be enacted by the Congress of the United States. The court say:

"It cannot be doubted that the purposes of the law are within the scope of legislative authority." * * * "This act proposes to subject the people of the several local divisions of the State, consisting of counties and cities to the payment of any damages to property in consequence of any riot or mob within the county or city.

"The policy on which the act is framed may be supposed to be to make good, at the public expense, the losses of those who may be so unfortunate as, without their own fault, to be injured in their property by the lawless acts of a particular kind, which it is the duty of the government to prevent; and further and principally, we may suppose, to make it the interest of every person, liable to contribute to the public expense, to discourage lawlessness and violence, and maintain the empire of the laws," &c." * * * "These are ends plainly within the purposes of civil government; and, indeed, to attain them it is that governments are instituted." * * * "This action is, therefore, based on a policy coeval with the laws of England."

And the court adds:

"It is a curious coincident that the policy of compelling a local community to answer, with their property, for acts of violence committed by others has been considered by the English Parliament as a supplement to, rather than a violation of, the great charter."

And, in the same sentence, the court of appeals declares that as the Magna Charta was in this identical with the prohibition imposed by the New York constitution upon depriving a person of "property without due process of law." "And' there can be no objection to imposing the burdens which shall arise in the execution of the act upon the local divisions where the riots take place and the losses were occasioned."

Three propositions are by these principles thoroughly established:

*First.* That the Government's duty to the citizen includes protecting against a mob the property of such citizen.

*Second.* That it is strictly within the scope of the legislative power of any Government, whose duty it is to protect a given privilege of a citizen against a mob's invasion of such privilege, to assess the damages of such invasion upon a prescribed subdivision of that government which owes such duty to protect.

*Third.* That so to assess the damages against such local division of the government is neither a taking of private property for public use, under the power of eminent domain, nor is it a violation of the Magna Charta, nor of the Bill of Rights, protecting property from being taken except "by due process of law." Even the dissenting opinion of Ingraham in Darlington *vs.* New York, (31 New York Reports, 206,) so expressly admits, for it says:

"That a law is valid making the county in which property shall be destroyed or injured by a mob or riot liable to the party injured I have no doubt."

If, therefore, this law is unconstitutional, it is not because it takes the property of peo-

ple who did not do the wrong to pay for the destruction of property by a mob, nor is it because it violates the right to "due process of law," nor is it because it is outside of the functions of a government which owes the protection of that particular right which the mob invaded. If this amendment is not invalid for these reasons, then what are the reasons which make it unconstitutional? There can be but three, to wit: either, first, that the right which this amendment seeks to protect is not one which the Government of the United States has jurisdiction to protect; or second, if it has the power to protect it, then that this section is not in its nature "appropriate" at what word "appropriate" is used in the Constitution; or third, if it be both within the class of things which Congress may protect, and this method is "adopted" to protect it, then that it is incompetent for the United States to inflict liabilities and resulting taxes upon a municipal corporation or an integral part or creature of a State.

But this amendment confines itself in express words to protection of a right conferred under the Constitution and laws of the United States; and to say we can pass no law to protect a right given by our own statutes and Constitution is not only to deny the power to pass this bill in any part of it, is not only to deny the United States the right to enforce its own laws, but is to literally and self-evidently strip the United States of every attribute of government—is to place it precisely where the doctrine of secession and Buchanan's message placed it, with a Constitution but no power to enforce it, with laws but no right to execute them, with citizens but no attribute to defend them! I did suppose the war had by its frightful lessons taught us all that this Government, like all others, was a nation.

Then the first objection to this amendment, that to protect a right held under United States laws is not constitutional, cannot be maintained.

The next, that making communities or divisions of a State liable for riots which they tolerate is "appropriate" as a means of stopping them, is proved by the experience of at least six hundred years in most of the enlightened Governments of the world.

