**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| | **:** | |
| **JAMES BLASSINGAME and** | **:** | |
| **SIDNEY HEMBY** | **:** | |
| | **:** | |
| **Plaintiffs** | **:** | |
| | **:** | |
| **v.** | **:** | **Case No.: 1:21-cv-00858-APM** |
| | **:** | |
| **DONALD J. TRUMP** | **:** | |
| | **:** | |
| **Defendant** | **:** | |

---

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................................... iv

INTRODUCTION ......................................................................................................................... 1

ARGUMENT ................................................................................................................................. 2

   I.   Trump's motion flouts the standard of review applicable to all motions to dismiss because he cannot win on the actual facts. ........................................................................................... 2

      A.  *The standard of review is well established.* .................................................................... 2

      B.  *Trump misstates or ignores the facts set out in the Amended Complaint.* ...................... 2

   II.   The Constitution does not bar plaintiffs' claims. ............................................................. 6

      A.  *Article II does not provide Trump with immunity for inciting an insurrection.* .............. 6

         1.  *Absolute immunity covers only presidents' official acts.* ............................................ 7

         2.  *The President has no role in the constitutionally prescribed congressional counting of electoral votes.* ................................................................................................... 9

*3.   When Trump subverted the constitutionally prescribed congressional counting of electoral votes, he was not taking care that the laws be faithfully executed.* ................... 11

*4.   The president does not have unchecked power to define his own duties.* ................... 13

*5.   Trump does not identify any official responsibilities that entail aiding, abetting, directing, or conspiring to stage an attack on the Capitol.* ............................................. 14

*B.   The political question doctrine has no bearing on plaintiffs' claims.* ........................... 16

*C.   The Impeachment Judgment Clause does not preclude any claims or issues in the Amended Complaint.* ............................................................................................................. 17

*D.   Neither res judicata nor collateral estoppel bar this lawsuit.* ....................................... 19

III.   Trump conspired to use force to disrupt congressional vote counting, in violation of several clauses of 42 U.S.C. § 1985(1). ..................................................................................... 20

*A.   Capitol Police Officers, the President, and the Vice President All Occupy an "office, trust, or place of confidence under the United States" under § 1985(1).* ........................... 22

*1.   Capitol Police Officers are covered by § 1985(1).* ..................................................... 22

*2.   The President and the Vice President are covered by § 1985(1).* .............................. 23

*B.   Plaintiffs allege sufficient facts to plausibly infer an unlawful agreement between Trump and co-conspirators.* ................................................................................................... 24

*1.   The Complaint alleges a multi-month period where the alleged co-conspirators acted in parallel.* ............................................................................................................................. 25

*2.   The Complaint alleges three additional "plus" factors that support the existence of a conspiracy.* ........................................................................................................................ 27

*C.   Section 1985 allows plaintiffs to hold Trump liable for injuries resulting from the illegal conspiracy.* ......................................................................................................................... 31

IV.   Plaintiffs adequately pleaded claims under District of Columbia law. ........................... 32

*A.   Plaintiffs' factual allegations and inferences support their claims that Trump "directed," and aided and abetted assault and battery.* ....................................................... 33

  1. *Trump directed the assault and battery of the plaintiffs.* ............................................. 33

  2. *Trump aided and abetted the assaults and batteries on plaintiffs.* ........................... 35

 B. *Plaintiffs adequately pleaded civil conspiracy.* ............................................................. 36

V. The First Amendment does not shield Trump's conduct and words. .............................. 36

 A. *There is no First Amendment right to engage in a conspiracy to incite violence, direct assault and battery, obstruct Congress, and injure federal officers.* .................................. 36

 B. *Trump's attacks on D.C. Anti-Riot Act are irrelevant to the portion plaintiffs are proceeding under.* ............................................................................................................... 40

 C. *Trump does not demonstrate a sufficiently "real" constitutional problem to justify application of the avoidance canon to the Klan Act.* ............................................................ 40

  1. *Trump's proposed pleading standard that conspirators need to agree to particular overt acts would upend centuries of conspiracy law.* ....................................................... 41

  2. *The Klan Act is neither constitutionally vague nor overbroad.* ................................. 42

CONCLUSION ...................................................................................................................... 44

# TABLE OF AUTHORITIES

## Cases

*Acosta Orellana v. CropLife Int'l*, 711 F. Supp. 2d 81 (D.D.C. 2010)......................................... 33

*Act Now to Stop War & End Racism Coal. & Muslim Am. Soc'y Freedom Found. (ANSWER) v.*

    *District of Columbia*, 846 F.3d 391 (D.C. Cir. 2017) ................................................................ 43

*Al Shimari v. CACI Premier Tech., Inc.*, 324 F. Supp. 3d 668 (E.D. Va. 2018) ......................... 29

*Am. Fed'n of Gov't Employees, AFL-CIO v. United States*, 330 F.3d 513 (D.C. Cir. 2003)....... 40

*Am. Fed'n of Gov't Emps. v. Off. of Special Couns.*, 1 F.4th 180 (4th Cir. 2021)....................... 15

*Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162 (2d Cir. 2012). .................................. 30

*Andrews v. Daw*, 201 F.3d 521 (4th Cir. 2000) ........................................................................... 19

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ......................................................................................... 2

*Bailey v. Fulwood*, 793 F.3d 127 (D.C. Cir. 2015)....................................................................... 20

*Baker v. Carr*, 369 U.S. 186 (1962).............................................................................................. 16

*Barr v. Clinton*, 370 F.3d 1196 (D.C. Cir. 2004).......................................................................... 42

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ....................................................... 2, 25, 39

*Boumediene v. Bush*, 553 U.S. 723 (2008) ................................................................................... 13

*Brandenburg v. Ohio*, 395 U.S. 444 (1969).......................................................................... 37, 38

*Brown v. District of Columbia*, 514 F.3d 1279 (D.C. Cir. 2008) ................................................. 2

*Carducci v. Regan*, 714 F.2d 171 (D.C. Cir. 1983) ..................................................................... 40

*Clinton v. Jones*, 520 U.S. 681 (1997)....................................................................................... 7, 8

*Cox v. Louisiana*, 379 U.S. 536 (1965); ...................................................................................... 37

*District of Columbia v. Chinn*, 839 A.2d 701 (D.C. 2003)........................................................... 33

*District of Columbia v. Trump*, 315 F. Supp. 3d 875 (D. Md. 2018) ............................................ 24

*\*Donald J. Trump, President of the United States, et al., Petitioners, v. Knight First Amendment Institute*, Petition for Certiorari, 2020 WL 4905204 (U.S.)........................................ 12, 14, 15

*Evergreen Partnering Grp. v. Pactiv Corp.*, 720 F.3d 33 (1st Cir. 2013).................................... 25

*\*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477 (2010)……………..…….14, 15

*Gelboim v. Bank of Am. Corp.*, 823 F.3d 759 (2d Cir. 2016). ............................................... 28

*Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490 (1949).................................................. 37, 42

*Griffin v. Breckenridge*, 403 U.S. 88 (1971)........................................................................ 22

*\*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) ........................................................ passim

*In re Discipline of Clinton*, 534 U.S. 806 (2001) ................................................................ 14, 18

*In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671 (S.D.N.Y. 2012) .................................. 28

*Jackson v. D.C.*, 412 A.2d 948 (D.C. 1980) ...................................................................... 20

*Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221 (1986)). ......................................... 17

*\*Jones v. Clinton*, 36 F. Supp. 2d 1118 (E.D. Ark. 1999) ..................................................... 15, 18

*\*Kurd v. Republic of Turkey*, 374 F. Supp. 3d 37 (D.D.C. 2019)............................................. 35

*Lamar v. United States*, 240 U.S. 60 (1916) ...................................................................... 23

*Libertad v. Welch*, 53 F.3d 428 (1st Cir. 1995) ................................................................ 21

*Little v. Barreme*, 6 U.S. (2 Cranch) 170 (1804) ................................................................ 17

*\*Macharia v. United States*, 334 F.3d 61 (D.C. Cir. 2003) ..................................................... 2

*McCord v. Bailey*, 636 F. 2d 606 (D.C. Cir. 1980)............................................................. 23, 44

*Medellin v. Texas*, 552 U.S. 491 (2008) ........................................................................... 12

*NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982)..................................................... 38

*Nat'l Org. for Women v. Operation Rescue*, 37 F.3d 646, 655-56 (D.C. Cir. 1994) ................. 37

*Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117 (2011) .......................................................... 15

*\*Nixon v. Fitzgerald*, 457 U.S. 731 (1982)................................................................................ passim

*\*Nixon v. United States*, 506 U.S. 224 (1993) .................................................................... 14, 19

*Ortiz v. United States*, 138 S. Ct. 2165 (2018) .......................................................................... 20

*Oxbow Carbon & Minerals LLC v. Union Pac. R.R. Co.*, 81 F. Supp. 3d 1 (D.D.C. 2015) ........ 30

*Oxbow Carbon & Minerals LLC v. Union Pac. R.R. Co.*, 926 F. Supp. 2d 36 (D.D.C. 2013) .... 27

*Rice v. Paladin Enters.*, 128 F.3d 233 (4th Cir. 1997) .......................................................... 37, 38

*Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*, 547 U.S. 47 (2006)........................................ 44

*Smalls v. United States*, 471 F.3d 186 (D.C. Cir. 2006) .............................................................. 19

*\*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004)....................................................................... 31

*Starr v. Sony BMG Music Entm't*, 592 F.3d 314 (2d Cir. 2010) .................................................. 28

*States v. Heredia*, 483 F.3d 913 (9th Cir. 2007) ........................................................................ 42

*States v. Ursery*, 518 U.S. 267 (1996) ...................................................................................... 18

*Trump v. Hawaii*, 138 S. Ct. 2392 (2018)................................................................................... 12

*Trump v. Mazars*, 140 S. Ct. 2019 (2020) ................................................................................... 7

*Trump v. Vance*, 140 S. Ct. 2412 (2020) ................................................................................ 7, 11

*United States v. Fulbright*, 105 F.3d 443 (9th Cir. 1997).............................................................. 42

*United States v. Khater*, No. 1:21-cr-222-TFH (D.D.C. Mar. 17, 2021 ...................................... 23

*United States v. Mejia*, 597 F.3d 1329  (D.C. Cir. 2010) ............................................................. 39

*United States v. Midwest Oil Co.*, 236 U.S. 459 (1915) .............................................................. 13

*United States v. Rahman*, 189 F.3d 88 (2d Cir. 1999).................................................................. 37

*United States v. Soderna*, 82 F.3d 1370 (7th Cir. 1996)........................................................ 37, 39

*United States v. Williams*, 553 U.S 285 (2008) .................................................................... 43, 44

*Venetian Casino Resort, LLC v. NLRB*, 793 F.3d 85 (D.C. Cir. 2015) ....................................... 39

*Virginia v. Hicks*, 539 U.S. 113 (2003).................................................................................... 44

*Wisconsin v. Mitchell*, 508 U.S. 476 (1993) ............................................................................ 37

*\*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1953) ....................................... passim

## U.S. Constitution

U.S. Const. amend XIV, § 3 ..................................................................................................... 11

*U.S. Const. art. II, § 3 ...................................................................................................... 12, 16

*U.S. Const. art. II, sec. 1, cl. 2. ........................................................................................ 9, 10

U.S. Const., amend. XII .......................................................................................................... 9, 10

## Statutes

18 U.S.C. § 372 ........................................................................................................................ 23

2 U.S.C. Ch. 29 ........................................................................................................................ 19

3 U.S.C. §§ 1-18 ...................................................................................................................... 10

*42 U.S.C. § 1985 ............................................................................................................. passim

28 U.S.C. § 2679 ...................................................................................................................... 16

*D.C. Code § 22-1322 ............................................................................................................. 40

## Rules

*Fed. R. Civ. P. 12(b)(6)........................................................................................................ 2,6

*Fed. R. Civ. P. 12(b)(1)....................................................................................................... 2, 6

## Treatises

Restatement (Second) of Torts § 442 (1965)................................................................. 32

Restatement (Second) of Judgments § 28 (1982) ....................................................... 28

## Other Authorities

*Application of 28 U.S.C. § 458 to Presidential Appointments of Fed. Judges*, 19 Op. O.L.C. 350

    (1995)......................................................................................................... 11

2 J. Elliot, Debates on the Federal Constitution 480 (1876 ed ................................. 7, 8

*A Dictionary of the English Language*  (1755).......................................................... 12

Documentary History of the Ratification of the Constitution (Merrill Jensen et al ed. 1976) ..... 18

Joseph Story, 2 Commentaries on the Constitution 251 (1833) .................................. 18

*Double Jeopardy: A Reference Guide to the United States Constitution* (2004) ........................ 18

Federalist No. 68 (Jacob Cooke ed., 1961).............................................................. 10

James M. Naughton, *Nixon Says a President Can Order Illegal Actions Against Dissidents*, N.Y.

