**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JAMES BLASSINGAME and
SIDNEY HEMBY,

                    *Plaintiffs*,

     v.

DONALD J. TRUMP,

                    *Defendant*.

Case No. 1:21-cv-00858 (APM)

## BRIEF OF LAW PROFESSORS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS

Elizabeth B. Wydra (DC Bar No. 483298)
Brianne J. Gorod (DC Bar No. 982075)
Dayna J. Zolle (DC Bar No. 1672633)
CONSTITUTIONAL ACCOUNTABILITY
   CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

INTEREST OF *AMICI CURIAE* ......................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ....................................... 1

ARGUMENT ....................................................................................................... 4

I.    Absolute Presidential Immunity Does Not Shield a Former President Sued in
      His Personal Capacity from Damages Liability for Unofficial Conduct .............. 4

      A.   The Supreme Court Has Held that Absolute Presidential Immunity Extends
           to the Outer Perimeter of a President's Official Responsibility—And No
           Further ........................................................................................................ 4

      B.   Trump's Conduct in Allegedly Inciting a Riot at the Capitol to Forcibly
           Disrupt a Constitutionally Mandated Session of Congress Went Far
           Beyond the Outer Perimeter of His Official Responsibility and Does Not
           Warrant Absolute Immunity ........................................................................ 7

II.   The Separation of Powers Concerns and Public Policy Considerations
      Underlying the Supreme Court's Immunity Precedent Further Compel the
      Denial of Trump's Claim for Absolute Immunity ............................................ 11

CONCLUSION ................................................................................................... 15

APPENDIX: LIST OF *AMICI* ........................................................................... 1A

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Barr v. Matteo,*
360 U.S. 564 (1959) ................................................. 5

*Butz v. Economou,*
438 U.S. 478 (1978) ................................................. 4

*Chastain v. Sundquist,*
833 F.2d 311 (D.C. Cir. 1987) ................................... 4

*Clinton v. Jones,*
520 U.S. 681 (1997) ................................................. *passim*

*Forrester v. White,*
484 U.S. 219 (1988) ................................................. 7

*Ferri v. Ackerman,*
444 U.S. 193 (1979) ................................................. 3, 5

*Halperin v. Kissinger,*
606 F.2d 1192 (D.C. Cir. 1979) ................................. 11, 13

*Harlow v. Fitzgerald,*
457 U.S. 800 (1982) ................................................. 12

*Kissinger v. Halperin,*
452 U.S. 713 (1981) ................................................. 11

*Nixon v. Fitzgerald,*
457 U.S. 731 (1982) ................................................. *passim*

*Nixon v. Sirica,*
487 F.2d 700 (D.C. Cir. 1973) ................................... 11

*Pierson v. Ray,*
386 U.S. 547 (1967) ................................................. 5, 12

*Spalding v. Vilas,*
161 U.S. 483 (1896) ................................................. 5

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

*Trump v. Vance,*
    140 S. Ct. 2412 (2020) ........................................................................ 3, 5, 11

*United States v. Lee,*
    106 U.S. 196 (1882) ........................................................................ 4

*United States v. Nixon,*
    418 U.S. 683 (1974) ........................................................................ 5

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952) ........................................................................ 8

## CONSTITUTIONAL PROVISIONS, STATUTES, AND LEGISLATIVE MATERIALS

3 U.S.C. §§ 1-21 ........................................................................ 9

3 U.S.C. § 15 ........................................................................ 9

U.S. Const. amend. XII ........................................................................ 9

U.S. Const. amend. XX ........................................................................ 9

U.S. Const. amend. XXII ........................................................................ 9

U.S. Const. art. II, § 1 ........................................................................ 9

U.S. Const. art. II, § 1, cl. 3 ........................................................................ 2

U.S. Const. art. II, § 3 ........................................................................ 9

