## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JAMES BLASSINGAME and SIDNEY HEMBY | ) ) ) ) |
| *Plaintiffs,* | ) Civil Case No. 1:21-cv-00858-APM |
| v. | ) ) ) |
| DONALD J. TRUMP, | ) ) |
| *Defendant.* | ) ) |

## REPLY IN SUPPORT OF DEFENDANT TRUMP'S
## MOTION TO DISMISS

Jesse R. Binnall (VA022)
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, VA 22314
Tel: (703) 888-1943
Fax: (703) 888-1930
jesse@binnall.com
*Attorney for Donald J. Trump*

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................... i

TABLE OF AUTHORITIES ............................................................. ii

I.   The Constitution Forecloses Plaintiffs Claims. ................................... 2

    a.   President Trump is Absolutely Immune............................................. 2

    b.   President Trump's political speech was protected by the First

Amendment.................................................................................................... 8

II.   Plaintiffs Fail to State a Claim for Which Relief May be Granted....... 18

    a.   Plaintiffs fail to adequately allege a violation of 42 U.S.C. § 1985... 18

    b.   Plaintiffs have failed to adequately plead any state law claim. ....... 23

Conclusion ................................................................................................ 29

CERTIFICATE OF SERVICE ......................................................... 30

# TABLE OF AUTHORITIES

## Cases

*3M Co. v. Boulter,*

    842 F. Supp. 2d 85, 119 (D.D.C. 2012) ...................................................... 28

*Am. Fed'n of Gov't Emps. v. Off. of Special Couns.,*

    1 F.4th 180, 187–88 (4th Cir. 2021).......................................................... 7

*Ashcroft v. Iqbal,*

    556 U.S. 662, 678 (2009) ................................................................. 24, 26

*Bell Atlantic Corp. v. Twombly,*

    550 U.S. 544, 570 (2007) ................................................................. 24, 26

*Biden v. Knight First Amend. Inst. at Colum. Univ.,*

    141 S. Ct. 1220 (2021) ...................................................................... 6

*Brandenburg,*

    395 U.S. 444, 447 (1969) ................................................................... 11

*Canlis v. San Joaquin Sheriff's Posse Comitatus,*

    641 F.2d 711, 717–718 (9th Cir. 1981) .................................................. 21

*Diulus v. Churchill Valley Country Club,*

    601 F. Supp 677, 681 (W.D. Pa. 1985)................................................... 21

*Flax v. Schertler,*

    935 A.2d 1091, 1108 n. 15 (D.C. 2007) ................................................ 29

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,

    561 U.S. 477, 493 (2010) ........................................................................................ 4

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,

    561 U.S. 477, 497–98 (2010) ............................................................................ 22, 23

*Giboney v. Empire Storage & Ice Co.*,

    336 U.S. 490 (1949) ............................................................................................. 11

*Griffin v. Breckenridge*, 4

    03 U.S. 88, 97 (1971) ..................................................................................... 19, 20

*Halberstam v. Welsh,*

    705 F.2d 472, 477 (D.C. Cir. 1983) ................................................................ 24, 28

*Halperin v. Kissinger*,

    578 F. Supp. 231, 233 (D.D.C. 1984) ................................................................... 4

*Knight First Amend. Inst. at Colum. Univ. v. Trump*,

    928 F.3d 226, 237 (2d Cir. 2019) ......................................................................... 6

*Kush v. Rutledge*,

    460 U.S. 719, 724 (1983) .................................................................................... 20

*Lobosco v. Falsetti*,

    No. 09–01455, 2010 WL 4366209, at *3 (D.N.J. Oct. 28, 2010) ........................... 21

*Lynch v. President of the U.S.*,

    2009 WL 2949776, at *1 (N.D. Tex. Sept. 14, 2009) ............................................. 5

*Masses Pub. Co., v. Patten*,

    244 F. 535, 540 (S.D.N.Y. 1917) ......................................................................... 27

*Miller v. Indiana Hosp.*,

    562 F. Supp. 1259, 1281 (3d Cir. 1983) .................................................. 21

*Morse v. Frederick*,

    551 U.S. 393, 442 (2007) ........................................................... 17, 25

*Myers v. U.S.*,

    272 U.S. 52, 122 (1926) .................................................................. 4

*National Organization for Women v. Operation Rescue*,

    37 F.3d 646 (D.C. Cir. 1994) ........................................................ 11

*Nixon v. Fitzgerald*,

    457 U.S. 731, 756 (1982) ............................................................. 2, 3

*Rice v. Paladin Enterprises, Inc.*,

    128 F. 3d 233 (4th Cir. 1997) ..................................................... 10, 11

*Snyder v. Phelps*,

    562 U.S. 443, 453 (2011) ............................................................... 5

*Thomas v. Collins*,

    323 U.S. 516, 535 (1945) ........................................................... 17, 25

*U.S. v. Jeffries*,

    45 F.R.D. 110, 116 (D.D.C. 1968) .................................................. 27

*U.S. v. Rahman*,

    189 F.3d 88 (2d Cir. 1999) ......................................................... 11, 12

*United States v. Mouat*,

    124 U.S. 303, 307 (1888) ............................................................. 21

## Statutes

42 U.S.C. § 1985 .................................................................................... passim

## Other Authorities

Alton L. Lightsey, *Constitutional Law: The Independent Counsel and the Supreme Court's Separation of Powers Jurisprudence*, 40 UFLLR 563, 573 (1988) .............. 4

Andrew M. Wright, *The Take Care Clause, Justice Department Independence, and White House Control*, 121 WVLR 353, 385 (2018) .................................................... 4

Annie Gowen, *Handful of protestors arrested during 'Occupy Congress'*, WA. POST (Jan. 17, 2012), https://www.washingtonpost.com/local/handful-of-protesters-arrested-during-occupy-congress/2012/01/17/gIQAjGgO6P_story.html ................ 14

Cheyenne Haslett, *Dreamers protest on Capitol Hill on DACA deadline day*, ABC NEWS (Mar. 5, 2018), https://abcnews.go.com/Politics/dreamers-protest-capitol-hill-daca-deadline-day/story?id=53539262 .................................................... 14

Gary Fineout, *Biden tells DeSantis to 'get out of the way' amid Covid surge*, (Aug. 3, 2021, 6:03 PM), https://www.politico.com/states/florida/story/2021/08/03/desantis-blames-media-for-hysteria-over-covid-surge-1389404 .............................................. 8