Really, therefore, the only question left is the third, to wit: whether, since a county is an integer or part of a State, the United States can impose upon it, as such, any obligations to keep the peace in obedience to United States laws. It is, in its legal significance, the same question we have heard before in these and other Halls, "Can the United States coerce a State?" To-day it is, "Can the United States coerce a county of a State, touching a subject-matter over which the United States has power to coerce every person in that county, to wit: touching there being or not being mobs in such county, kept up and perpetuated to defy the laws of the United States and destroy the rights secured by these laws?" Those who deny this power of the United States to touch a county, as such, rest their denial on various grounds. One is that the United States would, by this amendment, be imposing a direct tax on the county to pay this judgment, and that this is prohibited. There are many reasons why this is not a sound objection. I shall state but one, to wit: that in so far as the enforcement of payment of judgments in the United States courts against counties or other municipal corporations may involve or require the assessment of taxes upon the people of such counties, it is completely established that such assessment of taxes can be compelled by the laws and courts of the United States in favor of a private suitor in United States courts. For these cases, where the Supreme Court of the United States holds that such taxes may be ordered by mandamus from United States courts, see Knox County *vs.* Aspenwall, (24 Howard, 384, &c.)

This objection, therefore, is driven off from

it could not be found as the practice of the Senate in former times; but latterly we have been in the habit of addressing communications to the head of a Department; formerly it was never done.

Mr. CONKLING. In this case, if there were any reason for this information, it seems to me a very proper case to address a resolution, not to the head of a Department, but to the head of the executive branch of the Government; and then the resolution would contain the customary words, that he should report this information unless there be some reason to the contrary.

But, Mr. President, regardless of the form of the resolution, I submit again to the Senate it is a very extraordinary proceeding for Congress not only to interfere, as my friend before me [Mr. MORTON] reminds me we have been charged so much with doing, with the business of the executive branch of the Government, but to interfere by way of procuring a report to us of the professional and incidental proceedings in the conduct of a litigation which appears upon the records of the court as to all parts of it which are final, all parts of it which embody any result whatever. It is not quite as bad as if the honorable Senator should offer a resolution requiring the Attorney General to report all the conversations that had occurred between the counsel in a cause; it does not go quite as far as that; but it is the next thing to it; and I hope the Senate will not take up this resolution. We all know that at this session, at all events, there is not to be legislation in regard to it; and in the mean time the honorable Senator can inquire of the Attorney General, and doubtless he will obtain all the information he wants.

Mr. THURMAN. There was a time that will be recollected when the name of a very distinguished gentleman was before the Senate for one of the most important offices in the gift of the Government, and when there were Senators who thought that the information asked for by this resolution, or one which was substantially the same as this, would aid the Senate in forming an opinion whether that gentleman should hold that office or not. In that state of the case, I offered a resolution in the Senate substantially the same as that now offered by the Senator from Missouri. I never could get the Senate to take it up. I tried again and again—

Mr. CONKLING. What resolution was it?

Mr. THURMAN. A resolution offered by myself, substantially the same as this now offered by the Senator from Missouri.

Mr. CONKLING. On this same subject?

Mr. THURMAN. On this same subject, asking for precisely the same information. I never could get the Senate to take that resolution up. Morning after morning I asked the Senate to take it up, but I never could get it taken up, and although every one then understood that the information might be of some value upon the matter that was before the Senate for its consideration, I could not get it taken up. Now, when that state of affairs has passed by, we are met with another objection, that there is no use in passing this resolution or in asking for this information. I am inclined to think we shall never get it. When there was use for it we could not get it. Now, it is said there is no use for it, and I have very little expectation that we shall get it.