    Times (May 19, 1977)................................................................................. 13

*Mem. Op. for the Att'y Gen. Conspiracy to Impede or Injure an Officer of the United States, 18*

    *U.S.C. § 372*, 1 Op. O.L.C. 274 (1977) ................................................... 23

*President's Receipt of the Nobel Peace Prize*, 33 Op. O.L.C. 370 (2009) ................................. 24

*Presidential or Legislative Pardon of the President*, 1 Op. O.L.C. Supp. 370 (1974).................. 6

Saikrishna Prakash, *Why the Incompatibility Clause Applies to the Office of the President*, 4

    Duke J. Const. L. & Pub. Pol'y 143 (2009).......................................... 24

*Whether a Former President May Be Indicted and Tried for the Same Offense for Which He was*

    *Impeached by the House and Acquitted by the Senate*, 24 Op O.L.C. 110 (2000).................. 24

Resolutions of May 2, 1840, No. 4, 5 Stat. 409 ............................................................ 24

Act of Mar. 1, 1845, 5 Stat. 730 ................................................................................. 24

Letter from Abraham Lincoln, President of the United States of America, to His Majesty

    Somdetch Phra Paramendr Maha Mongut, King of Siam (Feb. 3, 1862) ............................... 24

Joshua Kaplan and Joaquin Sapien, *New Details Suggest Senior Trump Aides Knew Jan. 6 Rally*

    *Could Get Chaotic*, ProPublica (June 25, 2021) ...................................................................... 28

## INTRODUCTION

This case concerns failed presidential candidate Donald Trump's legal responsibility for the January 6, 2021 insurrection at the U.S. Capitol in which a mob of angry Trump supporters attacked police officers, including the plaintiffs, in an effort to overturn the results of the election. Plaintiffs' Complaint provides more than a hundred paragraphs of factual allegations detailing how Trump encouraged his most violent supporters to come to the Capitol on January 6, stoked their anger with "stop the steal" lies, repeatedly told them to fight and that the rules didn't apply to them, directed them toward the Capitol, and then watched with delight as they assaulted the Capitol's defenders and sacked the seat of our government.

In the face of these facts, most of them coming from the defendant's own lips or Twitter fingers, Trump constructs an alternative reality in which he cared only for peace, patriotism, and election integrity. Just as he told his supporters they could "go by very different rules," he urges the Court to disregard the usual rules for motions to dismiss, which require any court to accept the well-pleaded facts in the Complaint as true and draw all favorable inferences in plaintiffs' favor. Even more brazenly, he asks the Court to grant absolute immunity for his conduct that caused serious injuries to plaintiff police officers Blassingame and Hemby—injuries that affect them to this day—on the grounds that anything and everything he did while holding the office of president was within the scope of his presidential authority, as long as he says he was acting as president and not as a sore loser candidate. And he further claims that the First Amendment shields him from any legal accountability.

As we show below, no one has a right to conspire, direct, and incite assaults on police officers, even if they hold the highest federal office. Nor does anyone have a constitutional right to utter speech intended to incite violence or speech integral to criminal or tortious conduct. The

Constitution doesn't reward a failed candidate with immunity when he incites an insurrection to

halt the counting of electoral votes, particularly when the Constitution assigns no role to the

president in counting electoral votes. To hold otherwise would require the Court to conclude the

Constitution immunizes those who organize and incite a violent insurrection aimed at sabotaging

the Constitution. Our founding document does not contain the seeds of its own destruction. The

Motion to Dismiss should be denied.

## **ARGUMENT**

### I.   **Trump's motion flouts the standard of review applicable to all motions to dismiss because he cannot win on the actual facts.**

#### A.  *The standard of review is well established.*

Trump's motion says he seeks dismissal pursuant to Rules 12(b)(1) and 12(b)(6). Yet

nowhere does he address the standard that applies to such motions: the plaintiffs' well-pleaded

facts—all of them, plus inferences that may fairly be drawn therefrom—must be taken as true for

purposes of determining whether they amount to a legally cognizable claim. *Bell Atlantic Corp.*

*v. Twombly*, 550 U.S. 544, 570 (2007). While the Court must view the plaintiffs' allegations

more closely under Rule 12(b)(1) than it would under 12(b)(6), *Macharia v. United States*, 334

F.3d 61, 64, 69 (D.C. Cir. 2003), the Court must still "accept as true all of the factual allegations

contained in the complaint" and draw all reasonable inferences in favor of the plaintiffs. *Brown*

*v. District of Columbia*, 514 F.3d 1279, 1283 (D.C. Cir. 2008). To survive a 12(b)(6) motion, "a

complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is

plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up).

#### B.  *Trump misstates or ignores the facts set out in the Amended Complaint.*

Facts matter in a court of law, and the allegations of the complaint are what matter when

evaluating a motion to dismiss. But Trump misstates, ignores, or selectively quotes nearly all of

2

the allegations in plaintiffs' Amended Complaint ("Complaint"). As shown below, any fair reading of the Complaint reveals ample facts that go far beyond the low bar of plausibility at this stage of the proceedings and make clear how the Motion to Dismiss fails.

Plaintiffs' Complaint contains thirty-five pages of detailed factual allegations, Amended Complaint ("Compl.") at 2-36, ECF No. 3, and twelve pages explaining how those facts support their common law and statutory claims, *id.* at 36-48. Those allegations illustrate how the conspiracy had its roots in Trump's "stand back and stand by" shout-out to the Proud Boys in the September 2020 presidential debate, and then how Trump told his most violent supporters that they should travel to D.C. ready to fight and be wild, *id.* ¶¶ 14, 27-36, 38-40, 45, 216-21. They show how Trump's supporters took his words as "marching orders," *id.* ¶ 34, and began plotting an "insurrection" to "work together and shut this shit down," *id.* ¶ 35. They demonstrate how, after having assembled a crowd of followers who had repeatedly shown proclivities toward violence, Trump repeatedly incited those supporters to "FIGHT!," *id.* ¶¶ 45, 60, told them that the rules don't apply to them, *id.* ¶ 60, and pointed them towards Congress, *id.* ¶ 60, after which his supporters stormed Congress, *id.* ¶¶ 60-65, ready to kill "anyone they got their hands on . . . including Nancy Pelosi and . . . Mike Pence," *id.* ¶ 82. And, finally, they recount how the mob Trump incited assaulted and battered Officers Blassingame and Hemby, *id.* ¶¶ 88, 106-109, leaving both men with injuries that persist to this day, *id.* ¶¶ 130, 133-37, 142-46.

Rather than accepting those well-pleaded facts as true (as required by the standard of review), Trump makes demonstrably false misstatements of plaintiffs' Complaint and plucks other allegations out of context, all in the service of hiding his responsibility for the events of January 6. Trump's reinvention of reality starts with the first sentence of his brief when he says that on January 6 he simply "encouraged Americans to 'peacefully and patriotically make [their

voices] heard,'" Def. Mem. ISO Mot. to Dismiss ("MTD"), at 1, ECF. No. 10-1 (brackets in

original), a fiction which he then repeats again, *id.* at 25, and again, *id.* at 32, and again and again

and again until nearly the last page of his brief, *see, e.g.*, *id* at 36, 37, 38, 40. But no matter how

many times Trump's counsel repeats the word "peaceful"—a term Trump used exactly *once* in

his January 6 speech at the Ellipse—that doesn't change the overwhelming weight of Trump's

other words and conduct. It was Trump who invited his followers to "be wild," Compl. ¶¶ 35-38,

to "fight like hell," to "play by very different rules," and to "stop the steal," among his many

efforts to stoke their anger to a boiling point, *id.* ¶ 60.

     This is not just a case where—as Trump tries to suggest—"[p]laintiffs . . . try to establish

liability because of the way *others interpreted*" one of Trump's tweets about the January 6 rally,

MTD at 4-5, or on the basis of "two posts on social media . . . without alleging any connection"

to Trump's words, *id.* at 5. Instead, plaintiffs base their claims for liability on a mountain of

Trump's own words and actions over the course of months leading up to and throughout the day

on January 6. Compl. ¶¶ 9-10, 12-40, 45, 58-63, 65-66, 69, 79-82, 114-118, 123, 125, 127, 147-

149.

     Nor is this a case where plaintiffs "do not otherwise allege anything as to [his] state of

mind," or somehow "admit that President Trump took several actions to try to stop the actions on

January 6." MTD at 37 (citing Compl. ¶¶ 118, 155). For example, paragraphs 220 - 221 allege:

> When the militia conspirators converged on the District of Columbia, Defendant Trump
> knowingly gave a speech urging them, among other things, that "when you catch
> someone in a fraud, you're allowed to go by very different rules" and "if you don't fight
> like hell, you're not going to have a country anymore," the natural and probable
> consequence of which would be to lead the mob to storm the Capitol . . . .
>
> . . . Trump *intended* the natural and probable consequences of the act he knowingly did,
> namely the use of force, intimidation, and threats to prevent Congress and Vice President
> Mike Pence from discharging their duties . . . . *That intent*, and approval of the events of
> January 6th, *is further confirmed by*, among other things, *his delight when hearing of the*

> *Capitol break-in* as well as his *excitement that militia members were pushing against Capitol Police* trying to get into the Capitol Building.

Compl. ¶ 221 (emphasis added). Moreover, the paragraphs that Trump plucks from the Complaint (118 and 155) make clear that Trump—contrary to his suggestion—did not actually try to stop the insurrection. Paragraph 118 alleges that Trump's "banal" suggestion that the mob "stay peaceful"—issued well after it was clear that his "followers at the Capitol were anything but"—represented a choice by Trump "*not to call off the attack*" (emphasis added). Paragraph 155 alleges that Trump "ratified" the mob's "tortious conduct when he again said that the election had been stolen by fraud, and that his followers had every reason to be angry, and by announcing support, praise[,] and love for his followers," which is more than a fair interpretation of his actual words to the mob, uttered after the rioters had halted congressional proceedings, assaulted numerous police officers, and destroyed property: "Go home. We love you. You're very special." *Id.* ¶ 125. These words of praise for the insurrectionists never appear in Trump's brief yet directly contradict his assertions about his state of mind. Many more paragraphs in the complaint recount Trump's statements and actions before and after the election and then use those statements and actions to raise serious allegations about Trump's state of mind. *Id.* ¶¶ 13-17, 19, 21, 23, 25, 27, 32, 36, 38, 45, 60, 79, 114, 116, 118, 125, 127.

Even when Trump purports to quote from plaintiffs' Complaint, he misstates both his public remarks and how the Complaint quoted those remarks. When addressing Trump's links with the Proud Boys—who, as the Complaint recounts, would lead many of the pivotal actions in the storming of the Capitol, *id.* ¶¶ 14, 85—the Motion to Dismiss changes what he said at the first presidential debate. The Motion to Dismiss says at 33: "See Am. Compl. ¶ 14 (alleging that President Trump directed and therefore conspired with the Proud Boys by making a statement on

national television that their group should 'stand back')" (parentheses in original). What he actually said had a far different import: "Proud Boys, stand back and stand by." Compl. ¶ 14.

The above examples represent the tip of the iceberg of Trump's efforts to rewrite the history of his own conduct and to mischaracterize what plaintiffs allege. Further examples appear in the specific argument sections below. The bottom line is that no amount of Trump's obfuscating, inaccurate characterizing of his own words, selective memory, and ignoring of scores of paragraphs of the Amended Complaint, can avoid the Court's application of the well-established legal standards for his Motion to Dismiss under Rules 12(b)(1) and 12(b)(6). Accepting as true *all* of plaintiffs' well-pleaded factual allegations, and inferences that may fairly be drawn therefrom, Trump knowingly and intentionally incited an insurrection in an attempt to stop Congress from counting electoral votes. Such actions fall far outside his responsibilities as president and the protections of the First Amendment, and violate federal and District of Columbia law, so the Motion to Dismiss should be denied.