## OTHER AUTHORITIES

Am. Compl., *Thompson v. Trump*, No. 1:21-cv-400 (D.D.C. Apr. 7, 2021) ................. 2

Compl., *Swalwell v. Trump*, No. 1:21-cv-586 (D.D.C. Mar. 5, 2021) .......................... 2

Evan Caminker, *Democracy, Distrust, and Presidential Immunities*,
    36 Const. Comment. (forthcoming 2021) ........................................................ 14

## INTEREST OF *AMICI CURIAE*[1]

*Amici* are law professors whose teaching and research focus on constitutional law, executive immunity, and separation of powers principles.  Given their expertise, *amici* have a substantial interest in ensuring that this Court understands that, under binding Supreme Court precedent, a president is not entitled to absolute immunity for actions taken outside the outer perimeter of his official responsibility and that proper application of that precedent compels the conclusion that former President Donald Trump is not entitled to absolute immunity for the private conduct challenged here.  *Amici* also have a strong interest in ensuring that this Court recognizes that the separation of powers principles and public policy considerations that form the foundation for that precedent further compel the denial of Trump's bid for absolute immunity.

A full listing of *amici* appears in the Appendix.

## INTRODUCTION AND SUMMARY OF ARGUMENT

On January 6, 2021, then-President Donald Trump allegedly "conspired with his followers to stage an attack on the Capitol to prevent Congress and Vice President Mike Pence, by force, intimidation, or threat, from discharging their duties of certifying the winners of the 2020 presidential election."  Am. Compl. ¶ 216, ECF No. 3.  As the Amended Complaint explains, Article II, Section 1 of the Constitution and the Twelfth Amendment require Congress to count and certify the Electoral College's votes for president and vice president.  *See id.* ¶¶ 41-44. Plaintiffs James Blassingame and Sidney Hemby are U.S. Capitol Police officers who allege that they were on duty at the Capitol when "[t]he insurrectionist mob, which Trump had inflamed, encouraged, incited, directed, and aided and abetted, forced its way over and past [them] and their

---

[1] *Amici* state that no counsel for a party authored this brief in whole or in part, and no person other than *amici* or their counsel made a monetary contribution to the brief's preparation or submission.

fellow officers, pursuing and attacking them inside and outside the United States Capitol."  *Id.*
¶ 10.   Plaintiffs allege that Trump's "unlawful conduct," *id.* ¶ 11, caused them to suffer both
physical and emotional injuries, *see id.* ¶¶ 134-37, 140-45.   Twelve members of Congress have
made similar allegations in two related cases also pending in this Court.  *See* Am. Compl. ¶¶ 1-3,
*Thompson v. Trump*, No. 1:21-cv-400 (D.D.C. Apr. 7, 2021); Compl. ¶¶ 9-11, *Swalwell v. Trump*,
No. 1:21-cv-586 (D.D.C. Mar. 5, 2021).

   Trump argues that absolute presidential immunity bars Plaintiffs' claims against him.  *E.g.*,
Trump Mot. to Dismiss 7, ECF No. 10-1.   This Court should reject that argument, however,
because it is foreclosed by the application of well-established Supreme Court precedent, as well
as the separation of powers concerns and public policy considerations underlying that precedent.

   Although the Supreme Court has held that a president enjoys absolute immunity "from
damages liability for acts within the 'outer perimeter' of his official responsibility," *Nixon v.
Fitzgerald*, 457 U.S. 731, 756 (1982), the Court has made clear that absolute immunity does not
extend to any "unofficial conduct" that falls beyond that outer perimeter, *Clinton v. Jones*, 520
U.S. 681, 693 (1997); *see also id.* at 694 (explaining that the Court's reasoning in *Fitzgerald*
"provides no support for an immunity for *unofficial* conduct").   In allegedly inciting a riot at the
U.S. Capitol to forcibly interfere with Congress's certification of the 2020 presidential election
results, *see* Am. Compl. ¶¶ 10, 216, 226—conduct for which Plaintiffs have sued Trump in his
personal capacity, *id.* ¶ 40—Trump acted well beyond the scope of his official responsibility as
president.   Indeed, Trump took the alleged actions not as president, but as a *candidate* running for
president who, having lost the election, was trying to prevent the democratic process mandated by
the Constitution from playing out.   *Id.* ¶¶ 18, 40.   The Constitution and federal law expressly
require Congress to certify the Electoral College's votes, *see* U.S. Const. art. II, § 1, cl. 3, and this