Kalhan Rosenblatt, *Protestors pound the doors of the Supreme Court following Kavanaugh confirmation*, NBC NEWS (Oct. 6, 2018), https://www.nbcnews.com/politics/supreme-court/protests-build-capitol-hill-ahead-brett-kavanaugh-vote-n917351 .............................................................. 14

Miller Center, University of Virginia, *Andrew Johnson: Message Proposing Constitutional Amendment* (July 18, 1868) https://millercenter.org/the-presidency/presidential-speeches/july-18-1868-message-proposing-constitutional-amendments. ........................................................................................................ 8

Patricia Zengerle, *Congress rejects Obama veto, Saudi September 11 bill becomes law*, Reuters (Sept. 28, 2016), https://www.reuters.com/article/us-usa-sept11-saudi/congress-rejects-obama-veto-saudi-september-11-bill-becomes-law-idUSKCN11Y2D1..................................................................................... 7

Patrik Jonsson, *As portrait of Jared Loughner sharpens, 'vitriol' blame fades*, Christian Sci. Monitor (Jan. 11, 2011), https://www.csmonitor.com/USA/Politics/2011/0112/As-portrait-of-Jared-Loughner-sharpens-vitriol-blame-fades .................................................................. 15

Peter Schroeder, *Dem planning bill that would outlaw threats to lawmakers*, The Hill (Jan. 9, 2011, 9:08 PM), https://thehill.com/blogs/blog-briefing-room/news/136895-dem-planning-bill-that-would-outlaw-threatening-lawmakers ........................................................................................................ 15

*Read the full transcript from the first presidential debate between Joe Biden and Donald Trump*, USA Today (Oct. 4, 2020, 7:44 PM) https://www.usatoday.com/story/news/politics/elections/2020/09/30/presidential-debate-read-full-transcript-first-debate/3587462001/ ........................................... 13

*Remarks by the President on the Supreme Court Decision on U.S. Versus Texas* (June 23, 2016, 11:53 AM), https://obamawhitehouse.archives.gov/the-press-office/2016/06/23/remarks-president-supreme-court-decision-us-versus-texas ....... 8

ROBERT BOLT, A MAN FOR ALL SEASONS (1966) ............................................................ 17

*Schumer Threatens the Court,* WSJ (Mar. 4, 2020, 7:34 PM), https://www.wsj.com/articles/schumer-threatens-the-court-11583368462 ............ 15

SE Cupp, *Republicans, resist the temptation to blame liberals for this tragedy*, CNN (June 15, 2017, 9:54 PM), https://www.cnn.com/2017/06/15/opinions/republicans-dont-blame-liberals-cupp-opinion/index.html ........................................................ 16

Susan Cornwell, *U.S. lawmaker spends night outside Capitol to protest return of evictions*, REUTERS (July 31, 2021, 5:58 PM), https://www.reuters.com/world/us/us-lawmaker-spends-night-outside-capitol-protest-return-evictions-2021-07-31/ ..... 14

Yamiche Alcindor, *Attack Tests Movement Sanders Founded,* NEW YORK TIMES, (June 14, 2017), https://www.nytimes.com/2017/06/14/us/politics/bernie-sanders-supporters.html ............................................................................................... 16

## Regulations

11 C.F.R. § 100.29 ............................................................................................................. 7

## U.S. Constitution

U.S. Const. Art. II, § 2, cl. 2 ..................................................................................... 22, 23

U.S. Const. Art. II, § 3 ...................................................................................................... 3

The Constitutional protections at issue before this Court are not nearly as anemic as Plaintiffs and their amici would have this Court believe. Indeed, presidential immunity is robust; it is meant to guard against Article III courts making value determinations affecting presidential actions.

When determining whether a presidential act is covered by absolute immunity, the question is only whether it is within the "outer perimeter" of the President's duties. In making this analysis, only the nature of the presidential act is subject to review; content-based determinations of motives underlying that act must be eschewed. Here, the result is simple: it is normal for President's to speak to Americans in support of, or opposition to, congressional action. The motive behind that speech is a subject that courts are forbidden from inquiring into. Consequently, President Trump is absolutely immune from this lawsuit.

Moreover, Plaintiffs tout the length of their filings to distract from the lack of substance within. All of Plaintiffs' allegations, by their own admission, relate to the public speech of the then-sitting President of the United States. Indeed, the First Amendment stands strong against those that would use the Courts to punish Americans for speech, assembly, and the petition for redress of grievances. These important protections cannot easily be defeated by conclusory allegations of conspiracy, especially when the supposed conspiracy arises from nothing more than political activity. Holding otherwise would invent a new exception to the First Amendment that would substantially weaken that amendment's key protections for political activists, protestors, and dissidents.

1

Plaintiffs have also failed to state a claim upon which relief may be granted as their claims do not identify an appropriate party for relief under 42 U.S.C. § 1985, nor have Plaintiffs adequately pled any of their state law claims as to President Trump.

Therefore, President Trump respectfully requests that this Court dismiss Plaintiffs' claims in their entirety with prejudice as no amendment or attempt to replead could cure the defects contained therein.

## I.     The Constitution Forecloses Plaintiffs Claims.

### a.  President Trump is Absolutely Immune.

*1.  The Court should reject Plaintiffs' invitation to make content-based value determinations on a Presidential address in making its "outer perimeter" determination as to immunity.*

Plaintiffs and their amici wish to constrict the absolute immunity of the presidency by allowing courts to make content-based value determinations on the presidential activities and the motives behind those activities. That focus on the motive rather than the nature of the presidential act at issue has been squarely rejected by the Supreme Court. *Nixon v. Fitzgerald,* 457 U.S. 731, 756 (1982) ("[A]n inquiry into the President's motives could not be avoided under the kind of "functional" theory asserted both by respondent and the dissent. Inquiries of this kind could be highly intrusive.")

Plaintiffs largely regurgitate many of the same arguments made by the *Nixon v. Fitzgerald* respondents, who claimed that President Nixon lacked a legitimate presidential purpose for dismissing a federal employee in violation of federal law. *Id.,*

457 U.S. at 756-57. But the Court rejected that argument, just as should this Court. Indeed, such a "construction would subject the President to trial on virtually every allegation that an action was unlawful, or was taken for a forbidden purpose. Adoption of this construction thus would deprive absolute immunity of its intended effect." *Id.* at 757.

The limit of the inquiry is that President Donald J. Trump ("President Trump") spoke on January 6 to address forthcoming congressional action. It is of no moment as to whether he was directly involved in that action or whether Plaintiffs, or even this Court, agreed with arguments made in that Presidential address. It is enough that the nature of the activity, a speech by the President, is the type of activity normal and customary to the presidency. Indeed, it was not at the outer perimeter of the President's duties, it was dead center.