But I quite disagree with my friend from New York in treating this information that is asked for as a mere private arrangement between counsel in a cause in which the Government had no interest at all, and in which the public had no interest, but which was mere litigation between individuals. This is a wholly different case. If there were such an agreement as this resolution imports, it was an agreement made by the law officer of the Government in the conduct of a cause in which the Government was a party, and we have just as much right to know what that was as

we have a right to know anything that is transacted or done by the Government. He could not make any private arrangement as a private counsel; he could only act in his capacity as the Attorney General of the United States, and that in a cause in which the United States was a party, a cause involving great constitutional questions, a cause that excited great public feeling, and which has not been lost sight of, for on this very floor at this very session the fact that Yerger goes unpunished has been thrown up in the Senate as a reproach to the administration of the law and as a reason for legislation.

Now, sir, I say to my friend that my own belief is Senators are doing injury to the late Attorney General by refusing to let this information go forth. They will make the people believe that the matter was far worse than I believe it was. They will make the people believe that there is some great mystery and wrong that the friends of that gentleman will not allow to see the light. My own belief is that he will be far less injured, if injured at all—and I am not prepared to say that he will be injured at all—by letting this information see the day. I have seen what I believe to be a copy of the agreement alluded to, and I am free to say now that according to my best recollection, that agreement made by the Attorney General is one that he was perfectly justifiable in making. That is my opinion. But I say if you suppress the information the country will not believe so, and you are doing him more harm than good by refusing to let the resolution pass.

I suggest to my friend from Missouri, who has moved this resolution, that he ought to add to it at the end what is necessary to meet the case—an agreement not simply in reference to what should be done with the cause in the event of the court taking jurisdiction of it, but what should become of it in case Congress interfered and took jurisdiction of the matter.

Mr. FENTON. I venture to ask the indulgence of the Senate for a few moments on a matter that is in some measure personal to myself.

The PRESIDENT pro tempore. The Senator from New York asks unanimous consent to make a personal explanation.

Mr. THURMAN. Had we not better dispose of this resolution first?

Mr. FENTON. I shall occupy only a moment.

The PRESIDENT pro tem porc. Is there objection? The Chair hears none.

Mr. BLAIR. I object, until this resolution disposed of.

Mr. EDMUNDS. What is the pending question?

The PRESIDENT pro tempore. The pending question is the motion of the Senator from Missouri to proceed to the consideration of the resolution which has been read, pending which the Senator from New York asks unanimous consent to make a personal explanation. Is there any objection? The Chair hears none.

PERSONAL EXPLANATION.

Mr. FENTON. Mr. President, I send to the Clerk's desk, and ask to have read, the article which I have marked in this morning's Republican of this city.

The Chief Clerk read as follows:

"Will Senator Fenton Explain.—The name of the Republican member of the New York Assembly who last week sold himself and his party to the Democracy and William M. Tweed for $75,000 is Orange S. Winans, the representative of the second district of Chautauqua county. Chautauqua county is the home of Senator FENTON. Winans is a FENTON man. He was put in the Assembly by FENTON, with the understanding that he should do the bidding of his chief. Winans is also an employé of the Erie railroad.

"Now, here is the charge which we wish Governor FENTON to explain. It is made by the New York Times, as follows:

"Up till Friday evening the member from Chautauqua probably intended to come out of the struggle an honest man. But, unknowing to himself, two men appear to have been preparing for him the path of treachery. The one was his political sponsor

and the other was his employer—(he one was United States Senator FENTON and the other was Jay Gould. These two were closeted together for two hours on Friday, and at that interview there is reason to believe that Winans was selected to take the bribe of Tweed, said to be $75,000 cash down, with an additional bribe thrown in by the Erie ring of a five years tenure of a position worth $3,000 a year. The price might have been higher, for the price at stake was a great one, and the infamy to be incurred was deep and lasting. But the combined pressure of Senator FENTON and Jay Gould doubtless made Tammany's bargain easier with the man who has sunk low enough to be despised even by the unscrupulous ring that bought him.'