## II.   The Constitution does not bar plaintiffs' claims.

### A.   *Article II does not provide Trump with immunity for inciting an insurrection.*

Trump argues that because the losing candidate who led the attack on the foundation of our democracy—the one who aided, abetted, directed, and conspired with followers to stage the attack—was also the sitting president, he is immune from accountability for the attack on the Capitol and its defenders. He further asserts that only he can determine the scope of his presidential duties. *See* MTD at 12: "Duties that are solely determined by the person properly elected to that office."

Trump's argument runs contrary to law, history, and the foundational assumptions of our democracy. *See Presidential or Legislative Pardon of the President*, 1 Op. O.L.C. Supp. 370

(1974) (rejecting presidential self-pardon because of the "fundamental rule that no one may be a judge in his own case"). In our constitutional tradition, "not a single privilege is annexed to [the] President's character." 2 J. Elliot, Debates on the Federal Constitution 480 (1876 ed.) (James Wilson, constitutional drafter and signer and future Supreme Court Justice, at the Pennsylvania ratifying convention). "Far from being above the laws," the president "is amenable to them in his private character as a citizen." *Id.* Consistent with this tradition, the Supreme Court has explained that the president is "subject to the laws for his purely private acts," *Clinton v. Jones*, 520 U.S. 681, 696 (1997); *accord Trump v. Mazars*, 140 S. Ct. 2019, 2026, (2020) (A "private litigant [can] subject a President to a damages suit . . . in federal court."). This liability extends to private actions taken while serving as president. *See Nixon v. Fitzgerald*, 457 U.S. 731, 756 (1982). "In our system of government . . . no one is above the law, including the president." *Trump v. Vance*, 140 S. Ct. 2412, 2432 (2020) (Kavanaugh, J., concurring).

    *1.  Absolute immunity covers only presidents' official acts.*

    To balance our constitutional commitment to remedying legal wrongs with the need to prevent "the distortion of the Executive's decision making process with respect to official acts that would stem from worry as to the possibility of damages," the Court has crafted an "absolute immunity" doctrine for presidents. *Vance*, 140 S. Ct. at 2426 (majority opinion) (cleaned up). The doctrine permits suits against the president for acts taken in his personal capacity while granting absolute immunity from "damages liability predicated on his official acts." *Nixon*, 457 U.S. at 749. Immunity does not "extend[] beyond the scope of any action taken in an official capacity." *Id.* at 694.

    Under this doctrine, the president is absolutely immune for acts taken "within the outer perimeter of his official responsibility." *Nixon*, 457 U.S. at 756 (cleaned up). The reach of this

perimeter is generous but not all-encompassing. Courts take a "functional approach" to defining a president's responsibilities, looking to the "nature of the function performed" by the president and "not the identity of the actor who performed it." *Jones*, 520 U.S. at 694-95.

To find the outer perimeter, the Court applies a simple test: If a president's actions, taken at face value, fall within one of his constitutionally or statutorily authorized powers, then he enjoys immunity from civil liability. *Nixon*, 457 U.S. at 757. Otherwise, he is liable in his "private character, as a citizen." 2 J. Elliot, Debates on the Federal Constitution at 480. This test ensures that the president's official decision-making processes are not duly burdened and that he is not routinely subjected to trial on every allegation that an action was "taken for a forbidden purpose." *Nixon*, 457 U.S. at 756. But it is not the case, as Trump asserts, that any time "a plaintiff alleges that a president's actions exceed his legal authority, the privilege still prohibits litigation." MTD at 9 (cleaned up).

*Nixon v. Fitzgerald* applied this test in a suit brought by an Air Force management analyst and whistleblower who alleged that he had been fired from his government job not because of a lawful reorganization and reduction in force (the given reason), but rather due to unlawful retaliation by President Nixon. Because the "mandate of [the president's] office must include the authority to prescribe reorganizations and reductions in force," the Court concluded that separating the whistleblower "lay well within the outer perimeter" of the president's "official responsibility," and immunity was appropriate. *Id.* at 757. And in only one other case have courts directly taken up the question of what constitutes the outer perimeter of official responsibility. In that case, *Clinton v. Jones*, the Supreme Court held that misconduct that occurred before President Clinton was elected was "unrelated to any of his official duties as President." 520 U.S. at 686. The Court chose not to address whether allegedly defamatory

comments that President Clinton's press secretary made were "within the outer perimeter of his official responsibilities." *Id.*

Trump thus seeks refuge in his observation that "decisions where a President has been found subject to suit for an action taken during his presidency are non-existent in the various circuit courts of appeal." MTD at 8. But at least one district court has held a president liable for an action taken during his presidency. *See Jones v. Clinton*, 36 F. Supp. 2d 1118, 1120 (E.D. Ark. 1999) (holding President Clinton in contempt of court for his role as a litigant in a civil case initiated *during* his presidency). And it hardly needs to be said that a sitting president's engaging in a conspiracy to invade the Capitol and overturn the results of an election has never before happened in U.S. history.

   2.  *The President has no role in the constitutionally prescribed congressional counting of electoral votes.*

Trump argues that when he tried to prevent Congress from fulfilling its constitutional obligations to count the electoral votes on January 6, he was "engaged in the execution of his duties as President" and therefore was acting within the outer perimeter of his official responsibilities. MTD at 12. Not so. When Trump worked to subvert Congress's electoral vote counting, he could not have been acting within the outer perimeter of the official responsibilities of the president because the Constitution denies the president any official responsibility for counting electoral votes.

The Constitution prescribes that the selection of electors shall be determined by "Each State." U.S. Const. art. II, sec. 1, cl. 2. These electors then "meet in their respective states and vote by ballot for President and Vice-President." U.S. Const., amend. XII. The Constitution prescribes no role for the sitting president in determining the outcome of that vote. In fact, the Framers were so committed to excluding the sitting president from a role in the selection of the

next president that they "excluded from eligibility to [the electoral college], all those who from situation might be suspected of too great devotion to the president in office." Federalist No. 68, at 459 (Jacob Cooke ed., 1961). Accordingly, "No senator, representative, or other person holding a place of trust or profit under the United States, can be of the numbers of the electors." *Id.*; *see also* U.S. Const. art. II, sec. 1, cl. 2.

The Constitution prescribes that the counting of the votes that are cast and certified by the Electors shall be conducted by the President of the Senate in the presence of the Senate and House of Representatives. U.S. Const., amend. XII. The Constitution prescribes no role for the sitting president—nor any of his appointees—in conducting this task. Nor does the Electoral Count Act, the statute that governs the electoral count process, prescribe a role. 3 U.S.C. §§ 1-18.

To be sure, Trump could—and did—file lawsuits challenging alleged procedural irregularities. But he did so in his capacity as a candidate, through his campaign, because in his official capacity as president he had no role in the ballot counting, state certification, electoral vote casting, or congressional electoral vote counting processes. And while Trump may have had official responsibilities relating to security measures on January 6—notwithstanding Trump's effort to muddy the waters by talking about those security failures, *see* MTD at 4—this suit makes no allegations relating to any security operations on January 6 or Trump's role in them.

None of Trump's actions to subvert Congress's counting of electoral votes fall within one of his constitutionally or statutorily authorized powers. *See Nixon v. Fitzgerald*, 457 U.S. at 757. Where President Nixon could point to core powers of the presidency to justify his involvement in Air Force "reorganization," Trump has no claim to any constitutionally or statutorily authorized role in the electoral vote-counting process he sought to disrupt. Trump is less like Richard Nixon in *Fitzgerald* and more like the president who argues that accepting bribes falls within the duties

of the presidency. And just as "[t]he Constitution confers no power in the President to receive

bribes" and statutory law renders him criminally liable for bribery offenses, *Application of 28*

*U.S.C. § 458 to Presidential Appointments of Fed. Judges*, 19 Op. O.L.C. 350, 357 n.11 (1995),

the Constitution confers no power in the president to conspire to attack the counting of electoral

votes or violate statutory law prohibiting such conspiracy.

Thus, even if Trump genuinely believed that the election was stolen, his efforts to

undermine the congressional counting of electoral votes (no less the ballot counting, state

certification processes, and electoral vote casting), fall far beyond the outer perimeter of his

official responsibilities as expressed by the Constitution. Moreover, because the Constitution

excludes the president—and his appointees—from any official role in the ballot count, electoral

vote casting, and counting process, exposure to damages for active interference with those

processes could not possibly implicate the policy considerations that give rise to the absolute

immunity doctrine, namely that fear of liability would distort "the Executive's decision making

process with respect to official acts." *Vance*, 140 S. Ct. at 2426 (cleaned up).

Because subversion of the peaceful transfer of power is not an official responsibility of

the president, it is "unofficial conduct," *Jones*, 520 U.S. at 694, engaged in by a failed candidate.

Trump is as liable as he would have been as a candidate who had never set foot in the White

House before hatching a plot to overturn the election results. In short, all of his conduct outlined

in this lawsuit was carried out as a sore loser political candidate; none of it had anything to do

with exercising the powers of the presidency.

> 3. *When Trump subverted the constitutionally prescribed congressional counting of*
> *electoral votes, he was not taking care that the laws be faithfully executed.*

Trump cannot find any constitutional or statutory provisions authorizing insurrection. *See*

U.S. Const. amend XIV, § 3 (disqualifying from officeholding any federal or state officer who

"engaged in insurrection" after having taken an oath to support the Constitution). He argues that his tortious conduct and conspiring were simply "[c]ommenting on matters of public concern," and that such so-called commentary, "especially commentary on the security of a major election, falls dead center within the President's constitutional duties to see that the laws are faithfully executed." MTD at 5. He claims that "[q]uestioning the propriety of the election was part of the President's duty to uphold and defend the Constitution." MTD at 24.

Trump correctly quotes the Constitution in imposing on the president a duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. He is wrong about everything else.

The Take Care Clause is not a grant of roving authority to the president. It is long-established that the "President cannot rely on his Take Care powers" to faithfully execute the law when there are no constitutionally established or congressionally enacted laws for him to execute. *Medellin v. Texas*, 552 U.S. 491, 532 (2008); *see also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587-88 (1953) (rejecting idea that the Take Care Clause permits the president to define his own powers). Consistent with this limitation on presidential authority, the Department of Justice took the position that Trump's "tweets about official governmental business . . . are official actions only insofar as they reflect power possessed by virtue of federal law.'"[1] The Take Care Clause does not transmogrify Trump's words and acts subverting Congress's electoral-vote counting role into a presidential responsibility.

The Take Care Clause also requires that the president execute the law *faithfully*—that is, "[w]ith strict adherence to duty and allegiance," 1 Samuel Johnson, *A Dictionary of the English*

---

[1] *Donald J. Trump, President of the United States, et al., Petitioners, v. Knight First Amendment Institute*, Petition for Certiorari, 2020 WL 4905204, at 13 (U.S.) (cleaned up); *cf. Trump v. Hawaii*, 138 S. Ct. 2392, 2418 (2018) (distinguishing the "authority of the Presidency" in carrying out a "Presidential directive" from mere "words" and "extrinsic statements").

12

*Language* 763 (1755). Trump was hardly facilitating "faithful" execution when he conspired to stage an attack on the constitutionally-mandated congressional process for counting electoral votes—a conspiracy that is itself in violation of, rather than in faithful execution of, a congressionally-enacted statute, the Klan Act. *See generally Youngstown*, 343 U.S. at 585-88; *United States v. Midwest Oil Co.*, 236 U.S. 459, 505 (1915).

Trump's invocation of the Take Care Clause is thus hollow. Conspiring to stage an insurrection does not effectuate the president's responsibilities to take care that the laws be faithfully executed, it is not "part of the President's duty to uphold and defend the Constitution," and it does not fall within the outer perimeter of the president's official responsibilities.

*4. The president does not have unchecked power to define his own duties.*

Richard Nixon claimed that "[w]hen the President does it, that means that it is not illegal." James M. Naughton, *Nixon Says a President Can Order Illegal Actions Against Dissidents*, N.Y. Times (May 19, 1977).[2] Nixon was wrong and so is Trump when he similarly asserts that presidential duties "are solely determined by the person properly elected to that office." MTD at 12. Centuries of jurisprudence reject this dangerous assertion.