constitutionally mandated process was ongoing when Trump allegedly prompted his supporters to engage in "tumultuous and violent conduct," Am. Compl. ¶ 185, to interfere with it.

Significantly, the Supreme Court has held that presidents are entitled to immunity for their official conduct because, in the Court's view, absolute presidential immunity is needed to preserve the separation of powers and serve the public interest.  The Court has explained that because a president's "duties . . . are of unrivaled gravity and breadth," *Trump v. Vance*, 140 S. Ct. 2412, 2425 (2020), separation of powers principles dictate that courts must refrain from reviewing a president's official actions in private suits for damages, as the threat of such litigation could inhibit the performance of his official functions, *see Fitzgerald*, 457 U.S. at 749-54.  Relatedly, the Court has recognized that in cases challenging the exercise of a president's most sensitive official functions, "there exists the greatest public interest in providing [the president] 'the maximum ability to deal fearlessly and impartially with' the duties of his office."  *Id.* at 752 (quoting *Ferri v. Ackerman*, 444 U.S. 193, 203 (1979)).  Trump, however, seeks to invoke the immunity doctrine as a shield from damages liability for private conduct that allegedly sought to serve his own private interests as a candidate for office by forcibly interfering with the constitutionally mandated functions of Congress.  This Court should not allow Trump to do so.  Instead, the application of binding Supreme Court precedent, as well as separation of powers principles and public policy considerations, compel the denial of Trump's bid for absolute immunity for his personal efforts to incite a crowd to forcibly disrupt congressional proceedings and infiltrate the "People's House."

**ARGUMENT**

I.     **Absolute Presidential Immunity Does Not Shield a Former President Sued in His Personal Capacity from Damages Liability for Unofficial Conduct.**

   A.     **The Supreme Court Has Held that Absolute Presidential Immunity Extends to the Outer Perimeter of a President's Official Responsibility—And No Further.**

As the Supreme Court has repeatedly declared, "No man in this country is so high that he is above the law. . . . [The law] is the only supreme power in our system of government, and every man who by accepting office participates in its functions is only the more strongly bound to submit to that supremacy." *United States v. Lee*, 106 U.S. 196, 220 (1882); *accord Butz v. Economou*, 438 U.S. 478, 506 (1978).

Consistent with this maxim, although the Supreme Court has held that a president is absolutely immune from private suits for damages challenging his "*official acts*," *Fitzgerald*, 457 U.S. at 754 (emphasis added)—or "acts within the 'outer perimeter' of his official responsibility," *id.* at 756—it has "never suggested that the President, or any other official, has an immunity that extends beyond the scope of any action taken in an official capacity," *Jones*, 520 U.S. at 694.  In fact, the Court has flatly rejected the notion that absolute presidential immunity applies to conduct beyond the "outer perimeter" of the president's official responsibility, and it has held that a president remains "subject to the laws for his purely private acts."  *Id.* at 696; *cf. Chastain v. Sundquist*, 833 F.2d 311, 315 (D.C. Cir. 1987) (recognizing that absolute executive privilege is "subject only to the requirement that [executive officials'] actions fall within the outer perimeter of their official duties").  In applying the Supreme Court's binding precedent, this Court must reject the former president's "effort to construct an immunity from suit for *unofficial* acts grounded purely in the identity of his [former] office." *Jones*, 520 U.S. at 695 (emphasis added).