2. *President Trump was exercising a constitutional duty to take care that the Laws be faithfully executed.*

A president need not point to a specific constitutional duty to show that the activities at issue are absolutely immune from suit. Nevertheless, Plaintiffs' allegations support the conclusion that President Trump was executing his duties under the Constitution to "take Care that the Laws be faithfully executed." U.S. Const. Art. II, § 3. President Trump had an ever-present duty to ensure that the election laws were followed, including the certification process. The Framers specifically sought to ensure that it was the President's duty to *execute* the laws faithfully. Initially, the Framers directed the President to "carry into execution" the laws; however, at the Convention, the Framers replaced that language with giving

3

the President an affirmative duty to take care that those laws be faithfully executed.
Andrew M. Wright, *The Take Care Clause, Justice Department Independence, and
White House Control*, 121 WVLR 353, 385 (2018). As one scholar wrote, "enforcing
election laws … struck at the core of the executive branch's duty to faithfully execute
the law." Alton L. Lightsey, *Constitutional Law: The Independent Counsel and the
Supreme Court's Separation of Powers Jurisprudence*, 40 UFLLR 563, 573 (1988).
Therefore, President Trump's office included a duty to ensure compliance with
election laws in this Country.

Plaintiffs now argue that President Trump was not faithfully executing any
laws during his conduct. As the Supreme Court held, the take care clause "are
sweeping words." *Myers v. U.S.*, 272 U.S. 52, 122 (1926). It is the President's duty to
make sure the laws are faithfully executed. *Free Enter. Fund v. Pub. Co. Accounting
Oversight Bd.*, 561 U.S. 477, 493 (2010). Accordingly, President Trump had a broad
range of authority in ensuring that the laws are faithfully executed.

President Trump's efforts to question congressional action because of lapses in
election integrity was a discretionary act, not subject to second-guesses from the
judiciary. *See Halperin v. Kissinger*, 578 F. Supp. 231, 233 (D.D.C. 1984), *aff'd in
part, remanded in part*, 807 F.2d 180 (D.C. Cir. 1986) ("Judicial inquiries, however,
into possible motives for discretionary actions are 'highly intrusive[]' . . . and
disruptive of effective government. If this were permitted, the doctrine of absolute
immunity, which is based on the separation of powers, would lose its intended
effect.").

4

President Trump was speaking on a public issue in a public place on national television. The rally on January 6 and all other statements made by President Trump regarding the legality of changes to election laws and the validity of election results constitute speech on matters of public concern. *See Snyder v. Phelps*, 562 U.S. 443, 453 (2011) ("Speech deals with matters of public concern when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' . . . or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'"). What falls within this category for the President can be quite broad; in one instance, a district court held that the "[t]elevised publication of the President's views on various topical items is within the outer perimeter of his official duties." *Lynch v. President of the U.S.*, 2009 WL 2949776, at *1 (N.D. Tex. Sept. 14, 2009) (finding that the President had immunity and dismissing Plaintiff's case).

### 3. President Trump's speech was in his official capacity.

All the speech constituting Plaintiffs' allegations were delivered in President Trump's official capacity as President. Plaintiffs allege that President Trump participated in an unlawful conspiracy and, therefore, President Trump could not have been acting in his official capacity. Pls.' Resp. in Opp'n at 9 ("Pls.' Opp'n"). President Trump was not engaged in some elaborate conspiracy, and Plaintiffs have failed to point to any plausibly pled facts to the contrary; instead, President Trump was discussing matters of public concern. The sitting President of the United States is entitled to absolute immunity when speaking on matters of public concern,

5

especially here when the speech in question took place *after* the election and was related to the integrity of the election.

Indeed, courts have previously found that President Trump's speech on his Twitter account (@realDonaldTrump) is public speech in his official capacity. *See Knight First Amend. Inst. at Colum. Univ. v. Trump*, 928 F.3d 226, 237 (2d Cir. 2019) (describing that because President Trump "repeatedly used [@realDonaldTrump] as an official vehicle for governance and made its interactive features accessible to the public without limitation," it "created a public forum."). While the Supreme Court overturned that case on the basis that President Trump's blocking of users was not State action, *Biden v. Knight First Amend. Inst. at Colum. Univ.*, 141 S. Ct. 1220 (2021), the analysis of how speech on a widely accessible platform could amount to a public forum was not refuted by the Court. Therefore, Plaintiffs' allegations which include President Trump's Twitter posts and publicly televised remarks, clearly include speech within the outer perimeter of the Presidential office.

Most notably, the speech came well after the election, not before. Thus, the speech at and leading up to the Ellipse rally—the basis of Plaintiffs' claims—is speech that President Trump made in his official capacity as the President of the United States. Indeed, it could not have been in any other capacity. The presidential campaign had concluded, and Plaintiffs have not alleged (and cannot allege) that rally was sponsored by the Donald J. Trump for President campaign (because it was not). The Federal Elections Commission has laid out a detailed definition of electioneering (or what Plaintiffs refer to as campaign speech). The FEC definition requires four

things for a communication to be considered electioneering: (1) it must be a broadcast, cable, or satellite communication; (2) it must refer to a clearly identified candidate for federal office; (3) must be publicly distributed prior to an election; and (4) must be targeted to the relevant electorate. *See* 11 C.F.R. § 100.29. President Trump was not urging voters to support a candidate for political office, he was speaking regarding his position on congressional action. The only capacity in which he made that address was as the sitting President of the United States. Accordingly, when President Trump made this speech, he was acting in his official capacity and was not engaged in electioneering. Further, as of November 5, 2020, "President Trump was no longer a candidate for public office" and he was not engaged in electioneering. *Am. Fed'n of Gov't Emps. v. Off. of Special Couns.,* 1 F.4th 180, 187–88 (4th Cir. 2021).

Plaintiffs argue there is no situation where the President may speak on something in his official capacity when there is no explicit constitutional duty involved. Aside from the obvious issue of the "take care" clause giving the executive broad authority to speak officially, Plaintiffs' argument is incredible. Presidents past, present, and future will speak, and should speak, on numerous issues where they do not have any textually identifiable constitutional duty. For instance, Presidents have pushed against a veto override,[1] commented on expectations for Supreme Court

---

[1] *See, e.g.,* Patricia Zengerle, *Congress rejects Obama veto, Saudi September 11 bill becomes law*, REUTERS (Sept. 28, 2016), https://www.reuters.com/article/us-usa-sept11-saudi/congress-rejects-obama-veto-saudi-september-11-bill-becomes-law-idUSKCN11Y2D1 (describing that President Obama called and wrote a letter to

opinions,[2] supported Constitutional amendments,[3] and spoken against State actions.[4] A President need not sift through the text of Article II as a precondition of using his bully pulpit to support or oppose issues of public concern. Any assertion to the contrary is an ill-considered and impractical limitation on presidential speech.