"Senator FENTON is an aspirant for the Vice Presidency on the Republican ticket in 1872, as he was in 1868. He is one of the 'disappointed men' in the Senate. He assumes to control the Federal patronage in New York, and makes piteous appeals to his brother Senators in secret session. He is the head and front of the opposition to Administration men and measures in his own State. Where does Mr. FENTON stand? The charge of the Times is a serious charge, and cannot be dodged. He owes an explanation to his Republican associates in the Senate, to the Republican party of his own State, and to the Republicans of the country, whom he expects to vote for him in 1872. The question to be answered is this: 'Did he on last Friday leave the Senate of the United States while the bill for the protection of life and property in the South was under consideration, for the purpose of meeting Jay Gould in the city of New York to devise measures to bribe a Republican member of the Assembly, and thereby enable Tammany Hall to retain its corrupt ascendency in New York city, and help lose that State to the Republican party in the approaching presidential election?' Will Mr. FENTON explain?"

Mr. FENTON. Mr. President, I should not now notice this attack did it not appear in a paper supposed to be in some measure an organ of the Administration. It hardly seems necessary for me to deny charges or repel insinuations of this character, but I deem it best, departing from the rule I had adopted for myself in such cases, to say that so far as my having any knowledge, intimation, conference, talk, or thought in regard to the course of Mr. Winans previous to the announcement in the press of what he had done, is wholly without foundation and false. I have not seen Mr. Winans for three months past, nor have I had communication with him or others regarding him.

I was called away from here on the 7th of this month to my home in western New York, where I was detained a few days, and on my return stopped a day in New York city, and did not go from here last Friday, as reported.

I have known Mr. Winans for several years, not as an intimate friend, but as a person of fair standing in society and politics, and for whom I entertained a fair degree of regard. He was nominated and elected for the office he holds, first, while I was in Europe, one year ago last summer and fall. His course during the first session was regarded as honorable, and there was no division in the party, as I am aware, in reference to his return last fall. His betrayal of the confidence and trust reposed in him is not less startling to myself and the country than it must be to the patriotic and intelligent constituency who commissioned him to a seat in the Legislature.

I deeply deplore the act as I do all acts and conduct which bring disgrace to men and an injury to a good cause. I profoundly sorrow over this act as calculated in some degree, and as seems to be intended by the use that is made of it, in coupling my name with it, to disturb and divide our Republican friends in New York. I condemn, very earnestly, conduct or a course of action, whether at Albany or here, which does not tend to strengthen our cause.

ENFORCEMENT OF FOURTEENTH AMENDMENT.

The PRESIDENT pro tempore. The question is, Will the Senate proceed to the consideration of the resolution of the Senator from Missouri [Mr. BLAIR] which has been read?

Mr. EDMUNDS. I hope that may be laid aside, that I may make a report from a committee of conference, if there is no objection.

The PRESIDENT pro tempore. The report of a committee of conference has always been regarded as privileged.

Mr. EDMUNDS. I submit the following report from the committee of conference ap-

could have prevented: and such damages may be recovered in an action on the case in the proper circuit court of the United States; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in such action: *Provided,* That such action shall be commenced within one year after such cause of action shall have occurred. And if the death of any person shall be caused by any such wrongful act and neglect, the legal representatives of such deceased person shall have such action therefor and may recover not exceeding $5,000 damages therein, for the benefit of the widow of such deceased person, if any there be, or if there be no widow, for the benefit of the next of kin of such deceased person.

And that the same stand as section six of the said bill, and that section six stand as section five, and that section five be transferred to the end of the bill as section seven.