Our system of checks and balances exists to counteract the "hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power." *INS v. Chadha*, 462 U.S. 919, 951 (1983). Allowing the president to arrogate to himself the power to determine the scope of his own authorities "would permit a striking anomaly in our tripartite system of government, leading to a regime in which . . . the President, not this Court, say[s] what the law is." *Boumediene v. Bush*, 553 U.S. 723, 765 (2008) (cleaned up).

---

[2] *Available at* https://www.nytimes.com/1977/05/19/archives/nixon-says-a-president-can-order-illegal-actions-against-dissidents.html.

Courts have long interpreted the scope of the president's Article II duties, often rejecting presidential claims to authority. In *United States v. Nixon*, a case that also involved unlawful conduct by a candidate who happened to sit in the White House, the Court rejected the president's reading of Article II. *See* 418 U.S. 683, 703-05 (1974). The Court has also rejected the president's interpretation of the Commander in Chief Clause and the Take Care Clause, *Youngstown,* 343 U.S. at 587-88, and the Recess Appointments Clause, *NLRB v. Noel Canning*, 573 U.S. 513, 553-56 (2014). It is absolutely the province and duty of this Court to determine Trump's duties—or lack thereof—relating to the congressional counting of electoral votes.

Trump argues that "[c]ourts are not the place for such controversies" over the scope of the president's responsibilities but rather "self-discipline and the voters must be the ultimate reliance for discouraging or correcting such abuses." MTD at 11-12. To be sure, "[t]he Constitution . . . makes the President accountable to the people for executing the laws." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 514 (2010). But when the people held Trump accountable for executing the laws and "correct[ed]" his abuses at the ballot box, Trump turned a mob loose on Congress. His actions estop his argument.

> 5. *Trump does not identify any official responsibilities that entail aiding, abetting, directing, or conspiring to stage an attack on the Capitol.*

When Trump took to Twitter, he used an account that, according to his own Department of Justice, belonged to him "in his personal capacity, not his official one." *Donald J. Trump, President of the United States, et al., Petitioners, v. Knight First Amendment Institute*, Petition for Certiorari, 2020 WL 4905204 (U.S.), at *13. Throughout his term in office, the official position of the Administration was that Trump's Twitter account was of a "fundamentally personal character," that "Donald Trump's authority over it" was of a "private nature," and that the account was "a private mechanism that Donald Trump possesse[d] to communicate

14

statements he wishe[d] to make to his followers on Twitter and to any other person who visits the @realDonaldTrump page," rather than a platform from which the president could communicate with the American people writ large. Brief for Donald J. Trump, President of the United States, *Knight Institute v. Trump* (2nd Cir. 2018) (No. 18-1691), at 14, 18; *see* Petition for Certiorari at *13 n.1 (litigation challenging actions taken by Trump on Twitter "do not actually challenge any official state action that could be redressed by the Office of the President"). Trump was acting in no more of an official capacity when he took the stage at a campaign-adjacent Stop the Steal rally on January 6 to speak to die-hard supporters who refused to acknowledge his election loss.

Nor, in the two months leading up to January 6, was Trump preparing to face "accountabil[ity] to the people for executing the laws," *Free Enter. Fund*, 561 U.S. at 513-14; MTD at 5. The last votes in his election contest were cast on November 3. *See Am. Fed'n of Gov't Emps. v. Off. of Special Couns.*, 1 F.4th 180, 187 (4th Cir. 2021) (On November 4, 2020, "President Trump was no longer a candidate for public office."). In the lead-up to the insurrection, he tweeted and spoke to his followers not as a sitting president preparing to face the voters, but as a failed candidate who refused to concede.

Nor was Trump communicating with the American people about matters of public concern. On January 6, he was speaking to his supporters at a private rally, organized in part by his former campaign staff. Compl. ¶ 59. And he used his "fundamentally personal" Twitter account to communicate with his followers. Indeed, any argument that he was acting in his official capacity is belied by his claim to have First Amendment protection. The Supreme Court "has rejected the notion that the First Amendment confers a right to use governmental mechanics to convey a message," *Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 127 (2011), so the president's exercise of official responsibilities is not covered by the First Amendment's Speech

Clause. And while the president enjoys the right to "from time to time give to the Congress

Information of the State of the Union, and recommend to their Consideration such Measures as

he shall judge necessary and expedient," U.S. Const., art. II, sec. 3, Article II does not empower

the president to petition Congress for a redress of grievances. While the then-president's tortious

and conspiratorial conduct was not protected by the First Amendment, *see infra* Part V, that is

not because he was partaking in activities within the scope of his official responsibilities as

president.[3]

### B.   *The political question doctrine has no bearing on plaintiffs' claims.*

Trump's assertion that plaintiffs' claims against him raise nonjusticiable political

questions because they "would improperly regulate the executive department," MTD at 14, fares

no better. The political question doctrine does not bar judicial "regulat[ion]" of "the executive

department." *Id*. It merely excludes from judicial consideration cases where the Constitution

makes "a textually demonstrable . . . commitment of the issue to a coordinate political

department." *Baker v. Carr*, 369 U.S. 186, 217 (1962). There is no such commitment here.

Neither the "executive Power" nor the president's duty to "take Care that the Laws be faithfully

executed" includes the power to break the law. *See, e.g.*, *Youngstown*, 343 U.S. at 589. Courts

have called out violations of statutes by executive branch officers from the earliest days of the

---

[3] In a footnote, Trump asserts that this suit is "foreclosed by immunity under the Westfall Act."
MTD at 13 n.5. But Westfall Act defenses must be raised by the Attorney General; only after the
Attorney General refuses may an individual defendant petition the court. *See* 28 U.S.C. § 2679.
Accordingly, this is not a procedurally proper argument, and plaintiffs will respond once
defendant makes a procedurally proper argument in something other than a footnote. Trump's
qualified immunity argument is likewise raised in a single sentence in a footnote and also is
waived. Because qualified immunity does not apply to officers when they are acting in their
personal capacities, it is as inapplicable as absolute immunity is. And, in any case, inciting a mob
to assault the Capitol Police and storm Congress violates clearly established law.

Republic. *See, e.g.*, *Little v. Barreme*, 6 U.S. (2 Cranch) 170, 178-79 (1804). And the president can indeed be held civilly liable for unofficial acts. *See Jones*, 520 U.S. at 692-94, 705-06.

Nor is this a situation where the Court is required to make "policy choices and value determinations constitutionally committed for resolution" by another branch. MTD at 13 (quoting *Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 230 (1986)). The questions raised are quintessentially "legal in nature." *Japan Whaling Ass'n*, 478 U.S. at 230. As presidential immunity does not apply, the fact that Trump was president when he engaged in the conduct at issue does not change the legal analysis of that conduct and its consequences. The Court need simply determine whether, under relevant statutory and common law, Trump's alleged conduct was tortious or amounted to participation in an illegal conspiracy, thereby causing plaintiffs' injuries.

## C. *The Impeachment Judgment Clause does not preclude any claims or issues in the Amended Complaint.*

Trump asserts that the Impeachment Judgment Clause bars civil suits against the impeached party "on the same issues"—without explaining what constitutes the "the same issues"—regardless of whether he was acquitted or convicted. MTD at 21. Trump's argument can find no refuge in the Constitution's text, history, or structure.

The Impeachment Judgment Clause's language concerning subsequent litigation is wholly permissive, never prohibitory. It was added to the Constitution to clarify that protections against double jeopardy would not be manipulated to place officeholders above the law. *See Whether a Former President May Be Indicted and Tried for the Same Offense for Which He was Impeached by the House and Acquitted by the Senate*, 24 Op O.L.C. 110, 123-24 (2000). That's why Justice Story, Edmund Pendleton (the President of the Virginia Supreme Court and of the Virginia Ratifying Convention), and Justice Wilson all rejected the idea that the Clause prohibits

17

follow-on legal actions directed at an acquitted party.[4] It's also why the Office of Legal Counsel concluded that "[t]he Constitution permits a former President to be indicted and tried for the same offenses for which he was impeached by the House of Representatives and acquitted by the Senate." 24 Op O.L.C. at 110.

Moreover, the reason why the Clause does not discuss civil litigation—far from a desire to preclude anything—was that it was unnecessary: parallel civil forfeiture actions by the government were common in the founding era and not covered by double jeopardy. *See United States v. Ursery*, 518 U.S. 267, 274 (1996) (explaining commonality of parallel proceedings in the early republic). And, of course, "[t]he Double Jeopardy Clause clearly does not apply to civil actions brought by one private individual against another." David Stewart Rudstein, *Double Jeopardy: A Reference Guide to the United States Constitution* 202 (2004). The Clause does not bar follow-on civil litigation against an acquitted party, let alone by a private party.

We need not rely on Founding-era history alone. Trump does not cite any authority to support his reading of the Clause. President Clinton was subjected to civil liability and had his license to practice law suspended by the Supreme Court following his acquittal. *Jones*, 36 F. Supp. 2d at 1120 (holding President Clinton in contempt of court); *cf. In re Discipline of Clinton*, 534 U.S. 806 (2001) ("Bill Clinton . . . is suspended from the practice of law . . . ."). There is no reason to chart a different (and historically unprecedented) course here.

---

[4] Joseph Story, 2 Commentaries on the Constitution 251 (1833); Letter from Edmund Pendleton to James Madison, Oct. 8, 1787, Documentary History of the Ratification of the Constitution, 10 Ratification by the States 1773 (Merrill Jensen et al , eds. 1976-); Speech of James Wilson to the Pennsylvania Convention, Dec. 4, 1787, Documentary History of the Ratification of the Constitution, 2 Ratification by the States 492 (Merrill Jensen et al , eds. 1976-) (although officeholders "may not be convicted on impeachment before the Senate, they may be tried by their country; and if their criminality is established, the law will punish").

### D.  *Neither res judicata nor collateral estoppel bar this lawsuit.*

Trump argues that this lawsuit is barred by res judicata (claim preclusion) and collateral estoppel (issue preclusion). MTD at 14-20. He is wrong.

Claim preclusion bars subsequent litigation of previously adjudicated claims if (1) the parties are in privity; (2) the court adjudicating the prior case was one of competent jurisdiction; (3) the claims were the same as those previously litigated or could have been previously litigated; and (4) the judgment was final and on the merits. *See Smalls v. United States*, 471 F.3d 186, 192 (D.C. Cir. 2006). This case does not pass that test.

*First*, the plaintiffs are not privies of the Capitol Police which is not a privy of the House. The Capitol Police is statutorily established and managed by the Capitol Police Board, *see* 2 U.S.C. Ch. 29, and the plaintiffs are litigating in their personal capacities, *see Andrews v. Daw*, 201 F.3d 521, 523 (4th Cir. 2000) (government employee in individual capacity is not in privity with self in his official capacity, much less an agency). *Second*, there was no judgment on the merits in impeachment proceedings because at least 38 of the Republicans that voted against conviction did so on jurisdictional grounds, not on the merits.[5] *Third*, the claims are not the same because plaintiffs are suing Trump under District of Columbia law and federal statutory claims; these are not claims available to Congress in impeachment proceedings. *Finally*, the Senate cannot give rise to claim preclusion because it has only three "specific requirements" imposed when it sits as a court of impeachment: Senators must be under oath; a two-thirds vote is required to convict, and the Chief Justice must preside when the president is tried, *Nixon v.*

---

[5] Ryan Goodman & Josh Asabor, *In Their Own Words: The 43 Republicans' Explanations of Their Votes Not to Convict Trump in Impeachment Trial*, Just Security (Feb. 15., 2021), *available at* https://www.justsecurity.org/74725/in-their-own-words-the-43-republicans-explanations-of-their-votes-not-to-convict-trump-in-impeachment-trial/.

*United States*, 506 U.S. 224, 230 (1993). That is not sufficient for claim preclusion. Matters adjudicated in non-Article III bodies only give rise to preclusion when those decisions are made with "procedural protections [that] . . . are virtually the same" as Article III courts, *Ortiz v. United States*, 138 S. Ct. 2165, 2174, (2018), and that was not the case with impeachment.