The Supreme Court has long applied this "outer perimeter" test to determine the scope of official immunity in other contexts, *see, e.g.*, *Barr v. Matteo*, 360 U.S. 564, 575 (1959) (noting that the fact "that the action here taken was within the outer perimeter of petitioner's line of duty is enough to render the privilege applicable"); *Spalding v. Vilas*, 161 U.S. 483, 498 (1896) (acknowledging that immunity covers the scope of one's "official acts"), and it adopted that test in the context of adjudicating a claim of absolute presidential immunity in *Nixon v. Fitzgerald*, a private suit for civil damages against former President Richard Nixon for "actions allegedly taken in the former president's official capacity during his tenure in office," 457 U.S. at 733. The respondent in that case, a former management analyst with the U.S. Air Force, challenged Nixon's involvement in his dismissal from that post, which he alleged violated two federal statutes and the First Amendment. *Id.* at 733-34, 740.

In holding that a president "is entitled to absolute immunity from damages liability *predicated on his official acts*," *id.* at 749 (emphasis added), the Supreme Court reasoned "that the Presidential privilege is 'rooted in the separation of powers under the Constitution,'" *id.* at 753 (quoting *United States v. Nixon*, 418 U.S. 683, 708 (1974)). The Court explained that "[b]ecause of the singular importance of the President's duties," *id.* at 751, and because "a President must concern himself with matters likely to 'arouse the most intense feelings,'" *id.* at 752 (quoting *Pierson v. Ray*, 386 U.S. 547, 554 (1967)), the president must be able to "make the most sensitive and far-reaching decisions entrusted to any official under our constitutional system," *id.* at 752, without fear of private litigation for damages. The threat of such litigation, the Court observed, would "distract a President from his public duties." *Id.* at 753; *see also id.* at 752 (recognizing that immunity "provid[es] an official 'the maximum ability to deal fearlessly and impartially with' the duties of his office" (quoting *Ferri*, 444 U.S. at 203)); *Vance*, 140 S. Ct. at 2425 ("[The president's]

duties . . . are of unrivaled gravity and breadth.  Quite appropriately, those duties come with protections that safeguard the President's ability to perform his vital functions.").  Thus, the Court has determined that when a president makes those decisions constitutionally entrusted to him as president, separation of powers principles dictate that courts should refrain from entertaining private suits for damages challenging that official conduct, as such suits could infringe on the president's ability to do his job.  *See Fitzgerald*, 457 U.S. at 762 (Burger, C.J., concurring) ("Exposing a President to civil damages actions *for official acts within the scope of the Executive authority* would inevitably subject Presidential actions to undue judicial scrutiny . . . ." (emphasis added)).

In applying its "outer perimeter" test to the facts in *Fitzgerald*, the Court determined that "[i]t clearly is within the President's constitutional and statutory authority to prescribe the manner in which the [Air Force] Secretary will conduct the business of the Air Force."  *Id.* at 757 (citing the relevant statute).  Thus, the Court concluded that former President Nixon's role in "prescribing reorganizations and reductions in force" was statutorily "mandate[d]" by his office and "lay well within the outer perimeter of his authority."  *Id.*  His conduct was therefore unreviewable.  *See id.*

In *Clinton v. Jones*, the Court unanimously confirmed that absolute presidential immunity does not extend beyond the outer perimeter of a president's official responsibility.  520 U.S. at 694.  *Jones* was a private suit for damages against then-President Bill Clinton in which the respondent alleged that Clinton had sexually harassed her before he became president.  *Id.* at 684-86.  The Court examined the rationale underlying its decision in *Fitzgerald*—that "immunity serves the public interest in enabling such officials to perform *their designated functions* effectively without fear that a particular decision may give rise to personal liability," *id.* at 693 (emphasis added), and without "rendering the President 'unduly cautious in the discharge of *his*

*official duties*,'" *id.* at 694 (emphasis added) (quoting *Fitzgerald*, 457 U.S. at 752 n.32)—and concluded that "[t]his reasoning provides no support for an immunity for *unofficial* conduct," *id.* Thus, the Court determined that "[t]he principal rationale for affording certain public servants immunity from suits for money damages arising out of their official acts is inapplicable to unofficial conduct." *Id.* at 692-93.