Accordingly, when President Trump made this speech, he was acting in his official capacity as the President of the United States and is thus protected by absolute immunity.

### b. President Trump's political speech was protected by the First Amendment.

Plaintiffs would like the Court to believe that President Trump is both not acting within the scope of his Office as President, and not speaking on political

---

Senate Minority Leader Harry Reid to explain his opposition to the bill, and Reid was the only senator that sided against the veto override).

[2] *Remarks by the President on the Supreme Court Decision on U.S. Versus Texas* (June 23, 2016, 11:53 AM), https://obamawhitehouse.archives.gov/the-press-office/2016/06/23/remarks-president-supreme-court-decision-us-versus-texas (commenting that the even split of justices was a consequence of partisan reluctance to confirm a ninth justice and the President's policies "can't go forward at this stage, until there is a ninth justice on the Court to break the tie.").

[3] Miller Center, University of Virginia, Andrew Johnson: Message Proposing Constitutional Amendment (July 18, 1868) https://millercenter.org/the-presidency/presidential-speeches/july-18-1868-message-proposing-constitutional-amendments.

[4] *See, e.g.,* Gary Fineout, *Biden tells DeSantis to 'get out of the way' amid Covid surge*, (Aug. 3, 2021, 6:03 PM), https://www.politico.com/states/florida/story/2021/08/03/desantis-blames-media-for-hysteria-over-covid-surge-1389404 (quoting President Biden, saying if the state governors are "not going to help, get out of the way of the people that are trying to do the right thing.").

matters despite the alleged speech being from a public platform on matters of public concern. Such a reading would destroy the heart of the First Amendment protections for political speech.

"[P]laintiffs agree that merely giving a lawful political speech and assembling with others does not violate the act." Pls.' Opp'n at 41. Plaintiffs then claim, without citation, that "the Complaint alleges Trump did far more than agree to give a lawful political speech and assemble with supporters." *Id.* Plaintiffs, however, do not cite or infer any agreement at all. In fact, Plaintiffs only argument as to an agreement is based on the public, political speech of President Trump. Plaintiffs cannot show that any agreement was entered, what the alleged agreement was pertaining to, or what the parties' respective roles or responsibilities were. What Plaintiffs do is weave a conspiracy theory based on public speech and the responses of people that heard that speech devoid of any other contract with President Trump, let alone direct contact. Plaintiffs broadly have alleged several different goals: (1) injuring Capitol Police officers, (2) preventing Capitol police officers from discharging their duties, (3) injuring Vice-President Pence, (4) preventing Joe Biden and Kamala Harris from taking office, (5) an attack on the Capitol, (6) to disrupt or stop Congress from counting the electoral votes. This evinces that they do not know what the alleged conspiracy agreed on (because there was no agreement). Plaintiffs confuse the issue when they try to claim that President Trump is arguing over overt acts when Plaintiffs have not shown any agreement to enter the conspiracy. *See* Pls.' Opp'n at 41-42. Plaintiffs seek to put the cart before the horse claiming that allegations of a

conspiracy including only political speech automatically strip First Amendment protections.

      1. *Plaintiffs' incredible allegations of a conspiracy cannot preclude First Amendment protections.*

Plaintiffs argue that President Trump is not entitled to First Amendment protections because of the supposed conspiracy theory explained in their Amended Complaint. Yet, the actions they allege against President Trump universally are comprised of political speech, often made to political supporters. Political speech is never made in a vacuum; to be effective it must be made while engaging with others. For the Court to find that President Trump's speech here was unprotected under a theory of conspiracy liability, would be to create an exception that would swallow-whole the uniquely American protections for political discourse found in the First Amendment.

Indeed, Plaintiffs have cited several cases in support of their proposition; however, none of these cases support their assertion of liability for political speech and all point back to the *Brandenburg* incitement test, which is clearly inapplicable to the present case.

Plaintiffs cite *Rice v. Paladin Enterprises, Inc.,* 128 F. 3d 233 (4th Cir. 1997), to support an argument that abstract speech can be the basis for liability under *Brandenburg*. Pls.' Opp'n at 37 n. 17. In *Rice*, contrary to Plaintiffs' interpretation, the Fourth Circuit held that:

> the First Amendment might well (and presumably would) interpose the same or similar limitations upon the imposition of civil liability for abstract advocacy, without more, that it interposes upon the imposition

> of criminal punishment for such advocacy. In other words, the First
> Amendment might well circumscribe the power of the state to create and
> enforce a cause of action that would permit the imposition of civil
> liability, such as aiding and abetting civil liability, for speech that would
> constitute pure abstract advocacy, at least if that speech were not
> "directed to inciting or producing imminent lawless action, and ... likely
> to incite or produce such action."

*Rice,* 128 F.3d at 249 (citing *Brandenburg,* 395 U.S. 444, 447 (1969)).

Plaintiffs cite *National Organization for Women v. Operation Rescue,* 37 F.3d 646 (D.C. Cir. 1994) for the premise that aiding and abetting liability is not proscribed by the First Amendment. This is irrelevant to their cause of action for conspiracy which does not have similar standard for aiding and abetting, and the case is silent on the First Amendment and conspiracy liability.

Plaintiffs also cite *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490 (1949), for the premise that the First Amendment does not bar liability for conspiracies. This is well-established; however, Plaintiffs in this case, contrary to the *Giboney* plaintiffs, have not established any agreement or illegal objective of an actual conspiracy. In *Giboney*, the Court found that there was an agreement, not based solely on the public, political speech of defendants. *See Giboney,* 336 U.S. at 492-493 (asserting that uncontested evidence in the form of admissions, undisputed evidence, or unchallenged findings proved the illegal nature of the agreement).