GEORGE F. EDMUNDS,
MATT. H. CARPENTER,
*Managers on the part of the Senate.*
S. SHELLABARGER,
LUKE P. POLAND,
*Managers on the part of the House.*

Mr. EDMUNDS. It is right that I should explain the effect of this report. There were four points of disagreement open between the two Houses on the previous conference report, leaving the bill in these respects as it was recommended to be left by the former report, precisely word for word. As to the last section, in the way it stood originally, being the amendment offered by the Senator from Ohio, [Mr. SHERMAN,] the conferees of the Senate found it impossible to bring the Representatives of the House to agree to that section in the form in which it stood, on account of difficulties which had occurred to a majority of the House of Representatives respecting our power to deal with the particular organization in a State called a county or a town and for such other reasons as it is not necessary now to state. Thereupon, in order to aid in the repression of these outrages by tumults and conspiracies, the conferees on the part of the House of Representatives and ourselves agreed to substitute for that the provision which the Secretary has read, the substance and effect of which is to make the whole body of the inhabitants of the vicinity who have knowledge that a conspiracy is formed to destroy the property or to injure the person of any peaceable inhabitant, and who refuse or neglect to exert all lawful means to repress it, having the power to assist in preventing it, responsible. It is, in other words, dealing with the citizen under the Constitution.

Every citizen in the vicinity where any such outrages as are mentioned in the second section of this bill, which I need not now describe, are likely to be perpetrated, he having knowledge of any such intention or organization, is made a peace officer, and it is made his bounden duty as a citizen of the United States to render positive and affirmative assistance in protecting the life and property of his fellow-citizens in that neighborhood against unlawful aggression; and if, having this knowledge and having power to assist by any reasonable means in preventing it or putting it down or resisting it, he fails to do so, he makes himself an accessory, or rather a principal in the outrage itself, and his fellow-citizen, who is thus wronged on account of his refusal to help him to protect himself, is made responsible for it. I think, Mr. President, that in substance and effect this reaches the same result; and I am not at all sure but that it is quite as effectual as the redress against the county, without liability against the inhabitants of it, would have been. Therefore I hope the Senate will agree to the report which we have made.

Mr. SHERMAN. Mr. President, I do not intend to detain the Senate very long in regard to this matter. We have been debating now for three weeks a bill which is deemed by Congress so important as to hold us in session pledged only to transact business in regard to that particular subject. Our committees have been faithfully at work, and have reported us a bill to meet outrages which have scarcely a parallel in history. The startling fact upon which this bill is based is that an organized conspiracy, spreading terror and violence, burning and robbing, murdering and scourging both white and black, both women and men, and pervading large communities of this country, now exist unchecked by punishment, independent of law, uncontrolled by magistrates. We have specific cases, amounting to hundreds, of murder and violence, many of which have occurred since we have been in session here; our officers are driven from their duty; one officer since we have been sitting here has been scourged, his property destroyed, and his wife and children driven from his house. Another case occurred the other day in Tennessee, where two of our deputy marshals were killed in the discharge of their duty. Lawless bands of men, amounting to hundreds, while we have been in session here, have been roaming over the country independent and unchallenged, committing these atrocities, without fear of punishment, cheered by their neighbors, and despising your laws and your authority. We are called upon to legislate in regard to these matters. This condition of affairs, though doubted in the beginning, is now admitted on all hands.

Now, what is the result of this long debate? What remedy do you offer the victims and with what punishment do you threaten the guilty?

First, the party injured may sue in the courts of the United States for money damages. Whom? Disguised outlaws. What is the use of suing them? First, how can you identify them? What remedy have you? You are told by judges of the courts that the grand juries are closed against you; that the petit juries are closed against you; that organized perjury is enlisted against you. You know that of all the multitude of injuries not in a single case has redress ever been meted out to one of the multitude who has been injured. And now these scourged and mutilated victims are told by this bill that they may sue these murderous outlaws for a pecuniary compensation in the courts of the United States instead of the local courts. There they will meet the same grand jury, the same petit jury, the same organized perjury; and the only advantage you give them is a United States judge, one in a State far from the witnesses to be summoned and the place of their sufferings. How hopeless, how feeble, how like a stone to these poor sufferers is this remedy. How these disguised assassins will jeer at your lawsuit. Most likely their plea of abatement will be the assassination of the suitor who appeals to your court.