The attempt to invoke issue preclusion does no better. Trump has failed to identify any specific issues that any prior judgment settled, so the argument is waived. *See Bailey v. Fulwood*, 793 F.3d 127, 136 n.5 (D.C. Cir. 2015). And, in any case, there are at least five independent reasons that issue preclusion is inappropriate. *First*, the parties are not the same as in the impeachment proceedings, and they are not in privity either. *See Jackson v. D.C.*, 412 A.2d 948, 952 (D.C. 1980) (no issue preclusion "against one who was not a party"). *Second*, there is no possible appellate review of impeachment proceedings. *See* Restatement (Second) of Judgments § 28 (1982) (no issue preclusion if "the party against whom preclusion is sought could not, as a matter of law, have obtained review of the judgment in the initial action"). *Third*, the issues here weren't necessarily determined in prior proceedings. *See id.* § 27, cmt. i (no issue preclusion when the "judgment of a court of first instance is based on determinations of two issues, either of which standing independently would be sufficient to support the result"). *Fourth*, there are different burdens of proof here than in impeachment. *Id.* § 28, cmt. f (no issue preclusion if parties face "new and different burden"). *Fifth*, the procedural protections here are very different than in an impeachment trial. *Id.* § 28 (no issue preclusion when there are sufficient "differences in the quality or extensiveness of the procedures followed in the two courts").

**III.   Trump conspired to use force to disrupt congressional vote counting, in violation of several clauses of 42 U.S.C. § 1985(1).**

The Klan Act prohibits conspiracies to obstruct federal officers or to injure federal officers for engaging in federal functions. The relevant provision makes it unlawful for:

> two or more persons . . . [to] conspire to prevent, by force, intimidation, or threat,
> any person from accepting or holding any office, trust, or place of confidence
> under the United States, or from discharging any duties thereof; . . . or to injure
> him in his person or property on account of his lawful discharge of the duties of
> his office, or while engaged in the lawful discharge thereof . . .

42 U.S.C. § 1985(1). The Act provides a cause of action to *any* party injured as a result of an

unlawful conspiracy. *See* 42 U.S.C. § 1985(3). The elements of a § 1985(1) claim are: (1) a

prohibited conspiracy, (2) an act in furtherance, (3) whereby a person is injured in his person or

property. The Complaint more than plausibly alleges such a conspiracy. *See* Compl. ¶¶ 216-24.

The January 6 insurrection qualifies as a prohibited conspiracy under § 1985(1) in at least

five distinct ways.[6] First, the conspiracy sought "to injure" Capitol Police officers—including

plaintiffs—"on account of [their] lawful discharge of the duties of [their] office, or while

engaged in the lawful discharge thereof."[7] Second, the conspiracy sought "to prevent, by force,

intimidation, or threat" Capitol Police officers—including plaintiffs—from "discharging [their]

duties." Third, the conspiracy sought "to prevent, by force, intimidation, or threat" then-

President Elect Biden and then-Vice President Elect Harris "from accepting or holding any

office, trust, or place of confidence under the United States"—namely, the presidency and the

vice presidency. Fourth, the conspiracy sought "to prevent, by force, intimidation, or threat"

then-Vice President Pence from "discharging [the] duties" of his "office, trust, or place of

confidence under the United States" to preside over the counting of the electoral votes. Fifth, the

conspiracy sought "to injure" then-Vice President Pence "on account of his lawful discharge of

---

[6] Plaintiffs also agree with the plaintiffs in *Thompson* and *Swalwell* that Members of Congress
hold an "office, trust, or place of confidence under the United States."

[7] The mere fact that the rioters may have had a broader objective than assaulting the Capitol
Police is no defense. *See Libertad v. Welch*, 53 F.3d 428, 446 (1st Cir. 1995) ("While it is
indisputable that [there was a] broader objective behind . . . Appellees' actions . . . , the . . . issue
is whether . . . Appellees purposefully employed tactics [that violated the Klan Act].").

the duties of his office, or while engaged in the lawful discharge thereof."

Trump does not dispute, nor could he, the existence of a conspiracy to carry out any of the above objectives. Nor does he dispute that plaintiffs were injured as a result of the conspiracy. He argues only that (1) the conspiracy does not violate § 1985(1) because the statute does not cover conspiracies aimed at Congress or the vice presidency, (2) he was not involved in the conspiracy, and (3) he is absolved from liability because he did not cause plaintiffs' injuries. MTD 29-33. None of those arguments succeed.

### A. Capitol Police Officers, the President, and the Vice President All Occupy an "office, trust, or place of confidence under the United States" under § 1985(1).

Trump contends that a seditious mob carrying Confederate battle flags while storming Congress to halt proceedings of the federal government does not violate the Klan Act. This argument is counterintuitive, to say the least. It is based on the premise that the Klan Act only covers conspiracies to injure officers of the United States under a narrow definition of the term that excludes the presidency and the vice presidency and members of Congress, and therefore that the conspiracies alleged in the Complaint do not fall within the ambit of the statute. MTD at 29. Trump is wrong in two respects. First, the Capitol Police are "officers of the United States" and hold an "office, trust, or place of confidence under the United States" under the Act. Second, with respect to the presidency and the vice presidency, Trump's argument rests on an interpretation of language in the Constitution (and a minority view of what that language means that is wrong even on its own terms), which is irrelevant to the question of *statutory* interpretation presented here.

### 1. Capitol Police Officers are covered by § 1985(1).

Reconstruction civil rights statutes should be accorded a sweep as broad as their language. *See Griffin v. Breckenridge*, 403 U.S. 88, 97 (1971). That admonition applies to the

term "officer" in the Klan Act. As the Office of Legal Counsel has recognized, that term in the Act is not constrained by the Constitution but encompasses a broader category of officers and employees of the United States. *See Mem. Op. for the Att'y Gen. Conspiracy to Impede or Injure an Officer of the United States, 18 U.S.C. § 372*, 1 Op. O.L.C. 274, 275-76 (1977). Specifically, in interpreting § 1985(1)'s criminal analog—18 U.S.C. § 372, which uses the same terms to describe a covered conspiracy—OLC noted "the legislative history of the section indicates that a reading broader than that demanded by the constitutional usage must prevail." *Id.* at 276. That reading is consistent with Congress's purpose "to end Ku Klux Klan terrorism" by "protect[ing] Federal officers by providing for Federal prosecution whenever they were injured because of or in the course of their duties." *Id.* at 276. Thus, the provision encompasses "both permanent and temporary, full- and part-time officers and employees of the United States," *id.* at 276, a category broad enough to include Capitol Police officers. Unsurprisingly, DOJ has indicted January 6 insurrectionists under § 372 for conspiring to injure Capitol Police officers. *See* Indictment, *United States v. Khater*, No. 1:21-cr-222-TFH, ECF No. 8 (D.D.C. Mar. 17, 2021).

   2. *The President and the Vice President are covered by § 1985(1).*

   Trump's argument that the president and vice president do not hold an "office, trust, or place of confidence under the United States" rests on a comparison to similar terms in the Constitution. But this case turns on a question of statutory interpretation, and given the context in which the Klan Act was passed, *see generally McCord v. Bailey*, 636 F.2d 606, 615 (D.C. Cir. 1980) (describing that context), there is every reason to interpret the phrase "office, trust, or place of confidence under the United States" as encompassing the president and the vice president. *Cf. Lamar v. United States*, 240 U.S. 60, 65 (1916) ("[W]ords may be used in a statute in a different sense from that in which they are used in the Constitution.").

Even if the Constitution were to guide the interpretation of § 1985(1), that would not save Trump. That is because the term "office under the United States" and similar terms found in the Constitution do apply to the president and the vice-president.[8] OLC has repeatedly taken this position—particularly, that the presidency is an "Office of Profit or Trust under [the United States]." *See, e.g.*, *President's Receipt of the Nobel Peace Prize*, 33 Op. O.L.C. 370, 374 (2009). And the District of Maryland recently considered whether similar language in the Foreign Emoluments Clause applies to the president and—consistent with the longstanding view of the Executive Branch—concluded that it does. *See District of Columbia v. Trump*, 315 F. Supp. 3d 875, 882-86 (D. Md. 2018), *vacated as moot*, 838 F. App'x 789 (4th Cir. 2021).

Finally, at the time that § 1985(1) was drafted, the presidency was widely understood to be an "Office of Profit or Trust under [the United States]." This is apparent from the conduct of several presidents and Congress around the time of the enactment of the Klan Act.[9] In other words, even were the term "office, trust, or place of confidence under the United States" in § 1985(1) informed by the Constitution, the contemporaneous understanding of the Constitution only favors an interpretation that encompasses the president and the vice president.

### B.  *Plaintiffs allege sufficient facts to plausibly infer an unlawful agreement between Trump and co-conspirators.*

A civil conspiracy requires that (1) two or more persons agree, (2) to participate in an

---

[8] *See, e.g.*, Saikrishna Prakash, *Why the Incompatibility Clause Applies to the Office of the President*, 4 Duke J. Const. L. & Pub. Pol'y 143 (2009).

[9] Presidents Van Buren, Tyler, and Lincoln all refused personal gifts on the basis of the Foreign Emoluments Clause. *See* Resolutions of May 2, 1840, No. 4, 5 Stat. 409 (resolution concerning Van Buren gift); Act of Mar. 1, 1845, 5 Stat. 730 (directing disposition of Tyler gift); Letter from Abraham Lincoln, President of the United States of America, to His Majesty Somdetch Phra Paramendr Maha Mongut, King of Siam (Feb. 3, 1862), *available at* http://quod.lib.umich.edu/l/lincoln/lincoln5/1:269.1?rgn=div2;view=fulltext.

unlawful act or a lawful act in an unlawful manner, and (3) cause injury by an overt act, (4) pursuant to and in furtherance of the common scheme. *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983). The agreement need not be explicit and may be tacit. *Id.* at 477.

 *Twombly* sets forth the pleading standard for conspiracy. It requires "enough factual matter (taken as true) to [plausibly] suggest that an agreement was made." 550 U.S. at 556. But it does "not require heightened fact pleading of specifics." *Id*. at 570. (Trump's contrary cases, MTD at 29, all predate *Twombly*.) As a result, plaintiffs need not "definitively show an [unlawful] agreement" in response to a motion to dismiss. *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 426 (4th Cir. 2015) (cleaned up); *see also Evergreen Partnering Grp. v. Pactiv Corp.*, 720 F.3d 33, 46 (1st Cir. 2013) (requirement is to show "the general contours of when an agreement was made"). Instead, they need only "raise a reasonable expectation that discovery will reveal evidence of [an] illegal agreement." *Twombly*, 550 U.S. at 556.

 The Complaint alleges sufficient facts to more than plausibly suggest an unlawful agreement between Trump and his co-conspirators to use force to disrupt Congress's counting of the electoral votes. Compl. ¶¶ 216-24. It does so by alleging "parallel conduct" by the conspirators, coupled with "plus factors," as circumstantial evidence from which an agreement may be inferred. *See In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 59-60 (D.D.C. 2016). Plus factors are "further circumstance[s] pointing toward a meeting of the minds." *Twombly*, 550 U.S. at 557.

  1. *The Complaint alleges a multi-month period where the alleged co-conspirators acted in parallel.*

 The parties to the conspiracy started acting in parallel no later than the first presidential debate in September 2020, when Trump began fueling the nascent conspiracy with the falsehood that the election would be fraudulent and calling on the Proud Boys to "stand back and stand by,"

while telegraphing that the moment to deploy would come if he lost the election. *Id*. ¶¶ 14-15.

Within minutes, the Proud Boys' chairman noted agreement. *Id.* Then, on December 19, 2020,

Trump issued the deployment order that the Proud Boys and other conspirators were "waiting

for." *Id.* ¶¶ 32-33. He called his followers to a "wild" protest on January 6 that his campaign

organized to target Congress's counting of state-certified votes. *Id.* ¶ 32. His conspirators heard

this command as a "literal call to arms." *Id.* ¶ 33. Pursuant to their "marching orders," members

of the Proud Boys and Oath Keepers began plotting an armed insurrection and "discussing how

to work together and shut this shit down." *Id.* ¶¶ 33-35. Just days before January 6, a member of

the Proud Boys had a phone conversation with a Trump aide in the White House. *Id.* ¶ 37.