Applying that rationale in *Jones*, the Court held that Clinton remained "subject to the laws for his purely private acts." *Id.* at 696; *see id.* at 705 ("[I]t must follow that the federal courts have power to determine the legality of his unofficial conduct.").  In doing so, the Court emphasized that "immunities are grounded in 'the nature of the function performed, not the identity of the actor who performed it,'" *id.* at 695 (quoting *Forrester v. White*, 484 U.S. 219, 229 (1988)), and it rejected Clinton's "effort to construct an immunity from suit for *unofficial* acts grounded purely in the identity of his office," *id.* (emphasis added).  The Court therefore concluded that the case against Clinton could proceed, even though he was president at the time of the lawsuit.  *See id.* at 705-06, 708.

### B.   Trump's Conduct in Allegedly Inciting a Riot at the Capitol to Forcibly Disrupt a Constitutionally Mandated Session of Congress Went Far Beyond the Outer Perimeter of His Official Responsibility and Does Not Warrant Absolute Immunity.

Although the president enjoys a wide breadth of authority, that does not mean that every action he takes lies within the outer perimeter of his official responsibility.  The Supreme Court recognized as much in *Jones* when it determined that conduct that predated the president's time in office fell outside this outer perimeter.  *See* 520 U.S. at 692-94.  Here, too, the actions that Trump allegedly took on and before January 6 as a disgruntled candidate for office—including inciting a riot at the U.S. Capitol to forcibly interfere with Congress's approval of the presidential election results—fell far outside the "outer perimeter" of his official responsibility as president, and he

therefore cannot invoke absolute presidential immunity to escape the consequences of those private actions.

As Plaintiffs explain in detail in the Amended Complaint, Trump took the alleged actions as a failed candidate for president, Am. Compl. ¶¶ 18, 40, and as part of an ongoing course of action "to prevent Congress . . . , by force, intimidation, or threat, from discharging [its] dut[y] of certifying the winners of the 2020 presidential election" and "to prevent, by force, intimidation, or threat, Joseph Biden and Kamala Harris from accepting and/or holding their respective offices as President and Vice President," *id.* ¶ 216. Trump frequently characterized the election as having been "rigged," *id.* ¶ 13, and "stolen," *id.* ¶ 17, and he repeatedly signaled his support for those who threatened to use violence to achieve his goals, *see id.* ¶ 12; *see, e.g.*, *id.* ¶ 14 (directing a white supremacist group called the Proud Boys to "stand back and stand by"). In promoting the January 6, 2021 rally, which he dubbed "the 'Stop the Steal' Rally," Trump told his supporters to "be there," as it would "be wild!" *Id.* ¶ 217.

When he spoke to the crowd that ultimately gathered on January 6, he explained that Congress was in the process of certifying the election results, telling the crowd that they would "never take back [their] country with weakness. You have to show strength, and you have to be strong." *Id.* ¶ 60. He declared, "[I]f you don't fight like hell, you're not going to have a country anymore," *id.*, prompting the crowd to chant, "Fight like Hell," "Fight for Trump," and "Storm the Capitol," *id.* ¶ 61. These statements and others allegedly incited thousands of "insurrectionists" to "br[eak] through police barricades and storm[] up the steps of the Capitol . . . , attacking and injuring police officers . . . . [and] finally enter[ing] the Capitol itself, intent on committing further acts of violence against elected officials." *Id.* ¶ 65.