Finally, Plaintiffs cite to *U.S. v. Rahman*, 189 F.3d 88 (2d Cir. 1999), for the proposition that there is no First Amendment right to conspire against the government. Pls.' Opp'n at 37. In *Rahman*, the question related to whether the statute was overbroad rather than whether conspiracy speech is protected by the First

Amendment or not. The *Rahman* court affirmed that "the State may not criminalize the expression of views—even including the view that violent overthrow of the government is desirable—it may nonetheless outlaw encouragement, inducement, or conspiracy to take violent action. *Rahman*, 189 F.3d at 115. Further, this case is entirely distinguished by the evidence of the conspiracy, in *Rahman*, there was evidence that the defendants "had considerable phone contact and/or direct contact" with co-conspirators and many defendants engaged in military training drills together. *Id.* at 123. As to the only defendant to claim that he was involved only due to his speech, there was evidence of "constant contact" with co-conspirators and evidence that he accepted his role as a leader and encouraged the multiple acts of violence by co-conspirators. *Id.* at 124.

Each of these cases are easily distinguished from this case. Consequently, it is clear that Plaintiffs wish to create a new First Amendment exception from whole cloth. The Court should decline that invitation.

   2.  *Plaintiffs take President Trump's words out of context.*

Plaintiffs' claim that President Trump spoke to the Proud Boys is an example of a misleading, and patently false, allegation. Am. Compl. at ¶ 14. As Plaintiffs paint the story, President Trump answered a question during a *nationally televised* presidential debate, directing the Proud Boys to "stand back and stand by." *Id.* The full context of the question and answer shows a different story.

Chris Wallace: [A]re you willing tonight to condemn white supremacists and militia groups and to say that they need to stand down . . . [?]

. . .

President Trump: I'm willing to do anything. I want to see peace.

Chris Wallace: Well, then do it, Sir.

Vice President Biden: Say it. Do it. Say it.

President Trump: You want to call them . . . what do you want to call them? Give me a name, give me a name. Go ahead. Who would you like me to condemn?

Chris Wallace: White supremacist and right-wing militia.

Vice President Biden: The Proud Boys.

President Trump: Proud Boys, stand back and stand by. But I'll tell you what somebody's got to do something about Antifa . . . [5]

It was then-Vice President Biden who suggested that President Trump address the Proud Boys, and the context for his off-the-cuff comment with whom they should stand by to deal was not the federal government, but rather Antifa vigilantes and rioters.

Plaintiffs even go so far as to suggest that a social media post from a supposed Proud Boy leader shows conspiracy simply by its public response to President Trump

---

[5] *Read the full transcript from the first presidential debate between Joe Biden and Donald Trump*, USA TODAY (Oct. 4, 2020, 7:44 PM) https://www.usatoday.com/story/news/politics/elections/2020/09/30/presidential-debate-read-full-transcript-first-debate/3587462001/.

after the debate. The First Amendment is not so fragile as to be defeated by social media posts from debate viewers.

Given the numerous protests over the years on Capitol Hill[6] and the necessity of protecting political speech—the very type of speech that the First Amendment was designed to protect—a holding that individuals can be liable for violence by random listeners if their words could be interpreted as a threat would be a striking rejection of well-established American speech practices.

For example, Senate Majority Leader Schumer directed statements at Supreme Court Justices Gorsuch and Kavanaugh, saying "[y]ou have released the

---

[6] *See* Kalhan Rosenblatt, *Protestors pound the doors of the Supreme Court following Kavanaugh confirmation*, NBC NEWS (Oct. 6, 2018), https://www.nbcnews.com/politics/supreme-court/protests-build-capitol-hill-ahead-brett-kavanaugh-vote-n917351 ("[P]rotestors pushed past a police line, storming up steps to pound on the doors of the U.S. Supreme Court on Saturday after the Senate confirmation of Brett Kavanaugh."); Cheyenne Haslett, *Dreamers protest on Capitol Hill on DACA deadline day*, ABC NEWS (Mar. 5, 2018), https://abcnews.go.com/Politics/dreamers-protest-capitol-hill-daca-deadline-day/story?id=53539262 (describing the DACA protests in which protestors arrived at the Capitol and Senate office buildings to demand Congress pass legislation to renew DACA protections and quoting a protestor who claimed her conduct was "fighting for the people whose DACA expires soon."); Susan Cornwell, *U.S. lawmaker spends night outside Capitol to protest return of evictions*, REUTERS (July 31, 2021, 5:58 PM), https://www.reuters.com/world/us/us-lawmaker-spends-night-outside-capitol-protest-return-evictions-2021-07-31/ (describing how "progressive lawmakers" sat outside the Capitol all night to emphasize demand to extend the moratorium on evictions); Annie Gowen, *Handful of protesters arrested during 'Occupy Congress'*, WA. POST (Jan. 17, 2012), https://www.washingtonpost.com/local/handful-of-protesters-arrested-during-occupy-congress/2012/01/17/gIQAjGgO6P_story.html (describing a particularly large protest by the "Occupy" movement that involved entering Congressional buildings to make demands).

whirlwind, and you will pay the price" and "[y]ou won't know what hit you if you go forward with these awful decisions."[7] While his words were undoubtedly irresponsible, they were not actionable, and would not have been even if any actual harm befell the Justices from those who claimed they were inspired by Schumer's words. If every individual had to police her speech to ensure it could never be perceived as a threat in light of later events, nearly all political discussion would be off the table.

Consider two different acts of violence against politicians over the years – the shooting of Rep. Giffords by Jared Loughner and the shooting of multiple Republican representatives by James Hodgkinson. People were quick to assign blame for the shooting of Giffords on "political vitriol," despite the fact that the shooter was mentally ill.[8] And although one congressman used the incident to propose legislation to "make it a federal crime to use language or symbols that could be *perceived* as threatening or inciting violence,"[9] free speech survived and liability for the violence was ultimately assigned where it belonged: with the person who carried out the

---

[7] *See* video*:* https://youtu.be/rs1f7JhCxoQ; *Schumer Threatens the Court,* WSJ (Mar. 4, 2020, 7:34 PM), https://www.wsj.com/articles/schumer-threatens-the-court-11583368462.

[8] *See, e.g.,* Patrik Jonsson, *As portrait of Jared Loughner sharpens, 'vitriol' blame fades*, CHRISTIAN SCI. MONITOR (Jan. 11, 2011), https://www.csmonitor.com/USA/Politics/2011/0112/As-portrait-of-Jared-Loughner-sharpens-vitriol-blame-fades.

[9] Peter Schroeder, *Dem planning bill that would outlaw threats to lawmakers*, THE HILL (Jan. 9, 2011, 9:08 PM), https://thehill.com/blogs/blog-briefing-room/news/136895-dem-planning-bill-that-would-outlaw-threatening-lawmakers.

heinous act. Similarly, after the shooting of a Republican representative, a Capitol Police officer, and others at an Alexandria baseball field, it became apparent that a Bernie Sanders supporter with a known hatred for conservatives and Republicans was the culprit.[10] Prior to this shooting, Sanders passionately addressed his supporters, saying that "today in the White House we have perhaps the worst and most dangerous President in the history of our country. And we also have, not to be forgotten, extreme right-wing leadership in the U.S. House and the U.S. Senate."[11]



_____

[10] See, e.g., SE Cupp, *Republicans, resist the temptation to blame liberals for this tragedy*, CNN (June 15, 2017, 9:54 PM), https://www.cnn.com/2017/06/15/opinions/republicans-dont-blame-liberals-cupp-opinion/index.html.