Mr. President, the second remedy is that the offenders may be indicted as criminals in the courts of the United States. How indicted? How can you indict them when you have the proof positive that at the place of the crime where the facts are notorious no indictment can be found and no indictment has been found? No man can be tried as a criminal, and no man has been tried and punished for these enormities. And yet these suffering people are told, as your alternative remedy, as the limit of your power and disposition to protect them, that they may choose either a civil remedy in the courts of the United States far away from their homes, or they may institute a criminal prosecution in the same courts. What a choice you offer them! Costs to exceed the damages, a judgment not worth the paper on which it is written, or an idle prosecution with death or banishment staring them in the face?

It is true there is one vital feature of this bill; that is, when these atrocities assume the form of civil war and become so great that the State authorities either neglect to or will not put them down, then the President of the United States with the military forces may come in and suspend the writ of *habeas corpus*; in other words, you may wage local civil war in the community. Well, sir, if that is the only alternative, I am willing to make not only local civil war, but in order to put down civil war, and there is no other remedy, I am willing to again appeal to the power of the nation to crush, as we have once before done, this organized civil war. If we must have war it must not be waged solely by the Ku Klux Klan—another name for the same rebel armies who defied the authority of the nation so long, but who now, organized and disguised, seek by assassination to renew the war. This bill will enable the President to again meet force with force, and I do not hide from myself the terrors of this kind of warfare, or the dangerous precedent we set for this kind of legislation. I am willing to vote for it. If we are willing to do anything to punish and put down these outrages. That is the third and the chief remedy proposed by this bill.

But, sir, while we give the authority, have we or can we provide the means for its enforcement? The military force of the United States is very limited. It has ample occupation on the western plains. There are not troops enough in the Army of the United States to deal with this class of people now holding in terror vast regions of our territory. Shall you call out the militia? When and where shall this militia be organized, how armed, how equipped, how officered? These are grave and difficult questions. Still, the President of the United States may be compelled to resort to that; and there is, therefore, some virtue in this bill.

What next? There was a remedy provided by the vote of the Senate, twice given, once after a short debate. It was that when these outrages were committed in a community that made no effort to put them down, that took no means to arrest the offenders, and the outrage was a tumultuous and unlawful riot, aimed at the authority of the United States, then, and only then, the persons injured might sue the county or municipal division in which they occurred. And, now, why is not that remedy adopted—a remedy as old as the English law, older than the English law; a remedy derived from the old Saxon law in the country from which we draw all our institutions? There, for centuries, the law has been that when any community fails to protect its citizens, the community itself shall be responsible in damages. What is the objection to it? Is it not just that when a whole community allow a band of outlaws at night or in day, as they have done, to go and kill and slaughter, and murder, whip, and scourge, burn and rob, the community which allows these things to go on unchallenged and unpunished shall be punished? Is it to be said by the Congress of the United States that the property of a community is so sacred that it ought not to be affected because these outlaws do burn and rob and whip and scourge? Why, sir, these crimes could not exist a day if they were not sustained by the public sentiment of the property-holders of the community?

There is no county in North Carolina where twenty of the richest men in that county could not put down these bands of outlaws. If they would only will, they have the way, they have the power; and yet you will not touch the property of these people lest you may do injustice. Sir, we are told, by some mystic process, by some mode of reasoning, which I cannot comprehend, which seems to me so absurd that I cannot even fashion its face, that the Constitution of the United States does not allow a county to be sued in the courts of the United States. Why not? By what authority is any corporation sued? Where is the provision of the Constitution of the United States that allows a railroad company to be sued? A railroad company is the creature of State law, a pure creature of State law, having no powers except what are given it by the State law. Where is the power to sue a railroad company? Only in the general clause which confers upon the courts of the United States the power to entertain suits between persons. Suits may be brought by a citizen of one State against the citizen of another State. There is no express