      Then, on January 6, Trump gave his final orders with his conspirators "standing by." *Id.*

¶ 14. He announced, "we're going to the Capitol," an urged them to "fight like hell" or else they

would "not [] have a country anymore," and assured them that they could "go by very different

rules" when "catch[ing] somebody in a fraud." *Id.* ¶ 60. As Trump concluded, his followers'

chants changed from "Fight like Hell" to "Invade the Capitol Building"—the explicit purpose of

their conspiracy—and that is what they did. *Id.* ¶ 61. And, as the FBI later noted, members of the

mob would have "killed" anyone "they got their hands on." *Id.* ¶ 82. Contemporaneous actions of

Trump and his co-conspirators plausibly suggest that they shared a plan with a common

objective to prevent Congress from counting electoral votes. Oath Keeper Meggs believed he

was operating pursuant to a plan to "[s]hut this shit down." *Id.* ¶ 218. Proud Boy Pezzola

believed he was operating pursuant to a plan to "take this motherfucker over." *Id.* ¶ 222. During

the insurrection, Oath Keeper Watkins stated her belief that she was part of a group that was

"sticking together and sticking to the plan." *Id.* ¶ 223. Trump not only set this plan in motion, he

also delighted in watching live video of militia members storming the Capitol and attacking the
Capitol Police. *Id.* ¶¶ 94, 115, 221.

   2.   *The Complaint alleges three additional "plus" factors that support the existence of a
        conspiracy.*

Trump suggests that plaintiffs allege only parallel conduct—"President Trump spoke, and
others responded"—without more to indicate at least a tacit meeting of the minds. MTD at 33.
But the allegations in the Complaint, when taken together, allege not only a course of parallel
conduct between September 29, 2020, and January 6, 2021, but also three key "plus" factors—
communications between Trump and his co-conspirators, their conduct against self-interest, and
their attempts to cover their tracks. Allegations of this sort routinely overcome motions to
dismiss, as direct evidence of a conspiracy—particularly at the motion to dismiss stage—is
"extremely rare." *In re Domestic Airline Travel*, 221 F. Supp. 3d at 58; *Oxbow Carbon &
Minerals LLC v. Union Pac. R.R. Co.*, 926 F. Supp. 2d 36, 46-47 (D.D.C. 2013).

*Communications between parties acting in parallel*: "Allegations of communications and
meetings among conspirators can support an inference of agreement because they provide the
means and opportunity to conspire." *SD3*, 801 F.3d at 432. Here, Trump publically and
repeatedly gave thinly veiled instructions to his conspirators and they confirmed that they would
follow through. *Id.* ¶¶ 14-15, 32, 60. He further used these public communications to create the
motivation—false claims of election fraud—for his conspirators to take overt acts in furtherance
of the conspiracy and to generate the strength in numbers for his conspirators to feel emboldened
to use threats, intimidation, and violence. *Id.* ¶¶ 33, 34, 93. Similar communications in the
antitrust context have been found to support an inference of conspiracy. *See In re Domestic
Airline Travel*, 221 F. Supp. 3d at 61-63 (public statements by airline executives supported an

inference of conspiracy because they signaled a willingness to engage in prohibited conspiracy to potential co-conspirators). There is no reason they should not here too.

In addition, the Complaint alleges at least one private communication between the Proud Boys and an individual inside the White House in the days just before the January 6 insurrection. *Id.* ¶ 37. [10] Rather than evaluate this allegation in isolation, as Trump attempts to do, MTD at 33, it must be viewed in conjunction with its surrounding circumstances. *See SD3*, 801 F.3d at 432. The timing of the call as well as the fact that the Proud Boys led the assault on the Capitol and were "standing by" for Trump's command, all give rise to the inference that the call furthered the conspiracy. *See id.* at 432 (phone calls identify a practice that facilitates conspiracy).

*Conduct against self-interest*: A pattern of conduct against self-interest also supports an inference of conspiracy. *See Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 781-82 (2d Cir. 2016). The Complaint alleges that—after receiving communications from Trump—members of the Proud Boys and Oath Keepers started planning and executing seditious conspiracies for which they now face substantial jail time. They were unlikely to take these steps in the absence of believing they were working with Trump. *In re Elec. Books Antitrust Litig*., 859 F. Supp. 2d 671, 683 (S.D.N.Y. 2012) (counterfactual examination suggesting conspirators would have taken a different course but for agreement supports conspiracy inference); *see also Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 324 (2d Cir. 2010) (parallel law enforcement allegations support an inference of conspiracy). As the attorneys for an indicted Proud Boys member stated, "[o]nly

---

[10] Since the Complaint was filed, more facts have come to light suggesting additional communications between the White House and the Proud Boys. *See* Joshua Kaplan and Joaquin Sapien, *New Details Suggest Senior Trump Aides Knew Jan. 6 Rally Could Get Chaotic*, ProPublica (June 25, 2021), *available at* https://www.propublica.org/article/new-details-suggest-senior-trump-aides-knew-jan-6-rally-could-get-chaotic. These additional facts only reinforce the inference that defendant Trump was involved in the conspiracy.

someone who thought they had official endorsement would even attempt such a thing [as storming the Capitol with sticks and flags and bear spray]," and Trump gave the mob "explicit permission and encouragement to do what they did." *Id.* ¶ 149.

Trump, too, acted like a co-conspirator. He communicated with right-wing nationalists known for gang violence in a nationally televised debate. *Id.* ¶ 14. During the attack on the Capitol, he exhibited delight and enthusiasm about the unfolding violence, *id.* ¶¶ 94, 115, and he rejected the pleas of Minority Leader McCarthy to call off the insurrectionists, *id.* ¶ 114. Moreover, his agent Rudolph Giuliani took steps to further the conspiracy to try to achieve the conspiracy's goals even after the Capitol was sacked. *Id.* ¶ 128. Each of these facts makes his participation in the conspiracy more plausible.

*Attempts to cover up illegal actions*: Conduct taken to hide illegal activities also supports an inference of conspiracy. *See SD3*, 801 F.3d at 432 (attempts to hide actions could suggest that the defendants knew their actions "would attract antitrust scrutiny"); *Al Shimari v. CACI Premier Tech., Inc.*, 324 F. Supp. 3d 668, 694 (E.D. Va. 2018) (cover-up attempts and code words support an inference of conspiracy). The Complaint alleges how the co-conspirators and Trump took steps to hide their actions. The militia co-conspirators "took steps to remain incognito and mask their participation in the conspiracy" during its planning and initial execution. Compl. ¶ 219. And Trump cloaked some of his appeals to violence in coded language (e.g., told the mob they could "go by very different rules" when "you catch somebody in a fraud," *id.* ¶ 60), and he was careful to sprinkle his speeches with adverbs like "peacefully" that his Motion to Dismiss now plucks out of context in an ultimately futile attempt to gain plausible deniability.

In the face of this evidence of his involvement in the conspiracy, Trump argues for dismissal because at one point on January 6 he tweeted to "stay peaceful," contending that this

shows he was not the one who incited or directed the mob's actions. MTD at 32. That is an improper argument at the pleading stage where the question "is not whether there is a plausible alternative to the plaintiff's theory; the question is whether there are sufficient factual allegations to make the complaint's claim plausible." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 189 (2d Cir. 2012). A plaintiff "need not make any unlawful agreement more likely than independent action at the motion to dismiss stage." *Oxbow Carbon & Minerals LLC v. Union Pac. R.R. Co.*, 81 F. Supp. 3d 1, 13 (D.D.C. 2015).

Nonetheless, the allegations here belie Trump's proffered explanation of independent action by his followers. He knew that the Proud Boys and other extremist followers had attended previous rallies on November 14 and December 12 that turned violent. Compl. ¶ 22-29. He refused to condemn the violence even when state officials publicly implored him to do so. *Id.* ¶ 29. Similarly, Trump refused to condemn or call off the invasion of the Capitol on January 6. *Id.* ¶¶ 114, 116-18. In fact, he appeared "delighted" by the invasion. *Id.* ¶¶ 94, 115. Only after his conspirators had succeeded in halting Congress's electoral vote counting, terrorized occupants of the Capitol building, caused substantial property damage, and injured scores of law enforcement officers including plaintiffs did Trump ask his co-conspirators to "go home," at the same time doling out thanks and professing his love. *Id.* ¶ 125. Thus, even if it were appropriate for consideration at this stage, it is Trump's explanation—not plaintiffs'—that is implausible.

Finally, since filing his Motion to Dismiss, Trump has again praised the insurrectionists, noting that they "were great people" that acted "peacefully" and with "love."[11] That not only again demonstrates Trump's continuing endorsement of the insurrection but also that Trump's

---

[11] David Cohen, *Trump on Jan. 6 insurrection: 'These were great people,'* Politico (July 11, 2021), *available at* https://www.politico.com/news/2021/07/11/trump-jan-6-insurrection-these-were-great-people-499165.

use of the word "peaceful" bears no relation to the common understanding of the term and that it serves merely as a smokescreen and code word for violence.

### C. *Section 1985 allows plaintiffs to hold Trump liable for injuries resulting from the illegal conspiracy.*

Trump argues that he cannot be held liable for plaintiffs' injuries under the Klan Act because he claims he did not cause the events of January 6. In support, he notes that his January 6 speech was given at the Ellipse rather than the Capitol, "far removed" from the action. MTD at 32. Trump also repeats that "he wanted his supporters to remain peaceful," MTD at 32, the allegations in the Complaint notwithstanding.

Leaving aside the fact that his speech could be watched at the Capitol on cellphones and other devices, Compl. ¶ 58, and that the Ellipse is within walking distance of the Capitol, the argument still fails. Trump's co-conspirators' overt acts caused plaintiffs' injuries, Compl. ¶ 224, and the Klan Act does not require causation of plaintiffs' injuries *by the defendant*. Section 1985(3) makes liable "any" member of a prohibited conspiracy "whereby another is injured" by acts committed "in furtherance of the object of such conspiracy." This is consistent with black-letter law: "A conspirator need not participate . . . in the wrongful action in order to be found liable. He need not even have planned or known about the injurious action." *Halberstam*, 705 F.2d at 481. So, as a co-conspirator, Trump remains liable.

Trump's argument fails even on its own terms. To be a proximate cause, Trump need not be the sole cause of plaintiffs' injuries. *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 704 (2004) ("[A] given proximate cause need not be, and frequently is not, the exclusive proximate cause of harm."). And here Trump's conduct proximately caused plaintiffs' injuries. Compl. ¶¶ 162, 168. As Representative Cheney noted, Trump "summoned this mob, assembled the mob, and lit the flame of this attack. Everything that followed was his doing." *Id.* ¶ 147. Trump invented the lie

that the election had been fraudulently stolen, *id.* ¶¶ 13, 17-20, invited his co-conspirators to gather in Washington, D.C. on January 6, *id.* ¶¶ 32, 36, advised them that they were "allowed to go by very different rules" where "fraud" was involved, directed them to "fight like hell" and "go[] to the Capitol," *id.* ¶ 60, and declined to take steps to call off or respond to the attack when begged to, *id.* ¶ 114, 116. The mere fact that others committed the violent acts cannot break the chain of causation. The storming of the Capitol and the injuries plaintiffs sustained were foreseeable as the "normal result" of Trump's actions. Restatement (Second) of Torts § 442 (1965); Compl. ¶ 147 (Senator McConnell stating invasion was a "foreseeable consequence" of Trump's conduct). Plaintiffs' injuries were neither "different in kind" from the harm one would have expected nor "extraordinary . . . in view of the circumstances" at the time of his incitements. Restatement (Second) of Torts § 442. As a result, Trump remains liable.

## IV.  Plaintiffs adequately pleaded claims under District of Columbia law.

The Complaint alleges six claims under District of Columbia law against Trump. The Motion to Dismiss, however, only contests the merits of four of those claims. MTD at 32-41 (addressing civil conspiracy (claim 8), directing assault and battery (claim 1), aiding-and-abetting (claim 2), and IIED (claim 3)[12]). He raises no arguments against claim 4 (violation of the D.C. Anti-Riot statute) and claim 5 (violation of the D.C. Disorderly Conduct statute), and so he has waived any arguments with respect to those claims (other than, of course, his general constitutional and jurisdictional challenges). As a result, plaintiffs will not further discuss claims 4 and 5.