Although Trump, unlike Clinton, allegedly performed the challenged conduct while he held the office of president, his alleged actions were nevertheless "unrelated to any of his official duties as President of the United States," *Jones*, 520 U.S. at 686, and therefore fell well "outside the outer perimeter" of his presidential responsibility, *Fitzgerald*, 457 U.S. at 756.  The president's power to act "must stem either from an act of Congress or from the Constitution itself."  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).  The Constitution, as originally written, gave Congress the responsibility to count Electoral College votes, *see* U.S. Const. art. II, § 1 (unamended Constitution), and although the Constitution has repeatedly been amended to address the election, succession, or removal of the president from office, it still specifies no role for the president in the process of counting and certifying those votes, *see, e.g.*, U.S. Const. amends. XII, XX, XXII.  Likewise, although Congress has legislated in great detail on this topic, it has also never authorized the president to participate in the counting of electoral votes.  *See* 3 U.S.C. §§ 1-21; *see, e.g.*, *id.* § 15 (stating that "Congress shall be in session on the sixth day of January succeeding every meeting of the electors" and that "[t]he Senate and House of Representatives shall meet in the Hall of the House of Representatives . . . on that day" to count and certify the electors' votes).

Moreover, there is plainly no constitutional or legislative authority for an incumbent president to encourage the violent disruption of a congressional proceeding—especially one constitutionally mandated for the democratic transfer of power.  In fact, the only circumstance in which the Constitution explicitly authorizes the president to adjourn Congress and thereby prevent it from meeting is when the House and Senate disagree as to the time for adjournment.  U.S. Const. art. II, § 3.  And even if a president can attempt to influence the process of counting and certifying electoral votes, the actions Trump allegedly took to promote the disruption of that process for his

personal gain "by force, intimidation, or threat," Am. Compl. ¶ 216, plainly exceeded his official responsibility as president.  Trump took the alleged actions as a *candidate* running for president who, having lost the election, was trying to prevent the democratic process mandated by the Constitution from playing out.  *Id.* ¶ 40.  Just as Trump would not be eligible for absolute immunity if he were a failed candidate for president who refused to leave office after his term, he is not eligible for absolute immunity as a failed candidate who, for his personal gain, allegedly encouraged the use of force to prevent Congress from certifying the election results.

This case is therefore very different than *Fitzgerald*, where the Court held that the president enjoyed absolute immunity from liability for civil damages.  In *Fitzgerald*, the Court determined that the challenged decision-making was "clearly . . . within the President's constitutional and statutory authority" and was indeed "mandate[d]" by his office, *id.* at 757.  Far from being "mandate[d]" by his office, however, Trump's alleged actions were wholly unauthorized by any legal authority.[2]  They were instead unofficial and motivated by his private interests.  The former president therefore cannot invoke absolute presidential immunity for his purely private acts, *see Jones*, 520 U.S. at 696, which fell well outside the outer perimeter of his official responsibility.

Thus, with the proper application of binding Supreme Court precedent, this Court must deny Trump's attempt to invoke absolute presidential immunity.  Moreover, as the next Section explains, the reasoning underlying that precedent—particularly the recognition that presidential immunity is grounded in separation of powers concerns and the public policy interest in the effective functioning of the federal government—further demonstrates why Trump should not be

---

[2] Trump's argument that his actions were "protected under the First Amendment," Trump Mot. to Dismiss 28, does not alter this analysis.  Whether or not Trump's speech was protected by the First Amendment has no bearing on the question whether he was acting within the outer perimeter of his *official responsibility* as president.  His was still purely private speech that he allegedly delivered specifically to interfere with official government functions.

absolutely shielded from liability in this case.  *See Fitzgerald*, 457 U.S. at 755 ("In defining the scope of an official's absolute privilege, this Court has recognized that the sphere of protected action must be related closely to the immunity's justifying purposes."); *accord Jones*, 520 U.S. at 694.