[11] *See* video: https://youtu.be/7-nR_5UBIPU; Yamiche Alcindor, *Attack Tests Movement Sanders Founded,* NEW YORK TIMES, (June 14, 2017), https://www.nytimes.com/2017/06/14/us/politics/bernie-sanders-supporters.html.

Yet Rep. Steve Scalise, one of the victims of the shooting, did not attempt to cast aside the First Amendment to sue Sen. Sanders for his political rhetoric, almost certainly because Congressman Scalise understands that while he may have disagreed with Sen. Sanders' rhetoric, he was not willing to sacrifice the ancient protections of the First Amendment to hold the rival Senator accountable for that rhetoric. Perhaps, Rep. Scalise remembered Sir Thomas Moore's celebrated lines from *A Man for All Seasons*: "[t]his country is planted thick with laws, from coast to coast, Man's laws, not God's! And if you cut them down. . .  do you really think you could stand upright in the winds that would blow then?"[12]

    *3.  Plaintiffs mistakenly rely upon the effect upon the listeners to argue that President Trump incited violence at the Capitol.*

Plaintiffs' insistence that the way *others* interpret one's speech is somehow enough, or even relevant, to establish a conspiracy or incitement goes against well-established First Amendment law. *See Thomas v. Collins*, 323 U.S. 516, 535 (1945) (rejecting liability based on how others interpret one's speech because that "would 'pu[t] the speaker . . . wholly at the mercy of the varied understanding of his hearers and consequently of whatever inference may be drawn as to his intent and meaning.")'; *Morse v. Frederick*, 551 U.S. 393, 442 (2007) (Stevens, J., dissenting) (describing that liability based on others' understanding would blur "the distinction between advocacy and incitement."). In any event, quoting President Trump's

---

[12] ROBERT BOLT, A MAN FOR ALL SEASONS (1966).

language and leaving out key phrases that indicate a desire for peaceful protest does not amount to factual support for an allegation of conspiracy or incitement. Plaintiffs have cherry-picked their allegations from thousands of tweets, speeches, rallies, and public statements in order to create an out-of-context narrative. Taken in context, with the totality of only President Trump's actual language considered, Plaintiffs cannot plausibly state a claim.

Plaintiffs cannot, in fact, plausibly allege that President Trump expected, desired, or incited violence. The bulk of their allegations consist of general statements, interpreted by others to be calls to violence. This effect on others is not what is relevant under the First Amendment. Rather, it is President Trump's actual words. His words that included passionate flourish and calls for peaceful and patriotic protest. Taken overall, and in context, Plaintiffs cannot plausibly allege that President Trump sought to incite violence.

## II.     Plaintiffs Fail to State a Claim for Which Relief May be Granted.

### a.  Plaintiffs fail to adequately allege a violation of 42 U.S.C. § 1985.

Plaintiffs claim that there are five bases for the actions alleged as conspiracy under §1985(1); however, none of these are even remotely persuasive or within the parameters of §1985(1).

First, Plaintiffs claim that the alleged conspiracy sought to injury Capitol police while they were carrying out their official duties. *See* Pls.' Opp'n at 21. And second, Plaintiffs claim that the alleged conspiracy sought to prevent Capitol police officers from performing their official duties. *Id.* Third, Plaintiffs' claim that the

18

alleged conspiracy sought to prevent President Biden and Vice-President Harris from holding office. *Id.* Fourth, Plaintiffs claim that the alleged conspiracy was to prevent Vice-President Pence from discharging his duties. *Id.* Fifth and finally, Plaintiffs claim that the alleged conspiracy was to injure Vice-President Pence for discharging his official duties. *Id.* at 21-22.

### 1. *Capitol Police Officers are not Federal Officers.*

Plaintiffs cite a single case in support of their argument that Capitol Police officers are either federal officers or hold an office, trust, or place of confidence under the United States. *See* Pls.' Opp'n at 22-23 (citing *Griffin v. Breckenridge*, 403 U.S. 88, 97 (1971)). That case solely stands for the proposition that reconstruction statues should be accorded a broad sweep. They do not cite any statute, act, regulation, policy statement, or even statement that indicates that Capitol police officers hold such a station.

Plaintiffs have broadly alleged that they are both the harmed party and such persons holding an office, trust, or place of confidence under the United States or officers. Plaintiffs have not, however, plausibly alleged that they are officers of the United States as required by 42 U.S.C. § 1985. In *Griffin*, the Supreme Court held that Reconstruction Era statutes such as § 1985 should be accorded a sweep as broad as their language. *Griffin, 403 U.S.* at 97.

While it is generally true that remedial statutes are construed broadly, Plaintiffs left out that the Court made this particular statement in the context of § 1985(3) to address whether the prohibition of conspiracies to deny equal protection

19

applied to the actions of private individuals or solely the state. *Id.* at 97–98. The Court ultimately held that § 1985(3) should be read broadly enough to encompass the actions of private individuals, not just actions from the state in their official capacity, and this intent is evidenced from the inclusion of legislative history indicating that the act was meant to cover conspiracies by private individuals. *Id.* at 98, 101. Because § 1985(1) and § 1985(3) confer standing in different ways (and involve pleading different elements), it is misleading to use *Griffin*, a case specifically only involving the construction of § 1985(3), to argue that Plaintiffs have standing under § 1985(1), which requires a particular type of threat against enumerated parties. Reading § 1985(3) to cover deprivations of equal protection by private individuals is not the same as reading § 1985(1) to include conspiracies against Capitol Police officers who are, under binding Supreme Court precedent, not considered federal officers.

The Supreme Court has laid out five specific conspiracies that § 1985 proscribes, which are those that interfere with

> (a) the performance of official duties by federal officers; (b) the administration of justice in federal courts; (c) the administration of justice in state courts; (d) the private enjoyment of 'equal protection of the laws' and 'equal privileges and immunities under the laws'; and (e) the right to support candidates in federal elections.