Trump's remaining arguments in regard to the D.C. claims all share a common flaw: they

---

[12] Plaintiffs will voluntarily dismiss the IIED claim (claim 3) without prejudice. Without conceding the merit of defendant's arguments, there is no need for a separate emotional distress claim when those injuries are already covered by the other claims.

don't accept the pleaded facts of the Complaint but instead rely on an alternative fantastical reality where "he wanted nothing more than" peace, patriotism, and election integrity. MTD at 32. The pleading standard makes such arguments irrelevant. What matters now is the allegations of the Complaint, and the Complaint pleads the required elements of the claims under D.C. law.

### A. *Plaintiffs' factual allegations and inferences support their claims that Trump "directed," and aided and abetted assault and battery.*

#### 1. *Trump directed the assault and battery of the plaintiffs.*

A plaintiff can recover for assault by proving "intentional and unlawful attempt or threat, either by words or acts, to do physical harm," and for battery by proving an "intentional act that causes harmful or offensive bodily contact." *District of Columbia v. Chinn*, 839 A.2d 701, 705 (D.C. 2003). Specific intent to cause harmful or offensive contact is required. *See Acosta Orellana v. CropLife Int'l*, 711 F. Supp. 2d 81, 91 (D.D.C. 2010). A defendant must act "for the purpose of bringing about a harmful or offensive contact or an apprehension of such contact to another or to a third person or with knowledge that such a result will, *to a substantial certainty*, be produced by his act." *Id.* (emphasis added). The Complaint alleges these elements; as a result, the directing assault and battery claim should survive the Motion to Dismiss even assuming, for the sake of argument, plaintiffs don't substantiate a principal-agent relationship. (Trump cites no authority, MTD at 37-38, that such a relationship is a prerequisite for tort liability.)

*He acted*: Trump told his supporters to "go to the Capitol," to "fight like hell," to "go by very different rules," and to "take back our country." Compl. ¶ 60. This prompted his supporters on the Ellipse to chant, "Storm the Capitol" and "Fight for Trump," among other things, *id.* ¶ 61, while they started marching toward the Capitol after Trump's speech. *Id*. ¶ 69. And as Trump was speaking at the Ellipse, his supporters at the Capitol began chanting pro-Trump slogans and at 12:53 pm stormed the outer barricades of the Capitol. *Id.* ¶¶ 58, 65-66.

*With intent*: Trump's arguments that he did not intend for violence to occur at the Capitol—that he wanted a "peaceful" protest—are undermined by his conduct during the insurrection itself. Trump was "delighted" when he heard about the insurrection at the Capitol and was particularly excited when he heard that the insurrectionists were "pushing against Capitol Police trying to get into the building." *Id.* ¶ 115. He mocked Minority Leader McCarthy's urgent request to call off the insurrection. *Id.* ¶ 114. Trump's conduct demonstrates that he intended for his followers to do exactly as he had directed: march to the Capitol to stop Congress from counting votes by fighting like hell and operating under "very different rules." *Id.* ¶ 60. Had he felt otherwise, he would have acted otherwise.

*And substantial certainty*: Trump knew that his provocations of his supporters, urging them to go to Washington to "stop the steal," had led to violence against police officers twice in the months before January 6. Compl. ¶¶ 23-28. He had also been warned that he was "inspiring people to commit potential acts of violence" and that "[s]omeone is going to get shot" because of his lies about the election. *Id.* ¶ 29. And of course, Trump knew that the U.S. Capitol—and the Members of Congress and Vice President going about their business inside—was guarded by plaintiffs and their fellow officers of the United States Capitol Police, who would stand in the way of any attempt to invade the Capitol. So when he told the crowd with a demonstrated proclivity towards political violence that the rules didn't apply to them, that they should fight, and pointed them to the Capitol, *id.* ¶ 60, he would have had substantial certainty that he was urging the crowd to assault the Capitol Police guarding the building.

*To cause offensive contact*: Trump does not dispute that plaintiffs were injured during the insurrection. And while Trump disputes that he is responsible, the Complaint sufficiently pleads that Trump's supporters, acting on his direction, attacked the plaintiffs physically and placed

them in fear of imminent physical harm. *Id.* ¶¶ 158-59.

    2.  *Trump aided and abetted the assaults and batteries on plaintiffs.*

To support a claim for aiding and abetting, a plaintiff must allege that (1) the party [who the] defendant aided committed battery, (2) defendant was generally aware of their role in the tortious activity, and (3) defendant knowingly and substantially assisted in the battery. *See Kurd v. Republic of Turkey*, 374 F. Supp. 3d 37, 50 (D.D.C. 2019).

The first two factors are plainly satisfied. Trump's supporters at the Capitol battered plaintiffs. Compl. ¶ 164. Likewise, he was generally aware of his role in the insurrection. A defendant can be "generally aware" of the tortious activity if they knowingly create "a violent atmosphere in which others might be physically injured." *Kurd*, 374 F. Supp 3d at 50. Here, Trump summoned individuals and groups he knew had significant proclivities towards political violence and then gave them a speech calculated to incite them towards violence. Compl. ¶¶ 38, 45, 60, 147, 152, 154, 164.

The substantial assistance factor is also supported by clearly stated factual allegations and inferences the court must accept as true. "Suggestive words may also be enough to create joint liability when they plant the seeds of action and are spoken by a person in an apparent position of authority." *Halberstam*, 705 F.2d at 481-82. Here, Trump did just that: he told violent militiamen to "stand by" in case the election didn't go his way; pushed the "big lie" regarding the "stolen" election; called his most violent supporters to D.C.; and then incited them to insurrection. Compl. ¶¶ 38, 45, 60, 147, 152, 154, 164. Or, as Senator McConnell put it, Trump is "responsible for provoking the events of the day. The people who stormed this building believed they were acting" on Trump's "wishes and instructions" and that "belief was a foreseeable consequence of the growing crescendo of false statements, conspiracy theories and reckless hyperbole" Trump "kept shouting into the largest megaphone on planet Earth." *Id.* ¶ 147.c. Plaintiffs' case is not

merely based, as Trump argues, on Trump's schadenfreude as the Capitol Police were attacked, MTD at 36-38, but rather on a pattern of substantial assistance over a multi-month period where Trump played a unique role—that no other individual in America could have played—in assembling and inciting an insurrectionist mob to storm Congress. Trump may now contend that he was simply interested in election integrity and peace and patriotism, but that is a jury question for which he will need actual facts and evidence, not mere fantasy and spin.

### B. Plaintiffs adequately pleaded civil conspiracy.

To allege an unlawful civil conspiracy, plaintiffs must show "an agreement to do an unlawful act or a lawful act in an unlawful manner; an overt act in furtherance of the agreement by someone participating in it; and injury caused by the act." *Halberstam*, 705 F.2d at 487. Plaintiffs allege just that. Compl. ¶¶ 225-28. The Complaint plausibly alleges a conspiracy to violate the Klan Act between Trump and the right-wing nationalists that stormed the Capitol and battered the plaintiffs. *See* supra Section III.A. That necessarily establishes that the plaintiffs have also sufficiently alleged a conspiracy claim against Trump for the purposes of District of Columbia conspiracy law, particularly as this conspiracy had multiple unlawful objectives (including, among other things, obstructing Congress and assaulting law enforcement).

## V.    The First Amendment does not shield Trump's conduct and words.

### A. There is no First Amendment right to engage in a conspiracy to incite violence, direct assault and battery, obstruct Congress, and injure federal officers.

The Complaint provides ample factual allegations and inferences that Trump conspired with his followers to stage an attack on the Capitol. Compl. ¶¶ 213-224. It further alleges that Trump intentionally incited violence and other lawless behavior, and intentionally directed and aided and abetted assaults on the Capitol Police. *Id.* ¶¶ 150-168, 220-221. Trump's First Amendment defense accordingly fails before it begins: the First Amendment neither bars the

plaintiffs from using Trump's speech as evidence of his participation in unlawful acts, nor grants him a right to engage in speech integral to criminal or tortious conduct, nor grants him a right to incite violence.[13]

The First Amendment "does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent," *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993), and Trump had no First Amendment right whatsoever to engage in the wide swath of criminal and tortious conduct plausibly charged by the Complaint. There's no First Amendment right to conspire to use force against the federal government.[14] There's no First Amendment right to trespass or block access to public buildings, let alone invade them.[15] There's no First Amendment right to engage in assault or battery.[16] And there's no First Amendment right to aid or abet criminal activity, even when the direction or aiding-or-abetting is carried out through words.[17] As a result, even if some of the best evidence of his unlawful acts could otherwise be characterized as political speech, Trump can be held accountable for the unlawful conduct alleged in the Complaint without offending the First Amendment. His authorization, direction,

---

[13] Trump also raises no First Amendment challenge to the common law tort claims (claims 1, 2, and 8). As a result, any First Amendment defense to those claims is waived.

[14] *See, e.g.*, *United States v. Rahman*, 189 F.3d 88, 115 (2d Cir. 1999) (statute banning conspiracies to "*use* force" "passes the test of constitutionality"); *see also Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949) (no First Amendment right to unlawfully conspire).

[15] *See Cox v. Louisiana*, 379 U.S. 536 (1965); *United States v. Soderna*, 82 F.3d 1370, 1376 (7th Cir. 1996).

[16] *See Mitchell*, 508 U.S. at 484.

[17] *See, e.g.*, *Nat'l Org. for Women v. Operation Rescue*, 37 F.3d 646, 655-56 (D.C. Cir. 1994); *see also Rice v. Paladin Enters.*,, 128 F.3d 233, at 246-47 (4th Cir. 1997).. ("*Brandenburg*[] . . . poses little obstacle to the punishment of speech that constitutes . . . aiding and abetting, because "culpability . . . is premised . . . on defendants'Defendants' successful efforts to assist others ...").

and ratification of "specific tortious activity . . . justify holding him responsible for the consequences of that activity." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 927 (1982).

The First Amendment also does not extend to advocacy that "is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969). *Brandenburg* requires that the inciter must intend to produce imminent lawless action, and the speech in question has to be objectively likely to produce that action. When that threshold is met, the inciter can be held liable "for unlawful conduct that in fact followed within a reasonable period." *Claiborne Hardware*, 458 U.S. at 927. The First Amendment does not insulate a speaker "from responsibility for his actions simply because he may have disseminated his message to a wide audience." *Rice v. Paladin Enters.*, 128 F.3d 233, 248 (4th Cir. 1997).

The Complaint alleges sufficient facts to survive *Brandenburg*. It alleges that Trump spoke on January 6 with the specific goal of inciting the mob to violently invade Congress and that *he succeeded in that goal*. Compl. ¶¶ 220-21; *see also id.* ¶¶ 10, 116, 147.b-c, 148-149, 151-154, 216, 213. And though the Motion to Dismiss attempts to rebut the well-pleaded allegations of the Complaint by plucking words such as "peacefully" and "patriotically," MTD at 25, from Trump's January 6 speech out of the speech's broader context and message, that argument fails.

For one, Trump's argument is irreconcilable with his reaction to the storming; a speaker insisting on peacefulness and not intending to provoke violence would not have been "delighted," Compl. ¶ 115, and watching "happily . . . as the chaos unfolded," *id.* ¶ 147.c. It is irreconcilable with the widespread recognition from his own party's leaders and others that Trump's acts on and before January 6 caused the storming of Congress. *Id.* ¶ 147. It is also irreconcilable with the standard of review, where the Court must (i) accept the well-pleaded

factual allegations of the Complaint and (ii) construe all reasonable factual inferences in plaintiffs' favor. *See Twombly*, 550 U.S. at 570. That means this Court should accept the reasonable inference supported by the well-pleaded facts in the Amended Complaint that Trump intended the natural and probable consequence, Compl. ¶¶ 220-221—namely, the storming of Congress—of exhorting a mob prone to political violence that he had knowingly assembled, *id.* ¶¶ 15, 22, 26, 28-29, that they should "fight like hell" and were "allowed to go by very different rules" given his (spurious, yet nonetheless oft-repeated) accusations of fraud. Indeed, *juries* have long been permitted to infer that defendants intend the natural and probable consequences of the acts they knowingly do *at trial*, *United States v. Mejia*, 597 F.3d 1329, 1341 (D.C. Cir. 2010), so it necessarily follows that a court should give the benefit of the inference now.