II.     **The Separation of Powers Concerns and Public Policy Considerations Underlying the Supreme Court's Immunity Precedent Further Compel the Denial of Trump's Claim for Absolute Immunity.**

Although "[t]he Constitution makes no mention of special presidential immunities," *Halperin v. Kissinger*, 606 F.2d 1192, 1211 (D.C. Cir. 1979) (quoting *Nixon v. Sirica*, 487 F.2d 700, 711 (D.C. Cir. 1973) (en banc)), *affirmed by an equally divided Court in Kissinger v. Halperin*, 452 U.S. 713 (1981), the Supreme Court has held, as explained above, that a president enjoys absolute immunity when performing his official functions because such immunity protects the separation of powers and the public interest.  The Court has explained that "[b]ecause the Presidency did not exist through most of the development of common law, any historical analysis must draw its evidence primarily from our constitutional heritage and structure," including the nature of the federal "government under a constitutionally mandated separation of powers" and "concerns of public policy."  *Fitzgerald*, 457 U.S. at 747-48.  In developing the presidential immunity doctrine, the Court "drew a careful analogy to the common law absolute immunity of judges and prosecutors, concluding that a President, like those officials, must 'deal fearlessly and impartially with the duties of his office'—not be made 'unduly cautious in the discharge of [those] duties' by the prospect of civil liability for official acts."  *Vance*, 140 S. Ct. at 2426 (alteration in original) (quoting *Fitzgerald*, 457 U.S. at 751-52 & n.32).

Thus, as Trump acknowledged in his Motion to Dismiss, the Court has indicated that presidential immunity stems from separation of powers principles and public policy concerns.  *See,*

*e.g.*, Trump Mot. to Dismiss 7 ("[C]ourts have long held that presidents are covered by absolute immunity, which is grounded in the principle of separation of powers and entrenched in precedent dating back to common law traditions."); *id.* at 9 (citing *Pierson*, 386 U.S. at 554, for the proposition that "immunity serves the public interest in preserving the independence and decisiveness necessary of government officials"). Indeed, Chief Justice Burger wrote a separate concurrence in *Fitzgerald* "to underscore that the Presidential immunity derives from and is mandated by the constitutional doctrine of separation of powers." 457 U.S. at 758 (Burger, C.J., concurring); *see id.* at 760 ("Absolute immunity for a President for acts within the official duties of the Chief Executive is either to be found in the constitutional separation of powers or it does not exist. The Court today holds that the Constitution mandates such immunity and I agree.").

As noted above, the separation of powers rationale behind absolute presidential immunity lies in ensuring that a president, as the nation's "Chief Executive," *id.* at 760, can make the decisions specifically entrusted to him, without needing to worry about private suits for damages challenging his official conduct. The public interest rationale for presidential immunity is similarly grounded in an understanding that immunity is "not for the protection or benefit of a malicious or corrupt [official], but for the benefit of the public, whose interest it is that the [officials] should be at liberty to exercise their functions with independence and without fear of consequences." *Id.* at 745-46. Thus, the Court has acknowledged that "an executive official's claim to absolute immunity must be justified by reference to the public interest in the special functions of his office, not the mere fact of high station." *Harlow v. Fitzgerald*, 457 U.S. 800, 812 (1982).

Neither of these two rationales underlying the doctrine of absolute presidential immunity supports Trump's argument for the application of that doctrine in this case. In fact, they counsel

strongly against it.  As Chief Justice Burger explained, "[t]he essential purpose of the separation of powers is to allow for independent functioning of each coequal branch of government within its assigned sphere of responsibility, free from risk of control, interference, or intimidation by other branches." *Fitzgerald*, 457 U.S. at 760-61 (Burger, C.J., concurring).  But Trump's alleged actions challenged in this case—inciting a riot at the U.S. Capitol to forcibly disrupt a constitutionally mandated session of Congress—were designed specifically to interfere with the independent functioning of a branch of government.  *See* Am. Compl. ¶¶ 204, 216, 226.  It would therefore be particularly inappropriate for Trump to be able to hide behind the shield of absolute immunity— which is intended to preserve the separation of powers—for his flagrant attempt to forcibly interfere with Congress's lawful duties for his personal gain.  *See Halperin*, 606 F.2d at 1211-12 ("Clearly, a proper regard for separation of powers does not require that the courts meekly avert their eyes from presidential excesses while invoking a sterile view of three branches of government entirely insulated from each other.  Such an abdication of the judicial role would sap the vitality of the constitutional rights whose protection is entrusted to the judiciary.").