*Kush v. Rutledge*, 460 U.S. 719, 724 (1983). The Court further explained that as currently codified, § 1985(1) applied to (a), § 1985(2) applied to (b) and (c), and § 1985(3) applied to (d) and (e). *Id.* With this binding Supreme Court precedent, it is understandable that many courts, including the Third Circuit, merge the phrase "office, trust, or place of confidence under the United States" in § 1985(1) to mean

20

that the person interfered with must be a federal officer. *Miller v. Indiana Hosp.*, 562 F. Supp. 1259, 1281 (3d Cir. 1983). The Third Circuit went as far as to say "subsection [§ 1985(1)] only protects federal officers." *Id.* The Ninth Circuit also held that § 1985(1) applies exclusively to federal officers. *Canlis v. San Joaquin Sheriff's Posse Comitatus*, 641 F.2d 711, 717–718 (9th Cir. 1981).

Other district courts have also come to the same conclusion. The District of New Jersey found that to bring a claim under § 1985(1), a plaintiff must show that they are a federal officer. *Lobosco v. Falsetti*, No. 09–01455, 2010 WL 4366209, at *3 (D.N.J. Oct. 28, 2010). In *Lobosco*, the court dismissed the plaintiff's claims under § 1985(1) as a matter of law because the plaintiff failed to plead sufficient facts to show that he was a federal officer. *Id. See also Diulus v. Churchill Valley Country Club*, 601 F. Supp 677, 681 (W.D. Pa. 1985) (dismissing a § 1985(1) claim because the complaint did not indicate any action of a federal officer).

According to the foregoing precedent from the Supreme Court, circuit courts, and district courts, the phrase, "office, trust, or place of confidence under the United States" in § 1985(1) is all merged to mean federal officer. The scope of an officer of the United States is very clear. "Unless a person in the service of the government, therefore, holds his place by virtue of an appointment by the president, or of one of the courts of justice or heads of departments authorized by law to make such an appointment, he is not, strictly speaking, an officer of the United States." *United States v. Mouat*, 124 U.S. 303, 307 (1888). Additionally, the Supreme Court explained in 2010, "[t]he people do not vote for the 'Officers of the United States.' Art. II, § 2, cl.

2. They instead look to the President to guide the 'assistants or deputies . . . subject to his superintendence.'" *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 497–98 (2010). Accordingly, Capitol Police officers are not federal officers, nor do they hold an office, trust, or place of confidence under the United States for purposes of 42 U.S.C. § 1985(1).

Plaintiffs' claims do not fall within § 1985(1); it is also clear that their claims do not fall within either of the other two sections in § 1985, as § 1985(2) deals with the obstruction of the justice and § 1985(3) deals with depriving individuals of equal protection of the laws. Plaintiffs cite to an Attorney General's memo from 1977 to allege that because Capitol Police officers can be victims under a criminal conspiracy statute, that the same must apply to § 1985(1). This is in direct contradiction to the Supreme Court's own interpretation of § 1985. Not surprisingly, Plaintiffs fail to cite a single case where a court has held that a member of the Capitol Police had standing under § 1985(1). This is because members of the Capitol Police are not federal officials. Accordingly, Plaintiffs lack standing under § 1985.

   2.  *The President and Vice-President are not Federal Officers.*

Plaintiffs argue that the words in a statue may be interpreted differently than in the constitution. *See* Pls. Res. in Opp'n at 23. Secondarily, Plaintiffs argue that the President and Vice-President fall within the statute because DOJ has previously suggested that they occupy an "Office of Profit or Trust." *Id.*

Plaintiffs are again incorrect. First, the words in this statute specifically refer to officer *under the United States.* The implication that they are under the United

States is inherently constitutional unless otherwise defined. Further, as noted above, the Supreme Court in interpreting this statue has found that the entirety of the language condenses into "federal officer" and the President and Vice-President are not federal officers. The Supreme Court explained in 2010, "[t]he people do not vote for the 'Officers of the United States.' Art. II, § 2, cl. 2. They instead look to the President to guide the 'assistants or deputies . . . subject to his superintendence.'" *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 497–98 (2010). Because the President and Vice-President are elected, they are not officers of the United States. Therefore, it is irrelevant what other constitutional provision contain similar language, the Supreme Court has foreclosed this statutes applicability to the Presidency and Vice-Presidency.

### b. Plaintiffs have failed to adequately plead any state law claim.

#### 1. *Civil Conspiracy*

Plaintiffs boldly (and incorrectly) claim that President Trump "does not dispute, nor could he, the existence of a conspiracy to carry out any of the above objectives." Pls.' Opp'n at 22. President Trump's motion to dismiss challenged Plaintiffs' inability to demonstrate the existence of a conspiracy involving President Trump, or anyone else, as they failed to allege any agreement under 42 U.S.C. § 1985 and under a civil conspiracy. Def. Mem. in Supp. of Mot. to Dismiss at 28.

Plaintiffs once again correctly state the law: "[a] civil conspiracy requires that (1) two or more persons agree, (2) to participate in an unlawful act or a lawful act in an unlawful manner, (3) cause injury by overt act, and (4) pursuant to and in

furtherance of the common scheme." Pls.' Opp'n at 24-25 (citing *Halberstam v. Welsh,* 705 F.2d 472, 477 (D.C. Cir. 1983). Plaintiffs are further correct that the agreement may be tacit. *Id.*

Contrary to their assertions that they are subject to a lower standard, Plaintiffs must, at the very least, plausibly plead a conspiracy at this stage. They have failed to do so.  As previously discussed, Plaintiffs have not alleged a single fact in support of an unlawful agreement. As such, their conspiracy claims are hopelessly flawed. Indeed, under the *Twombly* and *Iqbal* standards, when there is a perfectly reasonable explanation that is as likely as the alleged illegitimate explanation, the plaintiffs have failed to carry their burden. 550 U.S. 544, 570 (2007); 556 U.S. 662, 678 (2009).

Plaintiffs again reiterate their incredible allegation that this was a months' long conspiracy beginning with comments at a nationally televised Presidential debate. This argument has been thoroughly debunked above. All the public statements alleged by Plaintiffs are incredible as the basis for entering into a conspiracy with specific individuals when President Trump was speaking to millions of Americans.

Plaintiffs then argue that they have three "plus" factors: (1) communications between Trump and his co-conspirators, (2) conduct against self-interest, and (3) attempts to cover tracks. All of these are merely recitations of the exact same incredible arguments Plaintiffs have already advanced.