Trump will have the opportunity later to try to show that he intended to provoke nothing more than peaceful patriotism. But a motion to dismiss is not when he gets to argue that he has a First Amendment defense based on a version of events that is amnesiac as to what actually occurred and contrary to the allegations of the Complaint. The Motion to Dismiss on First Amendment grounds must be judged on the facts alleged in the Complaint and should be denied because there is no First Amendment right for a failed candidate to conspire to incite the storming of Congress to stop the electoral vote count from confirming a rival candidate's election victory.[18]

---

[18] Framing Trump's First Amendment right as one of petition rather than speech (as he hints but never actually argues) doesn't change that result. The right to petition Congress doesn't extend to invading it, *see*. *See Soderna*, 82 F.3d at 1375, any more than the right of access to the courts grants the right to invade and disrupt a courtroom during a trial. Moreover, the right to petition doesn't grant the right to engage in "sham" petitions, which a plan to violently invade Congress surely must count as. *See generally Venetian Casino Resort, LLC v. NLRB*, 793 F.3d 85, 92 (D.C. Cir. 2015)

**B.   Trump's attacks on D.C. Anti-Riot Act are irrelevant to the portion plaintiffs are proceeding under.**

The D.C. Anti-Riot Act bans both (1) "willfully incit[ing]" and (2) "urg[ing] other persons to engage in a riot." D.C. Code § 22-1322(c). The Motion to Dismiss argues that the latter portion of § 22-1322(c) that bans speech urging a riot could be unconstitutional if interpreted too broadly. MTD at 26. That argument is beside the point and requests an impermissible advisory opinion. Plaintiffs are proceeding under the portions of the D.C. Anti-Riot Act banning willful incitement, which the Complaint plausibly alleges. *See* Section V.A. This Court need not consider a constitutional challenge (let alone a facial challenge) to statutory language that plaintiffs are not proceeding under.

**C.   Trump does not demonstrate a sufficiently "real" constitutional problem to justify application of the avoidance canon to the Klan Act.**

Trump advocates that this Court should adopt a construction of the Klan Act to avoid supposed (but unspecified) constitutional issues created by the overbreadth and vagueness doctrines. MTD at 27-28. And while both those arguments fail, so little is explained that the Court should deem arguments waived. *See Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983) (declining to entertain "asserted but unanalyzed constitutional claim"). Left unexplained is the standard for overbreadth and how a statute like the Klan Act that encompasses a wide range of non-speech conduct (such as conspiracies to assassinate federal agents) would be *unconstitutionally* overbroad. Likewise, unexplained is how the Act fails to give fair notice that it is illegal to conspire to attack federal officers and assault a federal building.

But even if this Court does not deem the argument waived, the Court should still reject it. Constitutional avoidance should be reserved for avoiding serious constitutional questions—not eviscerating clear statutes whenever counsel can hypothesize that a statute could possibly be broken by words. *See Am. Fed'n of Gov't Employees, AFL-CIO v. United States*, 330 F.3d 513,

519 (D.C. Cir. 2003) (explaining "that the constitutional doubt must be 'real'"). And here Trump's argument falls short of demonstrating the sort of clear constitutional infirmity necessary to justify constitutional avoidance or otherwise narrowing the clear text of the Act.

In particular, Trump's constitutional avoidance argument appears to be based on three propositions: (1) This Court should adopt an interpretation of the Klan Act that "an agreement to engage in lawful political speech and assembly with others is no conspiracy at all." MTD at 28. (2) The pleading standard should require "an actual agreement to perform an overt act that extends beyond protected political speech." MTD at 28. (3) Such a pleading standard is necessary to avoid the constitutional doubts that would supposedly be created if politicians could be held vicariously liable under the Klan Act for the actions of their supporters. MTD at 27.

That argument fails. To be sure, plaintiffs agree that merely giving a lawful political speech and assembling with others does not violate the Act. But that point is circular—it assumes that the speech is lawful—and the Complaint alleges that Trump did far more than agree to give a lawful political speech and assemble with supporters. And the other two propositions of Trump's argument have legal infirmities that are fatal to his constitutional avoidance argument, so the issue of constitutional avoidance can itself be avoided until another day.

> 1.  *Trump's proposed pleading standard that conspirators need to agree to particular overt acts would upend centuries of conspiracy law.*

The suggestion that the Klan Act should require an actual agreement to perform an overt act that extends beyond protected political speech, MTD at 28, confuses the difference between the object of the conspiracy and an overt act. Co-conspirators become liable when they agree to a general plan with an unlawful *objective*; they need not agree to every *overt act* before liability

attaches.[19] As a result, the proposed pleading standard is nonsensical: the agreement (or the lack of an agreement) to a particular overt act cannot insulate a co-conspirator from liability for the simple reasons that (1) it is the unlawful agreement—and not the overt act—that's giving rise to liability and (2) there is no First Amendment right to agree to participate in an illegal conspiracy.[20] And even were Trump's novel you-must-agree-to-certain-overt-acts standard the law, it still would not justify dismissing the Complaint insofar as it plausibly alleges Trump's agreement with the scheme to storm Congress, Compl. ¶ 216, and indeed, notes his visible delight at the sight of the assault on the Capitol Police, *id.* ¶ 221.

> 2.   *The Klan Act is neither constitutionally vague nor overbroad.*

Trump's unexplained vagueness and overbreadth challenges fail to justify narrowing a 150-year old statutory provision whose criminal analog has already been upheld against facial vagueness and overbreadth challenges. *See, e.g.*, *United States v. Fulbright*, 105 F.3d 443, 452 (9th Cir. 1997), *overruled on other grounds by United States v. Heredia*, 483 F.3d 913, 921-22 (9th Cir. 2007).

There is no as-applied vagueness problem here: applying the *Ku Klux Klan Act* to an armed conspiracy to assault a federal building and assault and injure federal officials to disrupt the proceedings of the federal government is crystal clear and far exceeds the minimum

---

[19] *See, e.g.*, *Halberstam v. Welch*, 705 F.2d 472, 481 (D.C. Cir. 1983 ("[A conspirator] need not even have planned or known about the injurious action . . . so long as the purpose of the tortious action was to advance the overall object . . . ." (cleaned up))..").

[20] *See, e.g.*, *Giboney*, 336 U.S. at 498. To be sure, some additional First Amendment scrutiny might be warranted where the *objective* itself of the conspiracy (and not merely one of the overt acts) is political speech, *see, e.g.*, *Barr v. Clinton*, 370 F.3d 1196, 1204 (D.C. Cir. 2004) (applying heightened First Amendment standard to Klan Act where unlawful objective was disseminating embarrassing information about politician). But that is not *this* case: the objective here—the illegal storming of Congress—has no First Amendment protection, *see supra* Section V.A, and the political speech is (at best) merely one of *many* overt acts taken in furtherance of the conspiracy.

constitutional threshold for vagueness. "Perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity," *United States v. Williams*, 553 U.S 285, 304 (2008), and the Klan Act gives "a person of ordinary intelligence fair notice," *id.*, that a conspiracy to lead a mob attack against Congress is prohibited.

The facial vagueness challenge does no better. Trump's brief appears to primarily base his vagueness challenge on the prospect that there may be some close cases where politicians could be held liable when their supporters riot after a speech. MTD at 27. That is not a vagueness problem at all: the Klan Act only renders such action illegal when there's an *agreement* to engage in an unlawful conspiracy proscribed by the Act, and the mere fact that "it will sometimes be difficult to determine whether the incriminating fact" (under Trump's hypothetical, the tacit agreement between a politician and supporters) does not create a vagueness problem under the Due Process Clause. *Williams*, 553 U.S. at 306; *see, e.g.*, *Act Now to Stop War & End Racism Coal. & Muslim Am. Soc'y Freedom Found. (ANSWER) v. District of Columbia*, 846 F.3d 391, 418 (D.C. Cir. 2017). All it does is make for challenging jury fact-finding in some situations, but that is inherent in every claim where the jury has to draw inferences about a particular defendant's state of mind. *Williams*, 553 U.S. at 306-07.

Moreover, though Trump tries to buttress his vagueness argument by raising the prospect of selective enforcement, MTD at 27, he does not show unconstitutional vagueness. "In any system that relies on the administration of laws of general applicability in many different circumstances, some degree of ambiguity is all but inevitable." *ANSWER*, 846 F.3d at 411. The Klan Act's prohibitions on unlawfully conspiring to use "force, intimidation, and threat" and "injury" give juries and courts "reasonably clear guidelines" to enforce the provisions of the Act, *id.* at 410, and that is all the Due Process Clause requires. Indeed, the guidelines given to juries

and courts by the Klan Act *must* be constitutional because they are no vaguer than other federal statutes banning conspiracy or solicitation. *See Williams*, 553 U.S. at 307 (rejecting vagueness challenge because statute is not any vaguer than statutes banning conspiracy and solicitation).

That leaves only the suggestion that plaintiffs' interpretation of the Act risks overbreadth. Not so. The Court has cautioned that overbreadth attacks are only appropriate where a statute's unconstitutional applications are "substantial, not only in the absolute sense, but also relative to the scope of the law's plainly legitimate applications," "particularly" where a law "reflects legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct." *Virginia v. Hicks*, 539 U.S. 113, 119-20 (2003) (cleaned up). Here, Trump does not substantiate *any* overbreadth on the part of plaintiffs' interpretation of the Klan Act, let alone a substantial one. Plus, the Klan Act prohibits a wide-swath of unlawful conduct—such as conspiracies to murder—that imperiled "[t]he operation of government" and "[c]ivil survival," *McCord*, 636 F.2d at 615, so it plainly furthers legitimate state interests in preventing harmful, constitutionally unprotected conduct. The overbreadth challenge fails: the legitimate reach of the Act's prohibitions against actions that obstruct the workings of the federal government by injuring its agents dwarfs any potential unconstitutional scope based on hypotheticals Trump's counsel may (but has yet to) concoct.[21]

## CONCLUSION

Immunizing Trump from tort liability for his words and conduct that led to the January 6 insurrection would put him above the law. No court concerned with upholding the Constitution

---

[21] And even if Trump can come up with hypotheticals Klan Act violations occasioned by words alone, that does not automatically equate to a First Amendment violation. *See Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*, 547 U.S. 47, 62 (2006) (no right to post sign reading "White Applicants Only").

has ever come close to doing what he seeks. The Motion to Dismiss should be denied (except as to the intentional infliction of emotional distress claim which should be dismissed without prejudice).

/s/ Patrick A. Malone
Patrick A. Malone (Bar No. 397142)
Daniel Scialpi (Bar No. 997556)
Heather J. Kelly (Bar No. 453154)
PATRICK MALONE & ASSOCIATES, P.C.
1310 L Street, N.W., Suite 800
Washington, D.C. 20005
P: 202-742-1500
F: 202-742-1515
pmalone@patrickmalonelaw.com
dscialpi@patrickmalonelaw.com
hkelly@patrickmalonelaw.com

Anne Tindall (Bar No. 494607)
Cameron Kistler (Bar No. 1008922)
Erica Newland (*motion for admission pending*)
UNITED TO PROTECT DEMOCRACY
2020 Pennsylvania Ave. NW, #163
Washington, D.C. 20006
P: 202-579-4582
anne.tindall@protectdemocracy.org
cameron.kistler@protectdemocracy.org
erica.newland@protectdemocracy.org

John Paredes (Bar No. NY0418)
UNITED TO PROTECT DEMOCRACY
115 Broadway, 5th Floor
New York, N.Y. 10006
P: 202-579-4582
john.paredes@protectdemocracy.org

Benjamin L. Berwick (Bar No. MA0004)
UNITED TO PROTECT DEMOCRACY
15 Main St., Suite 312
Watertown, MA 02472
P: 202-579-4582
ben.berwick@protectdemocracy.org

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 22nd day of July 2021, I served a copy of the foregoing *via* the

Court's electronic filing system (ECF) on:

> Jesse R. Binnall
> The Binnall Law Group, PLLC
> 717 King Street, Suite 200
> Alexandria, Virginia 22314
>
> *Attorney for the Defendant*


/s/ Daniel C. Scialpi