In short, the presidential immunity doctrine is designed to prevent the judicial branch from undermining the president's capacity to discharge fully and fearlessly his constitutionally assigned roles.  It would be entirely improper to apply that doctrine to allow a current or former president to encourage the use of violence in order to incapacitate *Congress* in the discharge of *its* constitutional obligations.  Such an application would be a perversion of the separation of powers and a threat to the rule of law.

Relatedly, the public interest in maintaining a well-balanced and functioning government compels the denial of absolute presidential immunity here.  As explained above, Plaintiffs are not challenging Trump's official conduct, so the public policy considerations that might justify

insulating the president from damages liability for his official functions, including ensuring that the president can fulfill his official responsibilities without fear of personal liability, are inapposite in this case.  And Trump's alleged conduct—his effort to prevent, "by force, intimidation, or threat," Am. Compl. ¶ 216, the certification of the presidential election results in the manner mandated by the Constitution and to prevent the orderly transition of power—is plainly at odds with the public interest in a functioning government that operates in a manner consistent with the Constitution and federal law.  *See* Evan Caminker, *Democracy, Distrust, and Presidential Immunities*, 36 Const. Comment. (forthcoming 2021) (manuscript at 29-30) ("If immunity is designed to let the president serve her national constituency rather than be deflected by narrower interests, . . . . [t]he representation-reinforcing justification for an immunity shield . . . dissipates for presidential misconduct motivated by self-dealing that injures the public interest.").  For this reason too, absolute immunity is particularly inappropriate in the context of this case.

Thus, not only does the proper application of Supreme Court precedent foreclose Trump's attempt to invoke absolute presidential immunity, but the separation of powers principles and public policy considerations underlying that precedent further demonstrate why this Court must deny his immunity claim.

**CONCLUSION**

For the foregoing reasons, this Court should conclude that absolute immunity does not bar

Plaintiffs' claims against Trump.

Respectfully submitted,

/s/ Brianne J. Gorod
Elizabeth B. Wydra (DC Bar No. 483298)
Brianne J. Gorod (DC Bar No. 982075)
Dayna J. Zolle (DC Bar No. 1672633)
CONSTITUTIONAL ACCOUNTABILITY
   CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

Counsel for *Amici Curiae*

Dated: July 29, 2021

# APPENDIX:
## LIST OF *AMICI*

**Evan H. Caminker**
Dean Emeritus and Branch Rickey Collegiate Professor of Law,
University of Michigan Law School

**Andrew Kent**
Professor of Law and John D. Feerick Research Chair,
Fordham University School of Law

**Sheldon Nahmod**
University Distinguished Professor of Law Emeritus,
IIT Chicago-Kent College of Law

**Daphna Renan**
Peter B. Munroe and Mary J. Munroe Professor of Law,
Harvard Law School

**Peter M. Shane**
Jacob E. Davis and Jacob E. Davis II Chair in Law,
The Ohio State University Moritz College of Law


† Current institutional affiliations are listed for identification purposes only.

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the type-volume limitation of Local Rule 7(o)(4) because it does not exceed 25 pages.

I further certify that the attached *amici* brief complies with the typeface and type style requirements of Local Rule 5.1(d) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 and 12-point Times New Roman font.

Executed this 29th day of July, 2021.

/s/ Brianne J. Gorod
Brianne J. Gorod
*Counsel for Amici Curiae*