Plaintiffs alleged communications, except for one, are based entirely upon public speech aimed at millions of Americans, some during an election cycle, and the rest on political issues within the President's purview to comment on topical issues. The single other alleged communication comes from an unconfirmed leak from a governmental agency alleging that someone within the White House complex had a phone call with someone from the Proud Boys. This is entirely insufficient to show that *President Trump* had communication with the Proud Boys or that the person that made the call was doing so on President Trump's behalf or even that there was an illegitimate purpose for the call. The White House has numerous calls in and out per day to a huge variety of individuals and organizations, for Plaintiffs to blindly assume that because someone associated with the Proud Boys was allegedly on a call log with an unknown individual in the vast White House complex, a conspiracy necessary followed. These thin arguments cannot withstand the plausibility test.

Plaintiffs' argument as to conduct against self-interest fares no better. Again, Plaintiffs *solely* rely upon their own conspiracy theories that independent actors would not take action unless President Trump told them to do so. First, President Trump's speech was focused on reaching all Americans, not specific individuals. Second, no direct communications are noted. Third, the effect on the listener is an ineffective method for showing conspiracy. *See Thomas v. Collins*, 323 U.S. 516, 535 (1945); *Morse,* 551 U.S. at 442-43 (Stevens, J., dissenting) ("that would 'pu[t] the speaker in these circumstances wholly at the mercy of the varied understanding

of his hearers and consequently of whatever inference may be drawn as to his intent and meaning.'")

Plaintiffs in one of their most fantastical allegations alleged that President Trump's speech does not sound like a call to violence because he "cloaked" the appeals in "coded language". Pls.' Opp'n at 29. Plaintiffs are blatantly asking this Court to interpret innocent statements as evidence of a conspiracy because they are not calls to violence, despite their previous arguments, based on the insinuations of code words and voodoo. Plaintiffs are grasping for straws.

Plaintiffs try to push aside the well-settled pleading standard by trying to support naked assertions, often devoid of factual specifics such as:

- Alleging knowledge of previous rally attendees without stating how or why a candidate would know random individuals in the massive crowds. (Am. Compl. ¶ 22-29).

- Alleging that a refusal to respond to random requests to condemn violence is relevant to an event entirely separate from the comments premise. (Am. Compl. ¶ 29).

- Alleging President Trump refused to condemn the violence at the Capitol despite his multiple efforts to do just that. (Am. Compl. ¶ 114-16).

These bald commentaries garner no such presumption as they are legal conclusions couched as facts. A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555.

As if to reenforce the incredible nature of their claims, Plaintiffs then cite to an interview claiming that the word "peaceful" is a smokescreen and code word for violence. *See* Pls. Opp'n at 30-31. This alone is highly indicative of the implausible nature of Plaintiffs' claims.

### 2. *Incitement to Riot and Disorderly Conduct*

Plaintiffs attempt to persuade this Court to take up an interpretation of the D.C. Anti-riot statute that would sweep up pure political speech as the basis for inciting a riot. The language cited by Plaintiffs at no point is such language that it has "no purport but to counsel the violation of law." *U.S. v. Jeffries*, 45 F.R.D. 110, 116 (D.D.C. 1968) (citing *Masses Pub. Co., v. Patten*, 244 F. 535, 540 (S.D.N.Y. 1917) (holding that the precursor statute to the current anti-riot statute only applies to certain circumstances where the language has "no purport but to counsel the violation of law".). In fact, Plaintiffs have alternately alleged that the language itself was violent, then admitted that you must infer from their cited language that it is meant to incite. *Compare* Pls.' Opp'n at 3, 4, 26 (alleging that President Trump's language was a call to violence), *with* Pls.' Opp'n at 29, 30-31 (alleging that President Trump used "coded language" and "smokescreens" to send messages that seemed innocent but were in fact violent). This alone shows that it is sweeping up language it should not.

As to disorderly conduct, President Trump specifically addressed this claim on pages 23 and 33 of his motion to dismiss. President Trump reiterates that the First Amendment or absolute immunity precludes liability for disorderly conduct as his

entire alleged involvement consists of either protected political speech or conduct within the outer perimeter of his office, as explained above.

### 3. *Directing or aiding and abetting assault*

Plaintiffs failed to cite any binding precedent supporting their suggestion that "directing" another common law tort is itself a tort. This is because neither this Court nor the D.C. Circuit has recognized such a tort.

Even if President Trump could be held liable for "directing" the torts of battery and assault, Plaintiffs have not satisfactorily answered how President Trump could be "directing" these actions when the persons taking the actions were not listening to him—President Trump explicitly requested that protestors be peaceful, he explicitly asked them to respect law enforcement, and he explicitly asked them to leave the Capitol. To sustain their claim that President Trump directed or ratified the assault and battery, Plaintiffs would have to allege facts proving that an agency relationship exists between President Trump and the individuals who caused Plaintiffs' harm. They have not done so. Accordingly, President Trump cannot be held liable for "directing" the torts of assault and battery.

Additionally, this Circuit has explicitly held that aiding and abetting is not a recognized common law tort. Since the *Halberstam* opinion, this Circuit has not recognized a tort of aiding and abetting. In fact, this Court held that "the tort of aiding and abetting is not recognized under District law." *3M Co. v. Boulter*, 842 F. Supp. 2d 85, 119 (D.D.C. 2012). In 2007, the D.C. Circuit held that "[a]lthough the *Halberstam* court predicted that this court would recognize a tort of aiding and

28

abetting tortious conduct, we have not done so to date, and we are not bound by that court's ruling." *Flax v. Schertler*, 935 A.2d 1091, 1108 n. 15 (D.C. 2007). Therefore, Plaintiff's claim for aiding and abetting must be dismissed because it is not recognized in this Circuit. Even if the tort was recognized, President Trump did not provide substantial assistance to the alleged main tortfeasors.

## CONCLUSION

For the foregoing reasons, President Trump's Motion to Dismiss should be granted. This matter should be dismissed, with prejudice.

Dated: August 16, 2021                       Respectfully submitted,


                                             /s/ Jesse R. Binnall
                                             Jesse R. Binnall (VA022)
                                             BINNALL LAW GROUP, PLLC
                                             717 King Street, Suite 200
                                             Alexandria, VA 22314
                                             Tel: (703) 888-1943
                                             Fax: (703) 888-1930
                                             jesse@binnall.com
                                             *Attorney for Donald J. Trump*

29

## CERTIFICATE OF SERVICE

I certify that on August 16, 2021, a copy of the foregoing was filed with the Clerk of the Court using the Court's CM/ECF system, which will send a copy to all counsel of record.


Dated: August 16, 2021                                    /s/ Jesse R. Binnall
                                                          Jesse R. Binnall
                                                          *Attorney for Donald J. Trump*